**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | |
|---|---|
| MICHAEL PEARSON, ANDREW CHILDE, and ANNA SILVER on behalf of and solely in their capacities as Joint Official Liquidators of Diversified Real Estate Development Ltd (in Official Liquidation), GMS Global Market Step Up Note Ltd (in Official Liquidation), Preferred Income Collateralized Interest Ltd (in Official Liquidation), Sentinel Investment Fund SPC (in Official Liquidation), SG Strategic Income Ltd (in Official Liquidation), Sports Aficionados Ltd (in Official Liquidation), Vanguardia Group Inc. (in Official Liquidation), and MICHAEL PEARSON, on behalf of and solely in his capacity as Liquidator of Sentinel Mandate and Escrow Ltd. (in Liquidation), Vanguardia Holdings Ltd. (in Liquidation), Spyglass Investment Management Ltd. (in Liquidation), North Pointe Holdings (BVI) Ltd. (in Liquidation), Biscayne Capital Holdings Limited (in Creditor Voluntary Liquidation), and  Biscayne Capital (B.V.I.) Ltd. (in Liquidation), | Civil Action No. _____ |
| Plaintiffs, | |
| v. | |
| Deutsche Bank AG, Deutsche Bank AG (London Branch), Deutsche Bank Luxembourg S.A., Deutsche Bank AG (New York Branch), Deutsche Bank Switzerland, Deutsche Bank Trust Companies Americas, | |
| Defendants. | |

**<u>COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................1

THE PARTIES.......................................................................................................4

     A.      The Liquidators................................................................................4

     B.      Defendants ........................................................................................7

JURISDICTION AND VENUE .............................................................................12

BACKGROUND ...................................................................................................14

     A.      The Individual Wrongdoers Began Their Fraudulent Scheme .............................14

     B.      The Individual Wrongdoers Begin Forming Special Purpose Vehicles to Raise More Capital .........................................................16

     C.      The Individual Wrongdoers Formed Madison Asset, LLC to Perpetuate The Scheme.........................................................20

     D.      Deutsche Bank Played an Essential Role in the Fraudulent Scheme...................21

CONTRACTUAL AND OTHER RELATIONSHIPS BETWEEN DEFENDANTS AND THE COMPANIES ......................................................................................26

DEFENDANTS' ROLE AND PARTICIPATION IN THE SCHEME ......................29

     A.      The Swap Transactions.....................................................................30

     B.      Re-Tapping of Notes by Note Issuers................................................39

     C.      Late Payments by Note Issuers.........................................................44

     D.      Other Modifications of Notes' Terms................................................48

     E.      The Madison Sub-Accounts..............................................................51

THE MAGNITUDE OF MISAPPROPRIATION AND LOOTING ...........................62

CLAIMS FOR RELIEF ..........................................................................................66

COUNT ONE: FRAUDULENT TRADING...............................................................66

COUNT TWO: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY .....................67

COUNT THREE: BREACH OF FIDUCIARY DUTY ................................................................68

COUNT FOUR: AIDING AND ABETTING CONVERSION ....................................................69

COUNT FIVE: BREACH OF CONTRACT ..................................................................................70

COUNT SIX: NEGLIGENCE ........................................................................................................71

COUNT SEVEN: VIOLATION OF THE FLORIDA CIVIL REMEDIES
FOR CRIMINAL PRACTICES ACT ..........................................................................................72

COUNT EIGHT: VIOLATION OF FLORIDA'S CIVIL REMEDIES
FOR THEFT OR EXPLOITATION STATUTE ...........................................................................78

STATEMENT OF RELIANCE ON FOREIGN SOURCES OF LAW ........................................79

JURY DEMAND ...........................................................................................................................79

RELIEF SOUGHT .........................................................................................................................80

Plaintiffs Michael Pearson, Andrew Childe, and Anna Silver (hereinafter the "Liquidators"), solely in their capacities as the Foreign Representatives and Joint Official Liquidators of various entities that are currently in official liquidation proceedings before the Grand Court of the Cayman Islands, and pursuant to appointments made in other jurisdictions, including the British Virgin Islands and Bermuda (collectively, the "Companies"), bring this action against Defendants and allege the following in support of their claims:

## INTRODUCTION

1.      The Liquidators bring this action to recover damages from Defendants for their participation in a global fraud that resulted in hundreds of millions of dollars of investor losses, looting of the Companies on a massive scale, and the creation of staggering liabilities for the Companies.

2.      Defendants were aware of the purposes and investment objectives for which the funds raised through this fraudulent scheme were supposed to be spent. Defendants also knew that little or none of the money raised through the scheme was actually used for those purposes and that instead, the funds were transferred to accounts in the names of other entities and individuals who had no legal right to these assets. Defendants, despite being aware of the actual use and diversion of innocent investor funds, perpetuated the fraud through numerous strategies designed to raise new money to repay liabilities to investors or to extend the maturity of pre-existing debt obligations. This prolonged the scheme's duration and enabled theft on a massive scale in what Defendants knew or recklessly disregarded was a classic Ponzi scheme. Even worse, ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

3.      The principals of two entities—South Bay Holdings, LLC ("South Bay") and Biscayne Capital International, LLC ("Biscayne")—originated the scheme. The complaint refers to those principals—Roberto G. Cortes, Ernesto H. Weisson, Juan Carlos Cortes (Roberto's brother), and Frank Chatburn—together, as the "Individual Wrongdoers."

4.      Others joined the Individual Wrongdoers in carrying out their scheme, including Gustavo Trujillo, Fernando Haberer, and Defendants.

5.      To date, two people have pleaded guilty to federal criminal charges in connection with this scheme. *United States v. Trujillo*, 19-CR-00134 (E.D.N.Y.); *United States v. Chatburn and Larrea*, 18-CR-20312 (S.D. Fla.). Other criminal cases and investigations are on-going.

6.      South Bay, which was owned and controlled by the Individual Wrongdoers, purported to develop real estate in South Florida.

7.      The Individual Wrongdoers formed another entity, Biscayne, to help raise capital for South Bay's development activities.

8.      The Individual Wrongdoers also created the Note Issuers (a subset of the Companies identified and defined below at ¶ 16), which were special purpose vehicles that issued and sold notes to investors claiming, falsely, that South Bay's real estate assets were sound collateral for the notes.

9.      In reality, the properties purportedly backing the notes were already heavily leveraged. Effectively, the notes were unsecured because there was no real collateral backing them.

10.     If the real estate were not already so heavily encumbered, the investors would have achieved the lower investment risk they believed they were taking on by purchasing notes backed by valuable real estate under development. Instead, the Individual Wrongdoers misled the investors and induced them to purchase notes backed by worthless security interests in real estate.

11.     Rather than actually and primarily funding the development of real estate, the Individual Wrongdoers used the proceeds generated through the issuance of notes to offset losses in real estate investments; cover liabilities incurred by other, Biscayne-related entities; pay interest and principal on other notes; enrich themselves, their relatives and associates through looting and diversion of assets; and fund unrelated investments and entities that they never disclosed to the innocent investors.

12.     When South Bay and Biscayne failed to generate revenue or cash to pay debt service obligations, the Individual Wrongdoers raised new funds by issuing more notes through the Note Issuers or by increasing the borrowing caps on note series from the Note Issuers.

13.     Defendants, which were the primary bank for both Biscayne and the Companies, were aware of or turned a willfully blind eye to multiple indicia of fraud that occurred repeatedly over the course of their nearly six-year relationship with Biscayne and the Note Issuers, resulting in hundreds of millions of dollars in losses to the Note Issuers, the Companies, and those who invested in them.

14.     Thus, although accomplished through a shifting and complex series of entities, the essence of the wrongdoing was simple—trick victims into investing money, divert the profits, and recruit new victims to continue and conceal the scheme. And it succeeded because the Defendants failed to do what the law and Defendants' highly touted business model required.

## THE PARTIES

### A.     The Liquidators

15.     The Liquidators are the Foreign Representatives[1] of the Companies. The Companies

consist of:

    a.     Biscayne Capital (B.V.I.) Ltd. (in Liquidation)[2] ("Biscayne Capital (B.V.I.)");

    b.     Biscayne Capital Holdings Ltd (in Creditor Voluntary Liquidation) ("Biscayne

           Capital Holdings");

    c.     Diversified Real Estate Development Ltd (in Official Liquidation) ("Diversified

           Real Estate"), formerly known as ORC Senior Secured Ltd. ("ORC");

    d.     GMS Global Market Step Up Note Ltd (in Official Liquidation) ("Global Market

           Step Up");

    e.     North Pointe Holdings (BVI) Ltd. (in Liquidation) ("North Pointe");

---

[1] This Complaint uses "Foreign Representative" as that term is defined in the United States Bankruptcy Code. A "foreign representative" is "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

[2] The identifiers "in Creditor Voluntary Liquidation," "in Liquidation," and "in Official Liquidation" reflect the nomenclature applied in the jurisdiction where each entity is domiciled. Biscayne Capital Holdings (in Creditor Voluntary Liquidation) is a Bermuda company. The entities in Liquidation—Biscayne Capital (BVI), North Pointe, Sentinel Mandate, Spyglass, and Vanguardia Holdings—are BVI companies. The entities in Official Liquidation—Diversified Real Estate, Global Market Step Up, Preferred Income, Sentinel Investment, SG Strategic, Sports Aficionados, and Vanguardia Group—are Cayman companies.

f.  Preferred Income Collateralized Interest Ltd (in Official Liquidation) ("Preferred Income");

g.  Sentinel Investment Fund SPC (in Official Liquidation) ("Sentinel Investment");

h.  Sentinel Mandate and Escrow Ltd. (in Liquidation) ("Sentinel Mandate");

i.  SG Strategic Income Ltd (in Official Liquidation) ("SG Strategic");

j.  Sports Aficionados Ltd (in Official Liquidation) ("Sports Aficionados");

k.  Spyglass Investment Management Ltd. (in Liquidation) ("Spyglass");

l.  Vanguardia Group Inc. (in Official Liquidation) ("Vanguardia Group"); and

m.  Vanguardia Holdings Ltd. (in Liquidation) ("Vanguardia Holdings").

16.  Five of these Companies are the Note Issuers, which are each special purpose vehicles created to raise funds for the benefit of South Bay. The Note Issuers consist of:

a.  Diversified Real Estate;

b.  Global Market Step Up;

c.  Preferred Income;

d.  Sentinel Investment; and

e.  SG Strategic.

17.  A special purpose vehicle is an entity created to fulfill narrow, specific, or temporary objectives. While generally formed to serve the purposes of the entity creating them, special purpose vehicles are legally separate from—rather than a subsidiary of—their creators.

18.  The chart below illustrates the general organizational structure and relationship of the Companies (including the Note Issuers) to each other:



19.     On July 4, 2018, SGG Management (BVI) Ltd. resigned as the director of four Note Issuers. This triggered a chain of events during the summer of 2018 that led to the appointment of the Liquidators and the decision to place the Companies and other, non-Plaintiff entities involved in the scheme into liquidation.

20.     On November 2, 2018, the liquidation proceedings of the Companies domiciled in the Cayman Islands were placed under the supervision of the Grand Court of the Cayman Islands (the "Grand Court").

21.     Cayman law obligates the Liquidators to protect the interests and recover the assets of the Companies so that remaining assets may be properly distributed among the Companies' creditors—most notably, the innocent investors and victims of the Individual Wrongdoers' scheme.

22.     As part of their roles, the Liquidators successfully sought leave from the Grand Court to obtain recognition of the Cayman Islands proceedings with the United States Bankruptcy Court.

23.     The Liquidators then directed counsel based in the United States to petition the United States Bankruptcy Court for the Southern District of Florida for recognition of the Cayman Island liquidation proceedings ("Cayman proceedings") as foreign main proceedings under Chapter 15 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

24.     On January 14, 2019, the United States Bankruptcy Court for the Southern District of Florida granted recognition of the Cayman proceedings as foreign main proceedings under Chapter 15. The court determined that the Liquidators had demonstrated that they were the Companies' duly authorized Foreign Representatives, as defined in the Bankruptcy Code at 11 U.S.C. § 101(24).

**B.     Defendants**

25.     Deutsche Bank AG is a German global banking and financial services company with branches at 60 Wall Street, New York, NY, USA and 1 Great Winchester Street, EC2N 2DB London, Great Britain. Relevant to this Complaint, it has branches in—among other places—New York ("Deutsche Bank New York") and London ("Deutsche Bank London"). Collectively, this complaint refers to Deutsche Bank AG and its branches in New York and London as "Deutsche Bank."

26.     The Defendants in this matter are Deutsche Bank (as defined above) and several of its subsidiaries:

> a.      Deutsche Bank Luxembourg S.A. ("Deutsche Bank Lux") is located at 2, Boulevard Konrad Adenauer, L-1115 Luxembourg, Luxembourg;
>
> b.      Deutsche Bank (Suisse) SA ("Deutsche Bank Suisse") is located at Place des Bergues 3, 1211 Geneva 1, Switzerland; and

      c.     Deutsche Bank Trust Companies Americas ("Deutsche Bank Trust Companies") is a New York corporation with a principal place of business located at 60 Wall Street, New York, New York.

27.    The graphic below illustrates in broad fashion the relationships between and among the various Defendants.



28.    As reflected in the graphic above, Deutsche Bank Trust, Deutsche Bank Suisse, and Deutsche Bank Lux are each owned by Deutsche Bank AG. Deutsche Bank Lux is directly and solely owned by Deutsche Bank AG, while Deutsche Bank Trust and Deutsche Bank Suisse are two among a number of Deutsche Bank AG's wholly owned subsidiaries.

29.    Deutsche Bank London and Deutsche Bank New York are simply branches of the parent company, Deutsche Bank AG.

30.     Notwithstanding Defendants' operation through numerous legal entities and branches throughout the world, Defendants emphasize the integrated, cooperative innerworkings of their divisions, branches, and global offices in their regulatory filings.

31.     For example, according to its 2014 Annual Review, Deutsche Bank positions itself as a "client-centric global universal bank" with a commitment to "putting . . . clients first" and "building a global network."

