**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

MICHAEL PEARSON, et al.,

    Plaintiffs,

    v.

DEUTSCHE BANK AG, et al.,

    Defendants.

CASE NO. 1:21-CV-22437-
Bloom/Otazo-Reyes

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT**

#3300566v1

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES .......................................................... iii

INTRODUCTION ......................................................................... 1

ARGUMENT AND CITATION OF AUTHORITY .......................... 2

**I.**     The complaint is sufficiently particular and not a shotgun pleading. ...................... 2

**II.**    The *in pari delicto* doctrine does not absolve Defendants of liability on the pleadings. ........................................................................ 4

    **A.**    The presence of innocent insiders and a legitimate purpose for the Companies defeats the *in pari delicto* doctrine. ......................................... 4

    **B.**    *In pari delicto* does not apply to the Liquidators' § 147 claim. .......... 6

**III.**   The Liquidators' allegations of Defendants' knowledge and assistance are sufficient to support their secondary liability claims. ................................ 7

    **A.**    The Liquidators allege that the Defendants had actual—rather than merely constructive—knowledge of the Individual Wrongdoers' fraud. ............... 7

    **B.**    Through both action and inaction, Defendants substantially assisted in the wrongdoing. .................................................................. 11

    **C.**    The same allegations more than suffice for the Cayman Islands Company Law § 147 claim, which imposes a lower knowledge threshold. ............. 14

**IV.**   Because Defendants' knowledge and relationships gave rise to various extra-contractual duties, both the breach of fiduciary duty and negligence claims survive. ................................................................... 15

    **A.**    Though the Agency Agreement created Deutsche Bank's fiduciary duties, the independent tort doctrine does not bar the Liquidators' tort claims. ............. 16

    **B.**    Defendants owed a duty of care to even the non-customer Companies. ......... 17

**V.**    The Complaint states a breach of contract claim. .................................. 19

    **A.**    Defendants clearly understand which contractual provisions are relevant to the Liquidators' contract claims. ................................................. 19

    **B.**    Deutsche Bank's acceptance of in-kind payments violated the Agency Agreements. ................................................................... 20

    **C.**    Because Deutsche Bank had reasonable grounds to believe that certain instructions were part of a scheme to defraud, following those instructions violated the Agency Agreements. .................................................. 21

**VI.**   The Liquidators' allegations support the Florida statutory claims. ....................... 22

**A.** **Because at least some elements of the offenses occurred in Florida, extraterritoriality does not bar the Liquidators' claims.**................................ 22

**B.** **The Liquidators allege facts—not just legal conclusions—in support of their Florida statutory claims.**.................................................................................. 26

**CONCLUSION** ............................................................................................................ 26

# TABLE OF AUTHORITIES

*625 Fusion, LLC v. City of Fort Lauderdale,*
        526 F. Supp. 3d 1253 (S.D. Fla. 2021) ................................................................2

*Absolute Activist Value Master Fund Ltd. v. Devine,*
        233 F. Supp. 3d 1297 (M.D. Fla. 2017) ..........................................................24–25

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.,*
        219 F.3d 519 (6th Cir. 2000) ..............................................................11, 13–14

*Alhassid v. Bank of Am., N.A.,*
        60 F. Supp. 3d 1302 (S.D. Fla. 2014) .................................................................2

*Allen v. USAA Cas. Ins. Co.,*
        790 F.3d 1274 (11th Cir. 2015) .........................................................................2

*Am. Pegasus SPC v. Clear Skies Holding Co.,*
        1:13-CV-03035-ELR, 2015 WL 10891937 (N.D. Ga. Sept. 22, 2015).........................6–7

*Arthur v. JP Morgan Chase Bank N.A.,*
        569 F. App'x 669 (11th Cir. 2014) ..............................................................22–23

*Boca Raton Sailing v. Scottsdale Ins. Co.,*
        No. 18-CV-81236, 2019 WL 7904805 (S.D. Fla. Mar. 18, 2019).............................19–20

*Calixto v. BASF Constr. Chems., LLC,*
        No. 07–60077–CIV, 2008 WL 2490454 (S.D. Fla. June 19, 2008) ...................................2

*Carl's Furniture, Inc. v. APJL Consulting, LLC,*
        15-60023-CIV, 2015 WL 1467726 (S.D. Fla. Mar. 30, 2015) ........................................17

*CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*
        3:16-CV-186-J-34JRK, 2018 WL 905752 (M.D. Fla. Feb. 15, 2018) .............................17

*Chang v. JPMorgan Chase Bank, N.A.,*
        845 F.3d 1087 (11th Cir. 2017) ...........................................................9, 11, 18

*F.D.I.C. v. Floridian Title Grp. Inc.*
        972 F. Supp. 2d 1289 (S.D. Fla. 2013) ..............................................................16

*Freeman v. JPMorgan Chase Bank N.A.*
        675 F. App'x 926 (11th Cir. 2017) ....................................................................18

*Gevaerts v. TD Bank, N.A.*
        56 F. Supp. 3d 1335 (S.D. Fla. 2014) ............................................................9, 13

*Glob. Quest, LLC v. Horizon Yachts, Inc.*,
    849 F.3d 1022 (11th Cir. 2017) ...................................................17

*In re Las Vegas Casino Lines, LLC*,
    454 B.R. 223 (Bankr. M.D. Fla. 2011). ...................................................24

*In re Mouttet*,
    493 B.R. 640 (Bankr. S.D. Fla. 2013) ...................................................26

*In re Pers. & Bus. Ins. Agency*,
    334 F.3d 239 (3d Cir. 2003)...................................................6

*Insight Securities, Inc. v. Deutsche Bank Trust Cos. Am.*,
    No. 20-23864-CIV, 2021 WL 3473763 (S.D. Fla. Aug. 6, 2021) ...................................19

*Kalisch v. Maple Trade Fin. Corp.*,
    No. 06-01717, 2007 WL 1580049 (Bankr.S.D.N.Y.2007)...................................................4

*Kyle K. v. Chapman*,
    208 F.3d 940 (2000)...................................................3

*Lesti v. Wells Fargo Bank, N.A.*,
    960 F. Supp. 2d 1311 (M.D. Fla. 2013)...................................................9

*Limehouse v. Smith*,
    797 So. 2d 15 (Fla. Dist. Ct. App. 2001) ...................................................20

*Loewe v. Seagate Homes, Inc.*,
    987 So. 2d 758 (Fla. Dist. Ct. App. 2008) ...................................................21

*Mills v. Barker*,
    664 So. 2d 1054 (Fla. Dist. Ct. App. 1995) ...................................................15

*Mock v. Bell Helicopter Textron, Inc.*,
    373 F. App'x 989 (11th Cir. 2010) ...................................................3, 21

*O'Halloran v. PricewaterhouseCoopers LLP*,
    969 So. 2d 1039 (Fla. Dist. Ct. App. 2007) ...................................................4–5

*Perlman v. Alexis*,
    09-20865-CIV, 2009 WL 3161830 (S.D. Fla. Sept. 25, 2009)...................................................4

*Perlman v. Wells Fargo Bank, N.A.*,
    559 F. App'x 988 (11th Cir. 2014) ...................................................7, 9, 11

#3300566v1

*Peterson v. Aaron's, Inc.*,
No. 1:14-CV-1919-TWT, 2017 WL 4390260 (N.D. Ga. Oct. 3, 2017) ...........................10

*Pinson v. JPMorgan Chase Bank, N.A.*,
942 F.3d 1200 (11th Cir. 2019) ..........................................................................3

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
917 F.3d 1249 (11th Cir. 2019) ..........................................................................3

*Receiver for Lancer Mgmt. Grp. LLC v. Taubman*,
No. 05-60199-CIV, 2007 WL 984452 (S.D. Fla. Mar. 27, 2007) ......................................2

