# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No.: 1:21-cv-22437-Bloom/Otazo-Reyes

MICHAEL PEARSON, *et al.*,

                Plaintiffs,

    v.

DEUTSCHE BANK AG, *et al.*,

                Defendants.

## <u>DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' PROFFERED EXPERTS IAN RATNER AND RICHARD FRAHER PURSUANT TO FEDERAL RULE OF EVIDENCE 702</u>

Harvey W. Gurland, Jr., Esq.
Florida Bar No. 284033
Julian A. Jackson-Fannin, Esq.
Florida Bar No. 93220
DUANE MORRIS LLP
201 S. Biscayne Boulevard, Suite 3400
Miami, FL 33131-4325
(305) 960-2214

-and -

David G. Januszewski, Esq. (*pro hac vice*)
Sheila C. Ramesh, Esq. (*pro hac vice*)
Sesi V. Garimella, Esq. (*pro hac* vice)
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Luxembourg S.A., and Deutsche Bank (Suisse) S.A.*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

LEGAL STANDARD........................................................................................................... 2

ARGUMENT ........................................................................................................................ 3

   I.    NO PORTION OF RATNER'S PROFFERED EXPERT TESTIMONY SATISFIES THE
       ELEVENTH CIRCUIT'S THREE-PART TEST FOR THE ADMISSION OF EXPERT
       TESTIMONY ........................................................................................................... 3

      A.   Ratner's Calculations of Inconsistent Use Damages Are Based on an Unreliable
          Methodology and Would Not Be Helpful to the Trier of Fact ......................... 4

      B.   Ratner's Calculations of Amounts the Companies Would Not Have Paid  or Incurred
          But For Deutsche Bank's Alleged Misconduct Are Also Unreliable and Would Not Be
          Helpful to the Trier of Fact ......................................................................... 11

      C.   Ratner Should Not Be Permitted to Provide Testimony Concerning Alleged
          Liquidation Expenses.................................................................................. 13

      D.   Ratner Should Not Be Permitted to Provide Testimony Concerning Alleged
          Prejudgment Interest .................................................................................. 14

   II.   FRAHER IS NOT QUALIFIED TO PROVIDE EXPERT TESTIMONY REGARDING
       DEUTSCHE BANK'S COMPLIANCE PROCEDURES................................................ 15

      A.   Fraher Is Not Qualified to Testify About Compliance Procedures at a Major Financial
          Institution .................................................................................................. 16

      B.   Fraher's Opinion 3 Is an Impermissible Attempt to Tell the Trier of Fact How to Rule
          18

CONCLUSION.................................................................................................................... 19

## **TABLE OF AUTHORITIES**

**Cases**                                                                         **Page(s)**

*Allapattah Services, Inc.* v. *Exxon Corp.*,
2006 WL 1132371 (S.D. Fla. Apr. 7, 2006) ................................................................14

*Bachmann* v. *Hartford Fire Ins. Co.*,
323 F. Supp. 3d 1356 (M.D. Fla. 2018)....................................................................15

*Cooperative Leasing, Inc.* v. *Johnson*,
872 So. 2d 956 (Fla. 2d DCA 2004) ........................................................................13

*Coquina Investments* v. *Rothstein*,
2011 WL 4949191 (S.D. Fla. Oct. 18, 2011)......................................................9, 11

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..................................................................................................2

*Day* v. *Edenfield*,
2022 WL 972430 (N.D. Fla. Mar. 31, 2022) ..........................................................19

*Deauville Hotel Mgmt., LLC* v. *Ward*,
219 So. 3d 949 (Fla. 3d DCA 2017) ..........................................................................9

*DFG Grp., LLC* v. *Heritage Manor of Memorial Park, Inc.*,
237 So. 3d 419 (Fla. 4th DCA 2018) .........................................................................9

*E.J. Brooks Co.* v. *Cambridge Security. Seals*,
105 N.E.3d 301 (N.Y. 2018)...................................................................................10n

*Herman* v. *Seaworld Parks & Entertainment, Inc.*,
320 F.R.D. 271 (M.D. Fla. 2017)..............................................................................5n

*Hughes* v. *Kia Motors Corp.*,
766 F.3d 1317 (11th Cir. 2014) .................................................................2-3, 4n, 18

*Kallas* v. *Carnival Corp.*,
2009 WL 901507 (S.D. Fla. Mar. 30, 2009)..............................................................8

*Mendel* v. *Royal Caribbean Cruises Ltd.*,
2012 WL 13129839 (S.D. Fla. Jan. 9, 2012) ..........................................................17

*Montgomery* v. *Aetna Casualty & Surety Co.*,
898 F.2d 1537 (11th Cir. 1990) ..............................................................................19

*Natures Way Marine, LLC* v. *Everclear of Ohio, Ltd.*,
2014 WL 5817535 (S.D. Ala. Nov. 10, 2014).........................................................17

*Seawell* v. *Brown*,
  2010 WL 11561287 (S.D. Ohio Sept. 9, 2010) ........................................................4n

*In re Sonic Corp. Customer Data Securities Breach Litigation*,
  2021 WL 5916743 (N.D. Ohio Dec. 15, 2021) ........................................................8n

*In re Titanium Dioxide Antitrust Litigation*,
  2013 WL 1855980 (D. Md. May 1, 2013)..................................................................19n

*Wiand* v. *Lee*,
  753 F.3d 1194 (11th Cir. 2014) .................................................................................14

**Rules**

Fed. R. Evid.
  Rule 403 .......................................................................................................................19n
  Rule 702 .................................................................................................. *passim*

Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Luxembourg S.A., and Deutsche Bank Suisse S.A. (collectively "Defendants" or "Deutsche Bank"), pursuant to this Court's October 17, 2022 Order Amending Scheduling Order and Certain Pre-Trial Deadlines (D.E. 116), hereby submit this motion to exclude the testimony of Plaintiffs' proffered experts Ian Ratner ("Ratner") and Richard Fraher ("Fraher") pursuant to Federal Rule of Evidence 702.

