# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No.: 1:21-cv-22437-Bloom/Otazo-Reyes

MICHAEL PEARSON, *et al.*,

     Plaintiffs,

  v.

DEUTSCHE BANK AG, *et al.*,

     Defendants.

---

## DEFENDANTS DEUTSCHE BANK AG, DEUTSCHE BANK TRUST COMPANY AMERICAS, DEUTSCHE BANK LUXEMBOURG S.A., AND DEUTSCHE BANK (SUISSE) S.A.'S <u>MOTION FOR SUMMARY JUDGMENT</u>

Harvey W. Gurland, Jr., Esq.
Florida Bar No. 284033
Julian A. Jackson-Fannin, Esq.
Florida Bar No. 93220
DUANE MORRIS LLP
201 S. Biscayne Boulevard, Suite 3400
Miami, FL 33131-4325
(305) 960-2214

-and -

David G. Januszewski, Esq. (*pro hac vice*)
Sheila C. Ramesh, Esq. (*pro hac vice*)
Sesi V. Garimella, Esq. (*pro hac* vice)
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Luxembourg S.A., and Deutsche Bank (Suisse) S.A.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................ 1

FACTUAL BACKGROUND ................................................ 3

LEGAL STANDARDS ................................................ 9

ARGUMENT ................................................ 10

I.      THE DOCTRINE OF *IN PARI DELICTO* BARS PLAINTIFFS' CLAIMS .............. 10

   A.  The Companies Are Substantially More Culpable as Key Drivers of the Ponzi Scheme 10

   B.  The Adverse Interest Exception Does Not Apply ........................................... 12

II.     PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS .......................... 16

III.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT CONCERNING
PLAINTIFFS' CLAIMS OF AIDING AND ABETTING CONVERSION AND BREACH OF
FIDUCIARY DUTY ................................................ 17

   A.  Deutsche Bank Did Not Have Actual Knowledge of the Companies'  Wrongdoing ..... 18

   B.  Deutsche Bank Did Not Provide the Companies with Substantial Assistance .............. 21

IV.     THERE IS NO MATERIAL ISSUE OF FACT REGARDING PLAINTIFFS'
FRAUDULENT TRADING CLAIM ................................................ 24

   A.   Deutsche Bank Neither Had Knowledge of Nor Was Willfully Blind to  the
Controllers' Misconduct ................................................ 24

   B.      Deutsche Bank Did Not Contribute to the Fraud ........................................ 25

V.      THERE IS NO MATERIAL ISSUE OF FACT CONCERNING DB LONDON'S
COMPLIANCE WITH THE TERMS OF ITS AGENCY AGREEMENTS .......................... 26

VII.    THERE IS NO MATERIAL ISSUE OF FACT CONCERNING DEUTSCHE
BANK'S BREACH OF ANY DUTY TO THE COMPANIES ................................. 27

VIII.   DB LUX AND DB SUISSE ARE NOT SUBJECT TO PERSONAL
JURISDICTION ................................................ 28

  A.  DB Lux and DBS Are Not Subject to General Jurisdiction......................................... 28

  B.  DB Lux and DBS Are Not Subject to Specific Jurisdiction ..................................... 29

CONCLUSION............................................................................................................................ 30

REQUEST FOR ORAL ARGUMENT ........................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Able Body Temporary Services, Inc.*,
    626 B.R. 643 (M.D. Fla. Bankr. 2020) ...................................................................17

*In re Agape Litigation*,
    773 F. Supp. 2d 298 (E.D.N.Y. 2011) ....................................................................18

*Angell* v. *Allergan Sales, LLC*,
    2019 WL 3958262 (M.D. Fla. Aug. 22, 2019) .......................................................21

*Brand* v. *Old Republic Nat'l Title Ins. Co.*,
    797 So.2d 643 (Fla. 3d DCA 2001) .....................................................................18n

*Celotex Corp.* v. *Cattrett*,
    477 U.S. 317 (1986)..................................................................................................9

*Daimler AG* v. *Bauman,*
    571 U.S. 117, 122 (2014).........................................................................................28

*A.L. ex rel. D.L.* v. *Walt Disney Parks & Resorts US, Inc.*,
    900 F.3d 1270 (11th Cir. 2018) ...............................................................................9

*Feltman* v. *Prudential Base Securities*,
    122 B.R. 466 (Bankr. S.D. Fla. 1990) ...................................................................14

*Freeman* v. *Dean Witter Reynolds, Inc.*,
    865 So. 2d 543 (Fla. 2d DCA 2003) ....................................................14, 17, 23

*Re ICP Strategic Credit Income Fund Limited and ICP Strategic Credit Income
Master Fund Limited*,
    [2014] 2 CILR 1....................................................................................................24n

*Insight Securities, Inc.* v. *Deutsche Bank Trust Company Americas*,
    2021 WL 3473763 (S.D. Fla. Aug. 6, 2021).................................................... 27-28

*Isaiah* v. *JP Morgan Chase Bank*,
    960 F.3d 1296 (11th Cir. 2020) .........................................................................16, 17

*Kapila* v. *Grant Thornton, LLP*,
    2017 WL 2590975 (S.D. Fla. Mar. 9, 2017)..........................................................13

*In re Kapila*,
    762 F. App'x 991 (11th Cir. 2019) .......................................................................15

**Page(s)**

*Kirschner* v. *Grant Thornton LLP*,
　2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009)..........................................................................13

*Lamm* v. *State Street Bank & Trust Co.*,
　889 F. Supp. 2d 1321 (S.D. Fla. 2012) ............................................................................ 20-21

*Lawrence* v. *Bank of America, N.A.*,
　2010 WL 3467501 (M.D. Fla. Aug. 30, 2010) .......................................................................22

*Lawrence* v. *Bank of America, N.A.*,
　455 F. App'x 904 (11th Cir. 2012) ........................................................................... 18, 19, 23

*In re Maidstone Buildings Provisions Ltd*,
　[1971] 1 WLR 1085 ................................................................................................................25

*Manifest Shipping Co. Ltd.* v. *Uni-Polaris Co Ltd*,
　[2003] 1 AC 469 .....................................................................................................................25

*In re Meridian Asset Management, Inc.*,
　296 B.R. 243 (Bankr. N.D. Fla. 2003) ...................................................................................14

*Morris* v. *State Bank of India*,
　[2003] EWHC 1868 (Ch) ..................................................................................................24, 25

*Mukamal* v. *Bakes*,
　2008 WL 11391157 (S.D. Fla. May 20, 2008) .......................................................................14

*Nathel* v. *Siegal*,
　592 F. Supp. 2d 452 (S.D.N.Y. 2008)....................................................................................21

*In re North Pointe Holdings (BVI) Ltd.*,
　No. 1:18-24659 .....................................................................................................................16n

*Official Committee of Unsecured Creditors of PSA, Inc.* v. *Edwards*,
　437 F.3d 1145 (11th Cir. 2006) ..............................................................................10, 11, 12

*In re Pharmalat Securities Litigation*,
　501 F. Supp. 2d 560 (S.D.N.Y. 2007)....................................................................................13

*Pinter* v. *Dahl*,
　486 U.S. 622 (1988)................................................................................................................10

*Richter* v. *Wells Fargo Bank NA*,
　2015 WL 163086 (M.D. Fla. Jan. 13, 2015).....................................................................23, 24

*In re Skyway Communications Holding Corp.*,
　389 B.R. 801 (Bankr. M.D. Fla. 2008) ..................................................................................12

**Page(s)**

*Trott et al.* v. *Deutsche Bank AG*,
No. 1:21-cv-10299 .................................................................................................17

*United States* v. *Bailey*,
288 F. Supp. 2d 1261 (M.D.Fla.2003) ...............................................................18n

*United States* v. *Cortes*
No. 1:21-cr-00458 .................................................................................................1n

*Wiand* v. *Wells Fargo Bank, N.A.*,
938 F. Supp. 2d 1238 (M.D. Fla. 2013) ................................................................18

*Yacht Club on the Intracoastal Condo. Ass'n* v. *Lexington Ins. Co.*,
944 F. Supp. 2d 1258 (S.D. Fla. 2013) ...................................................................9

**Statutes**

Fla. Stat. § 48.193(1)(a)(1) ............................................................................................29

**Other Authorities**

Fed. R. Civ. P. 56(c) ........................................................................................................9

Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Luxembourg S.A., and Deutsche Bank Suisse S.A. (collectively "Defendants" or "Deutsche Bank"), pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L.R. 56.1, move for summary judgment and in support thereof state as follows.

