## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

MICHAEL PEARSON, et al.,

    Plaintiffs,

    v.

DEUTSCHE BANK AG, et al.,

    Defendants.

CASE NO. 1:21-CV-22437-
Bloom/Otazo-Reyes

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT
## OF MATERIAL FACTS AND ADDITIONAL FACTS

Eduardo F. Rodriguez
Florida Bar No. 36423
*eddie@efrlawfirm.com*
EFRLAWFIRM
1 Alhambra Plaza, Suite 1225
Coral Gables, FL 33134
Telephone: (305) 340-0034

Frank M. Lowrey IV (*pro hac vice*)
Georgia Bar No. 410310
*lowrey@bmelaw.com*
Ronan P. Doherty (*pro hac vice*)
Georgia Bar No. 224885
*doherty@bmelaw.com*
John H. Rains IV
Florida Bar No. 0056859
Georgia Bar No. 556052
*rains@bmelaw.com*
Amanda Kay Seals (*pro hac vice*)
Georgia Bar No. 502720
*seals@bmelaw.com*
Juliana Mesa (*pro hac vice*)
Georgia Bar No. 585087
*mesa@bmelaw.com*
Zoe Beiner (*pro hac vice*)
Georgia Bar No. 878340
*beiner@bmelaw.com*
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, Georgia 30309
Tel. 404-881-4100 / Fax:404-881-4111

***Attorneys for Plaintiffs***

1. Undisputed.

2. Undisputed.

3. Around 1999, the Controllers formed South Bay Holdings ("South Bay"), a supposed real estate development company.  AC ¶¶ 9, 63.

   Undisputed, except to the extent real estate holdings and development are characterized as "supposed." South Bay, through affiliated businesses, actually held title to a number of pieces of South Florida real estate. As just one example, the Cinnamon Cay entities (Cinnamon Cay, LLC, Cinnamon Prime, LLC), which shared members and management with South Bay, Doc. 158-11, Real Estate Composite, at 11–12, 33–34, 55–56, held several real estate parcels in Monroe County, Florida, *e.g., id.* at 2, 13, 24, 35, 46, 57. Not only that, Note Issuer Diversified Real Estate, when it was known as ORC Senior Secured Ltd., held mortgages on those properties and associated promissory notes. *Id.* at 2, 13, 24, 35, 46, 57, 68, 72, 76, 80.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. The Controllers expanded their scheme by raising capital in different manners, including by creating a number of offshore special purpose vehicles ("SPVs") to issue debt, supposedly backed by these non-existent real estate projects.  AC ¶ 11.

   Undisputed, except to the extent that the subject real estate projects are characterized as "non-existent." As set out above in ¶ 3, there were actual real estate holdings slated for development.

8. Undisputed.

9. Undisputed.

10. Undisputed.

11. Undisputed.

1

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed.

16. Undisputed.

17. Undisputed.

18. Undisputed.

19. Undisputed.

20. Undisputed.

21. Undisputed.

22. Undisputed.

23. Undisputed.

24. Undisputed.

25. Undisputed.

26. Undisputed.

27. Undisputed.

28. The Controllers were the beneficial owners of the Note Issuers.  AC ¶ 18.

    Disputed to the extent that the material cited does not support the statement made.

29. Undisputed.

30. Other financial institutions provided similar, if not identical, services to Biscayne Capital and
    related entities.  Ex. 31 at 2; Ex. 29 at 1.  For example, in order to manage client funds and
    assets, Biscayne had accounts with several banks (AC ¶ 44), including Julius Bar, UBS, Credit
    Suisse, RBC Suisse, Banco Bilbao Vizcaya Argentaria, Pershing LLC, and J. Safra Sarasin.
    Ex. 45 at 1; Ex. 36 at 1; Ex. 47 at 1; Ex. 28 at 2–10; Ex. 43 at 22–23; Ex. 46 at 1. Moreover,
    Biscayne reached agreements to act as an external asset manager at several financial
    institutions, including UBS and RBC Suisse.  Ex. 48 at 1; Ex. 44 at 1.  And Trident Trust
    Company acted as Administrator, Registrar, and Transfer Agent for Sentinel Investment's

issuances. Ex. 32 at 18, 31–32.

Undisputed that Biscayne had accounts with other financial institutions but disputed that the

cited evidence or any other record evidence establishes that those institutions provided services

"similar, if not identical" to those provided by Deutsche Bank.

31. Between 2011 and 2017, four of the five Notes Issuers entered into Agency Agreements with
    Deutsche Bank AG, London Branch ("DB London") and Deutsche Bank Luxembourg S.A.
    ("DB Lux").  D.E. 137-1 (Deposition Ex. 193) at 478, 495, 512, 531, 550, 567, 578.

Disputed as to the timing specified. As confirmed by the materials cited, all initial agreements

were entered by August 2013. Doc. 137-1 at 476, 493, 510, 529, 576, 594, 605, 656, 673.[1]

32. Undisputed.

33. Undisputed.

34. The roles described above (issuing agent, paying agent, transfer agent, and registrar) are
    limited, non-discretionary, administrative roles within financial management services.  D.E.
    135-1 at 156:13–15, 164:6–15; D.E. 132-1 at 132: 37:8–10; *see also* Declaration of Frank
    Rückbrodt and Dr. Daniel Zapf in Support of Defendants' Motion for Summary Judgment
    ("DB Lux Decl.") ¶¶ 6-7, 13.

Disputed as phrased. While the roles described are limited, non-discretionary, administrative

roles, ¶ 34 omits that the Agency Agreements appointed the Bank[2] as the "agent of [each] Issuer

in respect of the Notes," for an enumerated list of purposes, "amongst other things." Doc. 137-1 at

480, 497, 515, 534, 580, 609, 660, 677; Doc. 135-1, 26:10–18, 30:11–19.

35. For example, as issuing agent, DB London would deliver the notes to the clearing system as
    instructed by the Note Issuers, their Director, or another authorized individual. *See* D.E. 135-

---

[1] Page numbers in citations to documents in the record refer to the page numbers found in the header affixed by the Court's electronic filing system.

