## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

MICHAEL PEARSON, et al.,

    Plaintiffs,

    v.

DEUTSCHE BANK AG, et al.,

    Defendants.

CASE NO. 1:21-CV-22437-
Bloom/Otazo-Reyes

---

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' PROFFERED EXPERTS IAN RATNER AND RICHARD FRAHER PURSUANT TO FEDERAL RULE OF EVIDENCE 702

Eduardo F. Rodriguez
Florida Bar No. 36423
*eddie@efrlawfirm.com*
EFRLAWFIRM
1 Alhambra Plaza, Suite 1225
Coral Gables, FL 33134
Telephone: (305) 340-0034

Frank M. Lowrey IV (*pro hac vice*)
Georgia Bar No. 410310
*lowrey@bmelaw.com*
Ronan P. Doherty (*pro hac vice*)
Georgia Bar No. 224885
*doherty@bmelaw.com*
John H. Rains IV
Florida Bar No. 0056859
Georgia Bar No. 556052
*rains@bmelaw.com*
Amanda Kay Seals (*pro hac vice*)
Georgia Bar No. 502720
*seals@bmelaw.com*
Juliana Mesa (*pro hac vice*)
Georgia Bar No. 585087
*mesa@bmelaw.com*
Zoe Beiner (*pro hac vice*)
Georgia Bar No. 878340
*beiner@bmelaw.com*
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

***Attorneys for Plaintiffs***

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** .......................................................................................................I

**INTRODUCTION**.............................................................................................................. 1

**ARGUMENT AND CITATION TO AUTHORITY** ......................................................... 1

**I.    Ratner is qualified to testify, his methodology is reliable, and his testimony will assist the jury in calculating damages.** ............................................................................ 2

    **A.    The Bank does not contest Ratner's qualifications.**............................................ 4

    **B.    Ratner's calculations are based on reliable methodology, and any disagreements raised by the Bank are improper Daubert challenges because they go to the opinions' weight—rather than their admissibility.**.................... 4

    **C.    Ratner's opinions will assist the jury in determining damages.** ....................... 7

    **D.    The Court should not exclude Ratner's calculations of the administrative expenses of the liquidation proceedings or prejudgment interest.** ................... 9

**II.   Fraher is qualified to provide his three opinions, and his opinions, including his third opinion, will be helpful to the jury.** ................................................................. 11

    **A.    Fraher's experience—including his experience with KYC, AML, and related banking compliance—qualify him to offer his opinions.**................................. 13

    **B.    Fraher's third opinion will be helpful to the jury.** ........................................... 16

**CONCLUSION** ............................................................................................................... 17

## Table of Authorities

### Case Law

*In re £E.S. Bankest, L.C.*,
No. 06-1220-BKC-AJC-A, 2010 WL 1417732 (Bankr. S.D. Fla. Apr. 6, 2010) .....................7

*AIM Recycling of Fla. LLC v. Metals USA, Inc.*,
No. 18-cv-60292-BFB, 2020 WL 209236 (S.D. Fla. Jan. 14, 2020) ..........................13, 15, 17

*Bailey v. St. Louis*,
196 So. 2d 375 (Fla. 2d DCA 2016) ........................................................................................7

*Bosem v. Musa Holdings, Inc.*,
46 So. 2d 42 (Fla. 2010) ........................................................................................................10

*Christopher Advert. Group, Inc. v. R&B Holding Co., Inc.*,
883 So. 2d 867 (Fla. 3d DCA 2004) ........................................................................................7

*City of S. Miami v. DeSantis*,
No. 19-cv-22927-BFB, 2020 WL 7074644 (S.D. Fla. Dec. 3, 2020) ......................................1

*Clena Inv., Inc. v. XL Specialty Ins. Co.*,
280 F.R.D. 653 (S.D. Fla. 2012) ...........................................................................................13

*Coquina Invs. v. Rothstein*,
2011 WL 4949191 (S.D. Fla. Oct. 18, 2011) ...........................................................................6

*Furmanite Am., Inc. v. T.D. Williamson, Inc.*,
506 F. Supp. 2d 1126 (M.D. Fla. 2007) ............................................................................14–15

*Hanson v. Waller*,
888 F.2d 806 (11th Cir. 1989) ...........................................................................................16–17

*In re Huff*,
109 B.R. 506 (Bankr. S.D. Fla.1989) ......................................................................................7

*J.G. v. Carnival Corp.*,
No. 12-cv-21089-RSR., 2013 WL 752697 (S.D. Fla. Feb 27, 2013) ...............................13, 15

*Maiz v. Virani*,
253 F.3d 641 (11th Cir. 2001) ...............................................................................................15

*Montgomery v. Aetna Cas. & Sur. Co.*,
898 F.2d 1537 (11th Cir. 1990). .......................................................................................16–17

*Moultrie v. Consol. Stores Int'l Corp.*,
    764 So. 2d 637 (Fla. 1st DCA 2000) .......................................................................16