32.     Indeed, Deutsche Bank has described one of its core "[c]ompetencies" as "teamwork, including close collaboration across [the bank's] corporate divisions and central functions."

33.     Deutsche Bank also touts its efforts to "align its organization more closely to its clients," by, among other things, "deepen[ing] cross-divisional engagement with key clients."

34.     The bank encourages its personnel and divisions to "work[ ] closely and intensively together to deliver 'One Bank' to [its] clients" and views "cooperation [as] key to achieving [the bank's] vision to be truly global."

35.     Because Defendants know that banks, and particularly financial institutions with cross-border and worldwide presence, provide a useful platform for money laundering and other fraudulent or criminal activities, Defendants maintain an "anti-money laundering program."

36.     According to Defendants, through their anti-money laundering program they "scrutinize clients and current transactions using meticulous procedures and an automated monitoring system through this compliance program."

37.     Defendants' anti-money laundering program "appl[ies] worldwide to all business units of the bank, regardless of their location. All [of Defendants'] employees and senior managers are required to comply with [the program] to prevent [the bank's] name or [its] products and services from being misused for money laundering purposes."

9

38.     In addition, Defendants have a "Know Your Customer" or "KYC Program."

39.     According to Defendants:

[Deutsche Bank] has implemented a strict group-wide KYC program to ensure all kinds of customers (natural or legal persons or legal structures, correspondent banks) are subject to adequate identification, risk rating and monitoring measures. This program has been implemented globally and throughout all business divisions[.]

KYC includes not only knowing the clients and entities the Bank deals with (either as a single transaction or ongoing relationship), or renders services to, but also the Ultimate Beneficial Owners (UBOs), Legal Representatives and Authorised Signatories as appropriate.

The program includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships.

40.     Notwithstanding Deutsche Bank's claim to have and abide by state-of-the-art compliance programs, the bank and its subsidiaries have paid over $15 billion in civil penalties and criminal fines since 2002 for wide-ranging regulatory and criminal violations.

41.     In 2017 alone, Deutsche Bank paid a $425 million fine for violations of New York's anti-money laundering laws.

42.     The Individual Wrongdoers' scheme, and Deutsche Bank's connection with it, has already sparked lawsuits in numerous jurisdictions across the United States and elsewhere. *See, e.g.*, *Madison Asset LLC v. Deutsche Bank*, 1:20-cv-10299-MKV (S.D.N.Y.); *Deutsche Bank Trust Co. v. Rado Ltd. P'ship*, 1:18-cv-06768-DLC (S.D.N.Y.); *Insight Sec., Inc.*, v. *Amicorp (BVI) Trs.*, 19-cv-06343 (N.D. Ill.); *Insight Sec. Inc. v. Hinojosa*, 6:19-ap-00323, (Bankr. M.D. Fla.); *Insight Sec. Inc. v. Hinojosa*, 1:18-cv-07572 (N.D. Ill); *Insight Sec. Inc. v. Haberer et al.*, 19-cv-02836 (N.D. Ill); *Alcivar et al. v. Biscayne Cap. Int'l, LLC et al.*, 2019-007503-CA-01 (Fla. Cir. Ct.); *Lincuez et al. v. Cortes et al.*, 2020-0004163-CA-01 (Fla. Cir. Ct.); *Romay et al. v. South Bay Holdings LLC et al.*, 2018-035014-CA-01 (Fla. Cir. Ct.); *Cinnamon Cay, LLC et al. v. Inversora CRV Inv.*

*et al.*, 2016-0187660CA-01 (Fla. Cir. Ct.); *Four Corners Investments et al. v. Weisson et al.*, 2019-003720-CA-23 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Meza*, 2021-000581-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Tapia Bermudez*, 2021-000667-CA-01 (Fla. Cir. Ct.); *GMS Global Market Step Up Note Ltd. v. Arkdale International Investments S.A. et al.*, 2021-000652-CA-01 (Fla. Cir. Ct); *Sentinel Investment Fund SPC v. Cadena Huertas Fabiola Jakeline*, 2021-000606-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Funds SPC v. Uribe Santamaria*, 2021-000543-CA-01 (Fla. Cir. Ct); *Sentinel Mandate & Escrow Ltd. v. Compania Anonima Practicasa et al.*, 2021-000670-CA-01 (Fla. Cir. Ct.); *GMS Global Market Step Up Note Ltd. v. Cornerstone Ventures Inc. et al.*, 2021-000509-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Denfield Investment Inc. et al.*, 2021-000674-CA-01 (Fla. Cir. Ct.); *Preferred Income Collateralized Interest Ltd. et al. v. Dollamay Services Ltd. et al.*, 2021-000544-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Dugan Investment S.A. et al.*, 2021-000511-CA-01 (Fla. Cir. Ct.); *Diversified Real Estate Development Ltd. v. Cepeda Vegas*, 2021-000530-CA-01 (Fla. Cir. Ct.); *GMS Global Market Step Up Note Ltd. v. Missale*, 2021-00054-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Fajardo Lemoine Carlos Jose*, 2021-000588-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Andrade*, 2021-000542-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC et al. v. Guillermo Jose Valery Davila*, 2021-000586-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Horgan Investments Inc. et al.*, 2021-000513-CA-01 (Fla. Cir. Ct.); *GMS Global Market Step Up Note Ltd. v. Suarez et al.*, 2021-000517-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Alarcon Repetto*, 2021-000662-CA-01 (Fla. Cir. Ct.); *GMS Global Market Step Up Note Ltd. v. Jose Luis Suarez Arosemena*, 2021-000518-CA-01 (Fla. Cir. Ct.); *Preferred Income Collateralized Interest Ltd. et al. v. Granadillo*, 2021-000524-CA-01 (Fla. Cir. Ct.); *Sentinel Mandate & Escrow Ltd. v. Krotona S.A. et al.*, 2021-000676-CA-01 (Fla. Cir.

Ct.); *GMS Global Market Step Up Note Ltd. v. Luis Barona*, 2021-000515-CA-01 (Fla. Cir. Ct.);

*Sentinel Investment Fund SPC v. Sandoval Cerda et al.*, 2021-000585-CA-01 (Fla. Cir. Ct.);

*Sentinel Investment Fund SPC v. Calvopina*, 2021-000666-CA-01 (Fla. Cir. Ct.); *Sentinel*

*Investment Fund SPC v. Almeida Garcia*, 2021-000514-CA-01 (Fla. Cir. Ct.); *Sentinel Investment*

*Fund SPC v. Almeida Garcia*, 2021-000538-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC*

*v. Andrade Mora*, 2021-000545-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Valencia*

*Llerena*, 2021-000582-CA-01 (Fla. Cir. Ct.); *GMS Global Market Step Up Note Ltd. v.*

*Whittembury*, 2021-000525-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Garcia*

*Gutierrez*, 2021-000526-CA-01 (Fla. Cir. Ct.); *Sentinel Investment Fund SPC v. Seagreen*

*Shipping Marine Corp. et al.*, 2021-000541-CA-01 (Fla. Cir. Ct.); *Diversified Real Estate*

*Development Ltd. v. Cassidy Gonzales*, 2021-000537-CA-01 (Fla. Cir. Ct.); *Diversified Real*

*Estate Development Ltd. v. Tyara Int'l Ltd. et al.*, 2021-000584-CA-01 (Fla. Cir. Ct.); *GMS Global*

*Market Step Up Note Ltd. v. V&B Int'l Consultants Ltd. et al.*, 2021-000527-CA (Fla. Cir. Ct.);

*GMS Global Market Step Up Note Ltd. v. Vernoia Group Ltd. et al.*, 2021-000528-CA-01 (Fla.

Cir. Ct.); *Sentinel Investment Fund SPC v. Brunetti*, 2021-000663-CA-01 (Fla. Cir. Ct.); *GMS*

*Global Market Step Up Note Ltd. et al. v. Chinchilla et al.*, 2021-000539-CA-01 (Fla. Cir. Ct.).

## JURISDICTION AND VENUE

43.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b)

because this action relates to cases pending under title 11 of the United States Bankruptcy Code,

specifically the Cayman proceedings that the United States Bankruptcy Court for the Southern

District of Florida recognized as foreign main proceedings under section 101(24) of the

Bankruptcy Code.

44.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409 because this proceeding relates to the foreign main proceedings, which arise under title 11 and are pending in this Court.

45.     Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this lawsuit occurred within the Southern District of Florida's Miami Division.

46.     This Court has personal jurisdiction over Defendants because they conspired with the Individual Wrongdoers to execute a scheme whereby the Individual Wrongdoers raised funds from investors through note issuances and then distributed the proceeds of those issuances to individuals and entities who were not entitled to the use of those proceeds. *See* FLA. STAT. § 48.193(1)(a). Defendants and the Individual Wrongdoers agreed, tacitly or otherwise, to participate in the fraudulent scheme. The Individual Wrongdoers resided in Florida at all times relevant to this Complaint. There, they committed multiple acts in furtherance of the conspiracy.

47.     Deutsche Bank maintains an office in Jacksonville, Florida.

48.     Deutsche Bank employees based in Jacksonville, Florida performed account services for Biscayne Capital. Deutsche Bank also provided securities services to Biscayne. As part of these services, Deutsche Bank employees repeatedly traveled to Miami and emailed and placed phone calls to senior Biscayne employees, including ones located in Florida. Deutsche Bank also provided Biscayne advice on mergers and acquisitions. Deutsche Bank rendered these advisory services by way of emails and phone calls to Biscayne employees based in Miami.

49.     Deutsche Bank appointed a registered agent in Florida. That registered agent may be served with process as follows: CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

50.     Deutsche Bank Trust Companies employees based in Miami and otherwise in Miami provided wealth and asset management services to Biscayne.

51.     Deutsche Bank Trust Companies has a registered agent in Florida. That registered agent may also be served with process as follows: CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

52.     Miami-based employees of Deutsche Bank Suisse and Deutsche Bank Trust Companies corresponded by way of email to provide asset and wealth management services to Biscayne and/or the Individual Wrongdoers. Deutsche Bank Suisse employees providing securities services to Biscayne corresponded with the Individual Wrongdoers and Biscayne employees via email to arrange meetings in the United States.

53.     Deutsche Bank Lux served as the registrar for the Note Issuers. As the registrar for the Note Issuers, upon information and belief, Deutsche Bank Lux was in regular contact with individuals affiliated with Biscayne.

## BACKGROUND

**A.**     ***The Individual Wrongdoers Began Their Fraudulent Scheme.***

54.     The Individual Wrongdoers held themselves out as brokers or investment advisors.

55.     Two of them—Roberto G. Cortes and Ernesto H. Weisson—were the founders, principals, and initial beneficial owners of South Bay Holdings, LLC.

56.     When it was founded in 1999, South Bay appears to have financed its operations for a time through commercial lenders.

57.     Beginning in 2005, three of the Individual Wrongdoers—Weisson, Roberto Cortes, and Juan Carlos Cortes—formed and operated several non-United States investment advisory firms for high net-worth individuals.

58.     In 2006 and 2007, South Bay attempted to expand significantly, including by acquiring real estate in South Florida and associated memberships at a resort in the Florida Keys.

59.     In 2008, the Individual Wrongdoers created their first United States-based, registered investment advisor, Biscayne. Biscayne was ostensibly formed to provide wealth management and investment advisory services, and its target client-base consisted mostly of individuals who reside in or are citizens of various Latin American countries. Biscayne had its headquarters in Miami, and South Bay was among the investments Biscayne marketed to its clients-investors.

60.     Biscayne and South Bay were closely intertwined. Individual Wrongdoers Roberto Cortes and Weisson beneficially owned South Bay, and South Bay was the majority beneficial owner of Biscayne. The other two Individual Wrongdoers—Juan Carlos Cortes and Frank Chatburn—held minority interests in Biscayne.

61.     Roberto Cortes served as Biscayne's Chief Executive Officer and Juan Carlos Cortes as its Chief Compliance/Operations Officer. Weisson, Roberto Cortes, and Roberto C. Rueda—Roberto and Juan Carlos Cortes's father—sat on Biscayne's Board of Directors.

62.     Biscayne had accounts with several banks, including Deutsche Bank, to manage client funds and assets.

63.     By 2014, Defendants held the vast majority of the Companies' assets, and most of those assets passed through one or more accounts at Deutsche Bank or other Defendants.

64.     Under its arrangement with Deutsche Bank, investors (typically the note holders) owned the assets in the accounts, but Biscayne—as the investment advisor—had authority to manage the investments in the account by, among other things, buying and selling securities or transferring funds to an investor's associated bank account.

65.     The Individual Wrongdoers and other financial advisors working with them steered client funds into investments they preferred. Spyglass was initially the entity through which the

Individual Wrongdoers supposedly performed the investment advisor function for the Note Issuers.

**B.      The Individual Wrongdoers Begin Forming Special Purpose Vehicles to Raise More Capital.**

66.     In 2006 and 2007, the Individual Wrongdoers, who were adept at shielding themselves from liability using complex offshore business structures, began forming special purpose vehicles to raise additional capital.

67.     While legally separate from Biscayne and South Bay, the special purpose vehicles, which were organized most often under Cayman Islands or British Virgin Islands law, created and offered securities—initially subscriptions for preferred shares in a segregated portfolio company, Sentinel Investment, and later in the form of tradeable notes issued by the other Note Issuers. Biscayne and the Individual Wrongdoers then encouraged their client-investors to purchase these securities.

68.     Each special purpose vehicle was legally separate from Biscayne and South Bay but managed—and, in some cases, beneficially owned—by the Individual Wrongdoers. The Individual Wrongdoers caused the special purpose vehicles to prepare offering memoranda and raise capital by selling securities in the form of notes.

69.     Sentinel Investment was created by the Individual Wrongdoers in 2006. Sentinel Investment was structured as a Cayman Islands investment fund, and as a result was subject to regulatory restrictions such as an annual audit requirement. The special purpose vehicles the Individual Wrongdoers formed later were not subject to this audit requirement.

70.     In almost all instances, the stated purpose of raising these funds through the special purpose vehicles was to invest in South Bay's real estate development while reducing South Bay's risk. The special purpose vehicles' securities typically promised to pay periodic interest.