*RJR Nabisco, Inc. v. European Cmty.*,
579 U.S. 325 (2016)........................................................................................25

*Safari Ltd. v. Adonix Transcomm, Inc.*,
No. 09-CV-21289, 2009 WL 10668265 (S.D. Fla. Sept. 1, 2009) .....................................2

*Spears v. SHK Consulting & Dev., Inc.*,
338 F. Supp. 3d 1272 (M.D. Fla. 2018)..........................................................16–17

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*,
110 So. 3d 399 (Fla. 2013).............................................................................16

*Weiland v. Palm Beach Cnty. Sheriff's Off.*
792 F.3d 1313 (11th Cir. 2015) ........................................................................3

*Wiand v. Wells Fargo Bank, N.A.*,
938 F. Supp. 2d 1238 (M.D. Fla. 2013).............................................................17

**Statutory Authority**

Fla. Stat. § 772.102 ......................................................................................25

Fla. Stat. § 895.01 .......................................................................................25

Fla. Stat. § 910.005 ................................................................................23–25

11 U.S.C. § 101...........................................................................................19

18 U.S.C. § 1344 ........................................................................................23

18 U.S.C. § 1956.........................................................................................23

18 U.S.C. § 1961..........................................................................................25

**<u>Foreign Authority</u>**

*In re ICP Strategic Credit Income Fund, Ltd.,*
    2014 (2) CILR 1, 15 May 2014 .......................................................................................6

*Re BCCI, Banque Arabe v. Morris,*
    [2001] 1 BCLC 263 .......................................................................................................15

*Stanford Int'l Bank Ltd. v. HSBC Bank plc,*
    [2021] EWCA Civ 535 ..................................................................................................21

## INTRODUCTION

No reasonable construction of the Liquidators'[1] complaint[2] casts Defendants as unwitting bystanders offering routine banking services that their customers happened to exploit in a fraud scheme. The Liquidators do not allege merely that Defendants *should have* known about the Individual Wrongdoers' looting of the Companies, but that Defendants investigated the activity and actually *did* know. The complaint further alleges that, armed with that knowledge, Defendants coached the Individual Wrongdoers and their co-conspirators on how to avoid scrutiny and continue their conduct without detection.

For example, Defendants identified hundreds of overdrafts and wires from the Companies' accounts—all activity wholly inconsistent with the accounts' purpose. Defendants' own policies required them to close accounts or refuse to process transactions in response to this activity. Instead, Deutsche Bank employees encouraged the Individual Wrongdoers to bring accounts in line *just enough* to avoid more noise within the Bank, all to maintain the revenue Defendants reaped from their relationships with the Individual Wrongdoers. *E.g.,* Doc. 31 ¶¶ 319–20, 325.

So, far from playing a merely administrative or ministerial role, the Liquidators allege Defendants actively assisted the Individual Wrongdoers' fraud by, among other things, coaching them to avoid the Bank's internal controls. Defendants' assistance had predictable results: The Individual Wrongdoers continued to loot the Companies—taking more money over a longer period of time—all with Deutsche Bank's help. These allegations, taken as true and with inferences construed in the Companies' favor at this stage, state a claim to relief.

---

[1] Capitalized terms refer to those terms as defined in the First Amended Complaint. Doc. 31.
[2] References to the "complaint" refer to the First Amended Complaint, Doc. 31, and page numbers in citations to the complaint and other documents in the record refer to the page numbers found in the header affixed by the Court's electronic filing system.

#3300566v1

1

## ARGUMENT AND CITATION OF AUTHORITY

"On a motion to dismiss, the Court simply determines whether the Complaint has plead sufficient facts to state a cause of action," and it is sufficient to state a claim "under any [jurisdiction's] law." *Safari Ltd. v. Adonix Transcomm, Inc.*, No. 09-CV-21289, 2009 WL 10668265, at *2 (S.D. Fla. Sept. 1, 2009). The Court must assume the truth of the facts as pleaded and construe both the facts alleged and "all reasonable inferences" therefrom in plaintiffs' favor. *625 Fusion, LLC v. City of Fort Lauderdale*, 526 F. Supp. 3d 1253, 1263 (S.D. Fla. 2021). These obligations combine to allow a court to dismiss only if "no construction of the factual allegations will support the cause of action." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (internal quotations omitted).

Though the parties dispute the law governing the Liquidators' claims, the Court need not—indeed *should* not—resolve choice of law questions now because "it is premature to undertake a conflict of laws analysis" at the motion to dismiss stage. *Receiver for Lancer Mgmt. Grp. LLC v. Taubman*, No. 05-60199-CIV, 2007 WL 984452, at *2 (S.D. Fla. Mar. 27, 2007). Resolving choice of law questions is a task better left until discovery is complete. *Calixto v. BASF Constr. Chems., LLC,* No. 07–60077–CIV, 2008 WL 2490454 at *4 (S.D. Fla. June 19, 2008)

## I.    The complaint is sufficiently particular and not a shotgun pleading.

Rule 9(b) requires "a reasonable delineation of the underlying acts and transactions allegedly constituting the fraud such that the defendants have fair notice of the nature of" the claims and their grounds. *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1317 (S.D. Fla. 2014). The complaint does more than provide fair notice, and Defendants' motion, in responding to the complaint's merits, confirms as much. This suffices for Rule 9(b), *id.*, but it also confirms that the complaint is not a shotgun pleading, as it establishes, again, that Defendants have "adequate notice

of the claims … and the grounds upon which each claim rests." *Pinson v. JPMorgan Chase Bank, N.A.*, 942 F.3d 1200, 1208 (11th Cir. 2019) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1325 (11th Cir. 2015)). Defendants' motion leaves no doubt that they "understood the claims well enough to address their merits," thus the complaint is not an impermissible shotgun pleading. *See id.* (rejecting district court's characterization of complaint as a shotgun pleading).

Because Defendants suggest the complaint is an impermissible shotgun pleading "in passing in a footnote only and do[] not elaborate … any further," the Court should consider the argument waived. *Mock v. Bell Helicopter Textron, Inc.*, 373 F. App'x 989, 992 (11th Cir. 2010); *see* Doc. 40 at 15 n.8. But the argument also fails for at least three other reasons. *First*, again, Defendants have adequate notice of the claims. *Second*, each count incorporates by reference only specifically enumerated (and relevant) paragraphs, rather than "adopt[ing] the allegations of all preceding counts," the most common species of shotgun pleading. *Weiland*, 792 F.3d at 1321. *Third*, accusing Defendants "collectively does not render the complaint deficient." *Kyle K. v. Chapman*, 208 F.3d 940, 944 (2000). That is particularly true where—as here—a complaint uses defined terms to refer to defendants or groups and specifies on behalf of which Companies and against which Defendants each claim is raised. The complaint clearly defines Defendant groups, Doc. 31 ¶¶ 28–29, and then each count identifies whether it is brought on behalf of all the Companies or a subset and against which Defendants it is brought. *Compare id.* at 72 *with id.* at 76. The Eleventh Circuit confirmed this method of group pleading is permissible in *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*, holding that defendants had sufficient notice of against whom claims were brought "where the term 'Defendants'" was defined to mean "each and every Defendant." 917 F.3d 1249, 1275 (11th Cir. 2019) (reversing dismissal).