## PRELIMINARY STATEMENT

For the reasons set forth in Defendants' summary judgment motion filed contemporaneously herewith, Plaintiffs' claims in this action are untenable as a matter of fact and law.  Although Plaintiffs attempt to use evidence from Ratner and Fraher to shore up these failures, the testimony of both purported experts only highlights the fatal flaws of Plaintiffs' case.

First, even setting aside the fact that Deutsche Bank did not cause Plaintiffs to suffer any damages, as set forth in Defendants' motion for summary judgment, Plaintiffs rely on Ratner to inflate their alleged damages beyond the bounds of any legal or factual explanation.  In so doing, Plaintiffs ignore the well-established, black letter rule of damages that limits Plaintiffs' recovery to the amount that would restore the position that the entities they represent (the "Companies") would have been in but for Defendants' alleged misconduct.  In order to support Plaintiffs' ill-founded attempt to extend their potential recovery beyond legal limits, Ratner is forced to rely on a hodgepodge of confusing, arbitrary, and ultimately unreliable methodologies which—as in a recent case in which one of Ratner's opinions was deemed inadmissible—is based on insufficient data and which he appears to have developed for purposes of this litigation alone.  For the reasons set forth in Section I, below, this testimony is unsound and unreliable and would not be of any assistance to a trier of fact in assessing damages.

Second, because Plaintiffs know that the factual record confirms that Defendants neither owed nor violated any duties to the Companies, Plaintiffs seek to use Fraher's testimony to suggest that Defendants' Know-Your-Customer (or "KYC") and related practices failed, and that this failure "facilitated" the fraudulent scheme underlying this lawsuit.  But, as discussed in Section II, below, Fraher is an attorney who has never worked at a bank in any capacity, much less in a compliance or anti-fraud role.  To the extent he has any experience concerning bank compliance procedures at all, it is with regard to small community banks, not a major global financial institution like Deutsche Bank.  As such, Fraher is unqualified to offer the opinions he seeks to provide in this case.  In addition, Fraher's opinion regarding Deutsche Bank's purported facilitation of the Ponzi scheme is an improper and transparent attempt to cloak a legal conclusion in the guise of an expert opinion.

For these reasons, and as set forth in more detail below, Defendants respectfully request that the Court bar Ratner and Fraher from providing expert testimony in this case.

## LEGAL STANDARD

Expert testimony is admissible only if the proffered expert witness "is qualified as an expert by knowledge, skill, experience, training, or education" and if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

The Eleventh Circuit—applying guidance set forth in the Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny—"has set out three requirements that an expert must meet before his opinions may be admitted."  *Hughes*

v. *Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014).  First, "the expert must be qualified

on the matter about which he intends to testify."  *Id.*  Second, the expert "must employ reliable

methodology."  *Id.*  In conducting this analysis, courts "look to a number of factors, including (1)

whether the methodology can be and has been tested, (2) whether the theory or technique has

been subjected to peer review, (3) the known or potential rate of error of the methodology

employed, and (4) whether the methodology is generally accepted."  *Id.*  Third, "the expert's

testimony must be able to assist the trier of fact through the application of expertise to

understand the evidence or fact in issue."  *Id.*  "The proponent of the expert opinion"—here,

Plaintiffs—"must carry the burden of establishing qualification, reliability, and helpfulness."  *Id.*

## ARGUMENT

## I.   NO PORTION OF RATNER'S PROFFERED EXPERT TESTIMONY SATISFIES THE ELEVENTH CIRCUIT'S THREE-PART TEST FOR THE ADMISSION OF EXPERT TESTIMONY

Ratner seeks to testify that the Companies suffered damages in four ways.  First, Ratner

asserts that "funds disbursed from the DB Custody Accounts that were inconsistent with the Note

Issuers' Offering Documents and the intended use of the accounts" constitute damages.  Exhibit

C (Oct. 21, 2022 Expert Report of Ian Ratner) ("Ratner Report") at 301.[1]  Second, Ratner opines

that "funds disbursed from the DB Custody Accounts that would not have otherwise been

disbursed had the Defendants closed the accounts at an earlier date," or, alternatively, "liabilities

(i.e., the Note issuances) that would not have been incurred had the Defendants closed the

accounts at an earlier date" constitute damages.  *Id.*  Third, Ratner asserts that "[t]he

---

[1]  Capitalized terms used in Section I of this brief have the same meaning assigned to them in the Ratner Report, unless otherwise specified.  Ratner defines the "DB Custody Accounts" to be the twelve sub-accounts opened with Deutsche Bank by Madison Asset, LLC ("Madison Asset") "on behalf" of the Companies.  *See* D.E. 139-1 (Ratner Report) at 299, 301-02.

administrative cost[s] of winding down the [Companies]" are damages Defendants caused.  *Id.*
Fourth, Ratner seeks to opine on the amount of prejudgment interest that should be applicable in
this case.  *Id.*