## PRELIMINARY STATEMENT

Plaintiffs are representatives and liquidators of thirteen foreign, offshore entities (the "Companies") that effected a Ponzi scheme that caused duped investors to lose hundreds of millions of dollars.  This action is a transparent attempt by representatives of those bad actors to improperly recoup losses from Deutsche Bank, an innocent bystander that provided ordinary banking services to the Companies.  Witness testimony and documentary evidence confirm that in performing its routine banking duties, Deutsche Bank had no reason to suspect that the Companies were secretly perpetrating a Ponzi scheme, and there is no evidence that Deutsche Bank substantially assisted the Companies in effecting that Ponzi scheme.  Indeed, the evidence corroborates the conclusion of the U.S. Attorney's Office for the Eastern District of New York that Deutsche Bank was a victim of the fraud, not a participant in it.[1]  There are no genuine issues of material fact relating to any of Plaintiffs' claims, and summary judgment should be granted.

First, because the Companies were active, knowing participants in the Ponzi scheme, Plaintiffs' claims are barred by the doctrine of *in pari delicto*.  The Companies were created and used for the purpose of perpetrating the fraud.  Those entities cannot now be permitted to recover from Deutsche Bank for their own fraud.

---

[1] Indictment at 18-20, *United States* v. *Cortes*, (No. 1:21-cr-00458), D.E. 1.

Second, Plaintiffs lack standing to assert their claims here.  In addition to the standing issues created by their status as wrongdoers, Plaintiffs also do not have standing because they premise their claims on the incorrect notion that they were entitled to funds in the custody account of a third party distinct from the Companies.

Third, there is no genuine dispute as to any material fact concerning Plaintiffs' aiding and abetting claims because the evidence confirms that Deutsche Bank neither had actual knowledge of the Companies' wrongdoing nor provided substantial assistance to the Companies in carrying out the Ponzi scheme.

Fourth, for the same reasons, there is no genuine dispute of any material fact concerning Plaintiffs' Cayman Islands fraudulent trading claim.  The evidence demonstrates that Deutsche Bank neither knew of the Companies' Ponzi scheme, nor made a decision to avoid confirming the existence of the Ponzi scheme, nor did anything to contribute to the Ponzi scheme.

Fifth, the evidence confirms that there is no genuine dispute of any material fact relating to Plaintiffs' claims that Deutsche Bank breached the terms of the governing Agency Agreements by executing instructions from the purported outside directors for certain note issuers.  Deutsche Bank's role as an administrative agent for those note issuers was defined and limited by the terms of the Agency Agreements.  Deutsche Bank did not, and had no authority to, substantively participate in any activity relating to those notes.  Its only duty was to receive and execute instructions from the note issuers.  That is what it did.

Sixth, there is no genuine dispute of any material facts concerning Deutsche Bank's breach of any duty to the Companies.  Because Deutsche Bank had no knowledge of the wrongdoing, it had no duty to investigate or question duly authorized instructions from its clients.

Finally, Plaintiffs fail to demonstrate any basis for this Court to exercise personal jurisdiction over the Deutsche Bank entities located and operated entirely in Luxembourg and Switzerland.

## FACTUAL BACKGROUND

### A.    *The Biscayne Ponzi Scheme*

Around 1999, Frank Chatburn, Juan Carlos Cortes, Roberto Cortes, and Ernesto Weisson (together, the "Controllers") created a real estate development company South Bay Holdings. Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("56.1") ¶¶ 2-3.  They later created an investment advisory firm Biscayne Capital International ("Biscayne Capital"), which solicited investments for South Bay's development projects.  56.1 ¶¶ 4-5.  In reality, however, South Bay and its subsidiaries were insolvent, and the Controllers used the unknowing investors' funds to pay off earlier investors and to collect their own illicit profits.  56.1 ¶ 6.  Over time, the Controllers created almost 100 entities to facilitate their scheme.  56.1 ¶ 9.  This web of "complex offshore business structures" kept the scheme afloat, while also "shield[ing]" the Controllers from liability.  D.E. 31 (Amended Complaint ("AC")) ¶ 73.  Since the Ponzi scheme began to unravel in 2017, the Controllers and their "lieutenants" have been indicted and charged with money laundering, wire fraud, and other crimes.  56.1 ¶¶ 10-11.

The Companies constitute only a small piece of the web of entities described above. They include five special purpose vehicles ("SPVs") created to issue debt that would keep the Ponzi scheme afloat (the "Note Issuers") and a variety of other holding companies, broker dealers, or investment advisors supporting the scheme.  56.1 ¶¶ 8, 14-16.  Each of the Companies was beneficially owned and controlled by the Controllers.  56.1 ¶¶ 14-28.  The Note Issuers' affairs were also "manag[ed]" and "supervise[d]" by either New Haven Management Inc. or the

3

related entity SGG Management B.V.I. Ltd. ("SGG") as outside Directors (the "Note Issuer Directors" or the "Directors").  56.1 ¶ 56.

**B.     *Banking Services Provided by Deutsche Bank***

Deutsche Bank AG and its subsidiaries provided three types of ordinary financial services to individuals and entities later linked to the Ponzi scheme: European trust and agency services, U.S. custody services, and wealth management services.  56.1 ¶ 29.[2]

**European Trust and Agency Services**:  Between 2011 and 2017, four of the five Note Issuers[3] entered into Agency Agreements pursuant to which Deutsche Bank AG, London Branch ("DB London") acted as transfer agent, issuing agent, and paying agent and Deutsche Bank Luxembourg S.A. ("DB Lux") acted as Registrar for the note issuances.  56.1 ¶¶ 31-32.  Each of these roles was non-discretionary and administrative.  For example, as issuing agent, DB London received instructions from the Note Issuers or their authorized agent and then delivered notes to a clearing system based on those instructions, not according to the bank's own discretion.  56.1. ¶ 35.  As Paying Agent, DB London also received instructions from the Note Issuers and then effected those instructions and delivered funds to the clearing system, after which the clearing system would then pass the funds on to the noteholders.  56.1. ¶ 37.  Finally, as Transfer Agent, when DB London received instructions from the Note Issuers, it would transfer Notes to different investors or bond holders.  *Id.* ¶ 36.  DB Lux's role was even narrower: it simply maintained the note register, which identified a single registered noteholder for all the notes at

---

[2]  Other institutions provided similar, if not identical services to Biscayne Capital and its related entities.  56.1 ¶ 30.

[3]  Plaintiffs have alleged that Deutsche Bank acted as an agent for Sentinel Investment Fund SPC, but there is no evidence confirming that allegation.

issue here, BT Globenet Nominees Limited ("BT Globenet"). *Id.* ¶¶ 47.  BT Globenet acted as legal owner of the notes on behalf of the depository institution.[4]  56.1 ¶ 48.

Consistent with these limited, non-discretionary roles and duties, the Agency Agreements strictly circumscribed DB London and DB Lux's potential liability in connection with the offerings:

- "***No obligations or duties of the Agents which are not expressly stated herein or in the Conditions shall be implied***." 56.1 ¶ 51;

- "***[U]nder no circumstances will the Agents be liable to the Issuer or any other party to this Agreement*** in contract, tort (including negligence) or otherwise for any consequential, special, indirect or speculative loss or damage . . . which arises out of or in connection with this Agreement[.]" 56.1 ¶ 52; and

- the Note Issuers "***shall indemnify the Agents for an amount equal to any loss, liability, cost, claim, action . . . or expense . . . that such Agent . . . may incur arising out of or in relation to or in connection with its appointment or the exercise of its function***." 56.1 ¶ 53.

The offering documents for the Note issuances underscored these limitations on liability, describing DB London and DB Lux as "service providers to the Issuer [who] are not responsible for the preparation of this document or the activities of the Issuer and therefore accept no responsibility for any information contained in this document[.]" 56.1 ¶ 55.