[2] "The Bank," as used herein, refers to Deutsche Bank A.G. Unless otherwise specifically noted, other capitalized terms used by the Liquidators in this filing refer to those terms as defined in the operative complaint, Doc. 31.

3

1 at 25:19-22 ("The role is to issue the bonds into the clearing systems.").

Undisputed that this is how the Bank should have performed these duties, but neither the material cited nor other record evidence establishes that it actually executed its duties as described.

36. Undisputed.

37. Undisputed.

38. Undisputed.

39. Undisputed.

40. DB London provided actual notice of late payments to the Note Issuer Directors on multiple occasions between 2010 and 2017.   Ex. 7 at 2; Ex. 23 at 1; Ex. 24 at 4; Ex. 26 at 7-8; Ex. 25 at 1; Ex. 8 at 1; Ex. 12 at 1; Ex. 13 at 1; Ex. 17 at 1; Ex. 14 at 2; Ex. 4 at 1; Ex. 5 at 1.

Undisputed that the Bank gave notice on the occasions reflected by the exhibits it cited, but the Liquidators dispute that the Bank provided actual notice to the Note Issuer Directors after late 2013 and before November 2016, Doc. 135-1 at 144:15–145:17, and the exhibits the Bank cites claiming to have fulfilled this duty stop in late 2013 and do not resume until November 2016. Docs. 146-4, 146-5, 146-7, 147-8, 146-12, 146-13, 146-14, 146-23, 146-24, 146-25, 146-26. Another, Doc. 146-17, does not show any evidence of notice to the Director.

41. From time to time, representatives of the Note Issuers or the Note Issuer Directors elected to make amendments to the notes, in which case they would draft notice of amendments and then DB London had the ministerial task of passing that notice on to the depository institution, which would in turn distribute the notice to the noteholders so they could vote on the amendments.  D.E. 132-1 at 37:8-10.

Disputed to the extent that the material cited does not support the statement made.

42. Upon a successful amendment, nothing in the Agency Agreements empowered DB London to decline to execute duly authorized instructions; for example as Principle Paying Agent, Deutsche Bank was required to perform "all other obligations and duties imposed upon it by the Conditions and this [agency] agreement." D.E. 137-1 at 483, 500, 517, 536, 555, 583.

Undisputed that the Agency Agreements required the Bank to execute duly authorized

instructions but disputed that all the instructions the Bank executed were duly authorized. Doc.

158-4 ¶¶ 7–8.

43. Undisputed.

44. Undisputed.

45. Undisputed.

46. Undisputed.

47. DB Lux held the note register, which identified BT Globenet Nominees Limited ("BT Globenet") as the single registered noteholder for all of the notes at issue here. Ex. 22 at 1; DB Lux Decl." ¶ 6.  DB Lux did not have access to the identities of the individual noteholders; instead, that information is held by the depository.  DB Lux Decl. ¶ 7.

Undisputed, but because the Bank has defied the Court's orders to produce documents in

response to the Liquidators' jurisdictional discovery request to Deutsche Bank Lux and Deutsche

Bank Suisse, the Liquidators have not been able to test the Bank's defenses regarding those two

entities.

48. Undisputed.

49. Pursuant to the Agency Agreements, DB London and DB Lux, as non- discretionary agents of the Note Issuers, acted "solely as Agent of the Issuers" and did "not have any obligation towards or relationship of agency or trust with the holder of any Note or Coupon." D.E. 137-1 at 488, 505, 524, 543.

Undisputed that the quoted language appears in the Agency Agreements.

50. For example, the Agency Agreements required Deutsch Bank to "perform such duties as are set out in this Agreement together with those set out in the Conditions." *Id.*

Undisputed that the quoted language appears in the Agency Agreements.

51. The Agency Agreements provided further that, "***No obligations or duties of the Agents which are not expressly stated herein or in the Conditions shall be implied.***" D.E. 137- 1 at 483, 500, 517, 536, 555, 583.

Undisputed that the Agency Agreements contain the quoted language, but the statement omits

other, material provisions in the Agreements, including Paragraph 2.1, which appoints the Bank

"as agent" of each Note Issuer, imposing fiduciary duties that extend to anything "in respect of the

Notes." *E.g.*, Doc. 137-1 at 480.

52. The Agency Agreements continued, "***[U]nder no circumstances will the Agents be liable to the Issuer or any other party to this Agreement*** in contract, tort (including negligence) or otherwise for any consequential, special, indirect or speculative loss or damage … which arises out of or in connection with this Agreement[.]"  D.E. 137-1 at 488, 505, 542, 560, 572, 588.

Undisputed that the quoted language appears in the Agency Agreements.

53. The Agreements also provided that the Note Issuers "shall indemnify the Agents for an amount equal to any loss, liability, cost, claim, action … or expense … that such Agent … may incur arising out of or in relation to or in connection with its appointment or the exercise of its function."  D.E. 137-1 at 488, 505, 523, 542, 560, 572, 588.

Undisputed that the quoted language appears in the Agency Agreement.

54. Undisputed.

55. The offering documents described DB London and DB Lux as "service provider[s] to the Company" which "[are] not responsible for the preparation of this document or the activities of the Company and therefore accepts no responsibility for any information contained in this document[.]"  D.E. 137-1 at 837.[5]

Undisputed that the quoted language appears in the Offering Memoranda.

56. Undisputed.

57. Undisputed.

58. Undisputed.

59. Undisputed.

60. Undisputed.

61. Undisputed.

62. Undisputed.

63. Undisputed.

64. Undisputed.

65. Undisputed.

66. Undisputed.

67. Undisputed.

68. Notwithstanding the creation of sub-accounts, all assets in the sub-accounts remain the property of the primary account holder.  Declaration of Floris Vreedenburgh in Support of Defendants' Motion for Summary Judgment ("Vreedenburgh Decl."), ¶ 6.