*Perlman v. Wells Fargo Bank, N.A.*,
    559 F. App'x 988 (11th Cir. 2014) ........................................................................17

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ..............................................................................1

*In re Richert*,
    632 B.R. 877 (Bankr. M.D. Fla. 2021) ...............................................................10

*Rosenfeld v. Oceania Cruises, Inc.*,
    654 F.3d 1190  (11th Cir. 2011) ...............................................................................1

*SEC v. Big Apple Consulting USA, Inc.*,
    783 F.3d 786 (11th Cir. 2015) ...............................................................................17

*Thabault v. Chait*,
    541 F.3d 512 (Fla. 3d DCA 2008) ...........................................................................7

*In re Toy King Distrib., Inc.*,
    256 B.R. 1 (Bankr. M.D. Fla. 2000) .........................................................................7

## INTRODUCTION

The Bank[1] impermissibly attempts to reframe attacks on the credibility and weight of Ian Ratner and Richard Fraher's testimony as arguments on admissibility. These are not proper *Daubert* challenges because determining the credibility of a witness or the persuasiveness of evidence are for the jury. The Court, therefore, should deny the Bank's motion to exclude and leave the Bank to raise these arguments at trial through "vigorous cross-examination" and "presentation of contrary evidence." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193–94 (11th Cir. 2011).

## ARGUMENT AND CITATION TO AUTHORITY

In determining the admissibility of an expert's testimony, the trial court inquires whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003).[2] These are *Daubert*'s "qualifications," "reliability," and "helpfulness" prongs. *City of S. Miami v. DeSantis*, 19-cv-22927-BFB, 2020 WL 7074644, at *3 (S.D. Fla. Dec. 3, 2020).

In analyzing each prong, it is "not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence," nor is the court's role "intended to supplant the adversary system or the role of the jury." *Quiet Tech.* 326 F.3d at 1341. Because the Bank's

---

[1] The Bank, as used in this brief, refers to the Defendants collectively. Unless otherwise specifically noted, capitalized terms refer to those terms as defined in the operative complaint. *See* Doc. 31. Page numbers in citations to documents in the record refer to the page numbers found in the header affixed by the Court's electronic filing system.

[2] Unless otherwise noted, internal quotations, citations, and alterations are omitted from legal citations and emphasis is added.

challenges are ultimately about persuasiveness, not admissibility, its motion should be denied. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking … admissible evidence." *Id.*

I.    **Ratner is qualified to testify, his methodology is reliable, and his testimony will assist the jury in calculating damages.**

The Liquidators' damages expert, Ian Ratner, performed two analyses applying straightforward and reliable accounting methodologies. In the first, Ratner and the accountants working under his supervision reviewed and categorized all the transactions in the 12 Deutsche Bank custody accounts opened in the Companies' names. Doc. 139-1 at 362–64. They verified the amount and associated information for each transaction and reconciled all the accounts. *Id.*

Ratner's team then categorized each transaction and presented detailed schedules identifying the sources and uses of all of the cash in those 12 accounts. *Id.* To identify and understand who the payees for the numerous transactions were, particularly the wire transfers, Ratner performed additional procedures, primarily involving searches of the document productions in this case and public records for the payees' names. *Id.* at 363–75 (explaining the procedures and presenting in tabular form the results). These procedures allowed Ratner to identify uses of cash in the accounts that were "inconsistent with the Offering Documents [for the Note Issuers] and the intended use of the DB Custody Accounts." *Id.* at 363. Using this approach, Ratner concluded that the Liquidators' damages were $134,453,158 before the administrative expenses of the liquidation proceedings and prejudgment interest. *Id.* at 296 (the sum of Ratner's Schedules 2, 3, 4, 5a, and 6). He then quantified the administrative expenses of liquidation and prejudgment interest. *Id.*

Ratner's second calculation is the total amount of note issuances from between 2014 and 2017 (the time period during which the Deutsche Bank custody accounts were opened and used). *Id.* at 296, 310. Under this approach, he determined that the damages were $131,268,038, again before prejudgment interest. He then calculated prejudgment interest on the principal amount. *Id.* at 296.

Ratner's first analysis is one way to measure the funds the Bank assisted the Individual Wrongdoers to misappropriate from the Companies. That is, Ratner has determined and quantified which proceeds of the note issuances in the custody accounts were used for apparently legitimate activity (*e.g.*, funding South Bay Holdings, LLC, the real estate developer described in the Note Issuers' offering documents, or trading in bona fide securities) versus the funds stolen by the Individual Wrongdoers (*e.g.*, cash transfers to those individuals or entities unrelated to South Bay Holdings, LLC that they formed and controlled). In effect, if the jury awarded damages using this first analysis, the Companies would be restored to the position they would have been in if the Companies had not been looted.