16

71.     The Individual Wrongdoers persuaded investors to purchase securities from the special purpose vehicles.

72.     The graphic below shows how money would have flowed if the investment structure operated the way the Individual Wrongdoers, Biscayne, and South Bay represented to consumers.



73.     Biscayne benefitted tremendously when its client-investors purchased notes because one of its affiliates typically charged fees associated with the issuance as well. Investors thus paid Biscayne twice: its management fee and the fees paid to the affiliates.

74.     In addition to being Biscayne's majority beneficial owner, South Bay was also a holding company for other Biscayne entities. In this role, South Bay funneled millions of dollars to Biscayne to maintain its appearance as a legitimate and profitable investment advisory firm.

75.     The Individual Wrongdoers used Biscayne to steer their clients-investors' funds into the special purpose vehicles. The special purpose vehicles, in turn, funded South Bay, and South Bay ostensibly funded real estate development while also funding Biscayne.

76.     Financial statements and other corporate documents that should have been requested by a financial institution in due diligence revealed these relationships; however, the Individual Wrongdoers did not disclose them and went to great lengths to avoid disclosure of these obvious conflicts to their clients-investors.

77.     In late 2008, the Great Recession drove the Individual Wrongdoers to intensify and expand their scheme.

78.     The global financial crisis, which disrupted South Florida's real estate market and caused development delays with the resort, left South Bay in a precarious situation.

79.     Instead of sharing these hard truths with their investors, the Individual Wrongdoers expanded their fraudulent scheme.

80.     Beginning in 2010 the Individual Wrongdoers formed more special purpose vehicles—including a number of the Note Issuers—and caused them to issue new securities and raise funds in order to pay interest to legacy investors.

81.     More specifically, the Individual Wrongdoers created the following Note Issuers from 2010 through 2013:

        a.      SG Strategic;

        b.      Diversified Real Estate;

        c.      Global Market Step Up; and

        d.      Preferred Income.

82.     This allowed the Individual Wrongdoers to cover their failures while perpetuating the scheme.

83.     The Note Issuers played the same role in the scheme as the earlier special purpose vehicles. The Note Issuers transferred the money they raised from investors to South Bay. South Bay then paid interest payments or repaid earlier investors, thereby disguising its financial troubles.

84.     The Individual Wrongdoers also relied on another of the Companies they created—Spyglass—to perpetuate the scheme. Spyglass, incorporated in the BVI, purported to be an investment advisor much like Biscayne.

85.     The Individual Wrongdoers used Biscayne, Spyglass, and the Note Issuers to continually raise new money. These efforts concealed the failure of the real estate development and facilitated on-going misappropriation. The Individual Wrongdoers also used the notes to mask side deals and arrangements with preferred clients.

86.     Obviously, no one disclosed to investors that their money would be funneled into this self-serving and corrupt scheme. Instead, the Individual Wrongdoers left new investors with the impression they were investing in a real project with prospects of success.

87.     Further, the interrelated structure of the various business entities allowed the Individual Wrongdoers to avoid independent audit opinions.

88.     The fraud lasted for nearly a decade. Although the original real estate development effectively failed during the Great Recession, the Note Issuers were utilized to raise more money for years thereafter.

89.     By March 2012, the SEC had opened an inquiry into Biscayne Capital and several of the special purpose vehicles it created to raise funds.

**C.**     ***The Individual Wrongdoers Formed Madison Asset, LLC to Perpetuate The Scheme.***

90.     In part to avoid the eye of United States regulators, the Individual Wrongdoers directed the formation of Madison Asset, LLC ("Madison") in January 2014 in the Cayman Islands.

91.     Madison purported to serve as an investment advisor to the Note Issuers. However, Madison effectively took on the roles Biscayne and Spyglass had been previously playing in the scheme. Madison became the entity steering investors toward the Note Issuers to fund the scheme, enabling Biscayne and Spyglass to avoid further regulatory attention.

92.     Roberto and Juan Carlos Cortes's father, Roberto Rueda, was an initial beneficial owner and director of Madison.

93.     Rueda instructed a Madison employee, Gustavo Trujillo, to open a custodian account for Madison through Deutsche Bank New York.

94.     Gustavo Trujillo was Madison's Operations Manager at the time of its formation. Although the Individual Wrongdoers continued to exert control over Madison, Trujillo became Madison's beneficial owner in about 2015.

95.     Trujillo used Madison as the Individual Wrongdoers directed: to effect transfers— including ones out of the Note Issuers' custodial sub-accounts—and to otherwise conceal the scheme.

96.     Trujillo operated Madison on a day-to-day basis. In this capacity, Trujillo opened a custodian account for Madison through Deutsche Bank.

97.     Trujillo and Deutsche Bank set up accounts in Madison's name with sub-accounts for a number of the Biscayne-related entities, including the Note Issuers and Companies.

98.     Trujillo was ultimately charged with wire fraud and money laundering for his role in the scheme. By April 2019, he pleaded guilty.

99.     In total, Deutsche Bank—working with Trujillo—set up nearly three dozen sub-accounts for various Note Issuers, Companies, and other entities related to the Individual Wrongdoers and Biscayne.

**D.      *Deutsche Bank Played an Essential Role in the Fraudulent Scheme.***

100.    Deutsche Bank allowed Madison to establish these sub-accounts for the Companies and Note Issuers without ever requiring proof of Madison's authority to act on their behalf. In fact, Deutsche Bank did not seek to make the Note Issuers a party to a custodial agreement and failed to require proof that Madison was authorized to act as a custodian for the Note Issuers. Deutsche Bank required only a custody agreement signed between Deutsche Bank and Madison Asset LLC, Biscayne Capital Bahamas, and Biscayne Capital BVI.





105.

(Emphasis added).

106.

107.    All transfers made into, out of, and through the Madison sub-accounts were visible to Defendants.

108.    Even a cursory review of the activity in these Madison sub-accounts reveals the obviously fraudulent and improper nature of the transactions.

109.    For example, from April 18–30, 2016, $3.225 million was transferred out of a Global Market Step Up's Deutsche Bank account to a Madison Deutsche Bank account. The chart below summarizes the fraudulent transactions that occurred from April 18–30, 2016.



110.    Deutsche Bank had no documentation authorizing transfers between these entities, and Deutsche Bank knew that Madison was not an intended recipient of the proceeds of notes issued by Global Market Step Up.

111.    Despite this knowledge of the unauthorized transfers, Deutsche Bank allowed millions of dollars to flow out of that Madison Account to the accounts of: other Note Issuers; a Madison account at another bank; other entities with no connection to Global Market Step Up or the intended recipients of the note proceeds; and individuals.

112.    In short, none of these transfers went to the intended recipients of note proceeds, and though Deutsche Bank had all of this information, it did nothing with it.

113.    These transfers, over just twelve days in 2016, are not an exhaustive accounting of the scheme's transfers. Instead, they are illustrative of numerous and frequent similar patterns of transfers that occurred with Deutsche Bank's help over a period of years.

114.    Defendants were either fully aware of the theft and other improper transfers these sub-accounts enabled, or Defendants turned a blind eye toward the conduct of the Individual Wrongdoers and Madison.

115.    The Securities and Exchange Commission entered a public order on May 26, 2016, in which it found that Biscayne and the Individual Wrongdoers violated several federal securities laws.

116.    As relevant here, the Commission found that Biscayne and the Individual Wrongdoers should have informed investors about the conflicts of interests created by the common beneficial ownership and effective control of Biscayne, South Bay, Spyglass, and certain Note Issuers— namely Sentinel Investment, SG Strategic, and Global Market Step Up.

117.    The Commission also found that:

    a.    Chatburn failed to disclose the conflict of interest created by Biscayne's dependence on South Bay for financial support while South Bay's financial condition was precarious.

    b.    Roberto and Juan Carlos Cortes willfully aided and abetted and caused Biscayne to make material misrepresentations in registration documents that were delivered to clients.

118.    The Commission determined that the failure to disclose these conflicts of interest constituted willful violations of Sections 206 and 207 of the Advisers Act.

119.    The Commission therefore imposed both monetary penalties and sanctions on Biscayne and the Individual Wrongdoers. The Commission ordered *inter alia* that Biscayne and the Individual Wrongdoers "cease and desist from committing or causing any violations and any future violations" of Sections 206 and 207 of the Advisers Act.

120.    Even after the May 2016 SEC Order revealed the nature of the fraud, Defendants did not end their relationship with and facilitation of transactions for the Companies.

121.    Though the cease-and-desist order apparently triggered a review at Deutsche Bank more intensive than anything that preceded it, Defendants nonetheless continued to facilitate the scheme. Deutsche Bank continued to facilitate the scheme by, among other things, restructuring notes to extend maturity and allowing payment in kind for interest in a manner inconsistent with relevant offering documents and without ever seeking or obtaining the required written consent of note holders.

122.    Defendants terminated their relationships with Biscayne, Madison, the Companies, and related entities only in June 2017.

123.    Weeks earlier, in May 2017, the Federal Reserve had entered an order fining Deutsche Bank for deficiencies in its Bank Secrecy Act and Anti-Money Laundering compliance and requiring it to, among other things, implement a more rigorous customer review and compliance system.

124.    This temporal proximity indicates that, had Deutsche Bank undertaken an earlier review of its relationships with the Madison, the Companies, and Biscayne, it likely would have terminated its relationship with these entities and ended the Individual Wrongdoers' fraud earlier.

125.    Defendants' misconduct in facilitating the fraud and allowing it to continue as long as it did renders them liable for breach of fiduciary duty, aiding and abetting breach of fiduciary duty,

aiding and abetting conversion, breach of contract, negligence, and several statutory causes of action.

126.    As a direct and proximate result of Defendants' misconduct, the Companies suffered significant damages.

127.    Accordingly, the Liquidators bring this action against Defendants to recover the damages they caused, along with prejudgment interest, attorneys' fees, and expenses of litigation.

### CONTRACTUAL AND OTHER RELATIONSHIPS BETWEEN DEFENDANTS AND THE COMPANIES

128.    Historically, the Individual Wrongdoers—specifically the Cortes brothers and their father—had a relationship with Deutsche Bank.

129.    When the first of the Note Issuers, Sentinel Investment, began issuing securities—subscriptions for preferred shares—in 2009, Deutsche Bank was the issuing agent. This meant Deutsche Bank was responsible for distributing the securities and realizing the resulting profits for the benefit of Sentinel Investment.

130.    As additional Note Issuers were created and began issuing their own notes, Deutsche Bank was—again—the issuing agent.

131.    In June 2011, Deutsche Bank entered the first of a series of contractual relationships with the Note Issuers when it executed an Agency Agreement with SG Strategic as issuer and Deutsche Bank as issuing agent, principal paying agent, and transfer agent for the notes SG Strategic began offering in June 2011.

132.    As the transfer agent, Deutsche Bank was responsible for issuing and canceling certificates showing note ownership, and as the principal paying agent, Deutsche Bank was responsible for accepting payments from the Note Issuers and distributing the funds to note holders.

133.    Per the terms of that Agency Agreement, Deutsche Bank Lux was the registrar. In that capacity, Deutsche Bank Lux was responsible for maintaining records of the name and other identifying information for each note holder.

134.    South Bay's involvement was known to Deutsche Bank from the beginning, because when SG Strategic created and began to issue its notes in June 2011, the notes' offering documents expressly linked the notes to South Bay. Defendants would have been familiar thanks to their respective work with the Note Issuers.

135.    Deutsche Bank followed its June 2011 Agency Agreement with SG Strategic with similar Agency Agreements with Global Market Step Up and Preferred Income.

136.    Again, the terms of those Agency Agreements made Deutsche Bank the issuing agent, transfer agent, and principal paying agent for the notes Global Market Step Up and Preferred Income began offering in December 2011. And again, per the terms of those Agency Agreements, Deutsche Bank Lux was the registrar for the notes offered by both Note Issuers.

137.    In setting up the notes issued in 2011, Deutsche Bank took its instructions from Individual Wrongdoer Juan Carlos Cortes.

138.    To further facilitate its work, on December 15, 2011, Deutsche Bank entered a Multimarket Custody Agreement with Biscayne Capital Agent de Valores S.A. ("Biscayne Capital S.A."), a Uruguayan company, through which that entity would provide custodial and trading services, including with respect to the Deutsche Bank accounts holding the Note Issuers' notes.

139.    Juan Carlos Cortes executed this agreement with Deutsche Bank on behalf of Biscayne Capital S.A., again leaving no doubt of the Individual Wrongdoers' involvement in the issuance of these notes from the very beginning.

140.    By the time Deutsche Bank was issuing notes for Global Market Step Up, the Individual Wrongdoers' roles were further reinforced. The offering documents for Global Market Step Up's 2014 notes identified Roberto Cortes as the investment advisor and disclosed that an entity owned by Individual Wrongdoers Ernesto Weisson, Roberto Cortes, and Juan Carlos Cortes, along with "a related individual" was Global Market Step Up's sole shareholder.

141.    As the scheme expanded and Madison assumed the role previously played by Biscayne and Spyglass, Defendants' participation in the scheme only increased.

142.    From 2014 to 2015, Madison transitioned the vast majority of Biscayne's banking relationships to Deutsche Bank, and Madison retained control of these accounts.

143.    In the same timeframe, Madison entered its own contractual relationships with Defendants and began establishing the Deutsche Bank sub-accounts for the Companies, including the Note Issuers.

144.    On March 7, 2014, Deutsche Bank executed a Multi-Market Custody Agreement and agreed to a Direct Securities Services Fee Proposal with Madison.

145.    Roberto Cortes Rueda—the father of Individual Wrongdoers Roberto and Juan Carlos Cortes—executed the March 7, 2014 agreement on behalf of Madison.

146.    Though that agreement obligated Madison to provide a number of documents to Deutsche Bank, Deutsche Bank ultimately did not require Madison to provide all of the enumerated documentation. For example, Deutsche Bank did not require Madison to provide an anti-money laundering affidavit certifying the source of the accounts' funds.