## II.     The *in pari delicto* doctrine does not absolve Defendants of liability on the pleadings.

*In pari delicto* is an affirmative, equitable defense prohibiting recovery by a plaintiff who bears "at least substantially equal responsibility for his injury." *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044 (Fla. Dist. Ct. App. 2007) (quotations omitted). Where it does apply, the affirmative *in pari delicto* defense requires defendants to prove certain factual predicates—like a plaintiff's wrongdoing—and, as an equitable doctrine, demands "balancing of the relative fault." *Kalisch v. Maple Trade Fin. Corp.*, No. 06-01717, 2007 WL 1580049, at *1 (Bankr. S.D.N.Y.2007). This makes *in pari delicto* a generally inappropriate "ground for a Rule 12(b)(6) dismissal." *Perlman v. Alexis*, 09-20865-CIV, 2009 WL 3161830, at *3 (S.D. Fla. Sept. 25, 2009) (citation omitted). Thus, dismissal is warranted only if the pleadings make the facts supporting the defense "definitively ascertainable" and "establish the affirmative defense with certitude." *Id.* Defendants cannot and have not met that heavy burden.

### A.     The presence of innocent insiders and a legitimate purpose for the Companies defeats the *in pari delicto* doctrine.

*In pari delicto* teaches that an entity cannot "suffer[] injury from the scheme it perpetrated." *O'Halloran*, 969 So. 2d at 1046. But the doctrine does not apply when the conduct at issue is adverse to the plaintiff. *Id.* This is the adverse interest exception, under which misconduct calculated to harm a plaintiff will not be imputed to the plaintiff and therefore will not support invocation of the *in pari delicto* defense. *Id.* at 1045 When, for example, wrongdoers "loot[]" a plaintiff corporation, they have acted adversely to the plaintiff, who is "purely the victim of the misconduct." *Id.* at 1046. "[*I*]n pari delicto," therefore, will "not apply." *Id.* And while the exception will not apply when the plaintiff entities are merely the wrongdoers' alter egos, "the presence of any innocent decision-maker … can provide the basis for invoking the adverse interest exception" and "defeating … the *in pari delicto* defense." *Id.*

The adverse interest exception bars applying *in pari delicto* because the Liquidators allege conduct adverse to the Companies, the Companies are not the Individual Wrongdoers' alter egos, and innocent insiders could have stopped the scheme if Defendants had acted appropriately.

*First*, the Liquidators allege the Individual Wrongdoers acted adversely to the Companies' interests by looting the Companies for their own personal benefit, to fund other companies, and even to pay bribes to government officials in Latin America. Doc. 31 ¶¶ 1, 14, 16, 17, 83, 94, 117, 119, 277, 281, 283–84, 310, 355–66. This kind of looting is "the 'classic example' of conduct" falling "within the adverse interest exception." *O'Halloran*, 969 So. 2d at 1046. The Individual Wrongdoers also acted adversely to the Companies' interest by driving the Note Issuers into needless and substantial debt through repeated swap and re-tap transactions. Doc. 31 ¶¶ 166–238.

*Second*, not even the two (of 461) complaint paragraphs Defendants highlight support their argument that the Companies were shams existing only to aid the Individual Wrongdoers' scheme. Doc. 40 at 16 (citing ¶¶ 75, 93). Paragraph 75 alleges that special purpose vehicles were used to raise capital by selling securities, but it in no way alleges that their sole purpose was supporting the scheme. In fact, elsewhere, the complaint alleges that in the same timeframe, the Individual Wrongdoers were actually acquiring "real estate in South Florida" for development, Doc. 31 ¶ 65, consistent with the purpose for raising funds given in the offering documents, *e.g.*, *id.* ¶¶ 78, 169. And though ¶ 93 alleges the funds were used for many inappropriate purposes, it does not allege they were used solely for those purposes, as would be required for *in pari delicto*. Defendants ignore allegations that the Companies did support some legitimate business and that the intended recipients of Note proceeds did receive some funds. *E.g. id.* ¶¶ 355, 358, 365 (describing share of note proceeds distributed to intended recipients).

*Third*, the Liquidators allege that SGG, the Note Issuers' director, was an innocent insider

with "the power and authority to take actions to bring the fraudulent scheme to an end." *Id.* ¶ 372. That precludes an *in pari delicto* defense. The complaint alleges that had Herman Oosten or anyone else at SGG known of the scheme, it "would have ended years earlier and hundreds of millions of dollars in losses could have been avoided." *Id.* ¶ 369. Even for the Companies for which SGG was not a director, the allegations establish that SGG had the ability to exercise control and end the fraud thanks to the relationships among the Companies. *Id.* ¶ 371. In fact, the Liquidators allege not only that SGG *could have* stopped the fraud, but that its noisy withdrawal in July 2018 was what ultimately *did* stop it. *Id.*

> **B.** ***In pari delicto* does not apply to the Liquidators' § 147 claim.**

Even if *in pari delicto* applied to the Liquidators' other claims, the § 147 claim cannot be dismissed. Section 147 is, as the Cayman law Defendants rely on confirms, "a cause of action which belongs to the [liquidators]" and arises only once liquidation commences. Doc. 40-1 at 28 (*In re ICP Strategic Credit Income Fund, Ltd.*, 2014 (2) CILR 1)). Defendants' declaration observes that § 147 is like § 146. Doc. 40-1 at 26-27. And § 146 claims, like those under § 147, arise only once litigation begins and vest in liquidators. *Am. Pegasus SPC v. Clear Skies Holding Co.*, 1:13-CV-03035-ELR, 2015 WL 10891937, at *20 (N.D. Ga. Sept. 22, 2015) (citing *In re Pers. & Bus. Ins. Agency*, 334 F.3d 239, 246 (3d Cir. 2003)). Sections 146 and 147, therefore, "should be read" together and *in pari delicto* should apply to neither, as these sections each create statutory remedies "aimed at different aspects of the same kind of mischief." Doc. 40-1 at 26.

*In pari delicto* does not apply to claims brought under § 146, *Pegasus*, 2015 WL 10891937, at *20, nor does it apply to the Liquidators' § 147 claim. The Cayman court applied this reasoning and construed these statutes together in *In re ICP Strategic Credit*, where it authorized liquidators to pursue their Cayman law § 147 claim in the United States courts along with their United States

common law claims. *See* Doc. 40-1 at 26. This Court should do the same, as the alternative "impute[s] the bad conduct of a debtor to a trustee who comes to the court with clean hands to pursue" innocent creditors' claims. *Pegasus*, 2015 WL 10891937, at *20.

### III. The Liquidators' allegations of Defendants' knowledge and assistance are sufficient to support their secondary liability claims.

To state aiding and abetting breach of fiduciary duty and conversion claims, Florida law[3] requires the Liquidators to allege "an underlying violation on the part of the" Individual Wrongdoers, Defendants' actual "knowledge of the underlying violation," and Defendants' "rendering of substantial assistance" to the Individual Wrongdoers in their underlying violation. *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014). In seeking dismissal, Defendants ignore the specific facts alleged by the Liquidators showing Defendants' actual knowledge of and substantial assistance in the Individual Wrongdoers' scheme.

### A. The Liquidators allege that the Defendants had actual—rather than merely constructive—knowledge of the Individual Wrongdoers' fraud.

Defendants' argument that the Liquidators have not pleaded actual knowledge ignores the complaint. The Liquidators' allegations do not consist merely of what Defendants should have known. Instead, the complaint alleges (among other things) that Deutsche Bank actually investigated activity and identified the Individual Wrongdoers' connection to it, threatened to restrain activity in response, and still left the accounts untouched, allowing the looting to continue.