For the reasons discussed below, none of these opinions satisfies the Eleventh Circuit's
three-part qualification, reliability, and helpfulness test and, as such, Ratner should not be
permitted to provide any expert testimony in this case.[2]

**A.**     **Ratner's Calculations of Inconsistent Use Damages Are Based on an
Unreliable Methodology and Would Not Be Helpful to the Trier of Fact**

In his Report, Ratner opines that the Companies suffered a total of $103,390,544 in
alleged damages as a result of net transfers from the DB Custody Accounts that Ratner asserts
were "inconsistent with the Offering Documents and the intended use of the DB Custody
Accounts."  D.E. 139-1 (Ratner Report) at 308-09 (referred to herein for convenience as
"Inconsistent Use Damages").  According to Ratner, this number includes "[n]et funds totaling
$24,576,872 [that] were transferred from the DB Custody Accounts to Madison Asset" (*id.* at
308); "net transfers to the Biscayne Capital Entities totaling $9,555,409" (*id.* at 309); "[n]et
funds totaling $3,451,806 [that] were transferred between the DB Custody Accounts and Atlantic
Sky's account #5121 maintained at Deutsche Bank" (*id.*); and an additional $65,806,457
transferred to various other entities from the DB Custody Accounts (*see id.* at 308).  Ratner

---

[2]  In addition to the specific issues discussed in this Section I, the Ratner Report also fails to
satisfy any of the usual indicia of reliability set forth in *Hughes* and other cases.  For example,
nowhere does Ratner suggest—much less cite to evidence supporting the idea—that the
methodologies he used to calculate any portion of his asserted damages has ever been used by
any other expert or has ever been subjected to peer review.  *See generally Seawell* v. *Brown*,
2010 WL 11561287, at *9 (S.D. Ohio Sept. 9, 2010) (barring expert damages testimony where
expert appeared to have "simply created his own method of calculating damages for the purposes
of this litigation" without pointing to anything "in the literature or elsewhere to show that his
method is an accepted method of calculating . . . losses").

should not be permitted to testify regarding Inconsistent Use Damages because his calculations are based on an unreliable methodology and would not be helpful to the trier of fact in any event because they do not constitute a legally-recognizable category of damages.

> **i.    Ratner's Calculations of Inconsistent Use Damages Are Based on an Inconsistent, Arbitrary Methodology**

Ratner calculated Inconsistent Use Damages using a two-step process.  First, Ratner assigned each transaction into or out of the DB Custody Accounts during the relevant time period to one of the approximately twenty categories.  *See, e.g.*, D.E. 139-1 (Ratner Report) at 303-07; D.E. 139-1 (Nov. 3, 2022 Deposition of Ian Ratner ("Ratner Dep. Tr.")) at 177:1-179:3. Second, Ratner unilaterally determined that some of these categories constituted transfers that were inconsistent with the Offering Documents or the intended use of the DB Custody Accounts, and that others did not.  *See, e.g.*, D.E. 139-1 (Ratner Report) at 308-09.

This process was not only unreliable, it was incoherent.  Indeed, the Ratner Report never even attempts to explain what methodology Ratner used to determine whether a given transaction or category of transactions was or was not inconsistent with the Offering Documents or the intended use of the DB Custody Accounts.  Nowhere, for example, does Ratner explain what transfers he believes the Offering Documents contemplated,[3] or whether he actually reviewed every transaction to determine whether each transaction was or was not consistent with the Offering Documents.  On the contrary, when asked "what the offering documents did and did not permit the note issuers to do," Ratner admitted that he did not "go[] through each [transaction] and prov[e] it out" and, confusingly, later testified that "[i]t doesn't matter what the

---

[3]  Since the interpretation of a contract is a legal question, Rule 702 would bar Ratner's testimony concerning what the Offering Documents do and do not permit in any event.  *See, e.g.*, *Herman* v. *Seaworld Parks & Entertainment, Inc.*, 320 F.R.D. 271, 283 (M.D. Fla. 2017) ("Courts regularly exclude expert opinions that opine on the interpretation of written contracts.").

offering document says."  D.E. 139-1 (Ratner Dep. Tr.) at 73:17-74:22; 76:8-9.

Nor does Ratner explain in his Report his understanding of what the "intended use" of the DB Custody Accounts was, whose intent is relevant to such a determination, or how he came to that understanding.  Although the Ratner Report itself does not cite to any specific deposition transcripts or portions thereof, during his deposition Ratner referred to unspecified depositions of Deutsche Bank employees to suggest that the DB Custody Accounts should have been used only for "holding securities, trading securities."  D.E. 139-1 (Ratner Dep. Tr.) at 79:9-10; *see also id.* at 82:9-12 ("These accounts are supposed to be used to hold securities as a custody, trade securities, low volume.").  But Ratner excluded from his Inconsistent Use Damages analysis not only trading activity, but also other net inflows—which, if included, would have offset and therefore reduced Plaintiffs' alleged damages—despite the fact that Ratner could not say whether those inflows were consistent with the Offering Documents or the intended use of the DB Custody Accounts.  *See, e.g.*, *id.* at 194:5-16 (when asked whether the $23,258,138 net inflows associated with IA Capital Structures (Ireland) PLC were inconsistent with the Offering Documents or the intended use of the DB Custody Accounts, Ratner responded: "I don't know. I'm not taking a position on that."); *id.* at 194:25-195:8 (Ratner acknowledged that it was "hard to explain the logic" of how he determined what amounts should or should not be included as Inconsistent Use Damages); *id.* at 208:12-211:24 (Ratner *included* as Inconsistent Use Damages miscellaneous wire transfers and other cash activity that represented net *outflows* from the DB Custody Accounts, but *excluded* from his Inconsistent Use Damages calculations miscellaneous wire transfers and other cash activity that represented offsetting *inflows* into the DB Custody Accounts).[4]