DB London's role was limited to acting upon duly authorized instructions received from the Note Issuers or their agents. 56.1 ¶¶ 34, 57-58.  These included, for example, instructions to re-tap the notes. 56.1 ¶ 44.  Re-tapping is a common practice that involves selling additional securities, which have already been authorized for sale but were held back from the initial offering. 56.1 ¶ 46.  The Note Issuers or their Directors also informed DB London that they had entered into certain "swap transactions" pursuant to which one of the Note Issuers would acquire

---

[4]  DB Lux did not have access to the identities of the individual noteholders.  That information is held exclusively by the depository.  56.1 ¶ 47.

a majority of the maturing Notes and then renounce cash payment in exchange for payment in kind (*i.e.*, an offset or other consideration).  56.1 ¶¶ 44-45.

**U.S. Custody Services**:  Separately, Deutsche Bank AG, New York Branch ("DB NY") provided U.S. custody services to four entities, later revealed to have been associated with the Ponzi scheme: Biscayne Capital S.A. ("Biscayne Uruguay"), Madison Asset LLC ("Madison Asset" or "Madison"), Biscayne Capital Bahamas, and Biscayne B.V.I.  56.1 ¶¶ 63-64, 71, 75. Pursuant to each of these entities' custody agreements and at the direction of the Controllers or their agents, DB NY held assets in the custody accounts for these entities.  56.1 ¶¶ 64, 76.  All of these entities underwent standard on-boarding and Know Your Customer ("KYC") reviews before their accounts were opened.  56.1 ¶¶ 65, 72, 77.  At the Controllers' request, all the three custody accounts were also divided into a number of sub-accounts, which are a common tool that banks offer to their clients in order to allow them to organize or segregate their assets as they wish.  56.1 ¶¶ 66, 73.  Notwithstanding the creation of sub-accounts, all assets in the sub-accounts remain the property of the single account holder.  56.1 ¶ 68.

**Wealth Management Services**:  Deutsche Bank Trust Company Americas ("DBTCA") and Deutsche Bank Suisse ("DB Suisse" or "DBS") provided wealth management services to other individuals for which Biscayne acted as a financial intermediary or investment advisor. 56.1 ¶¶ 79-80.  Because these entities acted primarily as financial intermediaries ("FIMs"), they referred their own clients to Deutsche Bank for certain financial services that the Biscayne entities could not provide themselves.  56.1 ¶¶ 80-82.  Although the private wealth relationship began with DBS, DBS decided not to continue its relationship with Biscayne in 2016. 56.1 ¶¶ 83-85.

C.      *The Ponzi Scheme Unravels*

Over time, operational challenges relating to the Controllers' DB NY custody accounts began to accumulate.  Specifically, issues arose relating to (1) wire transfers and (2) overdrafts. 56.1 ¶¶ 87-101.

First, the Biscayne and Madison custody clients instructed DB NY to process frequent wire transfers of funds from the custody accounts to third-party beneficiaries.  56.1 ¶ 87. Pursuant to its policies and procedures, Deutsche Bank subjected each of these transfers to a rigorous compliance and anti-money laundering ("AML") review.  56.1 ¶ 90.  Because those processes were not fully automated, they required both a custody operations team member and an offshore compliance team member to go through a lengthy series of time consuming checks. 56.1 ¶ 91.

Biscayne and Madison also regularly incurred overdrafts in their custody sub-accounts. Nonetheless, the net custody relationship generally remained positive (*e.g.,* one of Madison's 29 sub-accounts might fall into overdraft, while the remaining 28 sub-accounts held enough assets to cover the shortfall).  56.1 ¶ 95.  Deutsche Bank's internal overdraft reporting tools could not, however, distinguish between an overdraft in a sub-account and an overdraft that left the net relationship negative.  56.1 ¶ 97.  As a result, the overdrafts triggered frequent alerts that the operations team escalated to the business according to DB NY's internal protocols.  56.1 ¶ 98.

In February 2016, due to the operational burdens, DB NY asked Madison to curtail its practice of frequent wire transfers and incurring overdrafts.  56.1 ¶ 99.  At the same time, DB NY put in place additional internal controls to better facilitate the volume of wire transfers.  56.1 ¶ 100.  When these controls were not successful, DB NY again asked Madison to adjust its custody account practices.  56.1 ¶ 101.

In May 2016, the SEC issued a Cease-and-Desist Order (the "SEC Order") detailing its findings that Biscayne and the Controllers had violated the federal securities laws.  AC ¶ 123; 56.1 ¶ 102.  The SEC's investigation did <u>not</u> uncover or reveal the ongoing Ponzi scheme. Instead, the SEC found only that the common beneficial ownership and control of Biscayne, certain Note Issuers, and South Bay resulted in conflicts of interest that should have been disclosed to investors.  AC ¶¶ 124-26; 56.1 ¶¶ 103-104.  By early July, Deutsche Bank's internal compliance team had identified and escalated notice of the SEC Order to the custody business, which was prepared to sever its relationship with Madison.  56.1 ¶ 105.  Around this time, however, the FBI reached out to one of Deutsche Bank's anti-financial crime directors for assistance in its own investigation into Madison.  56.1 ¶ 106.  Deutsche Bank produced documents and information about Madison's account activity to the FBI and voluntarily complied with the FBI's request to keep Madison's custody account open.  56.1 ¶ 107.  Shortly thereafter, Deutsche Bank informed the FBI that the Madison and Biscayne custody accounts shared common owners and asked whether the FBI wished Deutsche Bank to keep the Biscayne accounts open as well.  56.1 ¶ 109.  The FBI confirmed that the Biscayne accounts should be kept open and requested additional information relating to Biscayne from Deutsche Bank.  56.1 ¶ 110.  In January 2017, the FBI extended its requests to keep the Madison accounts open for another six months.  In June 2017, Deutsche Bank closed both the Madison and Biscayne accounts.  56.1 ¶ 112.

At about this same time, DB London flagged issues with the Plaintiff Note Issuers. Specifically, as part of its regular compliance review, DB London asked the Note Issuers to produce updated KYC information.  56.1 ¶ 113.  When the Note Issuers did not provide that information, DB London escalated the issue to the Note Issuers' Directors.  56.1 ¶ 113.

Ultimately, neither the Note Issuers nor their Directors were responsive, and both DB London and DB Lux served resignation notices on the Directors in July 2017.  56.1 ¶ 114.

**D.      *The Liquidators' Claims***

The Liquidators assert five claims: a violation of Section 147 of the Cayman Islands Companies Act (Count I), aiding and abetting breach of fiduciary duty (Count II), breach of fiduciary duty (Count III), aiding and abetting conversion (Count IV), breach of contract (Count V), and negligence (Count VI).[5]

## LEGAL STANDARDS

The Court should enter summary judgment where the pleadings, depositions, affidavits, and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp.* v. *Cattrett*, 477 U.S. 317, 322 (1986).  While the party seeking summary judgment bears the initial burden of showing the nonexistence of any material fact, the party opposing the motion must "set forth specific facts showing that there is a genuine [dispute] for trial."  *A.L. ex rel. D.L.* v. *Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018)); *see also Yacht Club on the Intracoastal Condo. Ass'n* v. *Lexington Ins. Co.*, 944 F. Supp. 2d 1258, 1261 (S.D. Fla. 2013) (citing *Bailey* v. *Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002)).  "The existence of a mere scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on the basis of which a jury could reasonably find for the non-movant."  *Id.* (citing *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

---

[5]  The Court dismissed with prejudice Plaintiffs' claims for violation of the Florida Civil Remedies for Criminal Practices Act (Count VII), and violation of the Florida's Civil Remedies for Theft or Exploitation Statute (Count VIII).  D.E. 84.

<u>**ARGUMENT**</u>

**I.     THE DOCTRINE OF *IN PARI DELICTO* BARS PLAINTIFFS' CLAIMS**

The equitable defense of *in pari delicto* bars Plaintiffs' attempt to recover damages arising from the Companies' own wrongdoing.  *Official Committee of Unsecured Creditors of PSA, Inc.* v. *Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006) ("[D]enying judicial relief to an admitted wrongdoer is an effective means of deterring illegality.") (citation omitted).  Plaintiffs recognize that the defense applies with equal force to liquidators, standing in the shoes of the wrongdoers.  D.E. 84 (Order on Motion to Dismiss ("MTD Op.")) at 10 n.4.