Disputed that all the assets in the Madison subaccounts remained the property of the primary account holder. *First*, this is a legal conclusion that Vreedenburgh, a lay witness, cannot offer. *Second*, the Bank knew that the Note Issuers had a property interest in the contents of the subaccounts opened in their names. *See* Doc. 136-1 at 606, 61, 28–29; Doc. 134-1 at 55:11–57:11, 58:18–59:24; Doc. 123-1 at 37:1–39:7, 52:19–53:1 (all referring to Madison opening "subaccounts for each issuer"); *see also* Doc. 123-1 at 42:13–46:4 (testimony of Bank's 30(b)(6) designee that account titles themselves show the interests of the individually named issuers); Doc. 136-1 at 907 ("each of [the] Madison [sub]accounts are for different customers and therefore cannot be commingled."); Doc. 152-1 at 54:17–55:3, 62:15–63:17 (testimony of Bank's expert that the Bank learned during due diligence that Madison was "investing on behalf of others").

69. Undisputed.

70. Undisputed.

71. Shortly after Madison was formed, its principal Gustavo Trujillo opened a custody account for Madison with DB NY.  AC ¶ 104.

Undisputed that Madison opened a custody account April 8, 2014, Doc. 136-1 at 119, with the qualification that "DB NY," like "DB London" as defined in ¶ 31, is simply part of Deutsche Bank A.G., "a global bank with operations and employees in New York [and] London," Doc. 123-1 at 9:9–13, not a separate entity. Doc. 132-1 at 22:20–23:21.

72. As with the prior custody accounts, Madison underwent standard on-boarding and KYC reviews before being adopted as a client. D.E. 134-1 at 39:8-22; 62:7-23; 64:9-12; 67:10-15.

Disputed to the extent the Bank implies that its onboarding and KYC review of Madison was sufficient. Record evidence, including but not only the expert report of Richard Fraher, show that it was not. Doc. 153-2 at ¶¶ 11–23; Doc. 134-1 at 36:21–38:10, 41:2–14 (principal relationship manager never knew Madison's source of funding for the account), 46:3–47:11 (describing unsworn source of funds letter Madison provided to certify that "the funds to introduce are licit and originate from our commercial activities" as "pretty useless"); Doc. 136-1 at 920 (letter); Doc. 127-1 at 87:15–19, 87:23–88:18 (Habura testifying, "It shocks me that Deutsche Bank didn't have stricter policies in place," and acknowledging that the Bank lacked sufficient money-laundering safeguards in allowing Madison to open the account).

73. Undisputed.

74. In titling the sub-accounts, Madison chose names that referenced other entities controlled by the BCI Principals. Vreedenburgh Decl., ¶ 7; Declaration of Scott Habura in Support of Defendants' Motion for Summary Judgment ("Habura Decl."), ¶ 9.

Undisputed that in titling the subaccounts, Madison chose names referencing other entities, specifically the Note Issuers, but disputed to the extent the statement omits the material facts that the Note Issuers were Bank clients with a Director independent of the BCI Principals, as shown in the responses to ¶¶ 31 and 56, above.

75. Undisputed.

76. Undisputed.

77. When Madison and Biscayne opened their respective custody accounts, Deutsche Bank conducted an on-boarding and KYC review pursuant to its policies and procedures. D.E. 127-1 at 20:16-21; D.E. 134-1 at 69:5-19, 154:24-155:7, 156:1-14.

Disputed to the extent the Bank implies that its on-boarding and KYC review of the Madison and Biscayne Accounts was sufficient, for the reasons explained above in response to ¶ 72.

78. Sub-accounts created under an existing custody account do not require a separate on-boarding and KYC review pursuant to Deutsche Bank AG's policies and procedures. Vreedenburg Decl., ¶ 6.

Disputed. The Bank's minimum KYC requirements specify that its "standards apply to our dealings with … [o]ther persons who, while not *clients*, are parties involved in transactions in which we participate." Doc. 138-1 at 477 (emphasis in original). The Note Issuers for whom Madison was to provide custody and clearing services were involved parties, as the Bank learned during due diligence that Madison was "investing on behalf of others." Doc. 152-1 at 54:17–55:3, 62:15–63:17. Further, the Bank's "minimum" requirements mandate that the Bank "must confirm the capacity in which *clients* are acting (i.e. as agent or as principal)," Doc. 138-1 at 477 (emphasis in original), and emphasizes the importance of understanding the client, its business, and the source of its funds. *Id.* at 475, 532, 535. This includes understanding "[w]ho owns and controls the entity or benefits from the assets involved." *Id.* at 514. "Where a party is acting as an agent, the Bank must understand the underlying principal(s) in the relationship," *id.* at 477. Additionally, the source cited by the Bank's compliance expert endorses opening subaccounts with no additional due diligence only where subaccounts are opened at the Bank's "own administrative or operational purposes and not at the customer's request," as occurred here. Doc. 152-5 at 8–9; 152-1 at 50:23–51:17.

79. Undisputed.

80. Undisputed.

81. Undisputed.

82. Undisputed.

83. Undisputed.

84. Undisputed.

85. Undisputed.

86. Undisputed.

87. Undisputed.

88. Wire transfers such as these are not unusual.  Vreedenburgh Decl., ¶ 11.

Disputed. Multiple Bank documents show and multiple Bank witnesses testified that the wire transfers Madison requested were not typical of custody accounts, in which all cash movements should be tied to the transfer or acquisition of securities. Doc. 134-1 at 19:11–20:6, 20:17–21:16, 23:5–17, 24:11–25:5, 51:12–22; Doc. 127-1 at 15:19–17:18; Doc. 123-1 at 23:5–9.

89. Wire transfers such as these are one of the only ways that a custody client can transfer assets out of its account for whatever purpose they are intended. D.E. 129-1 at 21:19–22:1.

Undisputed that wire transfers are one of the relatively few ways to move cash out of a custody account, but the Bank's citation to the Kolb deposition does not support any conclusion that the volume or types of wires Madison requested were appropriate for a custody account. The evidence cited in response to ¶ 88 shows they were not.