Ratner's second calculation could also be helpful to the jury in determining the amount misappropriated from the Companies through the Bank's conduct. That is because all of the new note issuances were executed by the Bank and then the Bank delivered those notes free of payment to a Madison sub-account – an entity with no legal or contractual right to receive the notes. Ratner's work on this point could also support an award of damages under a "deepening insolvency" theory because the new note issuances also provide a measure of the increased liabilities the Companies incurred because of the misconduct aided by the Bank. Like the first, this analysis provides another way for the jury to measure damages so as to restore the Companies to the position they would have been in absent the fraud.

Not surprisingly, the Liquidators offer Ratner only as a damages expert. The Liquidators will prove the liability portions of their case, including causation issues and the appropriate date range for measuring damages, through other evidence. Accordingly, Ratner assumes liability for purposes of his damages opinions. Doc. 139-1 at 298 n.4.

A.      **The Bank does not contest Ratner's qualifications.**

Ratner, co-founded GlassRatner, a financial advisory services firm, in 2001. Doc. 139-1 at 296. GlassRatner merged with B. Riley Financial (now B. Riley Advisory Services) in 2018. *Id*. Ratner is a CPA with more than 30 years of experience in Forensic Accounting, including in complex financial and economic damages. *Id*. at 296–97. Ratner has worked on hundreds of matters involving estimating damages including lost profits, reasonable royalties, extra expenses, diminution of value, and deepening insolvency. *Id*. He has been involved in many matters where review of bank, brokerage, and custody statements are required. *Id*. He has testified at trial, arbitration, and depositions regarding forensic accounting more than 250 times. *Id*. The Bank does not dispute, nor could it, that Ratner is qualified to testify as a damages expert.

B.      **Ratner's calculations are based on reliable methodology, and any disagreements raised by the Bank are improper *Daubert* challenges because they go to the opinions' weight—rather than their admissibility.**

The Bank mischaracterizes the first of Ratner's analyses as the product of "inconsistent" and "[a]rbitrary [m]ethodology," and contends that it is "unreliable" and "incoherent." Doc. 142 at 9. This is not so. As an initial matter, the Notes Issuers' offering documents are plain, unmistakable, and clear as to how the proceeds of note issuances will be spent: either South Florida real estate development or investments in marketable securities (depending on the version and specific Note Issuer). *E.g.*, Doc. 137-1 at 1159 ("The Issuer will primarily invest in South Bay Holdings, LLC . . . . It is understood that South Bay will, in turn, use the proceeds of such

investment for its working capital needs and to construct, market and sell residential single family luxury homes . . . ."); *id*. at 909 ("Note Proceeds will be invested into a variety of investments including but not limited to commodities, fixed income notes and equities.").[3] The only two Bank witnesses who testified on this point acknowledged that the Bank knew the note issuances were to fund real estate development. Doc. 135-1 at 20:15–17, 26:6–9, 59:13–60:8, 69:8–11, 78:23–80:20, 84:19–86:8, 89:10–25; Doc. 132-1 at 35:21–36:2.

Likewise, the Bank understood when it opened the custody accounts that they would be used for trading and settlement activity, and as the Individual Wrongdoers misused the accounts, the Bank's employees repeatedly identified the misuse of the accounts. Doc. 127-1 at 17:15–18:2, 43:10–44:3, 47:24–48:18, 51:5–11; Doc. 134-1 at 22:15–23:2, 120:1–22, 134:2–135:15; Doc. 137-1 at 59–63, 80–81, 84–85, 88–96, 102–09. What Ratner's first analysis does is quantify how much of the net uses of cash in the accounts was obviously inconsistent with the stated purposes of the note issuances and accounts. That information will assist the jury in determining the amount misappropriated from those accounts, which are in turn the Companies' damages.

 The Bank's suggestions that it does not understand Ratner's methodology or that Ratner has not adequately explained his work do not withstand scrutiny. It is not a shortcoming, as the Bank wrongfully argues, that Ratner "had no knowledge of what the purpose" of particular transactions were that he included in his damages calculation. Doc. 142 at 11. It is legally irrelevant *why* – that is, for what purpose – the Individual Wrongdoers made millions in payments to individuals and entities (including themselves) who were not authorized to receive proceeds from

---

[3] Ratner is not, as the Bank argues (Doc. 142 at 9 n.3), offering a legal opinion on the interpretation of the offering documents. Instead, he relies on their plain meaning. The Bank has not proposed any competing interpretation of the offering documents' language on the intended use of the note proceeds; if the Bank has any argument that the offering documents mean anything other than what they say, the Bank should have included that in their motion.

the note issuances. What matters for calculating damages is that the funds were not used for the purposes stated in the Note Issuers' offering documents and were instead misappropriated to make payments to over 800 different beneficiaries. To the extent the Bank believes Ratner erroneously included any legitimate use of the Companies' funds in his damages model, they are free to point out such alleged mistakes on cross-examination. And while Ratner stands by his initial damages calculations, he has prepared a supplemental report that considers the points the Bank's damages expert made in his report and reduces the claimed damages accordingly. Doc. 158-5 at 162–225.[4]

Similarly, the Bank's accusation that Ratner's work is "based on guesswork and assumptions" instead of "any actual facts or data" is wrong. Doc. 142 at 12 n.5. Ratner prepared a detailed report that includes not only a narrative explanation of the work his team performed but also citations to the record and detailed schedules that analyze transactions one-by-one and identify the source documentation Ratner relied upon to determine whether particular transactions were included in the Companies' damages. Doc. 139-1 at 295–401. Indeed, the primary source of data for Ratner's report are the Bank's own statements, which the Bank produced in this litigation and which the Bank has had for years. Ratner's work is the opposite of *ipse dixit* and his report confirms the rigor and reliability of his methodology.