147.    A number of steps in the process of transitioning the Madison and Biscayne Capital relationships to Deutsche Bank alerted Deutsche Bank to the connections among Madison, Biscayne and South Bay, and the Individual Wrongdoers.

148.     In the very first inquiry to Deutsche Bank about setting up the first of the Madison accounts, Trujillo told Deutsche Bank on March 3, 2014 that the account would be for "one of the entities related to Biscaynes [sic] group."

149.     On March 20, 2014, Deutsche Bank requested "source of wealth / CV and copy of passport for Roberto Cortes-Rueda." In response, Trujillo on behalf of Madison requested that Deutsche Bank consider that Roberto Cortes Rueda was also a director and shareholder at Biscayne and that his prior due diligence should be on file.

150.     The connection among the Individual Wrongdoers and the entities with which Defendants dealt was reinforced numerous times over the years that the fraud continued.

## DEFENDANTS' ROLE AND PARTICIPATION IN THE SCHEME

151.     Defendants' wrongdoing can be divided into two broad categories: *First*, they allowed the Note Issuers to avoid certain debt service obligations. *Second*, they failed to investigate or turned a blind eye toward transactions and relationships of which they were actually aware and that would have revealed the Individual Wrongdoers' fraudulent scheme years before it collapsed on its own.

152.     Multiple times and through multiple means, Defendants assisted agents purporting to act on behalf of the Companies, ultimately allowing the agents to avoid significant pending cash maturity obligations to the investors who held their notes.

153.     Avoiding these debt obligations allowed the Individual Wrongdoers to raise additional funds for their scheme.

154.     As detailed below, Defendants' role and participation in this aspect of the scheme took several forms, including swap transactions that modified note terms and allowed payments-in-kind contrary to offering documents and investment objectives, re-tapping notes to cover maturing debt obligations (that is, issuing new notes to repay old ones), and late interest payments.

155.    As also detailed below, Defendants' failure to investigate was similarly multifaceted and spanned Defendants' relationships with Biscayne, South Bay, and ultimately Defendants' relationship with Madison and Madison's relationship with the Companies.

156.    Likewise, Defendants failed to follow their own anti-money laundering program and "Know Your Customer" rules, the adherence to which would have revealed the relationships between and among the Companies, Madison, Biscayne, South Bay, and the Individual Wrongdoers.

157.    Compliance with Defendants' own policies would have revealed the fraud and required Defendants to terminate their relationship with the Companies and Madison earlier—or to have prohibited Madison from opening the sub-accounts on the Companies' behalf in the first instance.

## A.    The Swap Transactions

158.    Defendants facilitated a series of at least three "swap transactions" in the five-month span from October 2013 to March 2014, through which they enabled the Individual Wrongdoers to avoid pending maturity obligations and thereby assisted the Individual Wrongdoers in their fraudulent scheme.

159.    In these transactions, one entity managed by the Individual Wrongdoers would acquire the majority of a Note Issuer's outstanding notes just before a maturity obligation would have required the Note Issuer to pay interest and other remuneration to its note holders, thereby "swapping" or trading the right to receive those payments from one note holder to another.

160.    The Note Issuers' offering documents—which Defendants had before they effectuated any of the swap transactions—describe how the Note Issuers should have generated revenue to cover these pending cash maturities.

161.    More specifically, the offering documents explained that the Note Issuers would apply proceeds from the issuance of notes to investments, primarily investments in South Bay in exchange for interests in the real estate South Bay developed and—ultimately—would market and sell.

162.    Mortgages on the South Bay properties ostensibly backed the notes issued by the Note Issuers, and South Bay was to satisfy its obligations to the Note Issuers arising from those mortgages with profits generated on its real estate projects.

163.    The Note Issuers, in turn, should have used that revenue to pay interest and dividend obligations to the investors who purchased the notes.

164.    Between October 2013 and March 2014, three of the Note Issuers—SG Strategic, Preferred Income, and Global Market Step Up—faced pending note maturity obligations totaling $31,650,000.00.

165.    That is, however, not what happened. Defendants facilitated swap transactions on at least three separate occasions, and each transaction shared at least four attributes that departed from the legally appropriate course charted in the offering documents and set out above.

166.    *First*, one of the Note Issuers would face a pending cash maturity, requiring it to pay interest or dividends to note holders on a certain maturation date.

167.    *Second*, shortly prior to or even after the maturity date, a second, ultimately South Bay-related entity ("the acquiring entity") would acquire a substantial majority of the maturing notes.

168.    *Third*, in each of these transactions, Herman Oosten, the individual at SGG who filled the role of "Director" for each Note Issuer,[3] would send Deutsche Bank a nearly identical email on behalf of the acquiring entity, announcing that the acquiring entity had acquired a substantial majority of the maturing notes. The acquiring entity would then—in the same email—renounce its right to receive cash payments on the maturing notes.

169.    This renunciation of cash payment was inconsistent with the investment objectives of the acquiring entities, inconsistent with the offering documents of the Note Issuers, and not contemplated by the Agency Agreement between Deutsche Bank and the Note Issuers. The contents of each of these documents were known to Defendants.

170.    *Fourth*, Defendants accepted these representations and instructions and did not require the Note Issuer who had issued the notes in the first instance to make a cash payment, instead allowing the Individual Wrongdoers to avoid the payment owed by the Note Issuer that they were unable to cover.

171.    In explaining the first swap transaction, Juan Carlos Cortes wrote:

> The notes issued by SG mature on October 31, 2013 for principal of $22MM. However, we have arranged a private exchange with over 95% of all note holders to roll over the investment for another 2 years, at a lower rate, through a new different SPV (same structure as SG, but different, improved terms for the investor). So its an upgrade. The new SPV is today, the holder of 95% of all outstanding and issued noted by SG. So technically, Deutsche Bank should arrange payment of principal to the new SPV. However, we do not want an organic payment. We will settle for an offset or payment in kind. I want to communicate this to Deutsche Bank, before maturity date.

172.    This, however, is not what happened. Nearly a year later, Trujillo described what actually transpired:

---

[3] For the Note Issuers created in 2010 and thereafter, SGG was the Director, but Oosten is the individual who controlled SGG's actions in that regard and to whom notice and communications to the Director were supposed to be sent.

1. ORC Senior Secured Limited issues ORC note Series II and raises funds from investors
2. SBH issues Master Promissory note to ORC Series II
3. Per promissory note, those funds raised by the issuance of the note, were to be sent to SBH
4. Instead, SBH instructs ORC to buy back 99% of the outstanding of SG Strategic Series I Note (no formal documentation, please advise procedure)
5. ORC being the new noteholder/beneficiary of SG, renounces to any capital + interest at maturity (see swift renunciation sent to DB, paying agent)

i.   *The First Swap Transaction*

173.    Defendants facilitated the first swap transaction in October 2013, allowing Note Issuer SG Strategic to avoid a pending maturity obligation worth millions of dollars.

174.    In total, SG Strategic had $23,057,375.00 due and payable to its Note Holders no later than October 31, 2013.

175.    To avoid having to make over $23 million in cash payments, SG Strategic's director sent an email to John Woodger, a Deutsche Bank employee, in which the director notified Deutsche Bank that of the $23,057,375.00 payable to SG Strategic's note holders, $22,157,575.00 was due to acquiring entity Diversified Real Estate, also a Note Issuer, and that Diversified Real Estate was declaring it had received payment in kind to its satisfaction.

176.    Defendants knew that Diversified Real Estate was a Biscayne-related entity based on the Agency Agreement with Diversified Real Estate.

177.    In that same email, the director instructed Deutsche Bank that, as the paying agent, Deutsche Bank should not make any payment to Diversified Real Estate (referred to by its former name, "ORC"):

Dear Mr. Woodger,

Please take note that as of October 29, 2013, ORC SENIOR SECURED LIMITED, is the Note Holder of the Note denominated SG STRATEGIC INCOME LIMITED (**ISIN: XS0518000442** ) in the amount $21,670,000.00 of a total outstanding issued Notes for $22,550,000.00

On October 31, 2013 SG STRATEGIC INCOME LIMITED (**ISIN: XS0518000442** ) outstanding principal and interest is due and payable to its Note Holders, for a total amount of $23,057,375.00 (Principal: $22,550,000.00 + Interest: $507,375.00). Of this total amount, **$22,157,575.00 ( Principal: $21,670,000 and interests: $487,575.00)** is due and payable to ORC SENIOR SECURED LIMITED.

ORC SENIOR SECURED LIMITED has declared that it has received to its full satisfaction, full and complete payment in kind, worth **$22,157,575.00** from SG STRATEGIC INCOME LIMITED.

Therefore, the Paying Agent does not need to perform a cash payment of principal and interest to the Note Holder ORC SENIOR SECURED LIMITED.

I have instructed our legal counsel Mr. McDonald to prepare documentation to support the above transactions.

178.    The director's email was sent on October 30th at 8:33 PM—the night before the payment was due.

179.    Defendants knew that renunciation of cash payment and acceptance of payment in kind was inconsistent with the investment objectives of the acquiring entity, Diversified Real Estate.

180.    For example, Diversified Real Estate's August 2013 offering memorandum, which Deutsche Bank possessed and with which Deutsche Bank was familiar, described how Diversified Real Estate would use proceeds to "invest in South Bay in exchange for interests in South Bay." South Bay would, in turn, use the proceeds of those investments "for its working capital needs and to construct, market and sell the South Bay Properties."

181.    Diversified Real Estate's acceptance of payment in kind did not enable Diversified Real Estate to contribute to South Bay's working capital needs, nor did acceptance of payment in kind allow Diversified Real Estate to re-pay those who had invested in it.

182.    Additionally, the Agency Agreement between Deutsche Bank and SG Strategic—like those between Deutsche Bank and the other Note Issuers—did not contemplate payment in kind,

rather than cash payments, to satisfy note obligations. Specifically, the Agency Agreement specified that payment "shall be" made "unconditionally by credit transfer in the payment currency and … freely transferable cleared funds."

183.    Deutsche Bank unquestioningly followed the instructions it received, despite knowing that the renunciation of cash payment was inconsistent with the acquiring entity's investment objectives, despite knowing that this type of transaction was not contemplated by the Agency Agreements between Deutsche Bank and the Note Issuers, and despite knowing that this would allow SG Strategic to avoid over $22 million in cash payments due.

184.    Deutsche Bank's participation enabled the Individual Wrongdoers to avoid making payments due to the investors who held those notes and facilitated the Individual Wrongdoers' continuing scheme.

> ii.    *The Second Swap Transaction*

185.    Just a few weeks later, in December of 2013, Deutsche Bank facilitated a second swap transaction, allowing another Note Issuer (Preferred Income) to avoid a pending maturity obligation worth millions of dollars even after the obligation was due.

186.    This time, Preferred Income was facing a $5,918,250.00 payment due on November 30, 2013.

187.    To avoid that cash outflow, the Individual Wrongdoers orchestrated a scheme in which Note Issuer Diversified Real Estate acquired $4,705,261.67—about 79%—of the outstanding and maturing Preferred Income notes.

188.    After accumulating 79% of the outstanding and maturing Preferred Income notes, the Individual Wrongdoers had Diversified Real Estate waive cash payment on the amount due.

189.    Once again, to complete this transaction, the director sent an email to Deutsche Bank nearly identical to the one sent to explain the earlier swap transaction.

190.    In the email, the director notified Deutsche Bank that of the $5,918,250.00 due, $4,705,261.67 was due to Diversified Real Estate and that Diversified Real Estate had received payment in kind to its full satisfaction.

191.    The director then instructed Deutsche Bank that, as the paying agent, Deutsche Bank should not make any payment to Diversified Real Estate, again referred to here by its former name, ORC:

---

Dear Mr. Woodger,

Please take note that as of November 29, 2013, ORC SENIOR SECURED LIMITED, is the Note Holder of the Note denominated Preferred Income Collateralized Interest (**ISIN: XS0707825617**) in the amount $4,651,000.00 of a total outstanding issued Notes for $5,850,000.00

On November 30, 2013 S Preferred Income Collateralized Interest (**ISIN: XS0707825617**) outstanding principal and interest is due and payable to its Note Holders, for a total amount of $5,918,250.00 ($ P: $5,850,000.00 + I: $68,250.00). Of this total amount, **$4,705,261.67** (P: 4,651,000.00 + I: $54,261.67) is due and payable to ORC SENIOR SECURED LIMITED.

ORC SENIOR SECURED LIMITED has declared that it has received to its full satisfaction, full and complete payment in kind, worth **$4,705,261.67** from Preferred Income Collateralized Interest. Therefore, the Paying Agent does not need to perform a cash payment of principal and interest to the Note Holder ORC SENIOR SECURED LIMITED.

---

192.    The director's email was sent on December 2, 2013 even though the payment was due on November 30th.

193.    Even with this transaction, which allowed Preferred Income to avoid a majority of its obligation, Preferred Income still did not have enough funds to cover the remaining payment due— $504,821.67.

194.    Deutsche Bank, of course, knew that Preferred Income did not cover the remaining amount due. A Deutsche Bank employee replied to the director's email stating that Deutsche Bank had yet to receive the $504,821.67 necessary to pay the remaining note holders.

195.    Still, Deutsche Bank complied with the director's instructions, despite knowing that the renunciation of cash payment was inconsistent with the investment objectives of the acquiring entity Diversified Real Estate, despite knowing that only weeks prior, another Note Issuer used the same type of transaction to avoid almost $23 million in payments due, despite knowing that there were insufficient funds to cover the remaining payments, and despite knowing that this transaction would result in the avoidance of yet another multi-million dollar obligation for yet another associated Note Issuer.

196.    Deutsche Bank's participation once again enabled the Individual Wrongdoers to avoid payments due and facilitated their continuing scheme.

### iii.    The Third Swap Transaction

197.    Deutsche Bank facilitated yet another swap transaction in February 2014. This transaction allowed Global Market Step Up to avoid significant pending cash maturity obligations.

198.    This time, the principal amount due on the maturing note was $3,250,000.00, to be paid no later than March 20, 2014.

199.    Once again, the director sent an email to Deutsche Bank nearly identical to those sent to explain the previous two swap transactions.