The Liquidators allege that the Individual Wrongdoers and their co-conspirators misused the Madison custody accounts to loot funds from the Companies. Deutsche Bank New York

---

[3] Again, it is too early to determine which jurisdiction's law governs the Liquidators' non-statutory claims. Still, because the Liquidators have stated a claim to relief for aiding and abetting conversion and breach of fiduciary duty under at least one source of law—that is, Florida law— their claims must survive Defendants' motion to dismiss.

employee Scott Habura's deposition testimony confirms that Deutsche Bank knew that because custody accounts exist "for trading securities," "'there shouldn't be' overdrafts from custody accounts like Madison's." Doc. 31 ¶ 325 (quoting Habura). Yet by January 2016, Habura and "[his] team" had "again" uncovered a high volume of wires from custody accounts with "hundreds" of beneficiaries, wires Habura knew were "not related to … custody activity." *Id.* ¶ 319. Habura even noted the connection between the Madison accounts and Biscayne and "insist[ed] that this activity" should be taking place in "a cash account outside of Deutsche Bank's custody environment." *Id.* Within a month, another Deutsche Bank employee observed that "[t]he activity" in the custody accounts "unrelated to trade settlement"—meaning, activity inconsistent with any custodial purpose—was "persistent" and that Deutsche Bank should not be processing it. *Id.* ¶ 320. In fact, not only were Defendants actually aware of the custody accounts' misuse by February 2016, Habura observed that overdrafts were "now being looked at on a daily basis." *Id.* ¶ 322. And no later than May 2016, that daily examination had turned into "a report" compiled by and circulated among Deutsche Bank employees "identifying unusual activity from the Madison sub-accounts not related to any securities or settlement function," further disseminating actual knowledge within the organization. *Id.* ¶ 284. Still, Defendants continued to service the accounts.

Put simply, the Liquidators do not allege merely that Deutsche Bank had a duty to investigate transactions nor do they rely only on what Deutsche Bank might have learned had it investigated. Instead, they allege (among other things) that Deutsche Bank actually investigated the wires out of the Madison sub-accounts, concluded that the activity was inconsistent with the accounts' purpose and that Deutsche Bank should not permit it, and yet continued to wire money away from the accounts anyway. These allegations and the reasonable inferences from them are enough to allege that Defendants had actual knowledge of the underlying wrongdoing.

*Perlman*, cited by Defendants, confirms that these allegations suffice. In *Perlman*, the Eleventh Circuit held that, while the allegations in plaintiffs' initial complaint were insufficient, those in the proposed amended complaint "demonstrate[ed] [the bank's] actual knowledge." 559 F. App'x at 994. The amended complaint alleged, for example, that bank staff's internal investigation raised alarms within the institution. *Id.* at 995. That investigation "confirmed questionable activity," and the amended complaint alleged that Wells Fargo "routinely close[d] accounts within 30 days" in response to such findings. *Id.* In fact, the amended complaint alleged that even after an internal report on suspicious activity led a bank employee to conclude the bank would "restrain[] all involved accounts pending further investigation," the accounts remained open for three more months. *Id.* Similarly, in *Lesti v. Wells Fargo Bank, N.A.*, the Middle District of Florida found that a complaint related to a Ponzi scheme pleaded a bank's actual knowledge, as required for an aiding and abetting claim, when the plaintiffs alleged that atypical transactions and the bank's knowledge of self-dealing relationships among certain of its customers lead the bank to further investigate activity. 960 F. Supp. 2d 1311, 1325 (M.D. Fla. 2013).

Additionally, allegations regarding Deutsche Bank's internal policies are circumstantial evidence of Defendants' actual knowledge, and "actual knowledge may be shown by circumstantial evidence." *Perlman*, 559 F. App'x at 993; *see also Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017) ("actual knowledge may be established through inference"). In *Gevaerts v. TD Bank, N.A.*, this Court ruled that bank policies can be evidence of what the bank *actually* knew, not only what it should have known. 56 F. Supp. 3d 1335, 1341–42 (S.D. Fla. 2014). *Gevaerts* involved allegations that a bank was obligated to report overdrafts of attorney trust accounts. That obligation supported inferences that the bank had systems "to detect such overdraws" and the systems thereby conferred "actual knowledge of the overdraws." *Id.*

Defendants, likewise, claim to employ an anti-money laundering program that "scrutinize[s] clients and current transactions using meticulous procedures and an automated monitoring system." Doc. 31 ¶ 38. Similarly, Defendants' know-your-customer ("KYC") program "includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships." *Id.* ¶ 41. Circumstantial evidence of Defendants' actual knowledge is not evidence of constructive knowledge, and allegations about the systems Defendants used to detect suspect activity support an inference that those systems conferred actual knowledge of the activity.

Deutsche Bank also knew that the Note Issuers were unable to repay note holders as interest and principal became due because Deutsche Bank facilitated the transactions enabling the Note Issuers to avoid those debt obligations. For example, the Individual Wrongdoers re-tapped notes hundreds of times, "issu[ing] new notes through Deutsche Bank to pay interest due on existing notes, in non-round number dollar amounts, just sufficient to make payments due on existing notes and days before principal and/or interest payments on those notes came due." *Id.* ¶ 219. Deutsche Bank also facilitated swap transactions that allowed the Note Issuers to avoid cash payments on maturing notes. *Id.* ¶ 170; *see also* ¶¶ 174–78 (describing mechanics of swap transactions).

In sum, the Individual Wrongdoers constantly repaid earlier investors by raising or borrowing additional money, instead of with revenue from real estate development, and Deutsche Bank knew that because Deutsche Bank participated in these transactions by raising or lending that additional money. Participation in this activity confirms knowledge of it because "having a general awareness of one's role in wrongful conduct necessarily presupposes that one had any knowledge of the tortfeasor's conduct in the first place." *Peterson v. Aaron's, Inc.*, No. 1:14-CV-1919-TWT, 2017 WL 4390260, at *6 (N.D. Ga. Oct. 3, 2017).

Finally, the existence of some legitimate purpose for certain banking activity does not render Defendants necessarily unaware of wrongdoing. Facially legal, "otherwise legitimate conduct" can still support an inference of wrongdoing. *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 536 (6th Cir. 2000). In *Leahey*, this meant that while "short-term lending may be 'commonplace,'" characteristics of a loan—its "four-day duration straddling" a month's end, creating the false impression the borrower was sufficiently capitalized—nonetheless supported an inference of underlying wrongdoing. *Id.* Of course, the legitimacy of certain banking activity under the circumstances alleged is a fact question the Court cannot resolve now. But just like *Leahey*'s facially legitimate short-term loan, Defendants' coaching on titling and using sub-accounts to avoid additional scrutiny is evidence of Defendants' knowledge of underlying wrongdoing, even where the practices may have some legitimate application in other contexts.

### B.     Through both action and inaction, Defendants substantially assisted in the wrongdoing.

A bank's inaction "when confronted with clear evidence" of mishandled funds "can constitute substantial assistance" for the purposes of an aiding and abetting claim. *Chang*, 845 F.3d at 1098. As the Eleventh Circuit held in *Perlman*, allegations that a bank "permitted the fraud to continue through use of its accounts after it had actual knowledge of the scheme" suffice to allege substantial assistance. 559 F. App'x at 996. As shown above, the Liquidators allege actual knowledge of the underlying fraud, and therefore need only allege Defendants' *inaction* to plead their substantial assistance. Still, the Liquidators allege more than inaction.

The complaint alleges Defendants affirmatively assisted the Individual Wrongdoers by departing from the Bank's own procedures in out-of-the-ordinary ways. The complaint alleges, for example, that Deutsche Bank employee Floris Vreedenburgh flew to Buenos Aires to meet with Gustavo Trujillo and Fernando Haberer—two of the Individual Wrongdoers' co-conspirators—

and coached them on how to "'properly title' sub-accounts to avoid Defendants' on-boarding and [KYC] rules." Doc. 31 ¶¶ 110–11 (quoting Vreedenburgh testimony). As Vreedenburgh explained, by avoiding on-boarding, the Individual Wrongdoers avoided "further scrutiny … of the whole organization, the articles, the memorandums [sic], the owners, everything," designed to detect illegal activity. *Id.* ¶ 113. Those directions on avoiding internal controls were not publicly "available in any kind of brochure or anything for customers." *Id.* ¶ 297. Instead, Defendants' personal coaching of the bad actors ensured they knew how to do this. *Id.* ¶¶ 299–301.