---

[4]  Ratner also suggested that transfers falling into the "inconsistent use" category would include

Ratner was unable to provide clarity on his methodology during his deposition.  Instead, Ratner acknowledged that he identified certain transactions as Inconsistent Use Damages even though he had no knowledge of what the purpose of those transactions was.  *See, e.g.*, *id.* at 94:15-95:2 (when discussing how he purported to identify the relationship between third party entities and the DB Custody Accounts for purposes of categorizing transactions, Ratner testified vaguely: "[I]t's possible that somebody knew something about this payee from just going through hundreds of pages of documents and reading depositions and looking at stuff.  . . .  I don't know how they knew that."); *id.* at 97:18-24 (Ratner admitted that he categorized disbursements to certain entities as Inconsistent Use Damages even though some of those entities "are unknown to us" and, even where Ratner did purport to identify the relationship of an entity to the DB Custody Accounts, he couldn't "remember what the document is or whatever" that he relied on to make that identification); 123:11-125:4 (when asked why Ratner included as Inconsistent Use Damages thirteen transfers from the DB Custody Accounts to JP Morgan totaling $867,040, Ratner acknowledged that he didn't "have the data" to determine the purpose of the transactions, and stated: "I could see the point of excluding it because I need more information."); *id.* at 159:18-160:25 (when asked why he did not offset $1,789,285 from his Inconsistent Use Damages to account for net inflows from Biscayne entities, Ratner testified: "[I]f we decide that maybe it doesn't matter which Biscayne entity had it, which I'm not sure it

---

"funds to go to somebody to pay a kickback or for money laundering."  D.E. 139-1 (Ratner Dep. Tr.) at 74:11-17.  But Ratner's asserted Inconsistent Use Damages constitute much more than just payments to those identified as being part of the underlying fraudulent scheme.  In Schedule 2 to his Report, Ratner identifies approximately $65.8 million in "wires and other cash activity" that he asserts should be included as Inconsistent Use Damages, but only approximately $45.1 million of that amount does Ratner assert were "Transfers Made to or for the Benefit of Wrongdoers/Others Complicit in the Scheme."  D.E. 139-1 (Ratner Deposition Exhibit 4) at 365-75, Columns I, J.

does, it doesn't matter.  So add back a million 789."); *id.* at 166:21-167:19 (when asked why he

included $3,451,806 in transfers to Atlantic Sky Consulting Group as Inconsistent Use Damages

given that it was unclear whether Atlantic Sky provided bona fide consulting services to some of

the Companies, Ratner testified that he "hadn't thought about [that] question before" and was

"just not sure").[5]

In short, Ratner's "methodology" for calculating Inconsistent Use Damages appears to

have been simply an *ipse dixit* attempt to construe as many outflows as he possibly could (even

where he did not know the purpose of those outflows) as damages, and to exclude potentially-

offsetting inflows.[6]  Rule 702 bars this kind of unreliable, arbitrary expert testimony.  *See*

*generally Kallas* v. *Carnival Corp.*, 2009 WL 901507, at *6 (S.D. Fla. Mar. 30, 2009)

("[N]othing in *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court

---

[5]  These examples make clear that Ratner's calculations were based on guesswork and
assumptions and were not tied to actual facts or data.  *See* Fed. R. Evid. 702(b) (expert
testimony not permitted if not "based on sufficient facts or data").  This is not the first time
Ratner has attempted to calculate damages based on insufficient data.  *See In re Sonic Corp.
Customer Data Securities Breach Litigation*, 2021 WL 5916743, at *5 (N.D. Ohio Dec. 15,
2021) (excluding Ratner's damages calculations because "he did not collect sufficient data . . . to
support reliable results").

[6]  Defendants refer the Court to the November 4, 2022 Expert Report of David Alfaro (the
"Alfaro Report," attached hereto as Exhibit A) for other examples of Ratner's methodological
shortcomings.  For example, Ratner deemed over $38 million transferred from a DB Custody
Account to other, related accounts as Inconsistent Use Damages without analyzing how those
related accounts used the funds.  Ratner does not appear to have considered the possibilities that
(1) such transfers were ultimately used in a manner consistent with the Offering Documents or
the intended use of the DB Custody Accounts or (2) those related accounts might have
transferred some or all of the funds back to the DB Custody Accounts.  *See* Alfaro Report at 7-8.
Ratner also does not appear to have considered that some disbursements from the DB Custody
Accounts may have been in exchange for reasonably equivalent value (such as non-cash assets
like bonds) such that the disbursement could not constitute a "loss" by the DB Custody
Accounts.  *See id.* at 9.

may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

> **ii.     Ratner's Testimony Regarding Inconsistent Use Damages Would Not Be Helpful to the Trier of Fact Because It Is Not Based on any Legally-Recognized Measure of Damages**

Even if Ratner's calculations of Inconsistent Use Damages were based on a reliable methodology—which they are not—his testimony should still be excluded because it would not help the trier of fact.