### A.  The Companies Are Substantially More Culpable as Key Drivers of the Ponzi Scheme

It is well established that a plaintiff may not recover for his own wrongdoing if he is *in pari delicto*, or at equal fault.  *Pinter* v. *Dahl,* 486 U.S. 622, 632 (1988); *Edwards*, 437 F.3d at 1152 ("In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one") (quoting *Bateman Eichler, Hill Richards, Inc.* v. *Berner*, 472 U.S. 299, 306(1985)).  This Court previously declined to resolve the issue of the *in pari delicto* defense on the pleadings. While Plaintiffs did not (and could not) dispute that the Companies were complicit in the wrongdoing, the Court explained that Defendants needed to show that the Companies were *more* at fault.  MTD Op. at 10. The evidence produced during discovery supports Plaintiffs' own allegations, which leave no doubt that the Companies were not only active participants in, but key drivers of the Ponzi scheme.  Plaintiffs admit that the Controllers used a web of offshore business structures to shield themselves from liability in connection with their fraud.  AC ¶ 73. Each of the entities represented by the Liquidators here was beneficially owned and controlled by one or more of the Controllers.  *See* 56.1 ¶¶ 14-28; AC ¶ 75 (the Note Issuers were "legally separate from Biscayne and South Bay but managed—and, in some cases, beneficially owned—

by the [Controllers].").  Because South Bay and its subsidiaries were already insolvent by the

time the Note Issuers began raising funds from third-party investors, the capital raised by the

Note Issuers could not have been intended for any legitimate purpose.  AC ¶ 75; *see also* AC ¶

96 ("Although the original real estate development effectively failed during the Great Recession,

the Note Issuers were utilized to raise more money for years thereafter.").  Instead, it was raised

and used to perpetuate the fraud.  56.1 ¶¶ 102-103; *see also* AC ¶¶ 88, 90, 91 ("The Note Issuers

transferred the money they raised from investors to South Bay.  South Bay then paid interest

payments or repaid earlier investors, thereby disguising its financial troubles.").

The non-issuer Companies were also active participants in the fraud.  Spyglass

Investment Management Ltd. ("Spyglass"), for example, acted as an investment advisor, steering

new investors towards the scheme.  AC ¶ 92 (the Controllers "relied on another of the

Companies they created—Spyglass—to perpetuate the scheme"); AC ¶ 93 ("The Individual

Wrongdoers used Biscayne, Spyglass, and the Note Issuers to raise new money continuously.

These efforts concealed the failure of the real estate development and facilitated on-going

misappropriation.").  The other entities were a part of the complex web of shell corporations and

holding companies that the Controllers used to conceal the fraud and insulate themselves from

liability.  AC ¶ 95 ("[T]he interrelated structure of the various business entities allowed the

Individual Wrongdoers to avoid independent audit opinions.").  Tellingly, Plaintiffs proffer no

purported legitimate business purpose for any of these entities.

In contrast, Plaintiffs premise their claims here on, at best, Deutsche Bank's inaction, or

failure to uncover the scheme and terminate banking relationships with the Companies.  *See infra*

Section III.B.  These facts are almost identical to those considered by the Eleventh Circuit in

*Edwards*.  In that case, the Eleventh Circuit held that a bankruptcy trustee's RICO suit against

purported "aiders and abettors" of a Ponzi scheme was barred by the doctrine of *in pari delicto*. The *Edwards* defendants, like Deutsche Bank here, acted as custodial banks and, according to the trustee's allegations, facilitated the Ponzi scheme by "failing to conduct appropriate due diligence and/or ignoring the facts altogether," ultimately enabling "thousands of investors to partake of the []scheme and caused [the debtor] to incur millions of dollars in additional debt." *Id.* at 1148, 1155. In applying the doctrine, the Court noted that the trustee's own allegations "fail[ed] to explain how the [custodial banks] violated RICO" while the debtor, which was the "hub" of the Ponzi scheme, was merely a "passive bystander in the scheme to defraud." *Id.* at 1155.

### B. The Adverse Interest Exception Does Not Apply

Plaintiffs have invoked the adverse interest exception to the doctrine of *in pari delicto*, and factual discovery has provided evidence that this exception does not apply for numerous reasons. MTD Op. at 4-6. That narrow exception provides that "if a corporate plaintiff's agents are acting in their own interests and adversely to the interests of the corporation, the agent's conduct will not be imputed to the corporate plaintiff." *In re Skyway Communications Holding Corp.*, 389 B.R. 801, 809–10 (Bankr. M.D. Fla. 2008). Plaintiffs attempt to shoehorn their facts into this exception with two different theories: (1) that the Controllers "looted" the Companies for their own benefit, and (2) that the Note Issuer Directors were "innocent of the fraud . . . and had the power and authority to take actions to bring the fraudulent scheme to an end if made aware of it." AC ¶¶ 354, 372. The undisputed facts confirm that the adverse interest exception does not apply here.

#### 1. The Controllers' Actions Were Not Adverse to the Companies

Plaintiffs' attempt to characterize the Controllers as rogue wrongdoers who siphoned assets away from the Companies fails on its face. As Plaintiffs concede, the Controllers created

the Companies for the singular purpose of perpetuating the fraud.  AC ¶¶ 89-90; *see supra* Part I.A.  By definition, it was not possible for the Controllers to divert funds from the Companies' legitimate business activities because the Companies had no legitimate business.  For example, the Note Issuers were SPVs whose only function was to serve as vehicles for raising capital for insolvent real estate development companies with no legitimate business.  AC ¶¶ 73, 91.  Plaintiffs themselves explain that the Companies were formed in order to "cover [the Controllers'] failures" by issuing new debt to meet ongoing liabilities.  AC ¶ 90.  When those Companies could not service their own debt, the Controllers continued the scheme by raising additional capital to keep the Companies (and their fraud) afloat.  Because the purpose of the fraud was to benefit the Companies, the adverse interest exception does not apply, and the fraudulent conduct is imputed to the Companies.  *See Kapila* v. *Grant Thornton, LLP*, 2017 WL 2590975, at *2 (S.D. Fla. Mar. 9, 2017), *on reconsideration in part*, 2017 WL 3638199 (S.D. Fla. Aug. 23, 2017), *aff'd sub nom. In re Kapila*, 762 F. App'x 991 (11th Cir. 2019) ("[U]nder Florida law, '[w]here it is shown, without dispute, that a corporate officer's fraud intended to and did benefit the corporation, to the detriment of outsiders, the fraud is imputed to the corporation and is an absolute defense to the corporation's action against its accounting firm for negligent failure to discover the fraud'"); *see also In re Parmalat Securities Litigation*, 501 F. Supp. 2d 560, 574 (S.D.N.Y. 2007) (extending credit to an insolvent company does not damage the company or "deepen" its insolvency); *Kirschner* v. *Grant Thornton LLP*, 2009 WL 1286326, at *8 (S.D.N.Y. Apr. 14, 2009) ("[E]xtending credit to a distressed entity in itself does the entity no harm. Cash infusions expand the debt of a corporation in precise proportion to the expansion of assets in the form of new cash contributed by the underwriters and investors.  Accordingly, with

respect to injury to the corporate body, as distinguished from injury . . . to creditors . . . the extension of credit is—at worst neutral.").