90. Each transfer however had to go through a rigorous compliance and anti-money laundering ("AML") process.  D.E. 129-1 at 13:15-16:13.

Disputed that each wire transfer had to go through a "rigorous" compliance and anti-money laundering process. The review process the Bank refers to would detect only whether a party to the wire was already listed as a suspect entity by OFAC, Doc. 123-1 at 127:20–128:2, and does not take place of transaction monitoring Doc. 152-1 at 51:20–52:22 (Bank's compliance expert).

91. Undisputed.

92. Undisputed.

93. For this reason, custody operations teams members escalated concerns about their capacity to manage the volume of wire transfers.  Habura Decl., ¶ 11; D.E. 136-1 at 624; D.E. 129-1 at 39:11-20.

Disputed that the process described was the only, or even the principal, reason operations employees escalated concerns about the volume of wire transfers. Bank employees also escalated concerns because the Madison wires were unrelated to genuine securities activities and raised anti-money laundering concerns. Doc. 136-1 at 624; Doc. 137-1 at 90–91; Doc. 134-1 at 102:6–103:23; Doc. 123-1 at 64:5-67:25, 91:11–16, 102:16–104:2, 127:2–12.

94. The Operations team followed DB NY's internal policy by escalating these issues to the business team. D.E. 124-1 (August 26, 2022 Deposition of Javier Britos) at 23:15-16; 86:9-18; D.E. 125-1 at 179:17-180:9; 181:2-7.

Disputed to the extent that the Bank omits the material fact that the Operations team also escalated their concerns to the compliance group. On April 22, 2015, six Bank employees scheduled a call, "to have a conversation about Madison," Doc. 136-1 at 624, noting that Madison was requesting "10-13 wire requests per day that seem not to be related to Custody Settlements" and that "40% are for new wires each day, out of the ordinary for Custody Settlement—AML," *id.*, a reference to anti-money laundering. Doc. 134-1 at 102:19–103:2; Doc. 127-1 at 18:13–16; Doc. 123-1 at 28:12–17. The Bank's compliance group, which was principally responsible for the Bank's AML efforts, was notified of these issues at "[s]ome point in 2015." Doc. 123-1 at 64:5–67:5, 91:11–16, 103:23–104:2.

95. While Biscayne and Madison also regularly incurred overdrafts in their custody sub-accounts, the net custody relationship nevertheless generally remained positive. Habura Decl., ¶ 11(c).

Undisputed that Biscayne and Madison also regularly incurred overdrafts in their custody sub-accounts but disputed that the net custody relationship nevertheless generally remained positive. That is inconsistent with the concern expressed in contemporaneous documents, including for example, an email showing that the Bank's "compliance group [was] extremely upset" about the overdrafts. Doc. 136-1 at 978; Doc. 123-1 at 102:1–103:22, 106:10–15; *see also* Doc. 127-1 at 51:5–11; Doc. 136-1 at 624 (Madison was "[o]ften" in negative balance); Doc. 134-1 at 152:6-

153:7 (Madison overdrawn by millions in mid-2016 and that those overdrafts remained unresolved

through at least February 2017 when witness left the Bank); Doc. 136-1 at 693. Further, the Bank's

effort to treat funds across subaccounts as fungible may have protected the Bank from loss, but it

did not protect the account beneficiaries. Doc. 127-1 at 112:11–113:2.

96. DB NY would not unilaterally transfer assets from one sub-account to another, but instead, would seek an instruction from the client to process such a transfer. D.E. 127-1 at 23:13-22; 31:13-19; 44:10-22.

Undisputed, with the understanding that, by "client" the Bank means only Madison, not the

Note Issuers, such that the Bank was receiving instructions from Madison and not from the Note

Issuers, via their independent Director or otherwise.

97. Deutsche Bank's internal overdraft reporting tools could not, however, distinguish between an overdraft in a sub-account and an overdraft that left the net relationship negative. D.E. 129-1 at 134:24-135:18.

Disputed. The Bank could—and routinely did—determine whether an overall account

relationship was positive or negative before reporting to management. Doc. 129-1 at 135:1–

136:20.

98. As a result, the overdrafts triggered frequent alerts that the operations team escalated to the business according to DB NY's internal protocols.  D.E. 124-1 at 22:21-23:16; 28:19-29:12; 67:16-68:5.

Disputed to the extent the Bank omits the material fact that the operations group also escalated

their concerns to the compliance group. Doc. 136-1 at 978; Doc. 123-1 at 103:14–19.

99. Undisputed.

100. At the same time, it put in place internal controls to better facilitate the volume of wire transfers. Habura Decl., ¶¶ 11-12; D.E. 136-1 at 672.

Disputed. The cited evidence does not show that the Bank ever implemented controls to

prevent Madison from making wires unrelated to securities activities. To the contrary, the Bank

expressly decided at least as late as April 1, 2016 "to continue to process all wires and intra account cash journals for the Madison client." Doc. 136-1 at 672; Doc. 123-1 at 93:13–17 ("whatever escalation may have happened earlier, as of April 1 [2016], the plan was that the bank would continue to process all wires for Madison"). Though the Bank contemplated restricting the beneficiaries who could receive wires from the Madison subaccounts to a pre-approved list of counter-parties, Doc. 136-1 at 672, 676, it never did. Doc. 134-1 at 149:15–23.

101. When these were not successful, DB NY returned to the clients to repeat the request. D.E. 131-1 (September 8, 2022 Deposition of Gloria Molina) at 190:8-191:1, 202:22-203:12; D.E. 124-1 at 24:1-5; D.E. 125-1 at 175:12-176:5.

Disputed. The Bank's citations to 131-1 and 125-1 discuss failed securities trades, not wires unrelated to securities transactions, and the citation to 124-1 does not support the stated fact.

102. Undisputed.

103. The SEC's investigation did not uncover or reveal the ongoing Ponzi scheme. D.E. 136-1 at 328-329.

Disputed. The SEC order, Doc. 136-1 at 316–33, identifies violations of the Advisors Act, but the cited material does not establish that the SEC "did not uncover or reveal the ongoing Ponzi scheme," nor could the Bank otherwise know what the SEC's investigation revealed.