Even *Coquina Investments v. Rothstein*, a case the Bank relies on repeatedly throughout its motion, makes clear that the types of attacks the Bank raises are not proper *Daubert* arguments. In that case, the court determined the defendants' "list of additional perceived errors or shortcomings" of the plaintiffs' expert, including the "assumptions made and facts [the expert] relie[d] upon" did

---

[4] In particular, Ratner's supplemental report addresses concerns raised by the Bank and its rebuttal damages expert concerning the categorization of certain transactions and the transfer of non-cash assets of reasonably equivalent value into the custody accounts. Doc. 142 at 10 & 12 n.6.

not render the opinion unreliable. 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011). These types

of attacks may instead be brought through "[v]igorous crossexamination" and "presentation of

contrary evidence[.]" *Id.*

### C. Ratner's opinions will assist the jury in determining damages.

The Bank's argument that Ratner's damages calculations will not be helpful to the jury

because they do not "comport with a recognized measure of damages" also misses the mark. Doc.

142 at 13. Both of the damages calculations Ratner performed measure the "amount of money

necessary to put Plaintiffs in the position they would have been in had the alleged misconduct

never occurred."[5] *Id*. The Bank is wrong about the legal measures of damages and wrong in its

criticism of Ratner.[6]

Specifically, Ratner's first calculation quantifies the extent of the looting and

misappropriation of the Companies' assets by detailing the misuse of the proceeds from the note

issuances. His second calculation measures misappropriation by the quantum of notes delivered

---

[5] Ratner's methodology is essentially a "but for" approach. It attempts to put the Companies back in the position they would have been in but for the Bank's conduct.

[6] While Ratner's calculations will certainly assist the jury in determining the amount of damages to award under this general standard, the Bank's motion pointedly omits (and in some instances inaccurately describes) the liability theories remaining in this case and their legal measure of damages. Doc. 142 at 13. The Liquidators, for example, are not asserting a "fraud" claim. Under the Cayman § 147 theory, English-law negligence theory, and aiding and abetting tort theories, the value of the property that the Individual Wrongdoers stole or misappropriated is a measure of damage. Doc. 158-1 (Toube Dec.) ¶¶ 106–114 & ¶¶ 73–79; *Christopher Advert. Group, Inc. v. R&B Holding Co., Inc.*, 883 So. 2d 867, 871 (Fla. 3d DCA 2004). And Florida approaches the exact measure of damage for claims related to breaches of fiduciary duty using a flexible approach that varies depending on the nature of the breach at issue, and those damages may include "deepening insolvency" damages. *In re Toy King Distrib., Inc.*, 256 B.R. 1, 175–76 (Bankr. M.D. Fla. 2000); *Bailey v. St. Louis*, 196 So. 3d 375, 377–79 (Fla. 2d DCA 2016); *In re £E.S. Bankest, L.C.*, No. 06-1220-BKC-AJC-A, 2010 WL 1417732, at *21–22 (Bankr. S.D. Fla. Apr. 6, 2010); *In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989); *Thabault v. Chait*, 541 F.3d 512, 523 (Fla. 3d DCA 2008). In short, while the Bank is wrong about Ratner's opinions in relation to the measure of damages they have articulated, the Bank also has not provided an accurate or complete picture of the legal landscape for damages in this case.

by the Bank to Madison – an entity that had no legal or contractual right to receive the notes free of payment. The second calculation also measures the increased liabilities to which the Note Issuers were exposed as a result of the Bank's conduct, which are recoverable under a "deepening insolvency" theory.

Ratner's calculations would not, as the Bank argues, result in a "windfall for the Companies." Doc. 142 at 17. Both calculations are substantially lower than the total outstanding debts owed by the Note Issuers, whether measured by the Bank's own data or the total of the creditor claims asserted against the Companies' estates. Indeed, a Bank calculation shows that, as of late 2017, the Issuers owed some $250 million in principal and interest to the note purchasers, money that the Bank had allowed Madison to disperse to the four corners of the Earth. Doc. 135-1 at 192:15–195:4; Doc. 138-1 at 204; Doc. 141-3 ¶ 11. Both of Ratner's calculations are conservatively tied to the Bank's damage-causing misconduct, as they are limited to the periods during which the Bank transferred the notes into the custody accounts Madison opened in the Companies' names. Thus, Ratner has not measured damages in terms of the whole fraud or any conduct or time period disconnected from the Bank's liability. And regardless, his calculation easily shows the damages that accrued as of any point in time. *See, e.g.*, Doc. 158-5 at 228, 278 (calculated compensable losses as of June 30, 2016, before the first FBI "hold open" request).