200.    In this email, the director notified Deutsche Bank that the acquiring entity Sentinel Mandate—also a Company—was the sole holder of the entirety of the maturing Global Market Step Up notes and that Sentinel Mandate had received payment to its full satisfaction.

201.    The director then instructed Deutsche Bank that, as the paying agent, Deutsche Bank should not make any payment to Sentinel Mandate:

> Dear Mr. Yetton,
>
> Please take note that as of February 5, 2014, Sentinel Mandate & Escrow is the note holder of the notes denominated GMS Global Market Step Up Series 1 (**ISIN XS0707826185** ) in the amount of 3,250,000.00 in Clearstream account 13163 which is the total amount outstanding of the note.
>
> On March 20, 2014 GMS Global Market Step Up Ltd ISIN XS0707826185 outstanding principal and interest is due and payable to its note holders. Sentinel Mandate & Escrow being the sole holder of the total amount issued, has declared that it has received payment to its full satisfaction, therefore the Paying Agent does not need to perform a cash payment of the principal and interest to the note holder.
>
> Please take note of the above in order to complete mark down of the issue. We have instructed our legal council to prepare documentation to support the above transaction"

202.    Acceptance of payment in kind was inconsistent with the investment of objective of the acquiring entity Sentinel Mandate, which was to invest in Sentinel Investment Fund, and its obligation to pay investors a quarterly coupon and the redemption of the principal amounts on the maturity date—terms which were known to Deutsche Bank.

203.    Once again, Deutsche Bank unquestioningly followed this instruction despite knowing that the renunciation of cash payment was inconsistent with the investment objectives of the acquiring entity Sentinel Mandate, despite knowing that the Agency Agreements between Deutsche Bank and Global Market Step Up did not contemplate this type of transaction, and despite knowing that the Note Issuers engaged in two other, nearly identical transactions within just a few months to avoid other pending maturity obligations.

204.    In all three of these transactions, Deutsche Bank knew that the entirety—or a substantial majority—of the payment due was being waived.

205.    In at least one of the transactions Deutsche Bank was aware that it had not received the payment necessary from the Note Issuer to pay the remaining note holders.

206.    Deutsche Bank knew that all of these transactions were performed shortly before or even after the payment obligation matured.

207.    The timing, frequency, nature, and the effect of these transactions—the avoidance of tens of millions of dollars in payments due—confirmed that the Note Issuers were unable to meet financial obligations and continue as going concerns. Facilitation of these transactions was just one of the many ways Deutsche Bank had notice of and participated in the Individual Wrongdoer's scheme.

**B.    Re-Tapping of Notes by Note Issuers**

208.    A "re-tap" is a process by which a security-issuing entity raises money by selling securities that the issuer previously authorized but were held back. Although re-tapping is a common way to raise money, it can also be a sign of fraud because it defers making required cash payments.

209.    Here, re-tapping was an indicator of fraud because the Individual Wrongdoers repeatedly worked with Defendants to re-tap the notes for the purpose of paying existing debt on previously issued notes, instead of using money raised for legitimate investment or business purposes.

210.    The Individual Wrongdoers "re-tapped" notes, that is, issued new notes through Deutsche Bank to pay interest due on existing notes, in non-round number dollar amounts, just sufficient to make payments due on existing notes and days before principal and/or interest payments on those notes came due.

211.    Further, the re-tapping bore no discernible connection to cash requirements of the real estate project they ostensibly supported, as opposed to the obligations on the existing notes. Though offering documents explained that note proceeds would be used to invest in South Bay, contributing to South Bay's "working capital needs" and enabling it "to construct, market and sell

South Bay properties," the timing of the re-tapping transactions was often linked to maturing debt obligations—including at regular quarterly intervals.

212.    This pattern of re-taps lining up with payment obligations at regular, generally quarterly, intervals was not consistent with the kinds of cash and capital needs typically seen in real estate development projects, where cash requirements are linked to construction stages that generally do not come and go at regularly spaced intervals. Additionally, these cash requirements would not consistently correspond to the debt service obligations of the Note Issuers' pre-existing notes.

213.    There were 325 re-tapping transactions in all, ranging from roughly $1,000 to as much as $15,000,000, for a total of approximately $250,000,000. Many of these amounts were in non-round or unusual dollar sums and were raised within days of payments becoming due.

214.    The volume of re-tapping—in both dollar amount and number of transactions—was unusually high and the quarterly timing, again, bore no connection to the typical needs of a real estate project. Yet Deutsche Bank did not question the re-taps' timing or purpose.

215.    Based on their nature, volume, and timing, Deutsche Bank should have understood these re-taps were intended to raise funds to pay interest on existing debt and/or to repay other notes previously issued by the Note Issuers.

216.    Deutsche Bank facilitated the re-tapping of the notes and, in so doing, the underlying scheme.

    i.    *SG Strategic Note Re-Taps*

217.    The series of SG Strategic note re-taps described and illustrated in the charts below are representative of how the Individual Wrongdoers, with the assistance of Deutsche Bank, used re-taps to perpetuate their scheme.



218.   As shown immediately below, SG Strategic owed an interest obligation no later than December 31, 2012.



219.   Just before that obligation came due, the Individual Wrongdoers with the assistance of Deutsche Bank executed a re-tap in a non-round dollar amount, receiving an additional $74,637.00.

220.   Only seven days later, on December 27, 2012, the Individual Wrongdoers made a payment covering interest and associated fees, through Deutsche Bank, in the amount of $74,622.72.

221.    This payment amount was within $15.00 of the re-tap issued by Deutsche Bank just seven days before.

222.    The same cycle of re-taps in non-round dollar amounts, just sufficient to cover interest and fees obligations and made just days before those quarterly obligations came due, repeated for this very same Note Issuer in the next 5 quarters—through March 2014.

223.    For example, SG Strategic owed an interest payment on March 31, 2013.



224.    Eleven days before that payment was due, the Individual Wrongdoers once again re-tapped the SG Strategic note, and Deutsche Bank, as the issuing institution, authorized a re-tap in another non-round dollar amount—$75,221.00.

225.    Only one day later, on March 21, 2013, the Individual Wrongdoers made an interest payment in almost the exact amount required to cover the next pending interest payment plus associated fees—a total amount of $75,215.34.

226.    This time, the payment was within $6.00 of the re-tap amount authorized the day before.

227.    Again, this pattern repeated four more times over the next year. Deutsche Bank continued to assist the Individual Wrongdoers in re-tapping the notes in an amount just sufficient to cover the next pending interest payment and associated fees, just days before the payment was made through Deutsche Bank.

228.    Deutsche Bank authorized the June 2013 re-tap of $75,813.00, for example, just one day before it received an interest and fee payment of $75,812.67, leaving a difference of just $0.33 between the re-tap Deutsche Bank authorized one day and the payment it accepted the next day.



229.    The three re-taps that followed, in the third and fourth quarters of 2013 and the first quarter of 2014, were, respectively, $76,401.00, $76,997.00, and $77,599.00. Respectively, these amounts were within $4.00, $4.92, and $4.50 of the interest and fee payments made. Deutsche Bank accepted the payments for the last two quarters of 2013 on the very same day as the re-taps, and Deutsche Bank authorized the March 2014 re-tap within a day of accepting the interest payment.



## C.    Late Payments by Note Issuers

230.    Even with the transactions and modifications described above, there were still repeated late interest payments, after which Deutsche Bank did not provide the contractually required notice to Note Issuers and their director.

231.    According to Section 4.1 of the Agency Agreements, "the Issuer shall pay to the Principal Paying Agent at least one Business Day before [] each date on which such payment in respect of the Notes becomes due …."

232.    Because Deutsche Bank served as the Principal Paying Agent for the Note Issuers, this meant that the Note Issuers were to pay Deutsche Bank at least one business day before interest and other payments on notes came due.

233.    At least 21 times from May 2014 through March 2017, Deutsche Bank accepted quarterly interest payments late. The pattern of late payments began as early as May 2014 and continued through March 2017.

234.    Further, late payments were either unexplained or attributed to factors—including blaming another Deutsche Bank branch for delays—that should have led Deutsche Bank to conduct further investigation.

235.    For example, on March 31, 2016, the late payments became so much of a concern that Paul Yetton of Deutsche Bank London emailed Trujillo (but not the Note Issuer's director as required) asking if there was "a larger problem here as we[']re not just talking about one amount?"

236.    That same day, Trujillo responded to Yetton's—and by extension, Deutsche Bank's—concern by writing that the payments were late because all the Note Issuers were using the "same bank", and that the bank was having "operational issues" that should be resolved by the following day.

237.    Deutsche Bank knew that this was not true for at least three reasons.

238.    *First*, Deutsche Bank knew that the "same bank" Trujillo was referring to was Deutsche Bank itself. In fact, Deutsche Bank had assisted in opening the sub-accounts from which payments would be made for the three Note Issuers whose payments were at issue.

239.    *Second*, if having set up the sub-accounts were not enough to alert Deutsche Bank to the fact that its accounts were the only ones Trujillo could have been referring to, the SWIFT confirmation Trujillo sent Yetton on April 1, 2016—showing SG Strategic's overdue payment had been ordered—also alerted Yetton to the fact that Deutsche Bank was on both sides of these transactions.

240.     The SWIFT confirmation below shows that Deutsche Bank New York was the originating

branch for the transfers, Deutsche Bank Trust was the intermediary (as shown at line 56D), and

Deutsche Bank London was the receiving branch (as shown at line 57D).

| | | | | | |
|---|---|---|---|---|---|
| Name: | DEUTSCHE BANK SECURITIES INC GLOBAL | | Amount: | 663,723.65 USD | |
| | 60 WALL STREET | | Dept.: | | |
| | NEW YORK, NEW YORK 10005 USA | | Auth.: | Correct | |
| | | | Date: | 3/31/2016 09:36:53 PM UMT | |
| Message | | | | | |
| | | \{1:F01DEUTUS33AXXX6891590858\} | | | |
| | | \{2:O1031736160331NWSCUS33AXXX85847149561603311736N\} | | | |
| | | \{3:\{108:WR21-15305097\}\} | | | |
| | | \{4: | | | |
| 20 | Trn Ref # | WR21-1530509718 | | | |
| 23B | Further ID | CRED | | | |
| 32A | Amount | 160331USD663723,65 | | | |
| 50K | Order. Cust. | MADISON ASSET LLC CUSTODY | | | |
| | | CLEARING SG STRATEGIC INCOME | | | |
| | | C O ADVNCD FND ADMINSTRN CYMN | | | |
| | | 27 HSPTL RD CAYMAN CORP CENTR | | | |
| 53B | Send. Corr. | /101775500008 | | | |
| 56D | Intermediary | //FW021001033 | | | |
| | | DEUTSCHE BANK TRUST CO. AMERIC | | | |
| | | NEW YORK NY | | | |
| 57D | Acct @ Inst. | /DEUTGB2LXXX | | | |
| | | DEUTSCHE BANK LONDON | | | |
| | | NY | | | |

241.     *Third*, although Trujillo told Yetton that the late payment from the Note Issuers was due to

a common issue that should be resolved by the following day, Trujillo forwarded only one SWIFT

confirmation the following day, the above SWIFT confirmation, instead of the multiple

confirmations one would expect if they were all delayed by a common issue.

242.     In fact, even on this occasion—when all the payments were late because of an issue

purportedly common to all the Note Issuers and their shared bank—the remaining payments were

not made until days later.

243.     Despite Yetton's concern that late payments were due to a "larger problem," Deutsche

Bank London allowed the pattern of late payments, and therefore the fraud, to continue through

2017.

244.    For example, in a 2017 email exchange regarding interest payments due February 28, 2017, related to notes issued by the entity later known as Diversified Real Estate, Deutsche Bank London sent an initial notification on February 23 to Trujillo and others at Biscayne and Vanguardia Holdings. Deutsche Bank then followed up on February 27, February 28, March 1, March 2, March 3, March 6, and March 8.

245.    On March 1, 2017, Deutsche Bank included the director, SGG Group, on its notifications regarding the payment for the first time.

246.    Deutsche Bank London finally received a response on March 8, 2017 from the director which simply said, "Apologies for the delay. We will revert to your email below as soon as possible."

247.    Deutsche Bank London allowed the payment to remain outstanding and did not receive the required confirmation until March 21, 2017—26 days after sending their initial notification, and 21 days after the payment's due date.

248.    Not only did Deutsche Bank repeatedly accept late payments—and do so without satisfactory explanation or any explanation at all—Deutsche Bank also failed to provide the contractually required notice to the Note Issuers and their director when payments were late.

249.    According to Section 4.3 of the Agency Agreements, if any payment was late, Deutsche Bank was to "notify by electronic mail or fax each of the other Agents and the Issuer if it has not received the amount … by the time specified for its receipt, unless it is satisfied that it will receive such amount."

250.    Despite knowing that notice should be given to the Note Issuers, notice was instead communicated to Trujillo, who had no documented connection to the Note Issuers and who Defendants knew was acting on behalf of Madison.

251.    The late note payments were numerous and persistent—another clear indicator of underlying fraud. Deutsche Bank knew that the Note Issuers frequently breached their Agency Agreement by making late payments, knew of the connection between the Note Issuers and the Individual Wrongdoers, and yet continued to work with the Individual Wrongdoers, assisting them in the underlying scheme.

252.    Finally, not only did Deutsche Bank knowingly allow the Individual Wrongdoers to persistently make late interest payments, but Deutsche Bank also knew that the Individual Wrongdoers consistently employed the strategies described above to make interest payments through the issuance of new debt or the alteration of other note terms instead of through cash payments.

253.    For example, on February 26, 2016, Diversified Real Estate made an interest payment from its Deutsche Bank account of $1,251,562.50. This payment was primarily funded by a transfer of $1,200,000 from the Global Market Step Up account, also a Deutsche Bank account.

254.    Deutsche Bank knew of the persistent issue of late interest payments, knew that the Individual Wrongdoers used cross trades to fund interest payments, yet continued to work with the Individual Wrongdoers.