Moreover, these instructions were not the only substantial assistance Deutsche Bank rendered to the Individual Wrongdoers, or even the only substantial assistance related to opening the sub-accounts. Deutsche Bank also opened all "29 custody sub-accounts without requiring a single anti-money laundering affidavit," something the Bank ordinarily required. *Id.* ¶ 306. "Instead, Deutsche Bank accepted a letter—written for the purpose of opening the prime Madison account—certifying that the funds were of a licit nature and from Madison's commercial activities." *Id.* ¶ 307. The letter, Vreedenburgh testified, was "clearly not sufficient to ensure proper anti-money laundering compliance," and by accepting it, Deutsche Bank disregarded its own procedures. *Id.* ¶ 308.

Deutsche Bank's aid also included instructions on how to *use*—not merely open—the subaccounts. For example, when the wires out of the Madison sub-accounts attracted the Bank's attention, Scott Habura counseled Gustavo Trujillo to involve a different bank or use "financial counterparties," *id.* ¶ 330, "rout[ing] the suspicious transactions through a cash account at another bank to avoid continued scrutiny," *id.* ¶ 333. Deutsche Bank even lobbied others on the fraudsters' behalf, meeting with a concerned investor to offer "reassurance concerning the relationship between the Companies, Madison, and Deutsche Bank," *id.* ¶ 331, and "provid[ing] a reference

letter … to assist Madison in opening accounts at another" bank, *id.* ¶ 334.

None of this conduct—the advice, the departures from Deutsche Bank's normal procedures, and Deutsche Bank's willingness to intercede on the Individual Wrongdoers' behalf— is merely administrative or ministerial support. Instead, it necessarily amounts to non-routine banking services. Judge Rosenberg reached the same conclusion in *Gevaerts*, finding that allegations a defendant bank departed from its standard practices despite its alleged actual knowledge of wrongdoing did not plead "normal banking activity." 56 F. Supp. 3d at 1342–43. Instead, those allegations, like these, sufficed to plead the bank's substantial assistance. *Id.*

Nor does it matter, at the pleading stage, that the use of sub-accounts is not necessarily illegal nor always intended to evade KYC procedures. The Liquidators allege that the specific direction and assistance Deutsche Bank provided amounted to substantial assistance in wrongdoing. After all, as the complaint alleges, these internal controls exist in part to prevent fraud, Doc. 31 ¶ 37, and avoiding these controls had predictable consequences for the Companies. In this way, evasion of the regulations is like the loan extensions the Sixth Circuit considered in *Leahey*. While loan extensions may not always be substantial assistance, where the bank's lending practices departed from its typical practices so much that the practices were "anything but routine," the record supported a claim of substantial assistance. 219 F.3d at 537.

Finally, the Court should reject any suggestion that the allegations regarding Deutsche Bank Trust Companies are insufficient to plead claims against it. The Liquidators specifically allege Trust Companies' substantial assistance. For example, the Liquidators allege that—after Deutsche Bank Suisse closed three accounts associated with the Individual Wrongdoers and provided notice to Deutsche Bank Trust Companies that it "planned to end [its] relationship with Biscayne"—Trust Companies assumed responsibility for those accounts. *Id.* ¶ 339. Deutsche Bank

Trust Companies opened those accounts under suspect circumstances, where communications were sent via separate email accounts "seemingly to conceal their true nature," *id.* ¶ 343, and kept them open even after receiving direction to terminate at least one problematic Biscayne-related account, *id.* ¶ 346. Moreover, Deutsche Bank Trust Companies employee Reynaldo Figueredo was "involved in countless trades and transactions involving the Companies and Biscayne" and corresponded with other of Defendants' employees regarding millions in overdrafts and "failed trades." *Id.* ¶ 53. Not only does this active participation amount to substantial assistance, but the substantial assistance—again—demonstrates Deutsche Bank Trust Companies' knowledge. Indeed, "[i]f one is aware that he has a role in an improper activity then surely he knows that the primary party's conduct is tortious." *Leahey*, 219 F.3d at 534 (internal citations omitted).

### C.   The same allegations more than suffice for the Cayman Islands Company Law § 147 claim, which imposes a lower knowledge threshold.

As an initial matter, this Court should apply Cayman law and hear the § 147 claim for fraudulent trading. Defendants argue that the Court should apply Florida or New York law, rather than Cayman Islands law, because—they protest—Cayman courts have not announced the appropriate standard for assessing whether plaintiffs have alleged § 147 claims. Doc. 40 at 21–22. Deutsche Bank has argued that only two aspects of the claim are unsettled: "whether Plaintiffs have adequately alleged Deutsche Bank's knowledge of the" underlying fraud "or the type of conduct that constitutes 'carrying on the business of'" the fraud. *Id.* at 21–22 (quoting § 147(2)).

Although this statutory language supplies more than adequate guidance, Defendants' declaration removes any credible doubt regarding the applicable standard. The declaration makes clear that knowledge for purposes of a § 147 claim "includes '*willful blindness*' and '*turning a blind eye*'" and agrees that "establish[ing] actual knowledge" is "not necessary." Doc. 40-1 at 9. As shown in Part III.A, the Liquidators have alleged that Defendants had *actual* knowledge of the

underlying wrongdoing, clearly surpassing the lower willful blindness standard imposed by § 147.

Similarly, Defendants' declaration acknowledges that "carrying on" the business of fraud is likely "not limited to the person who actually directs or manages the business concerned" and includes "third parties to the company." Doc. 40-1 at 8 (quoting *Re BCCI, Banque Arabe v. Morris* [2001] 1 BCLC 263, at 269 para. E). Rather, according to Defendants' expert, a Cayman court would interpret the term to include one who is "involved in and assists and benefits from" the fraud. *Id.* at 9 (quoting *Re BCCI, Banque Arabe*, 1 BCLC at 273 para.E). Though Defendants suggest "mere omissions and *bona fide* business transactions" may not be enough, *id.* at 7, Part III.B shows that the Liquidators allege more than inaction and ordinary banking services. Therefore, while the Court should not resolve choice of law questions now, the pleadings provide more than ample basis for finding the Liquidators have adequately pleaded their § 147 claim.

Even still, were the Court to conclude Cayman law is insufficiently settled on these two points, that poses no bar to applying Cayman law to the § 147 claim's remaining features. Under Florida law, if "the law of a foreign forum is claimed to be dispositional, but is not p[roved] to the trial court," "a presumption arises that the foreign law is the same as" Florida's. *Mills v. Barker*, 664 So. 2d 1054, 1058 (Fla. Dist. Ct. App. 1995). Thus, if Cayman law were not proven, the Court could presume that the § 147 claim follows Florida law, but as to only those two (purportedly) unsettled elements. In that case, again, the Liquidators have pleaded both Defendants' actual knowledge and their substantial participation in the fraud, and Cayman law would continue to govern other aspects of the § 147 claim because Defendants do not contend that Cayman law is otherwise unsettled or different from Florida law.

IV. **Because Defendants' knowledge and relationships gave rise to various extra-contractual duties, both the breach of fiduciary duty and negligence claims survive.**

Defendants contest only the duty element of the breach of fiduciary duty and negligence

claims, but the complaint alleges both duties under at least one body of law.