To be helpful to a trier of fact, a damages expert must proffer testimony that "comport[s] with a recognized measure of damages[.]" *Coquina Investments* v. *Rothstein*, 2011 WL 4949191, at *7 (S.D. Fla. Oct. 18, 2011).  In this case, Plaintiffs' remaining claims are common-law breach-of-contract, fraud, and other tort claims.  *See* D.E. 31 (First Amended Complaint ("AC")) ¶¶ 373-413.[7]  For all such claims, the proper measure of damages is the amount of money necessary to put Plaintiffs in the position they would have been in had the alleged misconduct never occurred.  *See, e.g.*, *DFG Grp., LLC* v. *Heritage Manor of Memorial Park, Inc.*, 237 So. 3d 419, 422-23 (Fla. 4th DCA 2018) ("The goal of damages in tort actions is to restore the injured party to the position it would have been in had the wrong not been committed.") (internal quotation marks omitted); *Deauville Hotel Mgmt., LLC* v. *Ward*, 219 So. 3d 949, 954 (Fla. 3d DCA 2017) (in a breach-of-contract action, compensatory damages are to be awarded in "the amount which represents the loss actually inflicted by the action of the defendant"); *Coquina*, 2011 WL 4949191, at *7 (fraud claims allow "for recovery of amounts

---

[7]  One of Plaintiffs' remaining claims is a claim under Section 147 of the Cayman Islands Companies Law (*see* AC ¶¶ 373-81), but this Court has considered such a claim to be analogous to common-law aiding-and-abetting fraud claims.  *See* D.E. 84 at 12-15.

that the plaintiff actually lost").[8]

Here, then, Ratner's opinions can be helpful only to the extent they attempt to quantify the amounts the Companies actually lost as a result of Deutsche Bank's alleged misconduct. But that is not what the Inconsistent Use Damages show. Rather, those amounts reflect **all** net transfers out of the DB Custody Accounts that Ratner classifies as being inconsistent with the Offering Documents or the intended use of the Accounts, regardless of whether those transfers actually constitute losses to the Companies.

For example, as Ratner acknowledges, there were "other sources of capital coming into these accounts" in addition to funds from the Companies' issuance of notes. D.E. 139-1 (Ratner Dep. Tr.) at 130:9-22. Given that Ratner apparently believes one purpose of the DB Custody Accounts was "holding securities [and] trading securities" (*id.* at 79:7-10), it must be the case that, if the underlying scheme had never occurred, the Companies would not have come into possession of money from sources other than the issuance of notes. But Ratner does not limit Inconsistent Use Damages only to funds from the proceeds of note issuances that then flowed out of the DB Custody Accounts. Put another way, if the DB Custody Accounts received $1 million from an allegedly improper source that had nothing to do with the notes, and then transferred that $1 million to some other improper party, that $1 million would be included as Inconsistent Use Damages even though, had the alleged misconduct never occurred, the Companies would never have come into possession of that $1 million in the first place. *See* Alfaro Report at 8 (similarly observing that such "pass-through" funds should not be included as damages). Since, therefore,

---

[8] This Court has not determined whether Florida or New York law should apply to Plaintiffs' common-law claims, but the proper measure of damages is the same in both states. *See, e.g.*, *E.J. Brooks Co.* v. *Cambridge Security Seals*, 105 N.E.3d 301, 307 (N.Y. 2018) ("The goal [of compensatory damages] is to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred.").

Ratner's Inconsistent Use Damages do not comport with the proper measure of damages in this case, they would not be helpful—indeed, they would be extremely confusing—to the finder of fact and Ratner's testimony concerning such damages should be excluded.

**B.** **Ratner's Calculations of Amounts the Companies Would Not Have Paid or Incurred But For Deutsche Bank's Alleged Misconduct Are Also Unreliable and Would Not Be Helpful to the Trier of Fact**

Separate from Inconsistent Use Damages, Ratner asserts the Companies would not have paid or incurred certain amounts had Deutsche Bank never opened the DB Custody Accounts, or closed them almost immediately after opening them. Specifically, Ratner identifies as damages "[t]he entire amount of Note interest payments totaling $31,062,614," which is based "on the premise that the interest on the Notes would have been saved had the Defendants closed the Note Issuers' accounts on or before the first interest payment on May 30, 2014" ("Interest Damages"), and "[i]ncreased liabilities as of April 8, 2014 [that] total $131,268,038," which represents "all of the Note issuances subsequent to the date the DB Custody Accounts were opened" ("Issuance Damages"). D.E. 139-1 (Ratner Report) at 308, 310.

These opinions, too, are unreliable and would not be helpful to the trier of fact. To be reliable for Rule 702 purposes, "[a]n expert's opinion on damages must be predicated on assumptions which have a reasonable basis in the evidence." *Coquina*, 2011 WL 4949191, at *7. Here, Ratner's Interest Damages and Issuance Damages rest on the assumption that Deutsche Bank should never have opened the DB Custody Accounts at all, or should have almost immediately closed them. *See, e.g.*, D.E. 139-1 (Ratner Dep. Tr.) at 133:23-134:12 (when asked whether he analyzed "whether there actually was a basis for defendants to close the [note] issuers' accounts before May 30, 2014," Ratner responded: "[T]hat's an assumption, a premise of the calculation. An assumption is a good word."). But Ratner does not cite any evidence to

support this assumption, much less any "reasonable" evidence—indeed, even Plaintiffs' unsupported AC alleges only that Deutsche Bank identified suspicious wire activity "as early as January 2016[.]" AC ¶ 289. Because Ratner's calculations rest entirely on a critical but unsupported assumption about when the DB Custody Accounts should have been closed, the calculations are unreliable.[9]