Courts considering substantially similar Ponzi scheme fact patterns have repeatedly dispensed with the notion that companies created to perpetuate the fraud were somehow "harmed" in the process.  *See, e.g.*, *Freeman* v. *Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 553 (Fla. 2d DCA 2003) (finding that the damages were "suffered by the individual customers and not by a corporation created and controlled by [the Ponzi scheme perpetrator]"); *In re Meridian Asset Management, Inc.*, 296 B.R. 243, 252 (Bankr. N.D. Fla. 2003) (where company's "bank accounts were a facade of legitimacy and were solely used to defraud customers and embezzle their money" injury to a company "was illusory."); *Mukamal* v. *Bakes*, 2008 WL 11391157, at *6 (S.D. Fla. May 20, 2008) ("Under Florida law, the knowledge of a corporate officer whose fraud or misbehavior brings short-term gain to the corporation, or merely injures a third party, is imputed to the corporation, even if the officer's misbehavior ultimately causes the corporation's insolvency."); *Feltman* v. *Prudential Base Securities*, 122 B.R. 466, 473-74 (Bankr. S.D. Fla. 1990) ("As the corporations were essentially only conduits for stolen money, any injury to the[m] in this case must be substantially coterminous with the injury to the defrauded creditors. Everything [corporate employee] stole from the debtor corporations, the debtors had stolen from the creditors.  [A]ny alleged injury to the debtors is as illusory as was their corporate identity.").

### 2. The Note Issuers Directors Were Not "Innocent Decision Makers"

Plaintiffs' argument that Deutsche Bank somehow prevented the Directors of the Note Issuers from uncovering and ending the fraud also fails.  Even if the facts supported that theory (which they do not), it is not a sufficient basis for them to avoid the doctrine of *in pari delicto* because, again, the Controllers intended that their wrongdoing benefit the Companies.  *In re Kapila*, 762 F. App'x at 994 ("While the presence of an innocent decision maker can provide a

basis to argue that an officer acted adversely to the interest of the corporation, when the officers' wrongdoing is calculated to benefit the corporation, it is in no position to invoke the adverse interest exception").  In other words, because the Controllers were acting in the interest of the Companies (*see supra* Factual Background, Section A), the presence of an innocent decision maker would be irrelevant.

Regardless, the Directors were not innocent actors.  Despite Plaintiffs' claims that the Directors did not know about the Note Issuers' repeated late payments to Deutsche Bank, discovery has confirmed that the Directors were well aware of the situation, as they received both regular statements and invoices from Deutsche Bank, as well as written notices of late payments on multiple separate occasions between 2010 and 2017. *See* 56.1 ¶ 40.  In fact, it was the Directors themselves who explicitly instructed Deutsche Bank to effect various transactions that Plaintiffs now identify as "red flags" that should have tipped Deutsche Bank off to the fraud. AC ¶ 162; *compare* AC ¶¶ 166-216 (alleging that DB London facilitated wrongful swap transactions), *with* 56.1 ¶ 44 (director's instruction to facilitate swap); *compare* AC ¶¶ 217-238 (alleging improper re-taps), *with* 56.1 ¶¶ 44 (directors' instruction to effect re-taps); *compare* AC ¶¶ 239-263 (alleging that late payments were a sign of wrongdoing, with 56.1 ¶¶ 40 (providing notice to Directors of late payments), *and* AC ¶¶ 264-276 (alleging that amendments to the notes' terms were improper), *with* 56.1 ¶ 44 (instruction from directors to amend notes), *and* 56.1 ¶ 41 (directors requesting notices to noteholders of amendment).

Plaintiffs also claim that the Directors' resignation in July 2018 marked the end of the Ponzi scheme.  AC ¶ 371.  In fact, the Directors resigned more than one year after Deutsche Bank terminated its relationship with the Note Issuers, after the Directors failed to provide the

necessary KYC paperwork that Deutsche Bank had sought from them for months.  56.1 ¶¶ 113-114.  The Directors' belated resignation is further proof of their complicity in the scheme.[6]

## II.   PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS

Plaintiffs' claims should be dismissed for the additional reason that Plaintiffs lack standing to pursue their claims.  First, Plaintiffs do not have standing to bring claims on behalf of the Companies because, as discussed above, the Companies were wrongdoers whose sole purpose was to perpetrate the fraudulent scheme Plaintiffs accuse Defendants of aiding and abetting.  Second, Plaintiffs do not have standing to seek damages in connection with bank accounts that were established and controlled by Madison Asset, an entity separate from the Companies.  56.1 ¶ 70.

The Eleventh Circuit recently dismissed an almost identical case on standing grounds. *Isaiah* v. *JP Morgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020).  In that case, a receiver for insolvent entities created as part of a Ponzi scheme sued a bank, alleging that the bank "helped facilitate the Ponzi scheme by transferring funds into, out of, and among the [entities'] bank accounts, despite its alleged awareness of suspicious banking activity on those accounts."  *Id.* at 1300.  The Eleventh Circuit upheld the district court's dismissal of those claims for lack of standing, holding that, because the insolvent entities "were wholly dominated by persons engaged in wrongdoing and . . . [did not] engage[] in any legitimate activities or [have] 'at least one honest member of the board of directors or an innocent stockholder,'" the individual wrongdoers' "torts cannot properly be separated from the [insolvent entities], and [those entities] cannot be said to have suffered any injury from the Ponzi scheme that the Entities themselves

---

[6]  Plaintiffs and the Note Issuer Directors recently sought approval of the Bankruptcy Court for the Southern District of Florida of a proposed settlement agreement that would resolve Plaintiffs' claims against the Note Issuer Directors in exchange for a $22.5 million payment from the Directors to Plaintiffs and a bar order that would prevent any other party from asserting claims against the Directors.  *In re North Pointe Holdings (BVI) Ltd.*, No. 1:18-24659, D.E. 130.

perpetrated." *Id.* at 1307; *see also Freeman*, 865 So.2d at 552 (representatives of insolvent entity lacked standing to pursue claims where entity was "a sham corporation created as the centerpiece of a Ponzi scheme"); *In re Able Body Temporary Services, Inc.*, 626 B.R. 643, 683 (M.D. Fla. Bankr. 2020) (granting summary judgment on aiding-and-abetting claims asserted against bank on similar standing grounds).

Here, as in *Isaiah*, *Freeman*, and *Able Body*, the Companies were controlled by the individuals that perpetrated the scheme. 56.1 ¶¶ 14-28. Plaintiffs do not and cannot identify any "honest member of the board of directors" or any "innocent stockholder." *Isaiah*, 960 F.3d at 1307; *see supra* Section I.B.2. Thus, putting aside any questions specific to the applicability of the *in pari delicto* analysis, such as whether the adverse interest exception applies, Plaintiffs' claims should be dismissed on standing grounds.

Plaintiffs also lack standing for the additional and independent reason that they assert claims on behalf of an entity which they do not represent: Madison Asset. Although Madison was, like the Companies, controlled by the Controllers and used as an instrument of the fraud to effect the Ponzi scheme, the Plaintiff Liquidators do not represent Madison here and, as a result, are not entitled to assert claims on its behalf. Indeed, Madison has filed a separate lawsuit relating to these issues that is currently pending in the Southern District of New York. *Trott et al.* v. *Deutsche Bank AG*, No. 1:21-cv-10299. Any and all claims asserted by Plaintiffs on behalf of Madison should be dismissed.

### III.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT CONCERNING PLAINTIFFS' CLAIMS OF AIDING AND ABETTING CONVERSION AND BREACH OF FIDUCIARY DUTY

To prove a claim for aiding and abetting liability, Plaintiffs must demonstrate that the primary wrongdoer (here, the Controllers) committed an underlying violation, and that Deutsche Bank (1) had knowledge of the Controllers' misconduct and (2) substantially assisted them in

that misconduct.  *Lawrence* v. *Bank of America, N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012).

There is no genuine dispute of material fact relating to either prong of this standard.[7]

> ### A.   Deutsche Bank Did Not Have Actual Knowledge of the Companies' Wrongdoing

Because aiding and abetting liability requires proof of actual, not constructive

knowledge, evidence of mere suspicions or "red flags" is not sufficient to sustain Plaintiffs'

claim.  *Wiand* v. *Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013) ("red

flags . . . are insufficient to establish a claim for aiding and abetting"); *see also In re Agape*

*Litigation*, 773 F. Supp. 2d 298, 318-19 (E.D.N.Y. 2011) ("While the Plaintiffs have gathered

allegations of 'red flags' and suspicious circumstances, which in hindsight may appear to

indicate the obviousness of the fraud, these allegations fail to … sufficiently allege[] facts that

raise a strong inference of actual knowledge from circumstantial evidence.").