104. Undisputed.

105. By early July, Deutsche Bank's internal compliance team had identified and escalated the notice to the custody business, which was prepared to off-board Madison on that basis. D.E. 123-1 at 137:10-17; D.E. 136-1 at 926; D.E. 132-1 at 38:2-4.

Undisputed that the Bank's compliance team had identified and escalated the notice to the custody business. Disputed that the Bank was prepared to off-board Madison before or during July 2016 and that it was prepared to do so based on the SEC's findings. Further, the materials cited by the Bank include a November 3, 2016 email stating that the business "may look to off board" Madison. Doc. 136-1 at 926. The Bank's head of security responded that as of that date, it was fine

to exit the relationship for business reasons but does not mention the SEC order, *id.*, and the custody business did not decide to exit the relationship until June 2017. Doc. 123-1 at 138:3-139:24.

106. The FBI reached out to one of Deutsche Bank's anti-financial crime directors for assistance in its own investigation into Madison during the time that Deutsche Bank was discussing off-boarding Madison. D.E. 123-1 at 120:16-122:10, 134:17-135:1, 137:8-17; D.E. 132-1 at 64:9-17; Declaration of Douglas Sloan in Support of Defendants Motion for Summary Judgment ("Sloan Decl."), ¶ 3.

Undisputed that in July 2016 the FBI reached out to one of Deutsche Bank's anti-financial crime directors for assistance in its own investigation into Madison. Disputed that the Bank was considering terminating its relationship with Madison during or prior to July 2016, as shown in the materials cited in response to ¶ 105.

107. Undisputed.

108. Deutsche Bank's internal policies require compliance with local law enforcement and regulators' requests whenever possible. D.E. 123-1 at 128:8-10; Sloan Decl., ¶ 5.

Undisputed that the Bank's policies are as stated, but disputed (and the evidence does not establish) that any law enforcement request required continuing to allow Madison to use the custody accounts to send wires unrelated to custodial activity, particularly where the Note Issuers were Bank clients. Doc. 138-1 at 617–20; Doc. 123-1 at 16–25.

109. Undisputed.

110. Undisputed.

111. In January 2017, law enforcement extended its requests to keep the Madison accounts open for another six months. Sloan Decl., ¶ 12; D.E. 123-1 at 136:11-14.

Disputed. A Bank email reflects that Sloan had cleared the business group to terminate Madison on November 3, 2016. Doc. 136-1 at 926. The November 2022 Sloan Declaration states only that "[t]o the best of my recollection, in or around January 2017, I received, by telephone, a

request from the FBI to extend the Keep Open letters," Doc. 145-7 ¶ 12, and a jury would not be required to accept his almost 5-year-old recollection of an undocumented phone call.

112. Undisputed.

113. Undisputed.

114. Undisputed.

## ADDITIONAL FACTS

115. Proper KYC procedures are important, in part, to prevent financial crimes. Doc. 132-1 at 43:8–12 ("one of the important reasons for a good KYC process is to be sure that the bank's services are not being used to aid financial crimes"); *id.* at 61:24–62:13; Doc. 135-1 at 56:3–9.

116. When on-boarding a new customer, the Bank should verify the client's line of business, its management structure and ultimate beneficial ownership, and the source of its funds. Doc. 134-1 at 38:4–39:24; Doc. 127-1 19:11–21:4; Doc. 123-1 at 25:19–26:2.

117. Bank employees were aware, and Bank documents showed, that the Note Issuers were issuing notes to raise funds to develop South Florida real estate. Doc. 135-1 at 20:15–17, 26:6–9, 59:13–60:8, 69:8–11, 78:23–80:25, 84:19–86:8, 89:10–25; Doc. 132-1 at 35:21–36:2.

118. In February 2014, Bank employee Floris Vreedenburgh met with individuals associated with a current Bank client, Biscayne Capital S.A, about Biscayne opening accounts for its clients. Doc. 136-1 at 602–03, 606. Vreedenburgh explained that the Bank would conduct due diligence on the clients and require a power of attorney from them before it would open subaccounts in the clients' names. *Id.* at 603; Doc. 134-1 at 52:2–22.

119. Bank employee notes and communications following this meeting show that the Biscayne associated entity was Madison, which held itself out as a licensed and registered investment advisor that would seek to open custodial subaccounts for its clients, including the Note

Issuers. Doc. 136-1 at 606 ("Open account for Madison Asset LLC (exempted Registered Advisor licensed in CIMA) and open subaccounts for each issuer."); *see also* Doc. 136-1 at 28–29.

120. Vreedenburgh also explained, in the 2014 meeting that, if Madison's name appeared as the account title's first words, *e.g.*, "Madison Asset LLC for [some other entity]," the Bank would conduct no additional inquiry or source of funds analysis. Doc. 134-1 at 84:11–87:12. No written materials from the Bank provided this information. *Id.* at 73:3–75:17, 81:17–20.

121. On April 9, 2014, one day after Madison's request, the Bank opeend three subaccounts thereafter titled, respectively "Madison Asset Custody & Clearing for ORC Senior Secured Ltd," "Preferred Income Collateralized Interest Ltd.," and "GMS Global Market Step Up Ltd." Doc. 136-1 at 154–55; Doc. 134-1 at 71:17–72:6; Doc. 127-1 at 27:23–29:17; Doc. 123-1 at 37:1–4.

122. A banker would expect Madison to use an account titled "Madison Asset Custody & Clearing for ORC Senior Secured Ltd." to perform custody and clearing services for an entity named "ORC Senior Secured Ltd," Doc. 123-1 at 42:13–46:4, and would not expect such an account to be used for any other entity. *Id.* at 46:5–47:12.