The Bank's complaints about Ratner's inclusion of newly issued note amounts and interest payments in his damages are also without merit. As for interest paid on the notes, Ratner has included them in his damages analysis because these are actual amounts paid by the Companies that would have been avoided from 2014 onward if the Bank had either not opened the custody accounts or closed them before the first interest payments were due in May 2014. Doc. 139-1 at 308; *id*. at 22:15–19, 133:2–22. And the Bank's suggestion that *interest* repaid to note holders

8

somehow reduces the Note Issuers' liability for unpaid *principal* (Doc. 142 at 16) is not supported by any authority and makes no sense – the innocent purchasers of the notes had a legal entitlement to interest payments and the reason the interest is included in damage is that the Note Issuers would never have incurred the principal or interest obligations if the Bank had not assisted the Wrongdoers in perpetrating the fraud.

The Bank's argument over the principal due under the notes and Ratner's purported failure to "offset" payments is frivolous. *Id*. at 16–17. There is no evidence that any of the principal was repaid, and if such evidence existed, the Bank would have the information because the Bank was the paying agent on the notes and was responsible for collecting payments and distributing them under the Agency Agreements. Moreover, in January 2018, one of the Bank's employees in London confirmed that over $250 million in note principal remained outstanding. Doc. 138-1 at 204–05; Doc. 135-1 at 193:4–195:4; *see also* Doc. 158-4 ¶ 13 (confirming no repayment of principal). It is hardly a methodological flaw for Ratner to not offset damages by non-existent re-payments.

### D.   The Court should not exclude Ratner's calculations of the administrative expenses of the liquidation proceedings or prejudgment interest.

The Bank also asks this Court to exclude Ratner's computation of the administrative expense of the liquidation proceedings as an element of damage. Doc. 142 at 17–18. Notably, the Bank does not argue that these expenses cannot be recovered as damages under the legal theories presented in the case. Instead, the Bank faults Ratner for not offering a *causation* opinion on this issue and contends that, because Ratner could not recall during his deposition which of the administrative expenses had been approved by the court overseeing the liquidations, the Court should exclude the entire expense calculation. Neither argument has merit. Of course, Ratner has not offered causation opinions, as he is only opining on the amount of damages and not liability.

The Liquidators will offer their causation evidence at trial and if the jury determines that the Bank caused these damages, Ratner's opinion will help the jury quantify that damage. With respect to the Court approval issue, this is another example of the Bank incorrectly conflating weight versus admissibility. If there is indeed any doubt as to whether all of the claimed expenses have been approved by the time of trial, the Bank can raise the issue on cross-examination and the jury may deduct any unapproved amounts. Or, the Court could address this issue through some legal instruction or ruling at trial. But the issue does not demonstrate any inherent unreliability in Ratner's methodology.

Finally, the Bank argues that Ratner's prejudgment interest calculation should not be presented to the jury, noting that the issue is one of law for the Court to determine after a verdict. Doc. 142 at 18–19. Ratner has prepared a prejudgment interest calculation (and will update it at trial) to assist the Court. That aspect of his damages analysis need not be presented to the jury, but will assist the Court in calculating and awarding prejudgment interest after a verdict. Contrary to the Bank's motion, however, an award of prejudgment interest in this case is not discretionary, but mandatory. *See, e.g.*, *Bosem v. Musa Holdings, Inc.*, 46 So. 3d 42, 45–46 (Fla. 2010); *In re Richert*, 632 B.R. 877, 902 (Bankr. M.D. Fla. 2021). The Court should therefore not exclude the prejudgment interest calculations Ratner has performed.

\* \* \*

Ratner has not invented some novel theory of damages or applied some fabricated methodology to invent damages opinions. Instead, he has measured the losses caused by the Bank using the Bank's own statements as the primary source and tried-and-true accounting methods such as account reconstruction, reconciliation, and funds tracing. To the extent that exercise is challenging it is because of the Bank's own role in the fraud – each wire or transfer among the

custody accounts was manually executed by a Bank employee. To the extent there is commingling or a lack of clarity as to the purpose of any particular transaction, it is the Bank that would experience a windfall if the Court excluded Ratner's opinions. Like any other accountant applying a straightforward methodology, Ratner will be subject to cross-examination at trial. There is nothing for the Court to exclude here in its gatekeeping role.

**II.    Fraher is qualified to provide his three opinions, and his opinions, including his third opinion, will be helpful to the jury.**

Richard Fraher offers three expert opinions: (1) the Bank fell short of the ordinary standard of care in the banking industry in conducting its initial KYC process for onboarding and opening custody accounts and subaccounts for Madison; (2) at various points from 2014 to 2016, when the Bank's own staff raised concerns about Madison, the standard banking practice would have been either to remediate Madison's misuse of the custody accounts or to terminate the relationship with Madison; and (3) the Bank facilitated the fraud's continuation and the cover up by failing to follow these standard banking practices. Doc. 153-2 at 5, 10, 14.