**D.    Other Modifications of Notes' Terms**

255.    Deutsche Bank repeatedly extended maturity dates, increased issue caps, and otherwise modified terms of the notes. This facilitated and perpetuated the fraud by allowing the Individual Wrongdoers additional avenues to avoid repaying investors with anything other than additional money borrowed from those same investors or new ones.

256.    For example, in 2017—over a year after the entry of the SEC order—Deutsche Bank assisted the Individual Wrongdoers in amending the terms of the notes to include an option to extend maturity on the notes for up to five years.

257.    Deutsche Bank also repeatedly facilitated the extension of maturity dates on notes even before assisting the Individual Wrongdoers with the 2017 change in terms. Indeed, Paul Yetton of Deutsche Bank effectively guided Trujillo through this process.

258.    For example, on November 5, 2014, just days before the initial maturity date of November 30, 2014, Deutsche Bank received instructions to extend the maturity date on a Preferred Income note to December 20, 2015. Deutsche Bank followed these instructions and facilitated the extension of the maturity date.

259.    Deutsche Bank facilitated the extension of the maturity date on this same note at least two more times. In December 2016 Deutsche Bank facilitated the extension of the maturity date to December 20, 2017. And in July 2017, Deutsche Bank received an instruction to restructure the note, once again facilitating the extension of the maturity date, this time to June 20, 2022.

260.    Similarly, Deutsche Bank facilitated the extension of the maturity date on Diversified Real Estate notes on multiple occasions. Deutsche Bank facilitated the modification of the terms of one note in March 2015, which extended the maturity date from March 21, 2016 to February 28, 2018.

261.    Deutsche Bank also facilitated the modification of the terms of a second Diversified Real Estate note in August 2016, which extended the maturity date from August 31, 2016 to November 30, 2016. This occurred once again in November 2016, this time extending the maturity date to February 28, 2017. And, in July 2017, Deutsche Bank received instructions to restructure the note, this time extending the maturity to March 1, 2022.

262.    Additionally, on at least four different occasions, Deutsche Bank facilitated the increase of the issue amount on notes.

263.    For example, in March of 2014, Deutsche Bank advised Biscayne Capital S.A.—which is ultimately owned by Biscayne Capital Holdings and Biscayne Capital (B.V.I.)—that the cap of $25,000,000 on a Global Market Step Up note had been exceeded. Yetton wrote to an employee of Biscayne Capital S.A., "It's been brought to my attention that the note for this deal is 'up to $25,000,000' and that has been breached, current outstanding amount is $26,165,000. Was [sic] you aware of this?"

264.    Trujillo then asked SGG Group to send instructions to Deutsche Bank to increase the amount to $30,000,000, and sent Yetton an email notifying him that he "should be receiving the confirmation to increase the limit for [the note] to 30MM today…." Deutsche Bank followed these instructions and facilitated the increase of the issue amount.

265.    Just a few months later, in September of 2014, SGG Group sent instructions to increase the limit on this same note to $50,000,000. Deutsche Bank once again followed these instructions and facilitated the increase of the issue amount.

266.    Deutsche Bank also facilitated the increase of the issue amount on an SG Strategic note and a Preferred income note in 2015—doubling the limit on the SG Strategic note and increasing the limit on the Preferred Income note by $5,000,000.

267.    Contrary to the terms of the offering documents, which were known to Defendants, Defendants did not require proof of affirmative consent of the note holders to make these modifications. And, to the extent any consent was obtained, it was obtained via methods inconsistent with the offering documents. Further, to the extent Defendants sought or received any

explanation for the modifications, the explanation was often inconsistent with the nature of the modifications.

**E.      The Madison Sub-Accounts**

268.    Defendants failed to adequately investigate Madison, its relationship with the Companies and Note Issuers, and transfers into and out of the Madison sub-accounts. Ultimately, these accounts were subject to substantial misuse, and though that misuse came to Defendants' attention, they nonetheless continued to facilitate the looting of the accounts at the expense of the Companies until Defendants ended their relationships with Madison, the Companies, the rest of the Biscayne-related and South Bay-related entities, and the Individual Wrongdoers.

269.    The sub-accounts Madison established for the Companies—including the Note Issuers— were custody accounts, which are, by their nature, accounts to be used for limited purposes.

270.    Here, the accounts ostensibly existed for—among other things—holding securities, providing settlement services for trades of securities like the notes issued by the Note Issuers, and providing services related to the advance of sale or redemption proceeds on such securities.

271.    In short, the nature of these accounts meant they were not to be used for purposes outside of custody and clearing services. They were not, for example, intended to function as cash accounts through which entities would cover costs such as fees for professional services providers, distribute profit to principals, or fund day-to-day business operations.

272.    Despite this, the Individual Wrongdoers—acting through their management of Madison— treated these sub-accounts as though they were one omnibus account and used them for purposes other than custody and clearing.

273.    In fact, Madison even asked Deutsche Bank to view the accounts as one single account, explaining to Deutsche Bank that even when some accounts were overdrawn, it "had enough between all accounts if you consider ourself as one relationship."

274.    Deutsche Bank also facilitated the use of the Madison sub-accounts as cash, rather than custody accounts, transferring funds to hundreds of third parties rather than only to other Madison accounts or other counterparties to securities transactions.

275.    In May 2016, Deutsche Bank employees even circulated a report identifying unusual activity from the Madison sub-accounts not related to any securities or settlement function, including wires to individual beneficiaries and an American Express Payment.

276.    Substantially all the proceeds from issuance of new notes were deposited into these custodial accounts.

277.    Madison had no contractual or other authority to act on behalf of the Note Issuers, and Deutsche Bank never took the necessary steps to confirm Madison's authority or the source of the underlying capital.

278.    Thus, by permitting Madison to access and freely transfer assets of the Note Issuers without any authority or authorization to do so, Defendants enabled fraud, theft, and conversion of the Companies' assets by Madison, the Individual Wrongdoers, and others.

279.    Further, the funds in these accounts were subject to substantial misuse, which came to Deutsche Bank's attention.

280.    Though Deutsche Bank identified hundreds of wires from the custodial accounts not related to custodial activity as early as January 2016, the activity persisted unabated for months, even after internal Deutsche Bank communications confirmed Deutsche Bank had drawn connections between Madison and Biscayne and related suspicious activity.

> i.      *Deutsche Bank Guided Madison on How to Open Unauthorized Custody Accounts.*

281.    In 2014, Madison, through Trujillo, opened custodial sub-accounts at Deutsche Bank in the name of each of the Note Issuers.

282.    Deutsche Bank assisted Trujillo by working directly with him to open these accounts, despite both Madison's and Trujillo's lack of authority to act on the Note Issuers' behalf.

283.    Although Deutsche Bank was to act as a custodian for Madison, and Madison purported to act as a custodian for the Note Issuers, Deutsche Bank did not seek to make the Note Issuers a party to a custodial agreement and failed to require proof that Madison was authorized to act as a custodian for the Note Issuers. To the contrary, Deutsche Bank possessed the documentation identifying who was authorized to hold and receive custody of the Note Issuers' assets, and it was not Madison.

284.    Notwithstanding this knowledge, Deutsche Bank required that a custody agreement be signed only between Deutsche Bank and Madison Asset LLC, Biscayne Capital Bahamas, and Biscayne Capital BVI, not any Note Issuer.

285.    Madison lacked authority to open these accounts and could not have done so without the direct aid and guidance from Deutsche Bank. In fact, in 2017 the Note Issuer's director wrote to Trujillo asking how he could have managed to open the accounts without the approval of the directors and without signed agreements:

> Dear Gustavo, since the agreements between Madison LLC and the entities in your below email were never signed, we wonder how you could have provided clearing and custody services to these entities.
>
> What we saw as well is that the Note Programs do not have their own bank account at Deutsche Bank but they are all in the name of Madison LLC. Can you explain how you managed to do so without prior approval of the director(s) and the signed agreements?
>
> At this stage SGG cannot and will not sign any agreement with regards to outsourcing to third parties until all our questions are answered satisfactory.

286.   Deutsche Bank's assistance did not stop there.

287.   

288.

289.

290.

291.

292.

293.



294.    For example, Deutsche Bank's account opening procedures also required a submission of an anti-money laundering affidavit, sometimes referred to as an "AML affidavit."

295.    Anti-money laundering affidavits and other "Know Your Customer" efforts are required, as a matter of law and bank policy, to prevent financial institutions from participating in money laundering and other forms of fraud and to enable financial institutions to work with government and regulators to prevent and detect such activity.[4]

296.    Although Deutsche Bank purported to be "committed to the highest standards of Anti-Money Laundering,"[5]



_____

[4] "Criminals have long used money laundering schemes to conceal or 'clean' the source of fraudulently obtained or stolen funds" and "banks play an important role in helping investigative and regulatory agencies identify money-laundering entities and take appropriate action." Office of the Comptroller of the Currency, https://www.occ.treas.gov/topics/supervision-and-examination/bank-operations/financial-crime/money-laundering/index-money-laundering.html
[5] https://www.db.com/files/documents/Excerpt-of-globally-applicable-Anti-Money-Laundering-and-Anti-Financial-Crime-Standard.pdf.

ii.    *After Assisting Madison with Opening the Unauthorized Accounts, Deutsche Bank Kept the Accounts Open Despite Knowledge of Improper Use.*

300.    

301.    Deutsche Bank knew of this activity, including information about hundreds of beneficiaries of improper wires from the custodial accounts, knowledge that a majority of those wires were not related to the activity in the accounts, and knowledge of persistent account overdrafts.

302.    Despite this knowledge, Deutsche Bank repeatedly looked away, perpetuating the fraud.

a.    *Deutsche Bank Began Investigating Account Activity but Looked Away When Instructed by Biscayne Capital to Stop Asking Questions.*

303.    For example, in a 2015 email exchange between Markus Wiessler, Vice President at Deutsche Bank (Suisse), and Luciana Fernandez, an employee of Biscayne, Wiessler questioned Fernandez about the source of funds sent from a Madison account.

304.    Fernandez responded that the Note Issuer who would be sending money had a Madison sub-account and, for that reason, the money was being sent from the Madison account.

305.    In response, Wiessler continued to raise additional concerns and ask more questions about the source of the funds.

306.    Fernandez eventually responded by instructing Wiessler, the Deutsche Bank employee, to stop making inquiries and to move forward with crediting the funds at issue.

307.    Fernandez, the Biscayne employee, had no authority to require a Deutsche Bank employee to stop asking questions about a transaction Deutsche Bank was to execute.

308.    Deutsche Bank nonetheless acquiesced and credited the funds as instructed by Fernandez, despite Wiessler's concerns and despite the troubling demand to stop making inquiries.

b.     *Emails Establish That Deutsche Bank Employees Knew That a Majority of the Wires Were Not Related to Activity in the Custody Accounts and That There Were Persistent Account Overdrafts.*

309.    Wiessler's inquiries were not the only time Deutsche Bank employees raised concerns about the activities in the Madison custody accounts, nor was it the only time employees looked away, assisting in the fraud's continuation.

310.    On January 19, 2016, Scott Habura, an employee of Deutsche Bank New York, wrote to Trujillo that his team had "again" brought to his attention issues concerning the accounts, including that a majority of the wires were not related to custody activity in the accounts. The email read:

> My operations team has again brought to my attention the number of wires and the hundreds of beneficiaries for both Madison and Biscayne Bahamas, that these wires are going out to. They have concluded that the majority of these wires are not related to the custody activity in the accounts.
>
> Unfortunately we need to insist that this activity be moved to a cash account outside of Deutsche Bank's custody environment.
>
> We will be able to facilitate wires to your bank account or to other financial counterparties, but we will not be able to send out third party wires.
>
> Regards,
>
> Scott

311.    Then, on February 8, 2016, Patrick Hannon, another Deutsche Bank employee, replied to that same email chain requesting an update and writing, "The activity is persistent and we shouldn't continue to process such activity unrelated to trade settlement."

312.    On February 18, 2016, Habura told Trujillo that the issue had been flagged by risk and compliance and that Deutsche Bank could no longer process wires unrelated to securities activity:

> Gustavo,
>
> This issue has been flagged by our risk and compliance group and beginning today we can no longer process these types of wires that are unrelated to your securities activity.
>
> We will still process your securities transactions and wires that are associated with your securities activity.
>
> Regards,
>
> Scott

313.    Then, on February 23, 2016, Habura once again followed up with Trujillo on the issue, advising Trujillo that if the issues in the account were not cleared, action would be taken:

> Hello Gustavo,
>
> I just wanted to let you know that your account overdrafts are now being looked at on a daily basis and I believe if they are not cleared there will be action taken which may include closure of the relationship.
>
> Please clear these overdrafts today.
>
> Regards,
> Scott

314.    Despite these warnings, Deutsche Bank did nothing.

58

315.    Instead, despite its on-going knowledge of misuse of funds within the accounts, and despite persistent concerns and warnings from its employees, Deutsche Bank continued to allow and facilitate the use of the accounts, perpetuating the fraud.

316.    Months later, Hannon once again raised issues with the accounts. On May 17, 2016, in response to internal cash and wire reports for Madison and internal wire reports for Biscayne Bahamas, Hannon wrote:

> We've identified similar behavior with the Biscayne relationship to that of Madison with respect to wire payments.  Examples attached demonstrate individual beneficiaries and an American Express payment (don't appear to be settlement related activity).  Not sure if the Biscayne relationship is related to Madison, but thought we would include this activity in the daily email given the unusual activity.
>
>
> Regards, pat

> *iii.    Even After One Deutsche Bank Branch Finally Closed Problematic Biscayne-Related Accounts, Another Deutsche Bank Branch Was Still Willing to Take Over These Same Accounts.*

317.    Throughout 2016, Deutsche Bank Suisse sent multiple communications to Biscayne regarding the dissolution of the relationship between Deutsche Bank Suisse and Biscayne.

318.    One such communication, sent in December 2016 read, "Your clients have received in the last 3 months 3 letter [sic] in order to fulfill the requirement of the Bank or send a transfer and closing instruction. As of today we have not received any feedback or any instruction . . . we are going to forced closure [of the accounts]."