A.     **Though the Agency Agreement created Deutsche Bank's fiduciary duties, the independent tort doctrine does not bar the Liquidators' tort claims.**

The independent tort doctrine bars tort actions only "when the parties [are] in contractual privity and one party [seeks] to recover purely economic damages in tort for matters arising from contract." *Spears v. SHK Consulting & Dev., Inc.*, 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018) (citing *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399, 401–02 (Fla. 2013)). That doctrine does not bar the Liquidators' tort claims because those claims include allegations separate and distinct from the contract claims.

To be sure, the Liquidators allege the breach of fiduciary duty claims on behalf of four Note Issuers—Diversified Real Estate, Global Market Step Up, Preferred Income, and SG Strategic—each of whom executed an Agency Agreement with Deutsche Bank. *E.g.*, Doc. 31 ¶¶ 139, 143, 184. Those Agency Agreements "designated the bank as these entities' agent, granted the bank broad authority to act on their behalf, and did not circumscribe or effectively limit that agency relationship." *Id.* ¶ 389; *see also* Doc. 40-2 at 38. Under Florida law, "[a]gency is [a] fiduciary relationship," *F.D.I.C. v. Floridian Title Group. Inc.*, 972 F. Supp. 2d 1289, 1296–97 (S.D. Fla. 2013), and Deutsche Bank, therefore, owed a fiduciary duty to these Note Issuers.

But while the Agency Agreements created the fiduciary duty, the conduct supporting the Liquidators' tort claims is not the same conduct that breached the contract. For example, the Liquidators allege that Deutsche Bank breached its duties by encouraging the Individual Wrongdoers and their co-conspirators to evade anti-money laundering and KYC policies and coaching them on precisely *how* to do so. Doc. 31 ¶¶ 391, 411. The Agreements do not mention or otherwise prohibit Deutsche Bank from engaging in this conduct, but the fiduciary relationship the Agreements create does. Similarly, while an engagement letter may not prohibit a lawyer from

misappropriating client funds, the relationship created by the letter clearly does.

Courts have routinely found that where the alleged contract does not make any reference to the scenario giving rise to the tort claims, the tort claims rely on a non-contractual duty and the independent tort doctrine, therefore, does not bar them. *E.g.*, *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 2031 (11th Cir. 2017); *CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus.*, Inc., 3:16-CV-186-J-34JRK, 2018 WL 905752, at *11 (M.D. Fla. Feb. 15 2018). The presence of an agreement between the Note Issuers and Defendants "does not mean any claim incident to their relationship is necessarily intertwined with a breach of contract claim." *Carl's Furniture, Inc. v. APJL Consulting, LLC*, 15-60023-CIV, 2015 WL 1467726, at *4 (S.D. Fla. Mar. 30, 2015). Because the duties owed under tort law stretch beyond those imposed by any contract, allegations Defendants breached those tort duties are distinct from the Liquidators' contract claims and therefore not barred by the independent tort doctrine.

Finally, the Liquidators asserted a breach of contract claim against only Deutsche Bank and not against Deutsche Bank Trust Companies. Doc. 31 ¶¶ 400–08. Florida's independent tort doctrine "requires contractual privity between the parties." *Spears*, 338 F. Supp. at 1270. Therefore, even if the independent tort doctrine precluded the Liquidators' tort claims against Deutsche Bank, any tort claims against Deutsche Bank Trust Companies would remain.

### B.      Defendants owed a duty of care to even the non-customer Companies.

"Banks owe a duty to customers." *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1247 (M.D. Fla. 2013). So Defendants owed a duty of care to their customers Diversified Real Estate, Global Market Step Up, Preferred Income, and SG Strategic. But Defendants also owed a duty of care to the non-customer Companies because of Deutsche Bank's relationship with Madison and its treatment of the Madison sub-accounts.

Under Florida law, a bank owes non-customers a duty of care under certain conditions. Specifically, "a bank may be liable to a noncustomer for its customer's misappropriation when a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation." *Chang*, 845 F.3d at 1094–95. The complaint pleads each of those conditions.

*First,* the nature of the Madison custody accounts establishes that Deutsche Bank knew Madison acted (or purported to act) as the Companies' fiduciary. In *Freeman v. JPMorgan Chase Bank N.A.*, the Eleventh Circuit reversed a trial court's grant of summary judgment and held that similar evidence about a bank customer's escrow account—opened by the customer to hold funds for its clients—created a jury question on the first two requirements. 675 F. App'x 926, 932 (11th Cir. 2017). In other words, evidence that the customer opened an escrow account to hold funds for its clients could show both the existence of and Chase Bank's knowledge of a fiduciary relationship between its customer—the account holder—and the non-customer plaintiffs. *Id.* The Liquidators' allegations regarding the custody accounts' function and purpose similarly plead Defendants' knowledge that Madison owed the Companies a fiduciary duty. *E.g.,* Doc. 31 ¶¶ 278–80.

*Second,* the complaint also alleges Deutsche Bank's knowledge of its customers' misappropriation. As shown in Part III.A., Defendants knew of the high volume of wires with "hundreds" of beneficiaries flowing from the sub-accounts, wires Defendants also knew could "not [be] related to … custody activity." *Id.* ¶ 319. In other words, Deutsche Bank knew Madison was "persistent[ly]" treating the custody accounts like cash accounts. *Id.* ¶ 320. Deutsche Bank also knew that its own procedures prohibited using custody accounts this way and that it therefore should not be processing these transactions. *Id.* Construed in the Liquidators' favor, these allegations support an inference that Deutsche Bank actually knew the transactions amounted to

misappropriation. The Liquidators have, therefore, alleged facts sufficient to show that Defendants

owed a duty of reasonable care, even to the non-customer Companies.

In short, the Liquidators do not allege "some general and all-encompassing duty" on the

part of banks to monitor and investigate customer activity. Doc. 40 at 30. Instead, the Liquidators

allege that Defendants breached a duty of care that arose because of what Deutsche Bank learned

when it *did* investigate, on its own accord.

Lastly, Defendants claim *Insight Securities, Inc. v. Deutsche Bank Trust Cos. America,* No.

20-23864-CIV, 2021 WL 3473763 (S.D. Fla. Aug. 6, 2021), supports their contention they owed

no duty of care to the Companies. *See* Doc. 40 at 30 (citing *Insight*). The *Insight* court's conclusion

that those plaintiffs could not recover for the losses suffered by *their* customers because the bank

owed them no duty of care is—however—irrelevant to the Liquidators' claims. Unlike the *Insight*

plaintiffs, the Liquidators do not seek to recover for losses suffered by the Companies' clients or

creditors. Instead, the Liquidators stand in the shoes of the Companies themselves pursuant to 11

U.S.C. § 101(24) and bring their claims to recover for losses the Companies suffered when, among

other things, Deutsche Bank facilitated the looting of the Companies via the Madison sub-

accounts. Whether Defendants owe any duty to the Companies' clients or creditors is irrelevant;

the complaint alleges that they owed a duty to the Companies.

## V.      The Complaint states a breach of contract claim.

### A.      Defendants clearly understand which contractual provisions are relevant to the Liquidators' contract claims.

Defendants ignore several allegations when arguing that the Liquidators' contract claims

fail because the complaint did not connect those claims "to any particular contractual provision."

Doc. 40 at 26. "[A] complaint must at least provide enough information regarding the disputed

terms to give the opposing party reasonable notice of which provisions are being contested." *Boca*

*Raton Sailing v. Scottsdale Ins. Co.*, No. 18-CV-81236, 2019 WL 7904805, at *2 (S.D. Fla. Mar. 18, 2019). But contractual "[p]rovisions need not be identified with a section or page number." *Id.*

The amended complaint identifies three Agency Agreement provisions supporting the contract claims with more than the specificity the law requires. Paragraph 403 alleges that "[a]ccording to the Agency Agreements, Deutsche Bank was not to carry out an instruction in circumstances where the bank had reasonable grounds to believe that the instruction was part of a scheme to defraud these Note Issuers." Paragraph 407 alleges that "pursuant to the Agency Agreements Deutsche Bank was authorized to accept payments of the notes only in currency." Paragraph 405 alleges that "the Agency Agreements required Deutsche Bank to notify the director of a Note Issuer if any payment was late." Defendants' own motion confirms that Defendants had notice of and understood the basis for the Liquidators' contract claims, as Defendants' arguments address each of these allegations specifically. Doc. 40 at 26–28.