In addition, Ratner's opinions on Interest Damages and/or Issuance Damages would not help the trier of fact because they, like the Inconsistent Use Damages, do not purport to quantify the amounts the Companies actually lost. *See* Section I(A)(ii), above. Ratner's Interest Damages reflect "payments that the note issuers made to investors" in the notes—i.e., the holders of notes that were the ultimate victims of the scheme. D.E. 139-1 (Ratner Dep. Tr.) at 136:21-25. But since any payments from the DB Custody Accounts to investors would reduce the amounts that those investors could seek from the Companies in the liquidation proceedings, these payments to investors should *offset* Plaintiffs' alleged damages, not add to them. For example, if an investor purchased $1 million in notes, but was paid $500,000 in interest out of the DB Custody Accounts, that investor would be out of pocket only $500,000, meaning that it would only take $500,000, not $1 million, to put that investor—and, by extension, the Companies themselves—back in the position they would have been had the scheme never occurred.

The same is true for Issuance Damages. Ratner acknowledged that he calculated Issuance Damages by totaling the amount of note issuances between the opening of the DB Custody Accounts and the beginning of the liquidation proceedings, and did *not* offset such

---

[9]  In addition, Ratner did not determine that all of the proceeds from note issuances flowed through the DB Custody Accounts. *See* D.E. 139-1 (Ratner Dep. Tr.) at 225:18-24. Since Deutsche Bank cannot be liable for amounts that never traveled through a Deutsche Bank account, this lack of analysis also renders Ratner's methodology in calculating Issuance Damages unreliable.

alleged damages with amounts investors were already repaid via interest payments, repurchases of notes, or otherwise. *See* D.E. 139-1 (Ratner Dep. Tr.) at 228:5-19. By not factoring in these payments, Ratner's calculations of Issuance Damages would, again, result in a windfall for the Companies. *See generally Cooperative Leasing, Inc.* v. *Johnson*, 872 So. 2d 956, 958 (Fla. 2d DCA 2004) ("[T]he purpose of compensatory damages is to compensate, not to punish defendants or bestow a windfall on plaintiffs."). Since Ratner's Interest Damages and Issuance Damages calculations do not comport with a proper measure of damages, those calculations would not be helpful to the trier of fact and Ratner should not be permitted to testify as to those categories of damages.

### C. Ratner Should Not Be Permitted to Provide Testimony Concerning Alleged Liquidation Expenses

Ratner also seeks to provide testimony concerning $9,005,139 in alleged "administrative expenses of the liquidation proceedings[.]" D.E. 139-1 (Ratner Report) at 18. Ratner states that the "entire amount is a component of damages," but never explains why. Indeed, it does not appear that Ratner conducted *any* analysis of the underlying liquidation proceedings.

Among other things, Ratner acknowledged during his deposition that he did not consider "whether [the Companies] might have gone bankrupt or had to be liquidated" regardless of Deutsche Bank's alleged misconduct. D.E. 139-1 (Ratner Dep. Tr.) at 169:9-14. As discussed above, the proper measure of damages in this case is the money, if any, Plaintiffs lost due to Deutsche Bank's alleged misconduct. *See* Section I(A)(ii), above, and cases cited therein. Since Plaintiffs may have gone into liquidation regardless of Deutsche Bank's alleged misconduct, however, and since Ratner has nothing to say one way or the other on that front, Ratner's testimony concerning the administrative expenses of the liquidation proceedings cannot be helpful to the trier of fact and thus should be excluded.

13

Moreover, Ratner could not say whether $9,005,139 is the proper amount of Plaintiffs' administrative expenses.  According to Ratner, he included administrative expenses that have been **_incurred_** in the liquidation proceedings, even though some of those expenses may not be approved by the court overseeing the liquidation proceedings.  *See* D.E. 139-1 (Ratner Dep. Tr.) at 170:23-172:8.  Ratner acknowledged that, even under his approach, damages should be limited only to expenses "approve[d]" in the underlying liquidation proceeding (*id.* at 172:6-8), but he has done nothing to determine whether and to what extent any expenses have been approved and paid (*see id.* at 171:12-17).  This testimony further reveals that Ratner's methodology with respect to this category of alleged damages was not just deficient, but, in fact, completely non-existent.

Since Ratner did not conduct any analysis of the liquidation administrative expenses, and since there is no evidence that such expenses are damages properly attributable to Deutsche Bank in any event, Ratner should not be permitted to testify about such alleged damages.[10]

### D.   Ratner Should Not Be Permitted to Provide Testimony Concerning Alleged Prejudgment Interest

The fourth category of damages about which Ratner seeks to testify is prejudgment interest.  But the applicability and amount of prejudgment interest is a question of law to be decided by the Court only if Deutsche Bank is found liable after trial.  *See, e.g.*, *Wiand* v. *Lee*, 753 F.3d 1194, 1204-5 (11th Cir. 2014) (noting that the decision to award prejudgment interest under Florida law includes, among other things, the consideration of various equitable factors); *Allapattah Services, Inc.* v. *Exxon Corp.*, 2006 WL 1132371, at *3 (S.D. Fla. Apr. 7, 2006) (court ruled on prejudgment interest "[a]fter trial").  During his deposition, Ratner readily

---

[10]  Given his lack of familiarity with the liquidation proceedings, this portion of Ratner's opinion, too, is "based on [in]sufficient facts or data."  Fed. R. Evid. 702(b).

acknowledged this fact. *See, e.g.*, D.E. 139-1 (Ratner Dep. Tr.) at 174:18-175:9; 176:15-25.