Plaintiffs' theory of Deutsche Bank's actual knowledge is premised on the incorrect

notion that Deutsche Bank should have uncovered the Ponzi scheme based on improper activity

in the Madison account or the publication of the SEC Order.  MTD Op. at 6, 14.  Both

---

[7]  With respect to their claim for aiding and abetting conversion, Plaintiffs cannot even prove the primary violation.  To succeed on a claim for conversion, Plaintiffs must prove: "(1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so."  *United States* v. *Bailey*, 288 F. Supp. 2d 1261, 1264 (M.D. Fla. 2003) (citations omitted), *aff'd*, 419 F.3d 1208 (11th Cir.2005).  "The essence of conversion, however, is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property." *Brand* v. *Old Republic National Title Insurance Co*., 797 So.2d 643, 646 (Fla. 3d DCA 2001).  Setting aside the fact that the Liquidators are asserting claims on behalf of the entities facilitating the Ponzi scheme (as opposed to the noteholders), Plaintiffs cannot claim a right to assets in *Madison's* custody account, nor have they identified any "demand for return" of the money from Madison itself.  *See supra* Section II.  Solely for purposes of this motion, and in light of the Liquidators' own allegations about Plaintiffs' activities, Deutsche Bank assumes *arguendo* that Plaintiffs satisfy the threshold requirement that the Companies engaged in the underlying breach of fiduciary duty.  *See* AC ¶ 133.

allegations are legally insufficient to demonstrate actual knowledge.  *Lawrence,* 455 F. App'x at

907 ("[A]lthough Plaintiffs alleged the transactions were atypical and therefore [Defendant

Bank] should have known of the Ponzi scheme, such allegations are insufficient under Florida

law to trigger liability.").

### 1.  No Material Issue of Fact Regarding Purported Red Flags

Discovery has demonstrated that Deutsche Bank did not fail to investigate overdrafts and

wire transfers in the Madison custody accounts.  MTD Op. at 6.  To the contrary, Deutsche Bank

employees followed internal protocols by escalating concerns about overdraft and wire transfer

activity in the account and evaluating that activity from both a risk and compliance perspective.

D.E. 124-1 (Aug. 26, 2022 Deposition of Javier Britos) at 23:15-24:4 ("When we see an

overdraft, we report that to the front office, the business…So the business can make a decision

on what to do with that particular client . . . . we send reports on a daily basis to the client. . . . .

Ultimately, the overdrafts are mostly driven by the -- the client because they are the ones

responsible to make sure that the account is in a credit at the end of the day."); *id.* at 109:25-

110:6); D.E. 128-1 (Sept. 20, 2022 Deposition of Patrick Hannon) at 37:19-22 ("Q. Do you ever

recall escalating [overdraft activity] to anyone above you at the bank.  A. Yeah. . . it was always

escalated.")); D.E. 129-1 (Aug. 24, 2022 Deposition of Frederick Kolb) at 32:23-33:24 ("I would

say that if there were any concerns about the wire activity, that it would have been properly

escalated by me . . . . There were certain activities in the Madison and Biscayne Capital Limited

accounts that we didn't necessarily see for other clients, so those I would have addressed with

my manager to make sure that he was at the very least aware of them. And after that, he would

have made a decision on how to act upon those on the information that I provided him with. . .

.")); *id.* at 35:18-25 (stating that "whenever there was an overdraft, that would have been

escalated right away by means of an overdraft report.")).  Plaintiffs' counsel acknowledged in

deposition that Deutsche Bank consistently monitored the accounts and escalated unusual behavior.  AC ¶ 38; D.E. 123-1 (Oct. 4, 2022 Deposition of Deutsche Bank AG, through Kamalita Abdool) at 124:6-17 ("Q. Okay. Have you seen any evidence, in either in working at the bank or in the course of preparing for deposition, have you seen any evidence that Deutsche Bank would have closed the Madison accounts earlier if it hadn't received this letter? A. I've seen it in some of the e-mails that you showed me, where there were efforts to monitor the account. Q. *So I agree with you we saw lots of e-mails about monitoring the account for the wires and for the overdrafts.*") (emphasis added)).

Deutsche Bank's ongoing efforts to comply with internal risk procedures and policies eventually made managing the Madison account prohibitively burdensome and prompted Deutsche Bank to begin off-boarding the client.  D.E. 124-1 at 108:24-109:21 ("Q. So, Mr. Britos, you made the point today that your concerns on the Madison wires were operational concerns.  A: Yes.  Q. And, again, that was because these wires for the Biscayne and Madison accounts, those were, as you said before, non-swift clients? A. Yes. So -- so my concerns around capacity and -- and there are resources that we need assigned to a particular task.  Q. And it was a capacity concern because these wires had to be manually processed by your team?  A. … The entire payment process is not automated in full. So the combination of the…wire process and the tools we have with the non-seen – seen client raise a concern because that's -- that's the -- that means that we need to spend more time on those clients that have structure.")); D.E. 129-1 at 33:14-18, 138:19-139:15; D.E. 123-1 at 125:6-11; 146:5-13).  Repeated instances of overdrafts and wire transfers in ordinary accounts do not suggest that Deutsche Bank had actual knowledge of the underlying Ponzi scheme.  *See, e.g.*, *Lamm* v. *State Street Bank & Trust Co.,* 889 F. Supp. 2d 1321 (S.D. Fla. 2012), *aff'd,* 749 F.3d 938 (11th Cir. 2014) (aiding and abetting requires

allegations of "actual knowledge" as opposed to constructive knowledge); *Angell* v. *Allergan Sales, LLC*, 2019 WL 3958262, at *9  (M.D. Fla. Aug. 22, 2019) ("[A]llegations which demonstrate merely constructive knowledge, recklessness or gross negligence" are insufficient).

> 2.  No Material Issue of Fact Regarding Deutsche Bank's Response to the SEC Order

The only fact that Plaintiffs plausibly claim put Deutsche Bank on notice of the Companies' wrongdoing was the publication of the SEC Order in May 2016, after which Plaintiffs allege that Deutsche Bank failed to act.  MTD Op. at 14.  Discovery has disproven this theory.

Shortly after the SEC Order was issued, Deutsche Bank was prepared to off-board Biscayne and Madison.  56.1 ¶ 105.  In July 2016, however, the FBI sent Deutsche Bank two "Keep Open Letters," asking that Deutsche Bank keep the Madison and Biscayne accounts open for at least six months pending an ongoing FBI investigation.  56.1 ¶ 110.  In January 2017, the FBI renewed their Keep Open requests by phone.  56.1 ¶ 111.  Six months later, in mid-2017, Deutsche Bank issued termination notices to Madison and Biscayne.  56.1 ¶ 112.

Deutsche Bank did not terminate its relationship with Madison and Biscayne immediately after the SEC Order was issued because it complied with the FBI's request to keep those accounts open.  56.1 ¶¶ 110-111.  *See also Nathel* v. *Siegal*, 592 F. Supp. 2d 452, 469 (S.D.N.Y. 2008) ("Even where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud.").

### B.  Deutsche Bank Did Not Provide the Companies with Substantial Assistance

The absence of any material issue of fact concerning Deutsche Bank not providing substantial assistance to the Ponzi scheme provides an additional, independent basis for

dismissal.  *See Lawrence* v. *Bank of America N.A.*, 2010 WL 3467501, at *4 (M.D. Fla. Aug. 30, 2010), *aff'd*, 455 F. App'x 904 (11th Cir. 2012) ("Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so . . . .").

As a preliminary matter, Deutsche Bank's participation in the FBI's investigation demonstrates its lack of involvement in the underlying scheme.  Indeed, it is difficult to imagine anything more damaging to the Ponzi scheme than Deutsche Bank's voluntary cooperation with law enforcement.  56.1 ¶¶ 107-109.  Not only did Deutsche Bank keep the Madison and Biscayne accounts open at the FBI's request, it also maintained the confidentiality of the investigation to avoid tipping off the Controllers (56.1 ¶ 107), produced information concerning activity in both accounts to the FBI (56.1 ¶ 107), and affirmatively informed the FBI about the Biscayne accounts and their relationship to the Madison account (56.1 ¶ 109).