123. The Bank had no documentation of Madison or Biscayne's purported authority to open the accounts, did not seek or obtain the Note Issuers' consent, from their Director or otherwise, and had no knowledge of a relationship or agreement "authoriz[ing] Madison Asset to receive" the Note Issuers' assets. Doc. 132-1 at 24:10–21, 33:7–10; Doc. 134-1 at 78:19–81:16.

124. The Bank should want to know if a person involved in transactions utilizing Bank accounts was already a client, Doc. 123-1 at 30:17–32:1, as were the Note Issuers. *See* ¶¶ 31–33, *supra*.

125. The Bank's retained banking expert did not opine that the Bank's pre-May 2017 due diligence and AML policies were appropriate, that the Bank obtained sufficient information during due diligence to onboard Madison or open the subaccounts, or the Bank took timely and appropriate action to limit Madison after Bank employees escalated concerns. Doc. 152-1 at 11:19–12:1, 14:16–15:20, 56:21–57:7, 58:6–22, 75:7–22, 95:24–97:6, 106:5–14, 121:22–126:17

126. The Bank's expert testified that the Bank knew Madison was "investing on behalf of others." Doc. 152-1 at 54:17–55:3, 62:15–63:17.

127. Evidence confirms that there was revenue generating, bona fide securities trading activity occurring within the Madison subaccounts held in the Note Issuers' names. Doc. 139-1 at 303–04 (showing a net $9,330,540 credited to the subaccounts from trading securities that "appear to be issued by bona fide unrelated third parties"). For example, the subaccounts in the names of Biscayne Capital (B.V.I.) and Global Market Step Up had trades in WTS Commerzbank AG securities. Doc. 158-6, DB Bank Statements Composite, at 8, 28–29, 59. There were also trades in securities issued by Banco do Brasil. *Id.* at 9–10, 13–19, 54–63.

128. The Bank allows fiduciaries to open custody accounts to hold and trade securities on their clients' behalf, Doc. 123-1 at 23:21–25, 24:9–23, such that "someone other than simply the account holder who is interested in the" account's proceeds. Doc. 127-1 at 61:11–15.

129. When opening the Madison subaccounts, the Bank anticipated two to three buy-and-hold securities transactions per day, Doc. 136-1 at 882, which would have been consistent with custodial activity. Doc. 127-1 at 24:7–9.

130. The employees servicing the Madison subaccounts dealt with perhaps 30 customers, Doc. 134-1 at 26:13–20, and Madison could not wire any money out of the accounts without a Bank employee processing each wire. Doc. 127-1 at 35:10–23; Doc. 134-1 at 25:8–26:9, 28:4–29:17.

131. In May 2014, the Bank's custody operations team approved a wire from a Madison subaccount after it was unable to find any public record of Madison Asset to verify the request. Doc.136-1 at 884, 890; Doc. 127-1 at 30:10–34:22, 35:6–9.

132. In June 2014, Madison initiated a wire transfer of $999,866 to a beneficiary who was also the "call back" person to verify the transfer. Doc. 136-1 at 897–905; Doc. 127-1 at 36:6–40:18.

133. By July 2014, the Bank saw a "very huge spike in volumes" of wires. Doc. 136-1 at 608; Doc. 134-1 at 90:2–91:20; Doc. 127-1 at 40:20–42:14.

134. The Bank opened a custody account for a fourth Note Issuer (SG Strategic Income) in August 2014, with no more diligence than it had exercised before. Doc. 123-1 at 53:17–54:16, 55:3–58:13; Doc. 138-1 at 586–614.

135. Scott Habura acknowledged that the Madison wire activity raised "risk and compliance" issues. Doc. 127-1 at 58:10–14.

136. Another employee wrote to Habura and others saying,

> Regarding Madison as a whole, it's *not* just the volumes but the type of activity we see. In the last 18 months they have sent wires to over 800 difference [sic] beneficiaries. To be clear, the vast majority of wire volume is unrelated to trading activity. This seems unusual (I pause to use the word suspicious) activity for a custody platform to process routinely.

Doc. 137-1 at 90 (emphasis added).

137. Bank employees compiled a list of the Madison wire recipients in connection with the meeting discussed in the response to ¶ 94, Doc. 136-1 at 627–33, noting many did not relate to securities processing at all. *Id.* at 625–33; Doc. 134-1 at 104:1–107:5; *see also* Doc. 136-1 at 635–37; Doc. 134-1 at 111:24–112:23.

138. According to the Bank's expert, it is likely the April 2015 meeting led employees to escalate concerns to compliance, based on the Bank's policies requiring an immediate report of suspected fraud. Doc. 152-1 at 89:16–92:6; Doc. 152-6 at 14 § 10.

139. Bank employees had identified over 430 unique beneficiaries from the Madison subaccounts by June 2015, Doc. 136-1 at 634, 600 by September and 715 by November 2015, when the Madison accounts were also overdrawn by over $8 million. Doc. 136-1 at 638–49, 965–66, 650–51; Doc. 134-1 at 118:2–119:10; Doc. 127-1 at 53:10–55:6.

140. By January 2016, there had been at least 800 unique beneficiaries, the "vast majority" of which were, as multiple employees observed, "unrelated to trading activity." Doc. 137-1 at 90; Doc. 136-1 at 654.

141. In February 2016, a Bank employee wrote, regarding the activity unrelated to securities trading in the Madison subaccounts, "The activity is persistent and we shouldn't continue to process such activity unrelated to trade settlement." Doc. 136-1 at 657; Doc. 127-1 at 57:19–23.

142. Another employee wrote, regarding Madison, "I believe we stop payments for this client immediately! I am concerned with the activity and their attitude." Doc. 136-1 at 910.

143. The Madison subaccounts had a $7.5 million overdraft in February 2016. Doc. 136-1 at 358.

144. On February 18, 2016, the custody operations group was instructed to "reject any wires from Madison that are not related to their securities transactions." Doc. 134-1 at 128:1–129:15; Doc. 136-1 at 656.