The Bank challenges Fraher's qualifications and his third opinion. Doc. 142 at 20–23. The Bank does not argue that Fraher's first or second opinions are unhelpful or that any of them is, in substance, unreliable. In fact, the Bank's own employee witnesses agree with Fraher, particularly with his conclusion that the Bank failed to satisfy the industry standard of care in its initial onboarding of Madison. For example, multiple Bank employees—including the Bank's Head of Securities Services for the Americas—testified that the onboarding process required the Bank to verify, among other things, the source of the client's funds. Doc. 134-1 at 38:4–39:11; Doc. 127-1 at 19:11–21:4; Doc. 123-1 at 25:19–26:2. The Bank's written policies say that as well.[7] Yet,

---

[7] Doc. 138-1 at 468 states the Bank's "minimum requirements" for customer due diligence. *Id.* at 47. The manual emphasizes the importance of fully understanding the client, its line of business,

Floris Vreedenburgh—the Bank employee charged with gathering onboarding information and managing the Madison relationship—testified that he does not remember *ever* knowing the source of funds in Madison's accounts. Doc. 134-1 at 36:21–38:24, 41:2–14. Additionally, Vreedenburgh testified that the unsworn letter the Bank accepted from Madison on the source of its funds—which merely stated the funds were "licit and originate from [Madison's] commercial activities," Doc. 136-1 at 920—was "pretty useless." Doc. 134-1 at 46:3–47:11. The Bank's own compliance expert agrees that this letter is not sufficient. Doc. 152-1 at 65:25–68:20.

Vreedenburgh is not the only Bank employee to agree with Fraher's opinion. Scott Habura, the other Bank employee responsible for the Madison relationship and for onboarding Madison, testified, "It shocks me that Deutsche Bank didn't have stricter policies in place." Doc. 127-1 at 87:15–17. He agreed that the Bank lacked sufficient money laundering safeguards in allowing Madison to open the account. *Id.* at 87:23–88:3.

As another example, Fraher opines that ordinary industry practice for opening the Madison subaccounts would have required the Bank to understand and verify Madison's role with respect to the Note Issuers. And, again, the Bank's own documents confirm his opinion. The Bank's own "minimum" due diligence requirements mandate that the Bank "must confirm the capacity in which *clients* are acting (i.e. as agent or as principal)." Doc. 138-1 at 477.[8]

Notably, the Bank does not attempt to show the Fraher's opinions are substantively wrong. That would be a losing endeavor. The Bank did not ask even its own retained banking expert to

---

and the source of the funds it will deposit with the Bank. *Id.* at 475, 532 & 535. The Bank must understand "who owns and controls the entity *or benefits from the assets involved*." *Id.* at 514 (emphasis added).

[8] The Bank's policies continue: "A *client* is acting as an agent when it is transacting with us for the benefit of one or more underlying principal(s). Where a party is acting as an agent, the Bank must understand the underlying principal(s) in the relationship." *Id.* Thus, the Bank had to know that custody and clearing accounts opened "for the issuers" were on behalf of the issuers.

opine that its pre-May 2017 due diligence and anti-money laundering policies were appropriate, or that the Bank obtained sufficient information during due diligence to onboard Madison or open the subaccounts, or that the Bank later took timely and appropriate action to limit Madison after its employees escalated concerns, even though all of these would be logical answers to Mr. Fraher's report. Doc. 152-1 at 11:19–12:1, 14:16–15:20, 56:21–57:7, 58:6–22, 75:7–22, 95:24–97:6, 106:5–14, 121:22–126:17. That is because no reliable expert could say that.

Because the Bank cannot argue that Fraher's opinions are unreliable, it instead attempts to challenge his qualifications and the helpfulness of his third opinion. The facts and the law, however, do not support these arguments.

### A. Fraher's experience—including his experience with KYC, AML, and related banking compliance—qualify him to offer his opinions.

Like the Bank's arguments on the reliability of Ratner's opinions, the Bank's arguments on Fraher's qualifications should be raised on cross-examination, not in a *Daubert* motion. As this Court has repeatedly recognized, whether an expert is qualified is "a relatively low threshold" and "so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *AIM Recycling of Fla., LLC v. Metals USA, Inc.*, 18-cv-60292-BFB, 2020 WL 209236, at *6 (S.D. Fla. Jan. 14, 2020); *J.G. v. Carnival Corp.*, 12-21089-CIV., 2013 WL 752697, at *3 (S.D. Fla. Feb 27, 2013); *Clena Inv., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012).