319.    Even though Deutsche Bank Suisse was moving forward with closing these accounts, a Biscayne employee responded to the December email by informing Deutsche Bank Suisse that

some of the accounts at issue were going to be transferred to Reynaldo Figueredo of Deutsche Bank Trust Companies.

320.    In fact, Figueredo had been planning on taking over these problematic accounts throughout 2016 and was working with Biscayne to open additional accounts. Figueredo moved forward with these plans even after having notice that Deutsche Bank Suisse planned to end its relationship with Biscayne.

321.    One exchange between Vanessa Simonetti at Deutsche Bank Suisse and Figueredo shows that Figueredo was directly informed that Deutsche Bank Suisse planned to end their relationship with Biscayne.

322.    On April 28, 2016, Santiago Trigo of Deutsche Bank Trust Companies responded to Simonetti that "Reynaldo [Figueredo] and I have agreed that we will exit this relationship in the US; Reynaldo will see the client tomorrow morning and communicate the decision."

323.    That, however, is not what happened. Instead, Figueredo continued to pursue these relationships to take over the problematic accounts himself at Deutsche Bank Trust Companies.

324.    An email exchange between Figueredo and Haberer started the very same day Trigo sent the above email to Simonetti. In this exchange, Haberer reached out to Figueredo to set up a meeting in Miami. After that meeting, Haberer emailed Reynaldo that he sent the information discussed during the meeting from a different email for confidentiality purposes. Later in the same email chain, Haberer told Figueredo that they had some new accounts to open in New York, and asked Figueredo if he could manage them directly.

325.    About a month later, Figueredo wrote to other Deutsche Bank Trust Companies employees explaining a plan to move forward with a relationship with Biscayne and explaining to his team that Biscayne received an order to close their accounts at Deutsche Bank Suisse. He explained that

Haberer, with whom he said he had a lot of communication, gave him the idea to work together in this manner and explained that the accounts would be coded to himself as individual relationships. He then explained that Haberer identified eight relationships related to this plan worth $49 million.

326.    Soon after, a colleague asked Figueredo if they had found a solution to the Biscayne relationship. Figueredo responded that he had met with the clients in Buenos Aires, that he understood his colleagues agreed with moving forward with the relationship, and that all that remained outstanding was to find out if the accounts that were to be transferred to him could be coded to him by only updating the KYC and without having to open new accounts.

327.    Figueredo moved forward with these relationships even though he knew that Deutsche Bank Suisse was forcing the closure of the accounts, and even though in September of 2016 he received an internal email informing him that he was to send termination letters to 53 of his accounts because they were not compliant. One of these accounts was yet another problematic Biscayne related account.

328.    Even though Figueredo, other employees at Deutsche Bank Trust Companies, employees at Deutsche Bank Suisse, and other Deutsche Bank employees knew that Deutsche Bank Suisse was forcing the closure of problematic Biscayne accounts, Deutsche Bank was still willing to continue the relationship related to these very same accounts through another branch.

> iv.    *Deutsche Bank Knew of the Underlying Fraud Not Only from its Own Documents, But Also From a 2016 SEC Cease-and-Desist Order.*

329.    In May 2016, the SEC issued a cease-and-desist order that revealed the nature of the underlying fraud being perpetrated by the Individual Wrongdoers.

330.    The order—issued against and with the consent of the Individual Wrongdoers—identified conflicts of interest among the Individual Wrongdoers, Biscayne, South Bay, and the Note Issuers.

331.    Further, the order indicated that there was insufficient revenue or operating cash to meet maturing debt.

332.    Despite the order, and despite its own inquiries referenced above, Deutsche Bank continued to facilitate the misconduct.

333.    In fact, Trujillo was still able to orchestrate transactions through the Madison accounts into November and December of 2016, many months after the SEC order.

### THE MAGNITUDE OF MISAPPROPRIATION AND LOOTING

334.    Defendants' decisions to ignore clear evidence of fraud and suspicious activity, to turn a blind eye toward other obvious irregularities, and ████████████████████████████████████ ████████████████████████████████████ enabled the Individual Wrongdoers to misappropriate and loot the Companies for years on a massive scale. Indeed, Deutsche Bank profited by enabling and assisting this conduct because of its fee structure and the money it earned as a result of the fraudulent scheme.

335.    The example of one Note Issuer, Global Market Step Up, reveals the enormous damage Defendants caused. During the time period Global Market Step Up held accounts with Defendants, Defendants' own records show that $141,262,465.63 flowed into and out of those accounts. Of that amount, it appears that only $698,000.00 (less than 0.5%) went to the recipient entities for whom the Note Issuers represented they were raising funds. The chart below illustrates the sums of inflows and outflows for the life of the Global Market Step Up sub-account with Deutsche Bank.



336.    Of the more than $134 million that went to destinations other than Deutsche Bank and the intended recipients of note proceeds, a staggering $104,259,459.46 was transferred into the accounts of other Note Issuers. This amount reflects efforts to repay existing debt to prop up the scheme. And over $17 million flowed into other entities controlled, managed, or owned by the Individual Wrongdoers. Over $2.1 million (approximately three times as much as went to the intended recipient entities) was used to pay bribes to government officials in Latin America. Another $3.5 million went to the Biscayne-named entities.

337.    The chart below illustrates the sums of inflows and outflows from the Global Market Step Up for just one month, April 2016.



338.    Even though over $14.5 million flowed through accounts with Defendants during that one month, less than 1% went to an intended recipient of the note recipients.

339.    Almost $10 million (68%) of the $14 million was transferred to the accounts of other Note Issuers, repaying existing debt to prop up the scheme.

340.   In short, had Deutsche Bank investigated earlier, these indicia of fraud would have been obvious well before the scheme collapsed in July 2018.

341.   Unfortunately, the enormous financial damage created through Global Market Step Up was not isolated.

342.   Another Note Issuer, SG Strategic, provides another example of the enormous damage Defendants caused.



343.   During the time SG Strategic held accounts with Defendants, Defendants' own records show that $278,002,979.49 flowed into and out of those accounts. Of that amount, it appears that only $6,723,828.85 (about 1%) went to the recipient entities for whom the Note Issuers represented they were raising funds. A total of $193,902,087.99 (almost 32%) was transferred into the accounts of other Note Issuers—again effectively repaying existing debt to continue to prop up the scheme. Additionally, almost $19 million flowed into other entities controlled, managed, or owned by the Individual Wrongdoers. Over $150,000 went directly to the Individual Wrongdoers themselves, almost $450,000 was used to pay bribes to government officials in Latin America, and over $22 million went to Biscayne-named entities.

344.    The accounting of the other Note Issuers paints a similar story. During the time that ORC (now Diversified Real Estate) held accounts with Defendants, Defendants' own records show that out of the $116,531,665.75 that flowed into and out of those accounts, only $855,000 (less than 0.5%) went to the recipient entities for whom the Note Issuers represented they were raising funds.



345.    Similarly, during the time that Preferred Income held accounts with Defendants, the Liquidators determined from Defendants' own records that out of the $78,718,570.96 that flowed into and out of those accounts, only $1,301,000.00 (less than 0.5%) went to the recipient entities for whom the Note Issuers represented they were raising funds.



346.    Despite claiming to have rigorous compliance and risk management policies, Defendants did nothing to safeguard any of these assets or seriously investigate the multiple indications that the Individual Wrongdoers were so wildly misusing the Note Issuers' funds.

347.    Defendants also never informed the Note Issuers' director, through Mr. Oosten or anyone else at his company, SGG, of any of the misuse of funds. SGG is a multi-jurisdictional, professional group of experienced directors.

348.    Had Defendants alerted the Note Issuers' director or even posed basic questions to the director, the fraudulent scheme would have ended years earlier and hundreds of millions of dollars in losses could have been avoided.

**CLAIMS FOR RELIEF**

**COUNT ONE: FRAUDULENT TRADING**
**(Cayman Islands Companies Law § 147)**
**Against All Defendants**

349.    The Liquidators incorporate the allegations of Paragraphs 1 through 348 of their complaint as if repeated here.

350.    The Individual Wrongdoers carried out the business of the Note Issuers with the intent to defraud creditors and engage in fraudulent transactions. The Individual Wrongdoers did this by using proceeds from the notes to pay interest payments and personal expenses, instead of using proceeds for their stated purpose. Additionally, the Individual Wrongdoers engaged in the swap transactions, which were used to avoid millions of dollars in pending maturity obligations. The Individual Wrongdoers also relied on the re-tap transactions to cover interest payments on existing debt.

351.    Defendants were also knowingly a party to the scheme to defraud creditors because Defendants provided substantial assistance to the Individual Wrongdoers and their co-conspirators by aiding them in opening the unauthorized sub-accounts. ███████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

352.    Defendants were knowingly a party to the scheme to defraud creditors because Defendants facilitated the swap transactions despite knowing that this would result in the Individual Wrongdoers' avoidance of millions of dollars in pending maturity obligations and despite knowing that these transactions were inconsistent with the offering documents provided to the bank. Defendants also facilitated the re-tap transactions which were used by the Individual Wrongdoers pay off interest payments and continue their scheme.

353.    The Note Issuers were damaged as a result of Defendants' assistance with this fraudulent activity.

354.    Defendants should be liable to the Liquidators for a contribution to the assets of the Companies' estates for distribution to their creditors.

### COUNT TWO: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### Against All Defendants

355.    The Liquidators incorporate the allegations of Paragraphs 1 through 354 of their complaint as if repeated here.

356.    The Individual Wrongdoers and Madison breached their fiduciary duty to the Note Issuers through the perpetration of the underlying scheme.

357.    Defendants knew that the Individual Wrongdoers and Madison were in breach of their fiduciary duty. As described above, Defendants knew, among other things, that: (1) the Individual Wrongdoers engaged in three separate swap transactions, whose nature was inconsistent with the offering documents Defendants had in its possession; (2) Madison had no authority to open custody accounts in the name of each Note Issuer; (3) there was improper activity within the custody accounts including numerous wires unrelated to the custody activity; (4) interest payments on notes were consistently late and therefore in breach of the Agency Agreements; and (5) the

Individual Wrongdoers relied on improper re-tap transactions in order to cover interest payments on existing debt.

358.    Defendants provided substantial assistance to the Individual Wrongdoers in their breach of fiduciary duty by, among other things, facilitating the swap transactions despite knowing that this would result in the Individual Wrongdoers' avoidance of millions of dollars in pending maturity obligations and despite knowing that these transactions were inconsistent with the offering documents provided to Defendants.

359.    Defendants also provided substantial assistance to the Individual Wrongdoers by aiding them in opening the unauthorized sub-accounts. ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████

360.    Defendants' aiding and abetting the Individual Wrongdoers in their breach of fiduciary duty proximately caused damages to the Companies.

## COUNT THREE: BREACH OF FIDUCIARY DUTY
### Against Deutsche Bank

361.    The Liquidators incorporate the allegations of Paragraphs 1 through 360 of their complaint as if repeated here.

362.    Deutsche Bank had a fiduciary relationship with and owed fiduciary duties to the Companies that arose through the Agency Agreements, which designated the bank as the Companies' agent, granted the bank broad authority to act on behalf of the Companies, and did not circumscribe or effectively limit that agency relationship.

363.    Deutsche Bank breached its fiduciary duties by, among other things, facilitating the swap transactions, by repeatedly accepting late payments, and by facilitating the re-tap transactions.

364.    



365.    As a proximate result of Deutsche Bank's breach of its duties, the Companies have been damaged.

## COUNT FOUR: AIDING AND ABETTING CONVERSION
### Against All Defendants

366.    The Liquidators incorporate the allegations of Paragraphs 1 through 365 of their complaint as if repeated here.

367.    The Individual Wrongdoers converted hundreds of millions of dollars from the Note Issuers through their fraudulent scheme.

368.    Defendants knew that the Individual Wrongdoers had converted millions of dollars. As described above in Count One, Defendants knew, among other things, that: (1) the Individual Wrongdoers engaged in three separate swap transactions, whose nature was inconsistent with the offering documents Defendants had in their possession; (2) Madison had no authority to open custody accounts in the name of each Note Issuer; (3) there was improper activity within the custody accounts including numerous wires unrelated to the custody activity; (4) interest payments on notes were consistently late and therefore in breach of the Agency Agreements; and (5) the Individual Wrongdoers relied on improper re-tap transactions in order to cover interest payments on existing debt.

369.    Defendants provided substantial assistance to the Individual Wrongdoers in their conversion by, among other things, facilitating the swap transactions despite knowing that this

would result in the Individual Wrongdoer's avoidance of millions of dollars in pending maturity obligations and despite knowing that these transactions were inconsistent with the offering documents provided to Defendants.

370.    Defendants also provided substantial assistance to the Individual Wrongdoers by aiding them in opening the unauthorized sub-accounts. 

371.    Defendants aided and abetted the Individual Wrongdoers and their co-conspirators in their conversion, and in doing so, proximately caused damages to the Companies.

**COUNT FIVE: BREACH OF CONTRACT**
**Against Deutsche Bank**

372.    The Liquidators incorporate the allegations of Paragraphs 1 through 371 of their complaint as if repeated here.

373.    Deutsche Bank entered into a valid, binding, and enforceable Agency Agreement with each of the Note Issuers.

374.    Pursuant to these agreements Deutsche Bank would facilitate the issuance of the notes by the Note Issuers, as well as the periodic payment of principal and interest on the Notes.

375.    According to the Agency Agreements, Deutsche Bank was not to carry out an instruction in circumstances where the bank had reasonable grounds to believe that the instruction was part of a scheme to defraud the Note Issuers.

376.     However, Deutsche Bank repeatedly accepted late interest payments, facilitated the swap despite knowing this would result in the Individual Wrongdoer's avoidance of millions of dollars in pending maturity obligations, and facilitated the re-tap transactions which assisted the Individual Wrongdoers with covering interest payments on existing debt.

377.     Additionally, the Agency Agreements required Deutsche Bank to notify the director of a Note Issuer if any payment was late.

378.     However, instead of giving notice to the proper party, Deutsche Bank gave notice to Trujillo, which allowed the Individual Wrongdoers to continue their scheme without notice to the director of the Note Issuers.