## B.   Deutsche Bank's acceptance of in-kind payments violated the Agency Agreements.

Defendants argue that using in-kind payments to satisfy note obligations cannot amount to breach because "[t]he Agreements did not explicitly prohibit payment in kind, and at least one of the Agreements explicitly permitted such payments." *Id.* at 28. But the Liquidators allege more than just that certain Agency Agreements "did not contemplate payment in kind." Doc. 31 ¶ 190. The complaint also alleges that in-kind payments were prohibited because the Agreements "specified that payment 'shall be' made 'unconditionally by credit transfer in the payment currency and … freely transferable cleared funds.'" *Id.* When a contract's terms are "clear and unambiguous," the Court must interpret and enforce terms "according to [their] plain meaning." *Limehouse v. Smith*, 797 So. 2d 15, 17 (Fla. Dist. Ct. App. 2001). Giving these clear and unambiguous terms their plain meaning, "payment currency" and "freely transferable cleared

#3300566v1

20

funds" cannot mean in-kind payments, particularly at the motion to dismiss stage where all reasonable inferences must be drawn in the Liquidators' favor. Thus, Deutsche Bank's acceptance of in-kind payments plausibly violated the Agency Agreements.

### C. Because Deutsche Bank had reasonable grounds to believe that certain instructions were part of a scheme to defraud, following those instructions violated the Agency Agreements.

Defendants argue that facilitating the swap transactions and re-taps and accepting late payments cannot amount to breach because there was no specific contractual prohibition of such activity, but their argument misunderstands the Liquidators' contract claims. The Liquidators have not alleged that accepting late payments or facilitating these repayment-avoiding transactions would—in isolation—amount to breach. Instead, the Liquidators allege that in accepting the late payments and facilitating the re-taps and swap transactions, Deutsche Bank "carr[ied] out [] instruction[s] in circumstances where the bank had reasonable grounds to believe that the instruction was part of a scheme to defraud the[] Note Issuers." Doc. 31 ¶ 403.

As Defendants acknowledge, "the Agency Agreements are subject to an English Choice of Law clause." Doc. 40 at 26 n.15.[4] And as the authority Defendants submit observes, under English law there is an "implied contractual and/or tortious duty owed by a banker to its customer" to "refrain from executing an order if and for as long as the banker … has reasonable grounds … for believing that the order is an attempt to misappropriate the funds of the company." Doc. 40-1 at 295 (quoting from *Stanford Int'l Bank Ltd. v. HSBC Bank plc* [2021] EWCA Civ 535, para. 3). Thus, under at least one jurisdiction's law, Deutsche Bank breached the contract by accepting late

---

[4] Given that English law governs the Agency Agreements, Defendants do not explain why Florida law would apply to the exculpatory clause. *See* Doc. 40 at 31 n.16. But even if it did—and even if Defendants developed the point beyond the footnote in which it appears, *see Mock*, 373 F. App'x at 992—Florida law would not permit Defendants to exculpate themselves from liability for intentional torts. *Loewe v. Seagate Homes, Inc.*, 987 So. 2d 758, 760 (Fla. Dist. Ct. App. 2008).

payments and facilitating the re-tap and swap transactions if—as the Liquidators allege—Deutsche Bank had reasonable grounds to believe that these instructions were part of a scheme to defraud the Note Issuers. This is all that is necessary to state the Liquidators' breach of contract claim.

Similarly, the Court should reject Defendants' argument that Deutsche Bank was not required to provide notice of late payment to the Note Issuers—rather than to Trujillo—if Deutsche Bank "[wa]s satisfied that it w[ould] receive" the payments. Doc. 40 at 27–28. Express contractual language provided that in the event of late payment, Deutsche Bank was to "notify by electronic mail or fax each of the other Agents and the Issuer if it has not received the amount … by the time specified for its receipt, unless it is satisfied that it will receive such amount." Doc. 31 ¶ 258 (quoting § 4.3 of Agency Agreements). And the Liquidators allege that Deutsche Bank violated the Agreements by providing notice to Trujillo rather than to the Note Issuers. The Liquidators do not allege that Deutsche Bank expected to eventually receive the late payments—that is merely Defendants' after-the-fact assertion. And it is plausible that Deutsche Bank would not have expected to receive the late payments because, again, the Liquidators have plausibly alleged that Deutsche Bank was knowingly assisting the Individual Wrongdoers in carrying out a scheme to defraud the Note Issuers. Whether Deutsche Bank was satisfied it would ultimately receive payments is a fact question for discovery.

## VI.    The Liquidators' allegations support the Florida statutory claims.

### A.    Because at least some elements of the offenses occurred in Florida, extraterritoriality does not bar the Liquidators' claims.

The Eleventh Circuit has held that a plaintiff alleging a claim under Florida's Civil Remedies for Criminal Practices Act (CRCPA) need plead only "a connection between Florida and the alleged wrongful conduct" to escape any extraterritoriality bar. *Arthur v. JP Morgan Chase Bank N.A.*, 569 F. App'x 669, 681 (11th Cir. 2014). The CRCPA claim alleges that Defendants

committed and conspired with others to commit related violations of theft, Fla. Stat. § 812.014;

bank fraud, 18 U.S.C. § 1344; money laundering, 18 U.S.C. § 1956; bribery and violations of the

Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2. Taking the theft predicates as an example, the

Liquidators plead the requisite connection to Florida three ways.

*First*, for predicates arising under Florida law, like the theft predicate, the CRCPA "run[s]

co-extensively with the reach of the Florida criminal statutes," *Arthur*, 569 F. App'x at 682, and

therefore encompasses offenses "committed … partly within the state." Fla. Stat. § 910.005(1)(a),

(2). An offense is committed "partly within" Florida "if either the conduct that is an element of the

offense or the result that is an element[] occurs in Florida." *Id.* Because the Liquidators have

pleaded that at least some conduct or result that is an element of theft happened at least partly in

Florida, they have alleged claims not subject to any extraterritoriality bar.

A person commits the relevant Florida predicate, theft, if:

[H]e or she knowingly obtains or uses, or endeavors to obtain or to use, the property
of another with intent to, either temporarily or permanently:
(a) Deprive the other person of a right to the property or a benefit from the property.
(b) Appropriate the property to his or her own use or to the use of any person not
    entitled to the use of the property.

*Id.* § 812.014(1). The complaint alleges (and the example offering memorandum Deutsche Bank

attached to its motion confirms) that the note proceeds were intended to be used to develop real

property in South Florida. *E.g.*, Doc. 31 ¶¶ 9–12; Doc. 40-2 at 3–30. Meanwhile, the "partly

within" standard stretches broadly enough to permit, for example, application of Florida's murder

statute where the state conceded that the victim died and the fatal blows were struck in Alabama,

because the assailant—at a minimum—premeditated the murder in Florida. *Lane v. State*, 388 So.

2d 1022, 1028 (Fla. 1980). Here too, conduct occurred partly in Florida because, at a minimum,

"a result that is an element"—deprivation or loss of use of property—occurred within Florida,

where the real property to be developed was located. *See* Fla. Stat. Ann. § 910.005(1)(a), (2).