"[P]roposed expert testimony that offers a legal conclusion is inadmissible." *See*

*Bachmann* v. *Hartford Fire Ins. Co.*, 323 F. Supp. 3d 1356, 1360 (M.D. Fla. 2018). Since the

applicability and amount of prejudgment interest in any case is a legal conclusion, Ratner should

not be permitted to provide expert testimony on that topic.[11]

## II.   FRAHER IS NOT QUALIFIED TO PROVIDE EXPERT TESTIMONY REGARDING DEUTSCHE BANK'S COMPLIANCE PROCEDURES

Fraher seeks to testify about the sufficiency of Deutsche Bank's customer on-boarding,

KYC, and transaction monitoring processes as well as later attempts to remediate business and

operational issues with those clients. Specifically, Fraher opines that:

- Opinion 1: "DB fell short of the ordinary standard of care in the banking industry when DB conducted its initial Know Your Customer ('KYC') process for onboarding and opening custody accounts and subaccounts for Madison." Exhibit B (Fraher Deposition Exhibit 1 (Oct. 21, 2022 Expert Report of Richard Fraher) ("Fraher Report")) at 5.

- Opinion 2: "At various points from 2014 to 2016 when DB's own staff raised concerns about Madison, the standard banking practice would have either to remediate Madison's misuse of the custody accounts or to terminate the relationship with Madison. If it had chosen to remediate, DB could have imposed effective measures to stop Madison from making payments through its custody account that were unrelated to securities transactions and to stop running up overdrafts. Alternatively, DB could have terminated its dealing with Madison. DB neither imposed effective remediation measures nor terminated the Madison accounts and therefore fell short of the standard of ordinary care for a similarly situated bank." *Id.* at 10.

- Opinion 3: "By failing to remediate the issues related to the Madison accounts or terminate its relationship with Madison, DB facilitated the continuation and the cover up of the fraud." *Id.* at 14.

---

[11]  To the extent a jury decides this case or some portion thereof, the question of prejudgment interest will be decided by the Court only ***after*** the jury has rendered a verdict. In that scenario, Ratner's testimony concerning prejudgment interest could not possibly be helpful to the jury. If anything, it would confuse the jury, and prejudice Defendants by implying that compensatory damages are higher in this case than they actually are. Thus, testimony by Ratner or anyone else concerning prejudgment interest should be barred under Federal Rule of Evidence 403 as well.

Given his lack of relevant experience, Fraher is not qualified to render these opinions. Even if he were, he should not be permitted to offer his Opinion 3, which is a legal conclusion that would not be helpful to the trier of fact because it does not rely on any expert analysis, but merely tells the trier of fact how Fraher thinks it should rule.

### A.      Fraher Is Not Qualified to Testify About Compliance Procedures at a  Major Financial Institution

As set forth above, Fraher seeks to opine that Deutsche Bank's internal KYC and related compliance procedures failed to satisfy "the ordinary standard of care in the banking industry," and that Deutsche Bank failed to follow "standard banking practices" with respect to the DB Custody Accounts.  *See* Ex. B (Fraher Report) at 5-13.  As such, the Fraher Report relies on the assumption that Fraher is qualified to testify about, among other things, what a global financial institution's "typical KYC program" entails (*id.* at 5), what such financial institutions "typically" do "during initial KYC due diligence on new customers" (*id.* at 5-6), and when a financial institution must "remediate . . . issues" or "terminate [an] account relationship" (*id.* at 13).

This assumption is incorrect.  Fraher is not, in fact, qualified to testify about any such subjects.  Indeed, a review of Fraher's resume (*see* Ex. B (Fraher Report) at 27-28) makes clear that he is a "lawyer, consultant, and expert witness" whose "[p]revious [e]xperience" is limited to work in the Retail Payments Office of the Federal Reserve Bank of Atlanta ("Atlanta Fed") and as a senior attorney in the enforcement division of the Federal Deposit Insurance Corporation ("FDIC").  Put another way:  ***Fraher has never been employed by a bank in any capacity at all***, much less in a compliance or anti-fraud role that might have given him some grounds on which to base his testimony.  *See also* Ex. B (Nov. 9, 2022 Deposition of Richard Fraher ("Fraher Dep. Tr.")) at 13:1-14:6 (Fraher once provided unspecified consulting services to "federally insured depository institutions" related to "remote banking services," but has never been employed by a

bank).  During his deposition, Fraher also acknowledged that he is not a certified anti-money laundering specialist or fraud examiner.  *See id.* at 11:4-17.