Evidence gathered in discovery has also disproven Plaintiffs' claim that Deutsche Bank employees "instructed the [Controllers] on how to circumvent" its KYC controls and monitoring procedures by opening sub-accounts under the umbrella of the Madison client relationship with Deutsche Bank.  MTD Op. at 14.  It was common practice for clients to open sub-accounts like Madison did here, and there was no reason for any Deutsche Bank employee to suspect that the subaccounts would be used for an improper purpose.  Declaration of Floris Vreedenburgh in Support of Defendants' Motion for Summary Judgment (Vreedenburgh Decl.), ¶ 8; *see also* D.E. 134-1 (Aug. 3, 2022 Deposition of Floris Vreedenburgh) at 87:15-23.  While the KYC policies required an on-boarding process for the client—in this case, Madison—there were no such requirements for any entities that were named in Madison's sub-accounts.  Vreedenburgh Decl., ¶ 7; D.E. 134-1 at 164:12-164:20.  Plaintiffs' attempt to create the specter of impropriety based on hindsight is not sufficient to sustain their claims.  Sub-accounts created under an existing

custody account do not require a separate on-boarding or KYC review, pursuant to Deutsche Bank AG's policies and procedures.  56.1 ¶ 78.  Providing routine banking services to a client does not constitute substantial assistance.  *Lawrence,* 455 F. App'x at 907 ("routine banking services" do not constitute substantial assistance absent bank's actual knowledge of customer's underlying fraud); *Freeman*, 865 So. 2d at 552 ("Merely conducting normal, lawful banking operations for the corporation is not enough to establish aiding and abetting an intentional tort"). Indeed, Plaintiffs' entire claim boils down to little more than an allegation that Deutsche Bank should have closed the custody accounts sooner.  But absent actual knowledge of the wrongdoing (which Plaintiffs cannot establish), inaction does not constitute substantial assistance.

*Richter* v. *Wells Fargo Bank NA*, 2015 WL 163086 (M.D. Fla. Jan. 13, 2015), which also involved allegations that a bank had aided and abetted a Ponzi scheme, is instructive here.  In *Richter*, the court granted summary judgment in favor of Wells Fargo, holding that evidence that Wells Fargo failed to freeze a Ponzi schemer's account could not constitute substantial assistance.  *Id.* at *4 ("Wells Fargo did not provide substantial assistance to the conversion by allowing [the Ponzi schemer] to access the investor funds she had previously transferred to her Personal Accounts.").  In holding that Wells Fargo's inaction could not reflect substantial assistance, the court noted that there was no evidence "that Wells Fargo acted in concert with [the Ponzi schemer] or that its failure to freeze her Personal Accounts was made with the goal of assisting [the schemer] in the commission of conversion."  *Id.*  In addition, the court explained that "extending aiding and abetting liability to Wells Fargo here would have a chilling effect on commercial banking relationships by requiring banks to preemptively freeze accounts on their own accord lest they risk liability for aiding and abetting misconduct by their accountholders."

*Id.* at \*5.  Here, too, premising liability on Deutsche Bank's failure to close the custody accounts, particularly in light of its cooperation with law enforcement, would set a dangerous precedent for future banking relationships.

### IV.   THERE IS NO MATERIAL ISSUE OF FACT REGARDING PLAINTIFFS' FRAUDULENT TRADING CLAIM

Although it appears that no court in the world has ever considered the merits of a fraudulent trading claim under Section 147 of the Cayman Island Companies Act ("Section 147"), the courts of England and Wales have applied an identical statute and established a standard for demonstrating liability under the analogous English law.[8]  According to the English test, a plaintiff must prove that a defendant (i) "participated in the carrying on of the business in [the allegedly fraudulent] manner[,]" and (ii) "that it did so knowingly (*i.e.*, with the knowledge that the transactions it was participating in were intended to defraud the creditors of the company or were in some other way fraudulent."  Declaration of Rupert Geoffrey Dangar Bell ("Bell Decl.")), Ex. E (*Morris* v. *State Bank of India*, [2003] EWHC 1868 (Ch) 736).  Discovery has confirmed that Deutsche Bank did not have any knowledge of any fraudulent conduct, and did not assist the Companies in the fraud.

### A.   *Deutsche Bank Neither Had Knowledge of Nor Was Willfully Blind to the Controllers' Misconduct*

To demonstrate that Deutsche Bank had knowledge of the Ponzi scheme, Plaintiffs must prove that Deutsche Bank intentionally participated in the Company's wrongdoing or acted with reckless disregard of it.  *See* Bell Decl., ¶ 22 ("In order to determine whether the relevant party

---

[8]  In the absence of any controlling case law or interpretation of this statute, Deutsche Bank relies on the English legal interpretation of Section 213 of the English Insolvency Act 1986 (Bell Decl., Ex. B) upon which Section 147 was modeled and is considered "actually identical."  *See* Bell Decl. Ex. D (*Re ICP Strategic Credit Income Fund Limited and ICP Strategic Credit Income Master Fund Limited*, [2014] 2 CILR 1).

acted dishonestly . . . it is necessary for the Grand Court to determine what the relevant party actually knew or believed and then to appraise the relevant party's conduct in light of that knowledge or belief against the objective standard of ordinary decent people.").  In the absence of any such knowledge, Cayman Islands law requires that Plaintiffs demonstrate that Deutsche Bank acted with "blind eye" knowledge by showing that it had both "a suspicion that the relevant facts do exist and [made] a *deliberate decision to avoid confirming that they exist.*"  Bell Decl., Ex. E (*Morris* v. *State Bank of India*, [2003] EWHC 1868 (Ch) 736; *see also* Bell Decl., Ex. J (*Manifest Shipping Co. Ltd.* v. *Uni-Polaris Co Ltd*, [2003] 1 AC 469 ("Blind eye knowledge must mean an assured failing to acquire the relevant knowledge deliberately.").  As explained *supra* in Section III.A, nothing in the record demonstrates that Deutsche Bank either had actual knowledge of the fraud or deliberately decided to avoid confirming suspicions of fraud.  Indeed, the evidence shows that, at the relevant time, Deutsche Bank had no reason to suspect that any fraud was being perpetrated.

### B.      *Deutsche Bank Did Not Contribute to the Fraud*

The second requirement to establish liability under Section 147 is that the defendant "carried on" the fraudulent business through some affirmative act that consists of "participat[ing] in," "tak[ing] part in" or "concur[ring] in" the company's fraudulent business.  Bell Decl., Ex. F (*In re Maidstone Buildings Provisions Ltd*, [1971] 1 WLR 1085, 1086).  As discussed *supra* in Section IV.B, the evidence instead demonstrates that Deutsche Bank did not assist the Companies in effecting the Ponzi scheme.  As a result, there is no genuine issue of material fact concerning Deutsche Bank's contribution to the fraud.

## V.   THERE IS NO MATERIAL ISSUE OF FACT CONCERNING DB LONDON'S COMPLIANCE WITH THE TERMS OF ITS AGENCY AGREEMENTS

Plaintiffs premise their breach of contract claim on the theory that DB London violated the terms of the Agency Agreement by executing express instructions from the Note Issuer Directors.  These included instructions to (1) accept late interest payments, (2) facilitate swap transactions, and (3) facilitate re-tap transactions.  56.1 ¶ 44.  Essentially, Plaintiffs argue that DB London should have declined to process these instructions where it had "reasonable grounds to believe that the instruction was part of a scheme to defraud the Note Issuers."  (AC ¶ 403).  As discussed *supra* in Section IV, there was no scheme to defraud the Note Issuers.  Instead, the Controllers beneficially owned and controlled the Note Issuers and used them to further their own fraud.  The only damages suffered were by the individual note investors.  But Deutsche Bank, as a non-discretionary agent of the Note Issuers, owed no duties to the noteholders.  *See* 56.1 ¶ 49 ("The Agents shall act solely as Agent of the Issuer and shall not have any obligation towards or relationship of agency or trust with the holder of any Note or Coupon.").