145. A February 2016 "Weekly Risk/Issue Report" noted Madison was "receivingg [sic] and sending cash wires through their custody account that [did] not appear to be related to the custody settlement activity occurring within their account," that Madison's "custody account [was] not being used soley [sic] for it's [sic] designed purpose," and that the Bank had

"processed incoming and out going wires unrelated to securities transactions." Doc. 136-1 at 686.

146. In April 2016, Bank employees wrote that Madison requested fund transfers between Madison subaccounts "several times a day, anywhere from 5–10 is the norm." Doc. 136-1 at 972.

147. In May 2016, a Bank employee identified "unusual" wire payments out of the Madison subaccounts that did not "appear to be settlement related activity," including specifically "an American Express payment." Doc. 136-1 at 376; *see also id.* at 946, 951 (listing American Express among "the unique beneficiaries for Madison wire payments" as of April 2016).

148. In July 2016, Scott Habura recognized that one Madison wire for more than $30,000 went to pay "[c]ollege tuition for one of the owners [sic] kids" at the University of Miami. Doc. 137-1 at 108.

149. In July 2016, there were multimillion dollar overdrafts in Madison custody accounts. Doc. 136-1 at 693.

150. Law enforcement requests played no role in the Bank's handling of the Madison subaccounts from April 9, 2014, when they opened, through July 20, 2016, when the FBI sent its "keep-open" letter. *Id.* at 124:1–20; *see also* Doc. 123-1 at 128:21–25 (the Bank was not obligated to comply with the FBI's request).

151. The nature of custody accounts, which are intended to move and hold securities, means that they should not be overdrawn except for brief and rare instances caused by delays in clearing securities transactions. Doc. 134-1 at 22:8–23:2, 51:12–22; Doc. 127-1 at 17:19–18:2. Persistent overdrafts are inconsistent with custody accounts' purposes. Doc. 127-1 at 17:15–18:2, 43:10–44:3, 47:24–48:18, 51:5–11; Doc. 134-1 at 22:15–23:2, 120:1–22, 134:2–135:15.

152. In January 2016 messages, Habura told Vreedenburgh he "was too busy making money on [overdraft fees]" from the Madison relationship to notice a task assigned to him. Doc. 136-1 at 652; Doc. 134-1 at 120:25–123:11. Vreedenburgh responded that "at some point [they] need to stop gustavo in his tracks," adding, "it's too obvious, and been going on for too long." *Id.*

153. Custody employees at the Bank are trained to recognize suspicious account activity and signs of money laundering and can recognize whether a wire leaving an account is genuinely related to securities transactions. Doc. 134-1 at 31:22–34:6; Doc. 127-1 at 18:3–24, 57:24–58:3.

154. The Bank was aware of no safeguards imposed around the Madison custody accounts after the Bank received the Keep Open letters in July 2016. Doc. 123-1 at 131:8–25.

155. By November 3, 2016, the custody group was authorized to close the Madison accounts if it wanted. Doc. 136-1 at 926; Doc. 123-1 at 138:18–139:8.

156. In October 2016, Bank employees, including Scott Habura, discussed how terminating customers would affect the Bank's reputation in the market. *See, e.g.*, Doc. 136-1 at 916–19; Doc. 127-1 at 78:18–81:20. One wrote, "There are competitors who would love to jump on the bandwagon that DB [is] no longer viable and proven by the fact that we are kicking clients out." Doc. 136-1 at 916.

157. Compliance employees "decided to leave up to the business folks whether to continue or discontinue this relationship" with Madison, Doc. 127-1 at 115:24–116:3, and ultimately the business, rather than compliance, personnel within the Bank made the decision to close the custody accounts. Doc. 123-1 at 147:8–9.

158. From early 2014 through at least spring 2016, the Note Issuers were not making timely interest payments, a fact known to the Bank. Doc. 135-1 at 144:15–145:17; Doc. 138-1 at 79–162; *see also* Doc. 135-1 at 93:17–144:3.

159. Floris Vreedenburgh testified that Madison's ability "to open the sub-accounts in order to make the investment transactions, … probably played a big part in [Madison] being able to extract the cash to carry out their fraud" and "to hide the scheme." Doc. 134-1 at 168:4–169:6.

160. A sole outside director signed each Agency Agreement on each respective Note Issuers' behalf, and each Agreement identified the Director, provided the Director's contact information, and designated the Director to receive any Bank communications to the Issuers. Doc. 137-1 at 490, 492, 507, 509, 526, 545, 562, 564, 590–92, 602, 619, 621, 670, 672, 687.

161. The Note Issuers' Offering Memoranda also identified Oosten as a Director of the Issuers. Doc. 137-1 at 719, 750, 781, 808, 834, 861, 917, 943, 970, 997, 1024, 1054, 1081, 1113, 1140.

162. The Bank possessed and could refer to the Agency Agreements and the Note Issuers' Offering Memoranda from the time of their execution. Doc. 135-1 at 52:22–54:13.

163. Hermann Oosten remained the individual contact for the respective Directors, New Haven Management Inc. and SGG, while each entity was serving as the Independent Director. Doc. 135-1 at 62:11–63:9, 65:3–11, 71:2–20, 75:6–16, 77:18–78:12, 81:22–82:20, 103:15–104:8; Doc. 137-1 at 719, 725, 808, 814, 861, 867, 876, 888, 917, 923.

164. In the second half of 2017, Oosten directed inquiries regarding the Madison accounts in the Note Issuers' names to the Bank. Doc. 138-1 at 188; Doc. 135-1 at 187:12–188:16.

165. In December 2017, Hermann Oosten wrote to Roberto Cortes, Ernesto Weisson, and others, stating that SGG "as directors of the different companies are kept complete in the dark" and that SGG did not receive "any answers/directions/documentation" in response to its requests. Doc. 158-8 at 2.

166. In December 2017, Oosten, on behalf of SGG, refused Gustavo Trujillo's request that he retroactively authorize Madison to provide custody services for the Note Issuer. Doc. 158-9 at 55.