The Bank argues that Fraher is not qualified because "Fraher has never been employed by a bank in any capacity at all." Doc. 142 at 20 (emphasis omitted). But this misunderstands both Fraher's extensive experience and the law. His experience includes years of employment at the Federal Reserve Bank of Atlanta—undoubtedly a bank—where he designed the institution's initial Office of Foreign Asset Control (OFAC) and Bank Secrecy Act/AML compliance policies and

procedures. Doc. 153-2 at 4; Doc. 153-1 at 29:20–31:13. Fraher also has experience working in KYC, AML, and related compliance related to banks' provision of payment services, Doc. 153-1 at 12:1–21, onboarding customers in the provision of payment services, *id.* at 86:4–8, working with complex layered account relationships, *id.* at 112:9–113:9, and performing diligence to understand the business risk that clients or counterparties engage in, *id.* at 92:13–22. And, in his current position as Founder and Principal of Payment Innovation & Regulation LLC, he provides consulting services to banks on regulation, risk management, and, most importantly, OFAC, BSA, and AML responsibilities and compliance. Doc. 153-2 at 27; Doc. 153-1 at 13:5–14:6.

Fraher's bank compliance experience does not stop there. He was also a compliance and enforcement attorney for nearly seven years, during which he was closely involved in discussions with examiners about compliance related issues that they encountered at banks. Doc. 153-1 at 20:25–21:15. He is currently a professor at Emory University School of Law where he teaches a course covering how financial crimes occur and who is responsible for their prevention. Doc. 153-2 at 3. Fraher's experience, therefore, well qualifies him to opine on the Bank's KYC, AML, and related compliance procedures.

Perhaps because the Bank recognizes Fraher's extensive experience, the Bank attempts an impermissibly narrow approach. It argues that, although his experience might qualify him to opine about KYC and related compliance practices in *some* financial institutions, he is not qualified to do so "at major financial institutions like [the Bank]." Doc. 142 at 22. But the law makes clear that an expert "is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007). Otherwise put, an expert's qualification's "need not be narrowly tailored to the precise circumstances of the case," and an expert may "testify regarding narrow sub-topics within

his broader expertise—notwithstanding a lack of specific experience with the narrower area—as long as his testimony would still assist a trier of fact." *AIM Recycling*, 2020 WL 209236, at *6.

Indeed, the Eleventh Circuit has rejected this very type of argument, finding an expert was sufficiently qualified to testify on damages related to a real estate scheme, even though the expert had no real estate experience. *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001). And in *J.G. v. Carnival Corp.*, then-District Judge Rosenbaum found that a law enforcement officer was qualified to testify about cruise-ship security even though he had no background in cruise-ship security. 2013 WL 752697, at *4.

Here, Fraher has ample KYC, AML, and related compliance experience, including experience from his time working at a bank and as a consultant to banks. Additionally, his testimony will assist the jury in determining whether the Bank failed to follow adequate compliance procedures, whether the Bank followed its own procedures, whether the Bank failed to act upon warnings about activity in the account, and whether the Bank's actions and inactions facilitated the continuation and cover up of a fraud. Doc. 153-2 at 2.

Notably, the Bank never demonstrates *why* its size and sophistication supposedly make Fraher's opinions unreliable. The custody group that onboarded and serviced Madison dealt with only 30 clients total, give or take, during the relevant years, Doc. 134-1 at 26:13–20, so it is unclear what difference the Bank's overall size supposedly makes. Further, its own compliance expert could not explain any reason *why* any of this Bank's characteristics somehow mean that it could be less careful than the average bank. Doc. at 30:19–31:14, 33:17–34:13. And, as noted above, Fraher's opinions about sound KYC and due diligence mirror the Bank's own policies. The Bank is welcome, through cross-examination and its own evidence, to try to show a jury why the KYC and compliance issues at a bank its size might be so different that Fraher's opinions are not

persuasive. But that is a matter for trial, not *Daubert*, and an uphill struggle at best, since the very Bank witnesses involved in onboarding Madison agreed that the Bank's procedures were not adequate. Fraher remains qualified to provide his three opinions.

### B.    Fraher's third opinion will be helpful to the jury.

Federal Rule of Evidence 704 "abolished" the "ultimate issue rule," which the Bank now relies on in objecting to Fraher's third opinion. *Hanson v. Waller*, 888 F.2d 806, 812 (11th Cir. 1989). As Rule 704 itself states, an "opinion is not objectionable just because it embraces an ultimate issue."

The Bank cites *Montgomery v. Aetna Casualty & Surety Co.* to support its argument that Fraher's third opinion impermissibly goes to an ultimate question. 898 F.2d 1537 (11th Cir. 1990). The expert opinion in that case, however, is nothing like the opinion Fraher offers here. As the Eleventh Circuit explained in *Montgomery*, "[a]n expert may testify as to his opinion on an ultimate issue of fact." *Id.* at 1541. In that case, the expert was not allowed to testify that the defendant had a specific duty to hire counsel because a witness may not testify on a *legal* conclusion. *Id.* And the question of whether a duty exists is clearly a legal one. *Id.*; *see also Moultrie v. Consol. Stores Int'l Corp.*, 764 So. 2d 637, 639 (Fla. 1st DCA 2000) ("[D]uty exists as a matter of law and is not a factual question for the jury to decide.").