379.     In addition, pursuant to the Agency Agreements Deutsche Bank was authorized to accept payments of the notes only in currency. In breach of this term of the contracts, Deutsche Bank allowed the Individual Wrongdoers to repay notes in kind with newly issued notes. Each such breach by Deutsche Bank increased the liabilities of the Note Issuers and the ensuing losses.

380.     The Note Issuers were damaged as a result of Deutsche Bank's breach of the Agency Agreements.

## COUNT SIX: NEGLIGENCE
### Against Deutsche Bank

381.     The Liquidators incorporate the allegations of Paragraphs 1 through 380 of their complaint as if repeated here.

382.     Deutsche Bank owed the Note Issuers a duty of ordinary and reasonable care applicable to banks and financial institutions.

383.     Deutsche Bank breached its duty of care by, among other things, facilitating the swap transactions, ████████████████████████████████████████████ ████ by creating accounts for the Note Issuers without making the Note Issuers a party to the

relevant agreements, by instructing the Individual Wrongdoers in how to avoid the bank's own policies and assisting them in transferring the Note Issuers' assets into the Madison sub-accounts, and by facilitating the re-tap transactions.

384.    The Note Issuers were damaged as a direct and proximate result of Deutsche Bank's negligence.

### COUNT SEVEN: VIOLATION OF THE FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT
**Against All Defendants**

385.    The Liquidators incorporate the allegations of Paragraphs 1 through 384 of their complaint as if repeated here.

386.    Defendants violated Florida's Civil Remedies for Criminal Practices Act, FLA. STAT. §§ 772.101-772.19, by committing, conspiring to commit, or endeavoring to commit a pattern of criminal activity and by associating with an enterprise to conduct or participate in a pattern of criminal activity.

387.    For purposes of this Count, the Liquidators allege that Defendants (a) acted with the knowledge and intent required to violate the criminal statutes identified in the pattern of criminal activity described below and/or (b) were willfully blind or deliberately ignorant of their association with the pattern of criminal activity described below.

*The Enterprise*

388.    Defendants have committed a pattern of criminal activity through their participation in an association-in-fact enterprise composed of the persons and entities described above, all so that the Individual Wrongdoers could utilize the Companies, and in particular the Note Issuers, to solicit funds from innocent investors in the form of note issuances, and then steal those funds

from the Companies instead of using the funds for their intended purpose and for the benefit of the Companies and the investors who purchased the notes.

389.    The members of the enterprise played specific roles in the issuance of notes and the distribution of the proceeds of those issuances, as described above. Defendants exercised their authority with respect to these note issuances pursuant to their written agreements with the Note Issuers and/or Defendants' course of dealing with the Companies and the Individual Wrongdoers. In some instances, Defendants performed actions themselves as part of the enterprise, while in other instances, as described above, they followed the instructions of other members of the enterprise or gave instructions to other members of the enterprise. Accordingly, Defendants had the ability to direct and did direct other members of the enterprise.

390.    Regardless of the specific entity that played any particular role in any particular note issuance transaction, these roles were well-defined, established, and accepted by the members of the enterprise. As alleged above, each of these roles was essential to the note issuance process, and the enterprise maintained this structure and hierarchy to conduct numerous note issuances, and distribute the proceeds of those issuances, over a period of many years.

391.    The enterprise included at least the following entities and individuals that typically played the following role's in the note issuance process:

(a)     The Individual Wrongdoers, who each purported to act on behalf of the Companies, and conspired with each other and the other members of the enterprise to misuse the Note Issuer entities to enrich themselves by engaging in the swap transactions, re-tap transactions, and the other conduct described above;

(b)     Madison, which worked with the Individual Wrongdoers and other members of the enterprise to perpetuate the enterprise by moving the investment advisor for the Note Issuers off-

shore to evade the SEC's jurisdiction and inquiry and to utilize the sub-accounts at Deutsche Bank to loot the proceeds of the note issuances;

(c)      Trujillo, who acted on Madison's behalf as part of the enterprise; and

(d)      Defendants, which fulfilled numerous roles in the enterprise as described above, including providing banking and custody account services with knowledge of the illegal use of those services and/or a blind eye toward manner in which their services were used and  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨

392.      Defendants and the other members of the enterprise shared the common purpose of obtaining pecuniary gain, including money, in connection with the note issuance transactions.

393.      Defendants participated in the enterprise by, among other things, facilitating the issuance of fraudulent notes, collecting and distributing the proceeds of those note issuances, advising other members of the enterprise as to how they could evade detection of their wrongdoing, and earning fees from the activities of the enterprise and its other members.

394.      The association in fact between the members of the enterprise constitutes an association-in-fact enterprise pursuant to FLA. STAT. § 772.102(3).

### *The Pattern of Criminal Activity*

395.      Defendants engaged in a pattern of criminal activity consisting of two or more separate and distinct incidents of criminal activity. Defendants engaged in this pattern of criminal activity over several years and in connection with numerous similar note issuance transactions. The incidents of criminal activity include, but are not limited to, those set forth below:

### a.    Theft (FLA. STAT. § 812.014)

396.    On two or more occasions Defendants, individually and as parties to the crime, committed, attempted to commit, or endeavored to commit acts involving theft.

397.    As alleged above, Defendants repeatedly assisted the Individual Wrongdoers in raising funds from investors through note issuances and then distributed the proceeds of those issuances to individuals and entities who were not entitled to the use of those proceeds, instead of directing the proceeds of the issuances to the Companies who were their intended recipients.

398.    Defendants also knowingly and intentionally assisted the Individual Wrongdoers and Madison in improperly and illegally transferring the Note Issuers' and Companies' assets into the Madison sub-accounts.

399.    The proceeds of the note issuance transactions and the cash and securities in the Companies' accounts with Defendants constitute property within the meaning of FLA. STAT. § 812.012(4)(b).

400.    Defendants' violations of FLA. STAT. § 812.014 constitute criminal activity pursuant to FLA. STAT. § 772.102(1)(a)(20).

### b.    Bank Fraud (18 U.S.C. § 1344)

401.    On two or more occasions Defendants, individually and as parties to the crime, conspired with the Individual Wrongdoers to execute a scheme or artifice to obtain money, funds, securities, or other property under the custody or control of a financial institution, by means of false or fraudulent pretenses or representations.

402.    Defendants' violations of 18 U.S.C. § 1344 constitute criminal activity pursuant to FLA. STAT. § 772.102(1)(b) and 18 U.S.C. § 1961(1).

### c. Laundering of Monetary Instruments (18 U.S.C. § 1956)

403.   On two or more occasions Defendants, individually and as parties to the crime, conspired

with the Individual Wrongdoers, Trujillo, and Madison, and committed acts involving the

laundering of monetary instruments, including but not limited to conducting financial

transactions involving the proceeds of some form of unlawful activity knowing that the

transaction was designed in whole or part to conceal or disguise the nature, source, ownership, or

control of the proceeds of specified unlawful activity in violation of 18 U.S.C.

§ 1956(a)(1)(B)(i).

404.   Defendants' violations of 18 U.S.C. § 1956(a)(1)(B)(i) constitute criminal activity

pursuant to FLA. STAT. § 772.102(1)(b) and 18 U.S.C. § 1961(1).

### d. Bribery and Violations of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-2)

405.   On two or more occasions Defendants, individually and as parties to the crime, conspired

with the Individual Wrongdoers, and committed acts involving willfully and corruptly making an

offer, payment, promise to pay, and authorization of the payment of money and other things of

value, to a foreign official or to a person, while knowing that all or part of such money or thing

of value would be and had been offered, given, or promised to a foreign official, for purposes of

(i) influencing acts and decisions of such foreign official in his or her official capacity; (ii)

inducing such foreign official to do and omit to do acts in violation of the lawful duty of such

official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his

or her influence with a foreign government and agencies and instrumentalities thereof to affect

and influence acts and decisions of such government and agencies and instrumentalities, in order

to assist the Individual Wrongdoers and others in obtaining and retaining business for and with,

and directing business to the Individual Wrongdoers and others.

406.     For example, Chatburn, who was indicted for money laundering and violations of the Foreign Corrupt Practices Act, made payments from the Companies' accounts at Deutsche Bank to entities involved in the PetroEcuador bribery and Foreign Corrupt Practices Act scandal. These funds should not have been used for these purposes, and the Companies were injured by reason of these transactions.

407.     Defendants' violations of 18 U.S.C. § 1956(a)(1)(B)(i) constitute criminal activity pursuant to FLA. STAT. § 772.102(1)(b) and 18 U.S.C. § 1961(1)(A).

### *The Incidents of Criminal Activity in Which Defendants Participated are Related*

408.     The incidents of criminal activity described above had, among other things, the same or similar intents, results, victims, and methods of commission.

409.     The incidents of criminal activity described above have the same or similar intents in that their purpose was to enrich Defendants and the Individual Wrongdoers at the expense of the Companies and the investors who purchased notes.

410.     The incidents of criminal activity described above have the same or similar results, in that Defendants and the Individual Wrongdoers actually obtained personal property, including but not limited to the Companies' money, through illegal means.

411.     The incidents of criminal activity described above have the same or similar victims: the Companies and their investors who purchased notes as part of the note issuance transactions.

412.     The methods by which Defendants committed and participated in the incidents of criminal activity were the same or similar, including by way of example and not limitation, distributing the proceeds of note issuance transactions contrary to the relevant offering documents for those transactions.

413.    The incidents of criminal activity described above are interrelated by distinguishing characteristics and are not isolated incidents. The incidents involve the same or similar methods of commission, the same or similar benefits to Defendants, and the same or similar injuries to the Companies.

### *Defendants' Violations of Florida's Civil Remedies for Criminal Practices Act Proximately Caused Injury to the Companies*

414.    Defendants' behavior directly targeted the Companies. The Companies' liabilities for the note issuance transactions and the theft of the proceeds of those transactions were controlled and known to Defendants, who played an active and integral part in the transactions. As a result, the Companies injuries flow directly from incidents of criminal activity in which Defendants participated that constitute part of a pattern of criminal activity.

415.    The Companies have been injured by reason of Defendants' violations of Florida's Civil Remedies for Criminal Practices Act, and the Liquidators are entitled to recover threefold the actual damages the Companies have sustained pursuant to FLA. STAT. § 772.104(1).

416.    Pursuant to FLA. STAT. § 772.185, the Liquidators are entitled to an award of their attorney's fees that shall be taxed as costs.

### COUNT EIGHT: VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR THEFT OR EXPLOITATION STATUTE
### Against Deutsche Bank and Deutsche Bank Trust Companies

417.    The Liquidators incorporate the allegations of Paragraphs 1 through 416 of their complaint as if repeated here.

418.    The Companies have been injured by reason of violations of Florida's theft statutes, FLA. STAT. §§ 812.012-812.037.

419.    Deutsche Bank and Deutsche Bank Trust Companies are liable to the Liquidators pursuant to Florida's Civil Remedy for Theft or Exploitation statute, FLA. STAT. § 772.11,

because they were actually aware that the Individual Wrongdoers and Madison were violating one or more of Florida's theft statutes, FLA. STAT. §§ 812.012-812.037, and Deutsche Bank and Deutsche Bank Trust Companies assisted and conspired with the Individual Wrongdoers and Madison to accomplish those violations of Florida's theft statutes.

420.    There is clear and convincing evidence to support the allegations of this Count.

421.    The Liquidators have timely made the statutory demand required by FLA. STAT. § 772.11(1) and Deutsche Bank and Deutsche Bank Trust Companies have not complied with that demand.

422.    The Liquidators are entitled to recover threefold the actual damages the Companies have sustained pursuant to FLA. STAT. § 772.11(1).

423.    Pursuant to FLA. STAT. § 772.11(1), the Liquidators are entitled to an award of their attorney's fees and court costs in the trial and appellate courts.

## STATEMENT OF RELIANCE ON FOREIGN SOURCES OF LAW

Pursuant to Federal Rule of Civil Procedure 44.1, the Liquidators give notice that this complaint raises issues of foreign law, including that of the Cayman Islands and the United Kingdom, with respect to certain of the claims alleged in the complaint. The Liquidators reserve the right to rely on and utilize any source to prove and resolve any issues of foreign law in accordance with the Federal Rules of Civil Procedure.

## JURY DEMAND

The Liquidators demand a trial by jury at to all claims they have asserted in this complaint.

## RELIEF SOUGHT

The Liquidators respectfully request that a judgment be entered in their favor against Defendants for the following relief:

    a.  Damages, including where applicable treble damages;

    b.  A contribution to the Companies pursuant to Section 147 of the Cayman Islands Companies Law;

    c.  Pre-judgment interest to the maximum extent provided by any applicable law;

    d.  Post-judgment interest;

    e.  Attorney's fees and expenses of litigation; and

    f.  Any such other relief the Court deems just and proper at law or in equity.

Respectfully submitted this 6th day of July, 2021.

/s/  *John H. Rains IV*
Frank M. Lowrey IV (*pro hac vice forthcoming*)
Georgia Bar No. 410310
*lowrey@bmelaw.com*
Ronan P. Doherty (*pro hac vice forthcoming*)
Georgia Bar No. 224885
*doherty@bmelaw.com*
John H. Rains IV
Florida Bar No. 0056859
Georgia Bar No. 556052
*rains@bmelaw.com*
Amanda Kay Seals (*pro hac vice forthcoming*)
Georgia Bar No. 502720
*seals@bmelaw.com*
Michael B. Jones (*pro hac vice forthcoming*)
Georgia Bar No. 721264
*jones@bmelaw.com*
Juliana Mesa (*pro hac vice forthcoming*)
Georgia Bar No. 585087
*mesa@bmelaw.com*
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, Georgia 30309

Telephone: (404) 881-4100
Facsimile: (404) 881-4111

Eduardo F. Rodriguez
Florida Bar No. 36423
*eddie@efrlawfirm.com*
EFRLAWFIRM
1 Alhambra Plaza, Suite 1225
Coral Gables, FL 33134
Telephone: (305) 340-0034

***Attorneys for Plaintiffs***