*Second*, Florida's criminal jurisdiction also extends to any "conspiracy to commit an offense" in Florida if "an act in furtherance of the conspiracy occurs" there. *Id.* § 910.005(1)(c). Numerous overt acts in furtherance of the alleged CRCPA conspiracy occurred in Florida: (1) Deutsche Bank employees met with the Individual Wrongdoers in Florida as part of the conspiracy, Doc. 31. ¶¶ 48, 52, 342; (2) Deutsche Bank Trust Companies employees "based in Miami" provided services in furtherance of the conspiracy, *id*. ¶¶ 50, 52; (3) Defendants' employees regularly communicated with Biscayne and the Individual Wrongdoers in Florida, *id*. ¶¶ 50, 52, 342; and (4) the investment adviser initially used to carry out the conspiracy was headquartered in Miami, *id.* ¶ 59. And in his proffer in support of his guilty plea, Frank Chatburn "repeatedly document[ed]" the scheme's connections to Florida. *Id.* ¶ 438; Doc. 31-1 (proffer).

*Third*, Florida exercises criminal jurisdiction over "conduct within the state" that "constitutes an attempt or conspiracy to commit in another jurisdiction an offense under the laws of both [Florida] and the other jurisdiction." Fla. Stat. § 910.005(1)(d). Thus, there is no extraterritoriality bar if any of the Florida conduct alleged is part of an attempt or conspiracy to commit theft in any of the jurisdictions where the innocent investors are located, so long as those jurisdictions also criminalizes theft. *Id.* And the complaint alleges that at least five jurisdictions where the Latin American investors are located does criminalize this kind of theft. Doc. 31 ¶ 455 (collecting statutes from Ecuador, Venezuela, Argentina, Uruguay, and Brazil).

None of the cases Defendants cite compels dismissal of the Florida statutory claims. *In re Las Vegas Casino Lines, LLC*, for example, holds only that federal maritime law preempts Florida's civil theft statute for acts of theft solely within "the special maritime and territorial jurisdiction of the United States." 454 B.R. 223, 228–29 (Bankr. M.D. Fla. 2011). *Absolute Activist*

*Value Master Fund Ltd. v. Devine*, meanwhile, followed the United States Supreme Court's *RJR Nabisco* decision to find that Florida's CRCPA did not apply extraterritorially. 233 F. Supp. 3d 1297, 1327–28 (M.D. Fla. 2017) (*citing RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016)). But neither *RJR Nabisco*'s ruling nor its reasoning applies to CRCPA claims.

The CRCPA's text confirms that criminal activity occurring only partly within Florida can give rise to civil liability under the statute. *First*, nowhere does the CRCPA impose a requirement that there be a domestic injury. Naturally, had the Florida Legislature desired or intended that result, it could have made it a prerequisite for the CRCPA's private cause of action. *Second*, the CRCPA does state that "criminal activity" that can support CRCPA liability includes "[a]ny crime that is chargeable by indictment" under the enumerated predicates. Fla. Stat. Ann. § 772.102(1)(a). The federal RICO statute defines "racketeering activity" without similar language. 18 U.S.C. § 1961(1). Thus, unlike federal RICO, where the Supreme Court has held that the civil remedy is not coextensive with the reach of criminal predicates that may apply extraterritorially, Florida *has* enacted a civil remedy with the same reach and application as its criminal law. Indeed, the enumerated predicates include crimes that—like theft, § 772.102(1)(a)(20)—are chargeable under Florida law even where the violation occurred only "partly within [Florida]." *Id.* § 910.005(1)(a), (2). Thus, the CRCPA's plain text creates a civil cause of action for criminal activity occuring only partly within Florida. *Third*, the CRCPA is an entirely separate statute from Florida's criminal RICO statute, and includes fewer predicates than does Florida's criminal RICO statute. *Compare* Fla. Stat. Ann. § 772.101 *et seq.*, *with* Fla. Stat. Ann. § 895.01 *et seq.* There is no reason decisions interpreting the federal RICO statute would be persuasive authority for the Florida RICO statute where there is no indication that the presumption against extraterritoriality applicable to federal statutes would apply to the CRCPA, much less overcome its plain text.

Finally, *In re Mouttet*, 493 B.R. 640 (Bankr. S.D. Fla. 2013), held that extraterritorial application of Florida's CRCPA turns on whether a complaint "allege[s] a significant relationship between Florida" and "any of the harm allegedly suffered" by a plaintiff. *Id*. at 657. For the reasons set forth above, the complaint clearly meets that standard.

### B. The Liquidators allege facts—not just legal conclusions—in support of their Florida statutory claims.

Defendants' suggestion that the Liquidators' CRCPA and Civil Remedies for Theft or Exploitation (CRTE) claims consist of "merely … boilerplate text tracking the elements of each cause of action," Doc. 40 at 33, hardly warrants a serious response, for two reasons. *First*, the argument ignores the facts alleged in the complaint's body and incorporated selectively into those counts. Doc. 31 ¶¶ 414 (incorporating "the allegations of Paragraphs 4–7, 49–60, 77, 98–135, and 149–372" into the CRCPA claim), 452 (incorporating the same paragraphs' allegations into the CRTE claim). *Second*, the suggestion is untrue. The allegations go beyond "bare legal conclusions" reciting the claims' elements. Doc. 41 at 33 (quotations omitted). The Liquidators allege, for example, that Defendants "assisted the Individual Wrongdoers and Madison in improperly and illegally transferring the Note Issuers' and Companies' assets into the Madison sub-accounts," Doc. 31 ¶ 426, and that the "[f]unds looted from the Companies' accounts were" used, among other things, "to purchase real and personal property" in Florida. *Id*. ¶¶ 446, 456.

### CONCLUSION

The Liquidators have stated a plausible claim to relief as to each count pleaded. Defendants argue otherwise only by ignoring allegations, recharacterizing them, or by relying on incorrect or incomplete statements of the law. The Court should therefore deny Defendants' motion to dismiss.

This 19th day of November, 2021.

/s/  *John H. Rains IV*
Frank M. Lowrey IV (*pro hac vice*)
Georgia Bar No. 410310
*lowrey@bmelaw.com*
Ronan P. Doherty (*pro hac vice*)
Georgia Bar No. 224885
*doherty@bmelaw.com*
John H. Rains IV
Florida Bar No. 0056859
Georgia Bar No. 556052
*rains@bmelaw.com*
Amanda Kay Seals (*pro hac vice*)
Georgia Bar No. 502720
*seals@bmelaw.com*
Michael B. Jones (*pro hac vice*)
Georgia Bar No. 721264
*jones@bmelaw.com*
Juliana Mesa (*pro hac vice*)
Georgia Bar No. 585087
*mesa@bmelaw.com*
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111


Eduardo F. Rodriguez
Florida Bar No. 36423
*eddie@efrlawfirm.com*
EFRLAWFIRM
1 Alhambra Plaza, Suite 1225
Coral Gables, FL 33134
Telephone: (305) 340-0034

***Attorneys for Plaintiffs***

#3300566v1

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be served the foregoing **PLAINTIFFS' RESPONSE**

**TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** by

filing it with the Clerk of Court using the CM/ECF system upon the following counsel of record:

> Harvey W. Gurland
> *hwgurland@duanemorris.com*
> DUANE MORRIS LLP
> 201 S. Biscayne Boulevard, Suite 3400
> Miami, Florida 33131-4325
>
> David G. Januszewski
> *djanuszewski@cahill.com*
> Sesi V. Garimella
> *sgarimella@cahill.com*
> Bonnie E. Trunley
> *btrunley@cahill.com*
> CAHILL GORDON & REINDEL LLP
> 32 Old Slip
> New York, NY 10005

This 19th day of November, 2021.

> */s/ John H. Rains IV*
> John H. Rains IV