The mere fact that Fraher worked at the Atlanta Fed and FDIC is not sufficient to render him qualified to testify about what Deutsche Bank should or should not have done in this case for two reasons.  First, the only experience at either of those institutions to which Fraher points to suggest he is qualified to provide an opinion on banking-industry standards of care with respect to KYC and related procedures is his role in "establishing the initial policies, procedures and practices with respect to standing up our OFAC/BSA/AML, Know Your Customer program for the federal ACH service" during his employment with the Atlanta Fed.  *Id.* at 12:1-25.  But this service is merely "a means of transmitting cross-border ACH [automated clearing house] credit payments to countries around the world."  Ex. B (Fraher Report) at 4.  It is unclear how experience with this service renders Fraher qualified to opine on a financial institution's KYC or similar procedures, and nothing in the Fraher Report or Fraher's deposition testimony sheds any further light on that question.  *See, e.g.*, Ex. B (Fraher Dep. Tr.) at 90:16-91:4 (Fraher was not involved with the kind of "customer on-boarding with the BSA/AML customer due diligence and then KYC/AML due diligence" relevant to this case); *see generally Natures Way Marine, LLC* v. *Everclear of Ohio, Ltd.*, 2014 WL 5817535, at *3 (S.D. Ala. Nov. 10, 2014) (mere fact that expert was attorney with experience in maritime law did not render him qualified to testify about "operating a tug, transporting fuel oil, or performing" other maritime tasks); *Mendel* v. *Royal Caribbean Cruises Ltd.*, 2012 WL 13129839, at *4 (S.D. Fla. Jan. 9, 2012) (fact that witness had investigated "maritime crime and accidents" did not render him qualified to testify about the proper design and placement of a step on a cruise ship deck, particularly given that

expert "[did] not explain" how his experience was relevant); *Hughes*, 766 F.3d at 1329 ("The proponent of the expert opinion must carry the burden of establishing qualification[.]").[12]

Second, to the extent Fraher's experience at the Atlanta Fed and FDIC somehow renders him qualified to opine about KYC and related practices at *some* financial institutions, it does not do so with regard to practices at a major financial institution like Deutsche Bank. When asked, for example, about his experience with transaction monitoring systems, Fraher acknowledged that his experience was limited to "small community banks" that "outsource a lot of this." Ex. B (Fraher Dep. Tr.) at 32:21-33:8. Fraher then attempted to speculate about "the larger financial institutions," but acknowledged he had no firsthand experience with such systems at such institutions. *Id.* at 33:12-34:8.

Taken as a whole, Plaintiffs have failed to carry their burden to establish that Fraher is qualified to offer any of the opinions addressed in his Report and, as such, Fraher should be barred from testifying pursuant to Rule 702.

> **B.      Fraher's Opinion 3 Is an Impermissible Attempt to Tell the Trier of Fact How to Rule**

Even if Fraher were somehow qualified to provide expert testimony about the subjects addressed in his Report, he should not be permitted to tell the trier of fact that Defendants "facilitated the continuation and cover up of the [underlying] fraud." Ex. B (Fraher Report) at 14. Whether Defendants "facilitated" the underlying fraud is the ultimate question the trier of fact must decide in this case (at least with regard to Plaintiffs' aiding-and-abetting and

---

[12] Fraher appears to have some experience in interpreting and enforcing certain laws applicable to financial institutions. *See* Ex. B (Fraher Report) at 3-4. But this is experience *as a lawyer*, not as a banking professional. To the extent the real opinion Fraher wishes to express in his Report is that he thinks Defendants violated the law, that is, of course, a legal conclusion he should not be permitted to opine about for the reasons discussed in Section II(B), below.

fraudulent-trading claims), so Fraher's testimony on that question would be improper.  *See, e.g.*, *Montgomery* v. *Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("An expert may not . . . merely tell the jury what result to reach."); *Day* v. *Edenfield*, 2022 WL 972430, at *7 (N.D. Fla. Mar. 31, 2022) (barring expert who attempts to provide "an advocacy-based narrative of the facts" because such testimony "merely [told] the jury what facts to find").[13]

## CONCLUSION

For the reasons set forth above, this Court should bar both Ratner and Fraher from providing any expert testimony in this case.

## LOCAL RULE 7.1(a)(3) CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(a)(3), undersigned counsel for Defendants conferred, by email and telephone, with counsel for Plaintiffs in a good faith effort to resolve the issues raised herein. Despite those efforts, the parties were not able to resolve the issues.

---

[13]  Fraher's status as an attorney poses a heightened risk that, if a jury decides this case or some portion thereof, it will treat this kind of testimony not as factual evidence to be weighed like any other piece of evidence, but instead as an instruction on the legal effect of Deutsche Bank's conduct.  Thus, even if Fraher's Opinion 3 had some minimal factual relevance (it does not), that relevance would be "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury[.]"  Fed. R. Evid. 403; *see generally In re Titanium Dioxide Antitrust Litigation*, 2013 WL 1855980, at *8 (D. Md. May 1, 2013) (barring testimony from law professor that was "likely to mislead the jury" into thinking he was offering a "legal opinion").

Dated:  November 11, 2022
        Miami, Florida

*/s/ Julian A. Jackson-Fannin*
Harvey W. Gurland, Jr., Esq.
Florida Bar No. 284033
Julian A. Jackson-Fannin, Esq.
Florida Bar No. 93220
DUANE MORRIS LLP
201 S. Biscayne Boulevard, Suite 3400
Miami, FL 33131-4325
(305) 960-2214

-and -

David G. Januszewski, Esq. (*pro hac vice*)
Sheila C. Ramesh, Esq. (*pro hac vice*)
Sesi V. Garimella, Esq. (*pro hac* vice)
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for Defendants Deutsche Bank AG,*
*Deutsche Bank Trust Company Americas,*
*Deutsche Bank Luxembourg S.A., and*
*Deutsche Bank (Suisse) S.A.*