Regardless, there is no genuine issue of material fact concerning a breach of the Agency Agreements.  Plaintiffs attempt to paint Deutsche Bank's acceptance of late payments from the Note Issuers as a breach of its duties under the Agency Agreement.  In so doing, they ignore the express language of the contract, which contemplated late payments and provided that "[i]f any payment . . . is made late but otherwise under the terms of this Agreement, the Agents shall nevertheless act as Agent."  56.1 ¶ 39.  Deutsche Bank's only duty in connection with late payments was to inform the Note Issuer Directors of the late payments (*see* 56.1 ¶ 38), which it did on numerous occasions.  56.1 ¶ 40.  There is no contractual or legal basis for Plaintiffs' claim that Deutsche Bank should have been required to reject any late payment.

Similarly, Plaintiffs have no basis for their claim that Deutsche Bank was somehow obligated to refuse expressly authorized instructions from the Note Issuers or Directors.  Here, Deutsche Bank served as an agent for the notes.  56.1 ¶ 31.  As the Offering Memorandum explained, Deutsche Bank was a "service provider to the [Note Issuers] and was not responsible for the preparation of [the disclosures] or the activities of the Company . . . . and did not participate in the investment decision-making process."  56.1 ¶ 55.  As a result, Deutsche Bank had no authority to exercise its own discretion or substantively participate in any activities relating to the Notes.  Any decisions to extend the maturity dates of the notes or to accept payment-in-kind were made by the Note Issuers or Directors pursuant to explicit terms of the notes.  56.1 ¶ 43.  The Note Issuers and Directors also coordinated providing notice of amendments to the noteholders of any such changes.  As discovery has shown, representatives of the Note Issuers or the Directors drafted the notice of amendments and Deutsche Bank London had the ministerial task of passing that notice on to the depository institution, which would in turn distribute the notice to the noteholders so they could vote on the amendments.  56.1 ¶ 41.  Deutsche Bank did not have the discretion to decline to execute these authorized instructions.

## VII.  THERE IS NO MATERIAL ISSUE OF FACT CONCERNING DEUTSCHE BANK'S BREACH OF ANY DUTY TO THE COMPANIES

Discovery has also revealed the absence of any material issue of fact concerning Plaintiffs' claim that Deutsche Bank owed a separate duty of care to the Companies because it was aware that Madison was misappropriating the Companies' funds.  MTD. Op. at 19.  First, as discussed *supra* in Section III.A, Deutsche Bank had no knowledge of any misconduct relating to the Madison account.  Second, Deutsche Bank did not owe the Companies any duties beyond the scope of the contracts it had with Biscayne and Madison, entities affiliated with but separate from the Companies.  *Insight Securities, Inc.* v. *Deutsche Bank Trust Company Americas*, 2021

WL 3473763, at *3-4 (S.D. Fla. Aug. 6, 2021) ("[W]here the plaintiff seeks only the recovery of an economic loss . . . the duty element of negligence law serves as an important barrier to over-extension of liability.").

### VIII.   DB LUX AND DB SUISSE ARE NOT SUBJECT TO PERSONAL JURISDICTION

Plaintiffs offer neither evidence nor allegations concerning either DB Lux's or DB Suisse's business activity, involvement in the underlying Ponzi scheme, or connection to the State of Florida.  On February 23, 2022, the Court denied DB Lux and DB Suisse's motion to dismiss for lack of personal jurisdiction without prejudice to their ability to renew the motion upon the completion of jurisdictional discovery.  At this point, however, dismissal is appropriate because jurisdictional discovery has confirmed that DB Lux and DB Suisse are not subject to personal jurisdiction.

#### A.      DB Lux and DBS Are Not Subject to General Jurisdiction

As the Declarations of Dr. Daniel Zapf and Allesandro Balestra confirm, DB Lux maintains both its principal place of business and place of incorporation in Luxembourg (D.E. 49-2 (Declaration of Dr. Daniel Zapf in Support of DB Luxembourg's Motion to Dismiss for Lack of Personal Jurisdiction)) ¶ 3), while DBS maintains both its principal place of business and place of incorporation in Switzerland.  D.E. 49-1 (Declaration of Alessandro Balestra in Support of DB Suisse's Motion to Dismiss for Lack of Personal Jurisdiction) ¶ 3).  Consistent with the Supreme Court's holding in *Daimler AG* v. *Bauman*, because neither of these entities is "at home" in Florida, they cannot be subject to general jurisdiction here (571 U.S. 117, 122 (2014)).  Plaintiffs have made no argument to the contrary.

### B.     *DB Lux and DBS Are Not Subject to Specific Jurisdiction*

Plaintiffs' flawed theory of specific jurisdiction hinges on the notion that DB Lux and DBS (1) transacted business within the state of Florida or (2) committed a tortious act within the state.  AC ¶¶ 48, 415 (citing Fla. Stat. §§ 48.193(1)(a)(1), and 772.101-772.19, respectively). Neither theory passes muster.

Florida's long-arm statute provides for personal jurisdiction in causes of action "arising from" the acts of a nonresident in "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.  Fla. Stat. § 48.193(1)(a)(1).  Here, there is no suggestion that either DB Lux or DBS engaged in *any* conduct from which Plaintiffs' claims arise, let alone, conduct within the State of Florida.

As its declaration in support of summary judgment confirms, DB Lux held a single, non-discretionary role in connection with the note issuances: it held the note register. Declaration of Frank Rückbrodt and Dr. Daniel Zapf in Support of Defendants' Motion for Summary Judgment ("DB Lux Decl."), ¶¶ 6-7.  There is no evidence that DB Lux participated in wrongdoing (nor did the Amended Complaint allege that it engaged in any wrongful conduct).  Indeed, it is hard to imagine what wrongdoing could arise from its narrow and ministerial role.  A reasonable search of DB Lux's files did not produce any documents responsive to Plaintiffs' jurisdictional discovery requests.  DB Lux Decl., ¶¶ 8-12.  This is not surprising given that DB London interacted with the Note Issuers and their Directors, and neither DB Lux nor DB London had visibility into the identity of the ultimate noteholders.

Nor can Plaintiffs plausibly argue that their claims arise from any conduct of DBS.  DBS offered wealth management services to an entity later associated with the Ponzi scheme.  At the motion to dismiss stage, Plaintiffs alleged that DBS terminated that relationship due to "problematic" accounts, which ostensibly could have served as red flags related to the Ponzi

scheme.  MTD Op. at 14.  Discovery confirmed, however, that DBS's decision to end its

relationship was not premised on any improper activity, but rather because the relationship was

not particularly profitable.  56.1 ¶¶ 84-85.[9]  In any event, Plaintiffs can demonstrate no

connection between DBS's actions and the State of Florida.

## CONCLUSION

For the foregoing reasons, Deutsche Bank's motion should be granted.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(b), Deutsche Bank respectfully requests oral argument on the

Motion for Summary Judgment and estimates that the parties will need one hour to address the

issues raised herein.  Deutsche Bank further believes that oral argument will assist the Court in

resolving any questions it may have regarding any issues of material fact.

---

[9] No evidence connects either DBS or DB Lux to the United States, let alone to any wrongful
conduct.  To the extent Plaintiffs claim that they lacked sufficient access to relevant discovery,
this argument also fails.  While DBS conducted a search of electronic files, it has yet to receive
from Plaintiffs the data privacy and bank secrecy waivers necessary to produce that information
in the United States.  Declaration of Christoph Kurth in Support of Defendants' Motion for
Summary Judgment, ¶¶ 8-9.  As demonstrated above, the existing discovery record does not
support the existence of personal jurisdiction, and DBS should be dismissed on this basis.

Dated: November 11, 2022
Miami, Florida

_/s/ Julian A. Jackson-Fannin_____
Harvey W. Gurland, Jr.
Florida Bar No. 284033
Julian A. Jackson-Fannin
Florida Bar No. 93220
DUANE MORRIS LLP
201 S. Biscayne Boulevard, Suite 3400
Miami, FL 33131-4325
(305) 960-2214

David G. Januszewski (admitted *pro hac vice*)
Sheila C. Ramesh (admitted *pro hac vice*)
Sesi V. Garimella (admitted *pro hac vice*)
Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for Defendants Deutsche Bank AG,*
*Deutsche Bank Trust Company Americas,*
*Deutsche Bank Luxembourg S.A., and*
*Deutsche Bank (Suisse) S.A.*