167. Oosten asked Trujillo, "since the agreements between Madison LLC and the entities … were never signed," how Madison "could have provided clearing and custody services to these entities" and how Madison opened the subaccounts "without prior approval of the director(s) and the signed agreements" in the first instance. Doc. 158-9 at 55.

168. Oosten questioned the Individual Wrongdoers "why amounts are being transferred from" the subaccount that Madison ostensibly opened to provide services for Note Issuer Global Market Step Up, "to Madison Asset LLC" and other entities. Doc. 158-7 at 2.

169. If calculated only through June 30, 2016, the Note Issuers' compensable losses exceed $150 million. Doc. 158-5 at 228 and 278.

170. The Liquidators' damages expert, Ian Ratner, has calculated the Companies' losses as $192 million or $182 million, depending on methodology. Doc. 139-1 at 296.

171. A Bank employee, Paul Yetton, calculated that, as of late 2017, the Note Issuers owed $250 million to their investors. Doc. 135-1 at 192:15–195:4; Doc. 138-1 at 204–06.

172. The Bank's compliance expert testified that "the compliance team was actively engaged in assessing [Madison's] activity throughout the course of the relationship," Doc. 152-2 at 17 ¶ 35, and that the "operations team frequently escalated wires that were unrelated to securities activities." *Id.* at 20 ¶ 39(b); Doc. 152-1 at 97:7–98:2.

173. The Bank's compliance expert also testified that the emails available to her (and the Liquidators) likely do not reflect the full extent of the escalation through other channels. Doc. 152-1 at 92:16–93:19.

174. Under the English law governing the relationship between Deutsche Bank and the Note Issuers, the Bank owes a duty to the Note Issuers to guard against the facilitation of fraud and to not execute transactions resulting in misappropriation of the Note Issuers' funds. Doc. 158-1 ¶¶ 107–14.

175. "[A]ctual knowledge" is not an element of a Cayman § 147 claim. Doc. 158-1 ¶¶ 58–59; *see also* Doc. 143 at 31; Doc. 145-1 at 10 ¶ 21 (Bank's foreign law declarant stating, "It is not necessary to establish actual knowledge.").

176. Assisting in carrying out even "bona fide business transactions" may support liability under § 147 if the statute's lower, "blind eye" knowledge standard is met. Doc. 158-1 ¶¶ 70–72.2.2.

177. Recklessness and assisting in transactions lacking a commercial purpose support an inference of willful blindness, as does "breach of duty together with the absence of a good explanation" for the defendant's assistance in the wrongdoing. Doc. 158-1 ¶¶ 61.6, 61.8. If a defendant "did suspect wrongdoing yet failed to make inquiries because 'he did not want to know' … [s]uch conduct is dishonest, and those who are guilty of it … are treated as if they had actual knowledge." *Id*. ¶ 61.7 (emphasis omitted).

178. Whether a defendant acts with willful blindness to satisfy the "blind eye" knowledge standard "is essentially a jury question." Doc. 158-1 ¶ 61.7.

179. "Substantial assistance" is not an element of a Cayman § 147 claim. "All is that is required … is that the defendant 'participates in,' 'takes part in' or 'concurs in' the carrying on of the company's business." Doc. 158-1 ¶ 72.2.1 (internal citations and emphasis omitted). That participation may consist of providing routine banking services or carrying out "bona fide business transactions." *Id*. ¶¶ 70–72.2.2.

180. Starting in 2014, the Bank executed multiple requests to transfer notes issued by the Note

Issuers into the custody subaccounts controlled by Madison. *E.g.,* Doc. 158-4 ¶¶ 7–8, Doc. 158-12 at 2–11.

This 9th day of December, 2022.

<table>
<tr><td>

Eduardo F. Rodriguez<br>
Florida Bar No. 36423<br>
*eddie@efrlawfirm.com*<br>
EFRLAWFIRM<br>
1 Alhambra Plaza, Suite 1225<br>
Coral Gables, FL 33134<br>
Telephone: (305) 340-0034

</td><td>

/s/    *John H. Rains IV*<br>
Frank M. Lowrey IV (*pro hac vice*)<br>
Georgia Bar No. 410310<br>
*lowrey@bmelaw.com*<br>
Ronan P. Doherty (*pro hac vice*)<br>
Georgia Bar No. 224885<br>
*doherty@bmelaw.com*<br>
John H. Rains IV<br>
Florida Bar No. 0056859<br>
Georgia Bar No. 556052<br>
*rains@bmelaw.com*<br>
Amanda Kay Seals (*pro hac vice*)<br>
Georgia Bar No. 502720<br>
*seals@bmelaw.com*<br>
Juliana Mesa (*pro hac vice*)<br>
Georgia Bar No. 585087<br>
*mesa@bmelaw.com*<br>
Zoe Beiner (*pro hac vice*)<br>
Georgia Bar No. 878340<br>
*beiner@bmelaw.com*<br>
BONDURANT MIXSON & ELMORE LLP<br>
1201 West Peachtree Street, N.W.<br>
Suite 3900<br>
Atlanta, Georgia 30309<br>
Telephone: (404) 881-4100<br>
Facsimile: (404) 881-4111

</td></tr>
</table>

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be served the foregoing **PLAINTIFFS' RESPONSE**

**TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND ADDITIONAL FACTS**

by filing it with the Clerk of Court using the CM/ECF system upon the following counsel of record:

> Harvey W. Gurland
> *hwgurland@duanemorris.com*
> Julian Jackson-Fannin
> *jjfannin@duanemorris.com*
> DUANE MORRIS LLP
> 201 S. Biscayne Boulevard, Suite 3400
> Miami, Florida 33131-4325
>
> David G. Januszewski
> *djanuszewski@cahill.com*
> Sheila Ramesh
> *sramesh@cahill.com*
> Sesi V. Garimella
> *sgarimella@cahill.com*
> Nicholas N. Matuschak
> nmatuschak@cahill.com
>
> CAHILL GORDON & REINDEL LLP
> 32 Old Slip
> New York, NY 10005

This 9th day of December, 2022.

> */s/ John H. Rains IV*
> John H. Rains IV