The Bank, meanwhile, acknowledges Fraher's third opinion addresses what is ultimately a question of fact for the jury, not a question of law. Doc. 142 at 22 ("Whether Defendants 'facilitated' the underlying fraud is the ultimate question [for] the trier of fact ...."). To be sure, Fraher "may testify as to his opinion" on an "issue of fact." *Montgomery*, 898 F.2d at 1541. The Eleventh Circuit, including in *Montgomery*, instructs that an opinion like Fraher's should not be excluded simply because it goes to an ultimate fact issue to be decided by the jury.

In *Hanson*, for example, the court found no error where an expert was allowed to opine on whether a driver or pedestrian contributed to an accident. 888 F.2d at 812. Instead, the court concluded that the testimony would be helpful to the jury in deciding whether either party was negligent. *Id.* And in *SEC v. Big Apple Consulting USA, Inc.*, the court found that an expert's opinion that the defendant failed to conduct reasonable due diligence under industry standards was a fact opinion rather than an impermissible legal conclusion. 783 F.3d 786, 812 (11th Cir. 2015). Thus, as an expert, Fraher may—as this Court has acknowledged elsewhere—"offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue [is] satisfied." *AIM Recycling*, 2020 WL 209236, at **7–8.

Fraher's third opinion does not "merely tell the jury what result to reach" on the aiding and abetting claims. Doc. 142 at 22–23. Here, aiding and abetting claims require the Liquidators to establish "an underlying violation on the part of the" Individual Wrongdoers, Defendants' actual "knowledge of the underlying violation," and Defendants "rendering of *substantial assistance*" to the Individual Wrongdoers in their underlying violation. *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014). In deciding whether the Bank's services were of substantial assistance, the jury can consider Fraher's opinion about the effects of the unlimited wiring activity and artificial liquidity that Bank provided Madison. The jury will decide whether that constitutes substantial assistance. Mr. Fraher does not purport to tell them how to resolve that issue

## CONCLUSION

The Bank's attempts to exclude the testimony of Ratner and Fraher do not raise issues appropriate for a court to resolve by exclusion under *Daubert*. The Bank must refute this expert evidence—if it can—through cross-examination and evidence, rather than shortcuts.

17

Respectfully submitted this 9th day of December, 2022.

|  | /s/    *John H. Rains IV* |
|---|---|
| Eduardo F. Rodriguez | Frank M. Lowrey IV (*pro hac vice*) |
| Florida Bar No. 36423 | Georgia Bar No. 410310 |
| *eddie@efrlawfirm.com* | *lowrey@bmelaw.com* |
| EFRLAWFIRM | Ronan P. Doherty (*pro hac vice*) |
| 1 Alhambra Plaza, Suite 1225 | Georgia Bar No. 224885 |
| Coral Gables, FL 33134 | *doherty@bmelaw.com* |
| Telephone: (305) 340-0034 | John H. Rains IV |
|  | Florida Bar No. 0056859 |
|  | Georgia Bar No. 556052 |
|  | *rains@bmelaw.com* |
|  | Amanda Kay Seals (*pro hac vice*) |
|  | Georgia Bar No. 502720 |
|  | *seals@bmelaw.com* |
|  | Juliana Mesa (*pro hac vice*) |
|  | Georgia Bar No. 585087 |
|  | *mesa@bmelaw.com* |
|  | Zoe Beiner (*pro hac vice*) |
|  | Georgia Bar No. 878340 |
|  | *beiner@bmelaw.com* |
|  | BONDURANT MIXSON & ELMORE LLP |
|  | 1201 West Peachtree Street, N.W. |
|  | Suite 3900 |
|  | Atlanta, Georgia 30309 |
|  | Telephone: (404) 881-4100 |
|  | Facsimile: (404) 881-4111 |

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be served the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' PROFFERED EXPERTS IAN RATNER AND RICHARD FRAHER PURSUANT TO FEDERAL RULE OF EVIDENCE 702** by filing it with the Clerk of Court using the CM/ECF system upon the following counsel of record:

> Harvey W. Gurland
> *hwgurland@duanemorris.com*
> Julian Jackson-Fannin
> *jjfannin@duanemorris.com*
> DUANE MORRIS LLP
> 201 S. Biscayne Boulevard, Suite 3400
> Miami, Florida 33131-4325
>
> David G. Januszewski
> *djanuszewski@cahill.com*
> Sheila Ramesh
> *sramesh@cahill.com*
> Sesi V. Garimella
> *sgarimella@cahill.com*
>
> CAHILL GORDON & REINDEL LLP
> 32 Old Slip
> New York, NY 10005

This 9th day of December, 2022.

> */s/ John H. Rains IV*
> John H. Rains IV