**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-22437-BLOOM/Otazo-Reyes**

MICHAEL PEARSON, *et al*.,

      Plaintiffs,

v.

DEUTSCHE BANK AG, *et al.*,

      Defendants.

_____/

**<u>OMNIBUS ORDER ON SUMMARY JUDGMENT MOTIONS</u>**

**THIS CAUSE** is before the Court upon Defendants'[1] Motion for Summary Judgment

("Defendants' Motion"), ECF No. [143], and Plaintiffs'[2] Motion for Partial Summary Judgment

("Plaintiffs' Motion"), ECF No. [141] (together, "the Motions").[3] Plaintiffs filed their Response to

Defendants' Motion, ECF No. [161],[4] to which Defendants filed a Reply, ECF No. [166].[5]

Defendants filed their Response to Plaintiffs' Motion, ECF No. [155],[6] to which Plaintiffs filed a

Reply, ECF No. [170]. The Court has carefully considered the Motions, the Responses, the Replies,

---

[1] The Defendants in this action are Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Luxembourg S.A., and Deutsche Bank (Suisse) S.A. (collectively, the "Defendants").

[2] The Plaintiffs in this action are Michael Pearson, Andrew Childe, and Anna Silver.

[3] Defendants filed a statement of material facts in support of its motion, ECF No. [144] ("Defs.' SOMF"), and Plaintiffs filed a statement of material facts in support of its motion, ECF No. [141-1] ("Pls.' SOMF").

[4] Plaintiffs also filed a response to Defendants' statement of material facts and additional facts. ECF No. [159] ("Pls.' CSOMF").

[5] Defendants also filed a reply to Plaintiffs' response to Defendants' statement of material facts and additional facts. ECF No. [167] ("Defs.' RSOMF").

[6] Defendants also filed a response to Plaintiffs' statement of material facts. ECF No. [156] ("Defs.' CSOMF").

the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, Defendants' Motion is granted in part and denied in part, and Plaintiffs' Motion is denied.

## **TABLE OF CONTENTS**

I.    Background and Material Facts .................................................................................. 3

    A.   The Motions ................................................................................................... 9

        1.   Defendants' Motion ............................................................................. 9

        2.   Plaintiffs' Motion ............................................................................. 12

    B.   Material Facts ............................................................................................. 13

        1.   The Individual Wrongdoers ............................................................... 13

        2.   Plaintiffs .......................................................................................... 13

        3.   The Companies ................................................................................. 14

        4.   The Companies' Business Activities ................................................... 17

        5.   SGG .................................................................................................. 17

        6.   Defendants ....................................................................................... 20

        7.   Terms of the Agency Agreements ..................................................... 20

        8.   Establishing Custody Accounts ......................................................... 21

        9.   Issues with Wire Transfers ................................................................ 23

        10.  SEC Cease-and-Desist Order ............................................................ 25

        11.  Harm to the Companies .................................................................... 25

        12.  Deutsche Bank Lux and Deutsche Bank Suisse ................................. 26

II.   Legal Standard ....................................................................................................... 26

III.  Discussion .............................................................................................................. 27

    A.   Defendants' Motion .................................................................................... 27

        1.   *In Pari Delicto* ................................................................................. 28

           a.   *In Pari Delicto* Defense Legal Standard ................................. 28

           b.   Adverse Interest Exception ...................................................... 29

               i.   Innocent Decisionmakers .............................................. 30

               ii.  Whether Individual Wrongdoers' Actions Were Adverse to the Companies ..... 34

           c.   Culpability of the Companies .................................................. 36

        2.   Standing .......................................................................................... 40

        3.   Aiding and Abetting Conversion and Breach of Duty ........................ 44

           a.   Knowledge .............................................................................. 45

           b.   Substantial Assistance ............................................................. 49

|   | 4. | Cayman Islands Companies Act § 147 | 51 |
|   | 5. | Compliance with the Agency Agreements | 53 |
|   | 6. | Duties Owed to the Companies | 54 |
|   | 7. | Personal Jurisdiction | 55 |
|   |   | a. General jurisdiction | 57 |
|   |   | b. Specific Jurisdiction | 58 |
| B. | Plaintiffs' Motion | | 59 |
|   | 1. | Defendants' Procedural Argument | 60 |
|   | 2. | 11 U.S.C. § 541 | 62 |
|   | 3. | *In Pari Delicto* Doctrine's Equitable Purpose | 64 |
|   |   | a. Legislative Policy | 64 |
|   |   | b. Public Interest | 66 |
|   | 4. | *In Pari Delicto* as to Plaintiffs' § 147 Claim | 69 |
|   |   | a. Whether Courts in the Cayman Islands Recognize the *in Pari Delicto* Doctrine | 70 |
|   |   | b. Whether § 147 Bars Defendants' *in Pari Delicto* Defense | 71 |
|   |   | c. Plaintiffs' Arguments in the Toube and Mokal Declaration | 72 |
| IV. | Conclusion | | 74 |

# I.     BACKGROUND AND MATERIAL FACTS

As alleged, the action stems from a global Ponzi scheme resulting in hundreds of millions of dollars in losses and dozens of lawsuits. Amend. Compl., ECF No. [31] ¶¶ 1-2, 44. The scheme was perpetrated by four individuals—Roberto G. Cortes ("Roberto Cortes"), Ernesto H. Weisson ("Weisson"), Juan Carlos Cortes, and Frank Chatburn ("Chatburn") (collectively, the "Individual Wrongdoers")—as principals of two companies—South Bay Holdings, LLC ("South Bay") and Biscayne Capital International, LLC ("Biscayne"). *Id.* ¶ 3. South Bay purported to develop real estate in South Florida, and Biscayne helped raised capital for the real estate developments. *Id.* ¶¶ 9-10.

Plaintiffs are foreign representatives[7] and liquidators of 13 companies currently undergoing liquidation in the Cayman Islands (collectively, the "Companies"). *Id.* ¶ 18.[8] Five of the Companies—Diversified Real Estate, GMS Global Market Step Up, Preferred Income, Sentinel Investment, and SG Strategic (collectively, the "Note Issuers")—were created by the Individual Wrongdoers as special purpose vehicles to raise funds for South Bay. *Id.* ¶¶ 11, 19. The Amended Complaint does not explain the role of the other eight Companies (collectively, the "Non-Issuers") in the Ponzi scheme. However, an organizational chart included in the pleading shows that the Non-Issuers served as either advisors and broker dealers, holding companies, trusts, or "Affiliated Companies." *See id.* ¶ 21.

Defendants are Deutsche Bank, a global financial institution with branches in the United States and abroad, and three of its subsidiaries: Deutsche Trust, Deutsche Bank Luxembourg S.A. ("Deutsche Bank Lux"), and Deutsche Bank Switzerland ("Deutsche Bank Suisse"). *Id.* ¶¶ 28-29. Pertinent here, Deutsche Bank has branches in New York ("Deutsche Bank New York") and London ("Deutsche Bank London"). *Id.* ¶ 28. References in the Amended Complaint to "Deutsche Bank" include its New York and London branches, which are not separate entities. *Id.*

The Ponzi scheme generally worked as follows. The Individual Wrongdoers used the Note Issuers to sell notes to investors who believed that the notes were backed by South Bay's real estate

---

[7] The Amended Complaint uses the term "foreign representative" as defined by the Bankruptcy Code: "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." Amend. Compl. at 7 n.4 (quoting 11 U.S.C.A. § 101(24)).

[8] The Companies are (1) Biscayne Capital (B.V.I.) Ltd. ("Biscayne Capital (B.V.I.)"); (2) Biscayne Capital Holdings Ltd. ("Biscayne Capital Holdings"); (3) Diversified Real Estate Development Ltd. ("Diversified Real Estate"); (4) GMS Global Market Step Up Note Ltd ("Global Market Step Up"); (5) North Pointe Holdings (B.V.I.) Ltd. ("North Pointe"); (6) Preferred Income Collateralized Interest Ltd. ("Preferred Income"); (7) Sentinel Investment Fund SPC ("Sentinel Investment"); (8) Sentinel Mandate and Escrow Ltd. ("Sentinel Mandate"); (9) SG Strategic Income Ltd. ("SG Strategic"); (10) Sports Aficionados Ltd. ("Sports Aficionados"); (11) Spyglass Investment Management Ltd. ("Spyglass"); (12) Vanguardia Group Inc. ("Vanguardia Group"); and (13) Vanguardia Holdings Ltd. ("Vanguardia Holdings"). Amend. Compl. ¶ 18.

assets. *Id.* ¶ 11. In truth, South Bay's properties were heavily leveraged, rendering the security interests worthless. *Id.* ¶¶ 12-13. The Individual Wrongdoers then

> used the proceeds generated through the issuance of notes to offset losses in real estate investments; cover liabilities incurred by other, Biscayne-related entities; pay interest and principal on other notes; enrich themselves, their relatives and associates . . . ; and fund unrelated investments and entities that they never disclosed to the innocent investors.

*Id.* ¶ 14.

Specifically, South Bay funneled money into Biscayne to make it appear like a legitimate advisory firm. *Id.* ¶ 82. The Individual Wrongdoers then used Biscayne to steer investor funds to special purpose vehicles. *Id.* ¶ 83. When the 2008 real estate crash affected South Bay's viability, the Individual Wrongdoers used some of the Note Issuers and special purpose vehicle ("SPV") Spyglass to prop up South Bay and continue gathering investor funds. *Id.* ¶¶ 85-96.

Plaintiffs contend that Defendants, who served as the primary bank for Biscayne and the Companies, knew that "little to none" of the innocent investors' funds were being used for their intended purpose. *Id.* ¶¶ 2, 16. Instead, the money was being diverted to individual accounts, and Defendants, despite knowing this, "perpetuated the fraud through numerous strategies designed to raise new money to repay liabilities to investors or to extend the maturity of pre-existing debt obligations." *Id.* ¶ 2.

Deutsche Bank served as the issuing agent for the Note Issuers. *Id.* ¶ 137-38. To that end, Deutsche Bank entered into Agency Agreements with Note Issuers SG Strategic, Global Market Step Up, and Preferred Income, with Deutsche Bank serving as an issuing agent, transfer agent, and principal paying agent. *Id.* ¶¶ 139, 143, 144.

In 2014, following an inquiry from the Securities and Exchange Commission, the Individual Wrongdoers also formed Madison Asset, LLC ("Madison"), which steered investors

toward the Note Issuers to fund the scheme. *Id.* ¶¶ 97-99. Deutsche Bank, working with Gustavo

Trujillo ("Trujillo"), Madison's Operations Manager at the time, "set up nearly three dozen sub-

accounts for various Note Issuers, Companies, and other entities related to the Individual

Wrongdoers and Biscayne." *Id.* ¶¶ 101-107. According to Plaintiffs, Deutsche Bank played a role

in the fraudulent scheme through these subaccounts, including by instructing "Trujillo . . . how to

circumvent Defendants' anti-money laundering and 'Know Your Customer' rules." *Id.* ¶¶ 108-09.

A Deutsche Bank employee personally met Trujillo and another individual associated with

Madison and explained how to "properly title" sub-accounts to avoid internal systems meant to

catch criminal acts. *Id.* ¶¶ 110-13.

> Plaintiffs divide Defendants' wrongdoing into four categories:

> > *First*, they allowed the Note Issuers to avoid certain debt service
> > obligations. *Second*, they failed to investigate or turned a blind eye
> > toward transactions and relationships of which they were actually
> > aware and that would have revealed the Individual Wrongdoers'
> > fraudulent scheme years before it collapsed on its own. *Third*, after
> > discovering that the Individual Wrongdoers and others were taking
> > actions in connection with the accounts that were plainly
> > inappropriate (*e.g.*, overdrafts in custody accounts), the bank neither
> > alerted the Note Issuers' director nor closed the accounts. *Fourth*,
> > Defendants provided advice and assistance to the Individual
> > Wrongdoers and others that allowed them to better conceal the fraud
> > and continue their scheme.

*Id.* ¶ 159.

> Specifically, Defendants facilitated three "swap transactions," allowing the Individual

Wrongdoers to avoid paying maturing notes by transferring the notes from one Note Issuer to

another. *Id.* ¶ 166. According to the Amended Complaint, in a swap transaction, an "entity managed

by the Individual Wrongdoers would acquire the majority of a Note Issuer's outstanding notes just

before a maturity obligation would have required the Note Issuer to pay interest and other

remuneration to its note holders, thereby 'swapping' or trading the right to receive those payments

from one note holder to another." *Id.* ¶ 167. The acquiring entity would then renounce the right to receive cash payments on the maturing notes and accept payments in kind. *Id.* ¶¶ 176, 179. The Agency Agreements did not contemplate renouncing cash payments or allow for payments in kind. *Id.* ¶¶ 177, 190.

The Note Issuers "re-tapped" previously held securities to defer making cash payments. *Id.* ¶ 219. "A 're-tap' is a process by which a security-issuing entity raises money by selling securities that the issuer previously authorized but were held back," *Id.* ¶ 217, and "[a]lthough re-tapping is a common way to raise money, it can also be a sign of fraud because it defers making required cash payments." *Id.* According to Plaintiffs, "re-tapping [here] was an indicator of fraud because the Individual Wrongdoers repeatedly worked with Defendants to re-tap the notes for the purpose of paying existing debt on previously issued notes, instead of using money raised for legitimate investment or business purposes." *Id.* ¶ 218. Based on the "nature, volume, and timing" of the re-taps, "Deutsche Bank should have understood these re-taps were intended to raise funds to pay interest on existing debt and/or to repay other notes previously issued by the Note Issuers." *Id.* ¶ 224.

Plaintiffs allege that "Deutsche Bank accepted quarterly interest payments late," without explanation, *id.* ¶¶ 242, 257, and Deutsche Bank "did not provide the contractually required notice to Note Issuers and their director," *id.* ¶ 239; *see also id.* ¶¶ 257-58. Moreover, "[t]he late note payments were numerous and persistent—another clear indicator of underlying fraud." *Id.* ¶ 260. "Deutsche Bank repeatedly extended maturity dates, increased issue caps, and otherwise modified terms of the notes," which "facilitated and perpetuated the fraud by allowing the Individual Wrongdoers additional avenues to avoid repaying investors with anything other than additional money borrowed from those same investors or new ones." *Id.* ¶ 264.

Plaintiffs further allege that Defendants failed to adequately investigate Madison. *Id.* ¶ 277. Plaintiffs then detail how Deutsche Bank guided Madison on how to open unauthorized accounts, *id.* ¶¶ 291-308, and "Deutsche Bank knew of this activity, including information about hundreds of beneficiaries of improper wires from the custodial accounts, knowledge that a majority of those wires were not related to the activity in the accounts, and knowledge of persistent account overdrafts," and yet "Deutsche Bank repeatedly looked away, perpetuating the fraud." *Id.* ¶¶ 310-11. Deutsche Bank began investigating account activity concerning Madison but stopped after being told to do so by a Biscayne employee. *Id.* ¶¶ 312-17. As evidenced by emails, other "Deutsche Bank employees raised concerns about the activities in the Madison custody accounts." *Id.* ¶ 318. Although Deutsche Bank Suisse closed some "problematic accounts," the same accounts were transferred to another Deutsche Bank entity. *Id.* ¶¶ 337-38.

In May 2016, the SEC entered a public order, finding that Biscayne and the Individual Wrongdoers violated securities laws. *Id.* ¶¶ 123, 349. "The order—issued against and with the consent of the Individual Wrongdoers—identified conflicts of interest among the Individual Wrongdoers, Biscayne, South Bay, and the Note Issuers." *Id.* ¶ 350. "Further, the order indicated that there was insufficient revenue or operating cash to meet maturing debt." *Id.* ¶ 351. The order triggered a review at Deutsche Bank, but Deutsche Bank continued perpetuating the scheme. *Id.* ¶¶ 129, 352. Defendants terminated their relationship with Biscayne, Madison, the Companies, and related entities in June 2017. *Id.* ¶ 130. Plaintiffs allege that if Deutsche Bank had reviewed their business with those entities earlier, it would have likely ended the fraud. *Id.* ¶ 132.

Plaintiffs assert eight Counts:

1. Count I: Fraudulent Trading under Cayman Islands Companies Law § 147 (by the Liquidators on behalf of Diversified Real Estate, Global Market Step Up, Preferred

Income, Sentinel Investment, SG Strategic, Sports Aficionados, and Vanguardia Group against all Defendants);

2. Count II: Aiding and Abetting Breach of Fiduciary Duty (against all Defendants);

3. Count III: Breach of Fiduciary Duty (by the Liquidators on behalf of Diversified Real Estate, Global Market Step Up, Preferred Income, and SG Strategic against Deutsche Bank);

4. Count IV: Aiding and Abetting Conversion (against all Defendants);

5. Count V: Breach of Contract (by the Liquidators on behalf of Diversified Real Estate, Global Market Step Up, Preferred Income, and SG Strategic against Deutsche Bank);

6. Count VI: Negligence (against Deutsche Bank);

7. Count VII: Violation of the Florida Civil Remedies for Criminal Practices Act ("Florida RICO Act"), Fla. Stat. §§ 772.101-772.19 (against all Defendants); and

8. Count VIII: Violation of Florida's Civil Remedy for Theft or Exploitation Statute ("Florida Civil Theft Statute"), Fla. Stat. § 772.11 (against Deutsche Bank and Deutsche Bank Trust Companies). Amend. Compl. ¶¶ 373-461.[9]

## A. The Motions

### 1. *Defendants' Motion*

Defendants move for summary judgment, raising seven primary arguments:

1. Plaintiffs' claims are barred by the *in pari delicto* doctrine because the Companies were created and used to perpetuate the Ponzi scheme. ECF No. [143] at 1.

---

[9] Plaintiffs do not specify in Count II, IV, VI, VII, and VIII on behalf of which Companies they are bringing those Counts.

2. Plaintiffs lack standing to assert their claims because Plaintiffs' claims are premised "on the incorrect notion that [Plaintiffs] were entitled to funds in the custody account of a third party distinct from the Companies," and because the Companies were instruments created solely to perpetuate the Ponzi scheme. *Id.* at 2.

3. There is no genuine dispute of any material fact concerning Plaintiffs' aiding and abetting claims (Counts II and IV) because the record lacks evidence that Defendants had actual knowledge of wrongdoing or provided substantial assistance to the Ponzi scheme. *Id.*

4. There is no genuine dispute of any material fact concerning Plaintiffs' Cayman Islands fraudulent trading claim (Count I).  *Id.*

5. There is no genuine dispute of any material fact regarding Defendants' breach of the Agency Agreements (Count V) because Defendants were operating in an administrative capacity when Deutsche Bank executed instructions from the purported outside directors for certain note issuers and lacked the authority to substantively participate "in any activity relating to those notes." *Id.*

6. There is no genuine dispute of any material fact concerning the Defendants' breach of any duty to the Companies (Counts III and VI) because Defendants had no knowledge of wrongdoing and thus had no duty to investigate the instructions that it received from the Companies as their clients. *Id.*

7. The Court lacks personal jurisdiction over Deutsche Bank Lux and Deutsche Bank Suisse because these entities are located and operated entirely in Luxembourg and Switzerland. *Id.* at 3.

Plaintiffs respond as follows.

1. Defendants cannot invoke the *in pari delicto* defense as a matter of law, and even if Defendants could, fact questions exist about whether the adverse interest exception bars the defense because the evidence shows (a) the Individual Wrongdoers "loot[ed]" the Companies and (b) the existence of one "innocent decision-maker," SGG, which obviates the "sham" exception to the adverse interest exception. ECF No. [161] at 12-15.[10] There is evidence that the Companies conducted "some legitimate business activity," which precludes a finding as a matter of law that the Companies were sham entities. *Id.* at 15-16. Further, because the *in pari delicto* defense applies only if a plaintiff is equally or more at fault than a defendant, fact questions prevent summary judgment in favor of Defendants on this defense. *Id.* at 16. Because the doctrine requires that the parties participate in the same wrongdoing, the *in pari delicto* defense does not apply as to most companies because there is no evidence that any Companies, save for one—as opposed to the Individual Wrongdoers—participated in the Ponzi scheme, and beneficial ownership does not qualify as wrongdoing. *Id.*

2. Defendants conflate standing with *in pari delicto* and fail to meet their burden to show Plaintiffs lack standing. *Id.* at 17-18.  Moreover, whether the Companies suffered a cognizable injury is a disputed factual question that precludes summary judgment on standing. *Id.* at 19.

3. The Defendants' actual knowledge of and assistance to the Ponzi scheme are questions of fact precluding summary judgment. *Id.* at 19-25.

---

[10] When citing to the parties' memoranda of law, the Court cites to the page numbers created by the parties. When citing to deposition transcripts, the Court cites to the page number of the underlying transcripts. For all other sources, the Court cites to the page number generated by the CM/ECF filing system, at the top of the page.

4. Defendants "indisputably breached the Agency Agreements" because, as Defendants concede, Defendants were required to notify the Note Issuers' directors of any late payment yet failed to do so from at least January 2014 until November 2016. *Id.* at 25.

5. As to Counts III and VI, there is no dispute that "Banks owe a duty to customers," or that the Note Issuers were Bank customers, and Defendants were the Note Issuers' agents and owed a duty to them. *Id.* at 26. In addition, under English law, which governs the relationship between Deutsche Bank and the Note Issuers, Defendants owe a duty to Note Issuers to guard against the facilitation of fraud and not to execute transactions that result in misappropriation of Note Issuer funds. *Id.* Moreover, Defendants do not genuinely dispute that a jury could find Defendants should have known Madison was using its services to commit fraud. *Id.*

6. Plaintiffs' Cayman Islands Section 147 claim survives summary judgment because that claim has a lower standard for liability than Plaintiffs' Florida tort claims: the "blind eye" knowledge standard. *Id.* at 27.

7. Defendants should be estopped from raising the personal jurisdiction defense because Deutsche Bank Lux and Deutsche Bank Suisse failed to provide discovery in this action, and estopping Defendants from raising this defense is an appropriate discovery sanction. *Id.* at 28-29.

### 2. *Plaintiffs' Motion*

Plaintiffs seek summary judgment on Defendants' twenty-first affirmative defense of *in pari delicto*, ECF No. [93] at 72, contending that its application would be inequitable and, thus, barred by Florida law. ECF No. [141] at 1. Alternatively, Plaintiffs contend that the *in pari delicto*

defense is unavailable under Cayman Islands law in cases brought under § 147 of the Cayman Islands Companies Act. *Id.* at 11-13.

Defendants respond that Plaintiffs lack standing, and alternatively, Plaintiffs' Motion is an untimely motion to strike. ECF No. [155]. On the merits, Defendants assert that Plaintiffs' arguments are legally unsupported and the Eleventh Circuit has rejected Plaintiffs' public policy argument. *Id.*

### B.  Material Facts

Based on the parties' statements, counterstatements, and reply statements of material facts, along with evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

### 1.  *The Individual Wrongdoers*

Chatburn, Joan Carlos Cortes, Roberto Cortes, and Weisson masterminded a Ponzi scheme. Defs.' SOMF ¶¶ 1, 2, ECF No. [144]; Pls.' CSOMF ¶¶ 1, 2, ECF No. [159]. Around 1999, the Individual Wrongdoers formed South Bay, which purported to develop real estate in South Florida. Defs.' SOMF ¶ 3; Pls.' CSOMF ¶ 3. The Individual Wrongdoers formed Biscayne, which held itself out as an investment advisory firm. Defs.' SOMF ¶ 4; Pls.' CSOMF ¶ 4. The Individual Wrongdoers expanded their scheme by raising capital, including by creating a number of offshore SPVs, including the Note Issuers, to issue debt. Defs.' SOMF ¶¶ 7, 8; Pls.' CSOMF ¶¶ 7, 8.  The Individual Wrongdoers formed or caused the formation of nearly 100 entities, which formed "complex offshore business structures" that "kept the scheme afloat" while also shielding the Individual Wrongdoers from liability. Defs.' SOMF ¶ 9; Pls.' CSOMF ¶ 9.

### 2.  *Plaintiffs*

Plaintiffs are the Liquidators of the Companies in certain "foreign main proceeding[s]" who will distribute all recovery in this action pursuant to judicial oversight in those foreign main

proceedings. ECF No. [141-1] ¶¶ 2, 10. Prior to March 2018, Plaintiffs were not affiliated with and had no involvement with the Companies or the Individual Wrongdoers. *Id.* ¶¶ 6, 8-9.

### 3. *The Companies*

The Companies in this action are (1) Biscayne Capital (B.V.I.); (2) Biscayne Capital Holdings; (3) Diversified Real Estate;[11] (4) Global Market Step Up; (5) North Pointe; (6) Preferred Preferred Income; (7) Sentinel Investment; (8) Sentinel Mandate; (9) SG Strategic; (10) Sports Aficionados; (11) Spyglass; (12) Vanguardia Group; and (13) Vanguardia Holdings. Amend. Comp. ¶ 18. The Companies include the five Note Issuers. Defs.' SOMF ¶ 15; Pls.' CSOMF ¶ 15. Biscayne convinced investors to invest in South Bay's development projects. Defs.' SOMF ¶ 5; Pls.' CSOMF ¶ 5. South Bay and its related entities were insolvent, and the Individual Wrongdoers used later investor funds to pay off earlier investors while enriching themselves from the scheme. Defs.' SOMF ¶ 6; Pls.' CSOMF ¶ 6.

The Court briefly describes the Companies and their leadership prior to their insolvency.

1. The Individual Wrongdoers raised capital for their scheme in different manners, including by creating a number of offshore SPVs to issue debt, which include the Note Issuers. Defs.' SOMF ¶¶ 7, 8; Pls.' CSOMF ¶¶ 7, 8. Among these SPVs is ***Diversified Real Estate***, a Note Issuer. Defs.' SOMF ¶ 8; Pls.'s CSOMF ¶ 8.

2. ***Global Market Step Up*** is a Note Issuer. Defs.' SOMF ¶ 8; Pls.'s CSOMF ¶ 8.

3. ***Preferred income*** is a Note Issuer. Defs.' SOMF ¶ 8; Pls.'s CSOMF ¶ 8.

4. ***Sentinel Investment*** is a Note Issuer. Defs.' SOMF ¶ 8; Pls.'s CSOMF ¶ 8.

5. ***SG Strategic*** is a Note Issuer. Defs.' SOMF ¶ 8; Pls.'s CSOMF ¶ 8.

---

[11] Diversified Real Estate was formerly known as ORC Senior Secured Ltd. Defs.' SOMF ¶ 8.

6. ***Biscayne Capital Holdings*** was incorporated in Bermuda on July 30, 2012. Defs.'
   SOMF ¶ 18; Pls.' SOMF ¶ 18. Biscayne Capital (B.V.I.) Ltd. and Biscayne Capital
   Holdings "owned" Biscayne Capital. Defs.' SOMF ¶ 17; Pls.' CSOMF ¶ 17.
   Roberto Carlos Rueda and Individual Wrongdoers Roberto Cortes, Weisson, and
   Juan Carlos Cortes were appointed directors on July 31, 2023. Defs.' SOMF ¶ 18;
   Pls.' CSOMF ¶ 18.

7. ***Biscayne Capital (B.V.I.)*** was incorporated in the British Virgin Islands on August
   24, 2006. Defs.' SOMF ¶ 19; Pls.' CSOMF ¶ 19. As of December 11, 2013, Roberto
   Ivan Cortes and Individual Wrongdoers Juan Carlos Cortes, Roberto Cortes,
   Weisson, and Chatburn were Biscayne Capital (B.V.I.) Ltd.'s directors. Defs.'
   SOMF ¶ 19; Pls.' CSOMF ¶ 19.

8. ***Vanguardia Group Inc.*** was incorporated on April 21, 2015 in the Cayman Islands.
   Defs.' SOMF ¶ 25; Pls.' CSOMF ¶ 25. Weisson and Roberto Cortes each owned
   40% of Vanguardia Group Inc., and Juan Cortes owned 10%. Defs.' SOMF ¶ 25;
   Pls.' CSOMF ¶ 25.

9. ***Spyglass*** was incorporated in the British Virgin Islands which perpetuated the
   Individual Wrongdoers' scheme. Defs.' SOMF ¶ 24; Pls.' CSOMF ¶ 24. Spyglass
   was wholly owned by Vanguardia Group Inc. Defs.' SOMF ¶ 24; Pls.' CSOMF
   ¶ 24. The Individual Wrongdoers used Spyglass to purportedly act as an investment
   advisor for the Note Issuers. Defs.' SOMF ¶ 24; Pls.' CSOMF ¶ 24.

10. ***Sentinel Mandate*** was incorporated in the British Virgin Islands on April 3, 2007.
    Defs.' SOMF ¶ 21; Pls.' CSOMF ¶ 21. As of June 17, 2014, Vanguardia Group Inc.
    wholly owned Sentinel Mandate. Defs.' SOMF ¶ 21; Pls.'s CSOMF ¶ 21. As of

15

February 5, 2014, Sentinel Mandate was the sole note holder of GMS Global Series 1. Defs.' SOMF ¶ 21; Pls.' CSOMF ¶ 21.

11. ***Vanguardia Holdings Ltd.*** was incorporated in the British Virgin Islands on February 1, 2016. Defs.' SOMF ¶ 27; Pls.' CSOMF ¶ 27. SGG was appointed director of Vanguardia Holdings on February 1, 2016. Defs.' SOMF ¶ 27; Pls.' CSOMF ¶ 27.

12. ***Sports Aficionados*** was incorporated in the Cayman Islands on March 8, 2016; SGG acted as a director, and Trujillo was its ultimate beneficial owner. Defs.' SOMF ¶ 23, Pls.' CSOMF ¶ 23.

13. ***North Pointe*** was incorporated in the British Virgin Islands on January 27, 2016. Defs.' SOMF ¶ 20, Pls.' CSOMF ¶ 20. North Pointe was 100% owned by trustee Amicorp (BVI) Trustees Ltd, and SGG was one of its directors. Defs.' SOMF ¶ 20; Pls.' CSOMF ¶ 20.

The Note Issuers participated in the Individual Wrongdoers' scheme by transferring the money the Note Issuers raised from investors to South Bay, which then paid interest payments or repaid earlier investors, thereby disguising its financial troubles for nearly a decade. Amend. Compl. ¶¶ 88, 90, 91, 96.[12] In addition, Spyglass acted as an investment advisor for the Note issuers. Defs.' SOMF ¶ 24; Pls.' CSOMF ¶ 24.

The interrelated structure of those entities allowed the Individual Wrongdoers to avoid independent audit opinions. Amend. Compl. ¶ 95.

---

[12] The allegations in the Amended Complaint are judicial admissions that "bind the part[ies] who make[] them." *Chick-Fil-A, Inc. v. CFT Development, LLC*, 652 F. Supp. 2d 1252, 1260 (M.D. Fla. 2009). As such, the Court considered the Amended Complaint's allegations as undisputed facts for the purpose of adjudicating the Motions.

### 4. *The Companies' Business Activities*

The record evidence reflects that some of the entities formed in furtherance of the Ponzi Scheme engaged in bona fide business transactions. South Bay held title to several pieces of Florida real estate, *see, e.g.*, ECF No. [158-11] at 2-12, 13-23, 24-34, 35-45, 46-67. Global Market Step Up traded in WTS Commerzbank AG securities, ECF No. [158-6] at 8, 9-10, 13-19, 28-29, 54-63. Biscayne Capital (B.V.I.) traded Commerzbank AG securities on August 4, 2014 and traded Banco do Brasil securities in August 2014 and June 2015. ECF No. [158-1] at 8-10, 13-19, 54-63.

### 5. *SGG*

SGG was an independent director of North Pointe, Global Market Step Up, Sports Aficionados, Vanguardia Holdings, Diversified Real Estate, Preferred Income, Sentinel Investment, and SG Strategic. Defs.' SOMF ¶¶ 20, 22, 23, 27, 56; Pls.' CSOMF ¶¶ 20, 22, 23, 27, 56. Hermann Oosten acted as agent on behalf of SGG. Pls.' CSOMF ¶¶ 161, 163; Defs.' RSOMF ¶¶ 161, 163, ECF No. [167].  SGG was responsible for overseeing the Note Issuers' investment activities and the use of the proceeds. Defs.' SOMF ¶¶ 56-58; Pls.' CSOMF ¶¶ 56-58.

SGG was aware that between 2010 and late 2013, and from November 2016 through 2017, Deutsche Bank London provided it and other Note Issuer Directors with notice of late payments "on multiple occasions." Defs.' SOMF ¶ 40; Pls.' CSOMF ¶ 40. SGG, along with other Note Issuer directors, notified Deutsche Bank London that the Note issuers had effected "various transactions," including swap transactions, re-taps, and "other amendments" to the terms of the notes that the Note Issuers issued. Defs.' SOMF ¶ 44; Pls.' CSOMF ¶ 44. On February 7, 2014, Oosten informed Paul Yetton ("Yetton"), a Deutsche Bank employee, that a swap transaction was executed that resulted in Sentinel Mandate becoming the note holder of the notes denominated GMS Global Market Step Up Series 1 (ISIN XS0707826185). ECF No. [146-50] at 3. Sentinel Mandate declared on March 20, 2014 that it has received payment to its full satisfaction on the notes, and

that "therefore the Paying Agent does not need to perform a cash payment of the principal and interest to the note holder." *Id.* On May 19, 2015, Shurnalis Nersicio, an Assistant Account Manager at SGG, informed Yetton that a re-tap was executed that increased the number of issued notes associated with "ISIN XS0707825880" to $30,000,000.00. On August 8, 2017, Tara Cannegieter, a "Client Leader" at SGG, amended a "PIK table." ECF No. [146-49] at 3.

On March 20, 2017, Cannegieter attached wire instructions to an email addressed to Yetton and another Deutsche Bank employee to wire funds from a Madison subaccount to Deutsche Bank London. ECF No. [168-8] at 2. Those instructions were provided to cover payments due for Diversified Real Estate's ORC Senior Secured Limited notes. *Id.*

On June 22, 2017, Yetton emailed Cannegieter that "I believe the interest payment dates are all 20th June which has now passed. Advanced Fund Administration (Cayman) Ltd is the new Calculation Agent but I've not received the contact information from you yet despite asking a number of times." ECF No. [168-7] at 3. On that same day, Oosten, replied, "[t]he interest payments on the notes are heavily depending on the sale of the underlying assets, in this case real estate in Florida." *Id.* at 1. Oosten continued,

> A great effort is done to get this done but the reality is that it takes more time than anticipated. The PPM allows to skip interest payments until the cash flow from the sale of the property recovers. We can inform you with certainty that interest payments are not expected to take place for the current interest period.

*Id.* at 2.

On July 24, 2017, SGG drafted an Amendment to Diversified Real Estate's Disclosure Concerning Terms of Payment, and Maturity, and Maximum Offering Amount for Global Notes Series 2 ("Amended Disclosure for Global Notes Series 2"), ECF No. [168-6] at 5, in which SGG acknowledged that the SEC issued a cease-and-desist order against Roberto Cortes, Weisson, Juan Carlos Cortes, and Chatburn, *id.* at 50. According to the Amended Disclosure for Global Notes

Series 2, Cortes, Weisson, Juan Carlos Cortes, and Chatburn neither admitted nor denied the SEC's allegations concerning a violation of the Investment Advisors Act of 1940[13] for, among other things, failing to disclose beneficial ownership interests and South Bay's failure to generate sufficient cash flow to meet maturing debt. *Id.*

In the second half of 2017, Oosten directed inquiries regarding the Madison subaccounts to Defendants. Pls.' CSOMF ¶ 164 (citing ECF Nos. [138-1] at 188); Defs.' RSOMF ¶ 164. On December 6, 2017, Oosten wrote to Melisa Brandt, a person with a "vanguardiaholdings.com" domain email address, that he "would like to know why amounts are being transferred from the [Global Market Step Up] account 5094 to Madison Asset LLC and Atlantic Sky. As example I see a transfer of USD 1,000,000 from 5094 to Madison LLC in June 2016. Why is that?" ECF No. [158-7] at 2.

On December 8, 2017, Oosten wrote to Yetton:

> Dear Paul, we are looking for cash account information regarding the following notes:
>
> Preferred Income . . .
> SG Strategic . . .
> SG Strategic . . .
> GMS Global . . .
> GMS Global . . .
> Diversified Real . . .
> Diversified Real . . .
>
> The cash accounts for these notes are in the name of Madison LLC and we would like to know who the signatories are on these accounts. On the accounts we see some cash movements that require more explanation but we do not know who to approach within Madison LLC. Can you please put me in contact with the account manager of the accounts?

ECF No. [138-1] at 188; *see also* ECF No. [135-1] at 187:13-188:15.

---

[13] 15 U.S.C. § 80b-1 *et seq.*

On December 11, 2017, Oosten complained to Roberto Cortes:

> We as directors of the different companies are kept completely in the dark and do not get any answers/directions/documentation. We really try to perform our duties as expected from us but by not providing us with the requested information, our role as director is made impossible. Again, we urge all of you to provide us with the requested information and take responsibility.

ECF No. [158-8] at 2.

On October 13, 2017, Trujillo wrote to Oosten requesting that Oosten retroactively authorize Madison to provide clearing and custody services for the Note Issuers. ECF No. [158-9] at 56. On December 12, 2017, Oosten replied:

> Dear Gustavo, since the agreements between Madison LLC and the entities in your below email were never signed, we wonder how you could have provided clearing and custody services to these entities. What we saw as well is that the Note Programs do not have their own bank account at Deutsche Bank but they are all in the name of Madison LLC. Can you explain how you managed to do so without prior approval of the director(s) and the signed agreements?
>
> At this stage SGG cannot and will not sign any agreement with regards to outsourcing to third parties until all our questions are answered satisfactory.

ECF No. [158-9] at 55.

### 6. *Defendants*

Deutsche Bank and its subsidiaries provided three types of financial services to individuals and entities connected to Biscayne: "U.S. custody services," European trust and agency services, and wealth management services. Defs.' SOMF ¶ 29; Pls.' CSOMF ¶ 29.

### 7. *Terms of the Agency Agreements*

Between 2011 and August 2013, Note Issuers Diversified Real Estate, Global Market Step Up, Preferred Income, and SG Strategic entered into Agency Agreements with Deutsche Bank London and Deutsche Bank Lux. Defs.' SOMF ¶ 31; Pls.' CSOMF ¶ 31. Pursuant to the Agency

Agreements with GMS Global, Preferred Income, and SG Strategic, DB London acted as transfer agent, issuing agent, and paying agent for their note issuances, while DB Lux acted as registrar. Defs.' SOMF ¶ 32; Pls.' CSOMF ¶ 32. DB Lux held a "note register." Defs.' SOMF ¶ 47; Pls.' CSOMF ¶ 47. For Diversified Real Estate, Deutsche Bank London acted as issuing agent and paying agent, and Deutsche Bank Lux acted as registrar and transfer agent. Defs.' SOMF ¶ 33; Pls.' CSOMF ¶ 33.

Pursuant to the Agency Agreements, DB Lux acted "solely as Agent of the Issuers." Defs.' SOMF ¶ 49; Pls.' CSOMF ¶ 49. The Agency Agreements describe DB Lux as "service provider[s] to" the Note Issuers. Defs.' SOMF ¶ 55; Pls.' CSOMF ¶ 55.

### 8. *Establishing Custody Accounts*

Critical to the alleged operation of the scheme was the Individual Wrongdoers' use of custody accounts at Deutsche Bank, which enabled the Individual Wrongdoers to divert proceeds generated through the issuance of notes to, among other things, offset losses in real estate investments. Amend. Compl. ¶¶ 14, 101-07. The record shows that, in December 2011, Biscayne Uruguay, an entity controlled by the principals of Biscayne, opened a custody account with Deutsche Bank New York. Defs.' SOMF ¶ 63; Pls.' CSOMF ¶ 63. Pursuant to an agreement governing the custody account, Deutsche Bank New York would hold assets in the custody account for Biscayne Uruguay at the direction of the Individual Wrongdoers or their agents. Defs.' SOMF ¶ 64; Pls.' CSOMF ¶ 64. At the Individual Wrongdoers' request, Biscayne Uruguay's custody account was also divided into several subaccounts. Defs.' SOMF ¶ 66; Pls.' CSOMF ¶ 66. Subaccounts are a common tool that banks offer to their clients to allow them to organize or segregate assets as clients desire. Defs.' SOMF ¶ 67; Pls.' CSOMF ¶ 67.

By 2012, the U.S. Security and Exchange Commission ("SEC") had begun to investigate several of the entities that the Individual Wrongdoers created in furtherance of the Ponzi scheme.

Defs.' SOMF ¶ 69; Pls.' CSOMF ¶ 69. In 2014, the Biscayne principals created Madison in order to avoid regulatory scrutiny. Defs.' SOMF ¶ 70; Pls.' CSOMF ¶ 70.

Deutsche Bank employee, Floris Vreedenburgh, met with representatives from Biscayne on February 21, 2014, to discuss the possibility of "opening separate acct under different name, same Biscayne Group, to segregate certain wire activity." ECF No. [136-1] at 602. On February 27, 2014, Vreedenburgh met with Fernando Haberer and Gustavo Trujillo to discuss "Happy with the US Custody service." ECF No. [136-1] at 606. Vreedenburgh's notes read:

> They are in expansion mode. Need to open separate account for Cayman domiciled subsidiary 'Madison' to segregate business currently processed under Biscayne Capital SA (Uruguay). Will want to establish sub accts to further segregate new business in the future, also under Madison. They also have an entity in Bahamas that they want to consolidate under their custody relationship in DBNY. Their requirements . . . Open account for Madison Asset LLC (excempted [sic] Registrered [sic] Advisor licensed in CIMA) and open subaccounts for each issuer[.]

*Id.*

It is disputed whether Vreedenburgh explained to Madison that if Madison's name appeared as the account title's first words, e.g., "Madison Asset LLC for [some other entity]," then "maybe [Madison or the entity] would not go through the same client on-boarding process as a new client." ECF No. [134-1] at 83:11-86:12. None of Deutsche Bank's written materials provided that information. *Id.* at 72:3-74:17; 80:17-20.

Trujillo, Madison's principal, opened a custody account for Madison with Deutsche Bank New York. Defs.' SOMF ¶ 71; Pls.' CSOMF ¶ 71. On April 9, 2014, one day after Madison's request, the Deutsche Bank New York opened three subaccounts thereafter titled, "Madison Asset Custody & Clearing for ORC Senior Secured Ltd," "Preferred Income Collateralized Interest Ltd.," and "GMS Global Market Step Up Ltd." Pls.' CSOMF ¶ 121; Defs.' RSOMF ¶ 121. Trujillo

set up other subaccounts and, in titling those accounts, Madison chose names that referenced other entities controlled by the Biscayne principals. Defs.' SOMF ¶ 74; Pls.' CSOMF ¶ 74.

On July 9, 2014, a Deutsche Bank employee, Savitha Venkataramaiah, explained:

> CBU wanted to get our thoughts on the volumes flowing in from Institutional Margin team in the recent past and is the very reason for writing this email.
>
> It is with respect to requests flowing in only for Biscayne / Madison on a daily basis . We see a very huge spike in volumes especially for this particular customer . . . .

ECF No. [136-1] at 608. Vreedenburgh forwarded this email. *Id.*

### 9. *Issues with Wire Transfers*

By 2016, it became apparent that there were significant problems with the wire transfers that Trujillo effected, including that such wire transfers led to overdrafts, resulting in overdraft fees for Deutsche Bank, and that some transfers had no connection to legitimate investment activity.

In a chat message exchange on January 12, 2016, Vreedenburgh wrote to Scott Habura, a vice president of U.S. Custody at Deutsche Bank: "I corrected the biscayne invoice you sent Pamella – cells were shifted, payment instructions erased. Want me to send her [sic] revised version?" ECF No. [136-1] at 652. Habura replied: "sure . . . didn't notice it . . . was too busy making money on ODs." *Id.* Vreedenburgh replied: "I was wondering about that – at some point we need to stop gustavo in his tracks – it's too obvious, and been going on for too long . . . maybe I can address in person when I see them in Bs and As? . . . we've given enough warnings[.]" *Id.*

On January 19, 2016, Adrian Hevia, a senior operations analyst at Deutsche bank, wrote to Habura and Vreedenburgh:

> I wanted to inform you of some wires which we have received to pay out of the Biscayne Bahamas account which do not seem related to settlement activity.

> The first wire is to pay a retainer with a law firm. The remaining 6 wires are to individual employees of both Biscayne Uruguay and Madison Asset.
>
> Please advise if ok to process these wire payments.
>
> As a side note, today we received a total of 12 wires for Biscayne Bahamas and 13 wires for Madison.

ECF No. [137-1] at 91. Habura replied: "OK to process these wires today. I will speak with Biscayne and find out what their plan is going forward." *Id.* at 90. Patrick Hannon, a Deutsche Bank employee, wrote:

> Regarding Madison as a whole, it's not just the volumes but the type of activity we see. In the last 18 months they have sent wires to over 800 difference [sic] beneficiaries. To be clear, the vast majority of wire volume is unrelated to trading activity. This seems unusual (I pause to use the word suspicious) activity for a custody platform to process routinely.
>
> In my opinion, there should be some investigation and explanation for this activity. Additionally, although I realize they have a line of credit, they have a high occurrence of over draft items.
>
> We thought it prudent to escalate given the unique nature of the wire activity.

*Id.* at 90. Habura replied: "I will raise this with the client and tell them that they need to curtail this type of activity. These type of wires should be run through a cash account and not a custody account." *Id.*

On February 18, 2016, Don Linford, the Director of Latin America Regional Executive Investor Services at Deutsche Bank S.A., wrote to Habura: "I believe we [sic] stop payments for this client immediately! I am concerned with the activity and their attitude." ECF No. [136-1] at 910. Habura replied, "I'll communicate it to them immediately." *Id.*

Habura testified that on February 18, 2016, Habura wrote an email to Trujillo: "Gustavo, this issue has been flagged by our risk and compliance group and beginning today we can no longer

process these types of wires that are unrelated to your securities activities." ECF No. [127-1] at 57:10-14. On May 17, 2016, a bank employee identified "unusual" wire payments out of the Madison subaccounts that did not "appear to be settlement related activity," including specifically "an American Express payment." ECF No. [136-1] at 376. Habura forwarded the bank employee's May 17, 2016 email to Trujillo explaining: "[f]yi . . . compliance will be stepping in and halting activity. Please re-direct these through your bank account." *Id.*

In July 2016, Habura recognized that one Madison wire for more than $30,000 went to pay for "[c]ollege tuition for one of the owners [sic] kids" at the University of Miami. ECF No. [137-1] at 108. In October 2016, Paul Bishop wrote an email to several Deutsche Bank employees, including Habura: "[t]here are competitors who would love to jump on the bandwagon that DB [sic] no longer viable and proven by the fact that we are kicking clients out." ECF No. [136-1] at 916-19. This was in response to an email discussing potentially "off boarding" "Biscayne Capital LTD, Bahamas," "Biscayne Capital, Uruguay," and "Madison Asset, LLC, Cayman." *Id.* at 916-17.

### 10. SEC Cease-and-Desist Order

In May 2016, the SEC issued a Cease-and-Desist Order ("the "SEC Order"") detailing its finding that Biscayne and the Individual Wrongdoers had violated the federal securities laws. Defs.' SOMF ¶ 102; Pls.' CSOMF ¶ 102. The SEC found that Biscayne, Roberto Cortes, and Juan Carlos Cortes violated the Investment Advisors Act of 1940. ECF No. [136-1] at 328.

### 11. Harm to the Companies

Yetton testified that he calculated that the Note issuers owed their investors about $250 million. ECF No. [135-1] at 191:13-195:4. On October 26, 2017, Yetton wrote to Oosten:

> Please find the amounts outstanding:
> Preferred Income XS0707825880 29,450,520
> SG Strategic XS0634222318 50,920,531

> SG Strategic XS0634515331 25,390,576
> GMS Global XS0707826425 30,937,500
> GMS Global XS0707826854 42,090,345
> Diversified Real XS0967596734 55,890,000
> Diversified Real XS0906486757 16,645,216[.]

ECF No. [138-1] at 205.

### 12. *Deutsche Bank Lux and Deutsche Bank Suisse*

DB Lux has its registered office in Kirchberg Plateau, Luxembourg, and its principal place of business is in Luxembourg. ECF No. [49-2] ¶ 2. DB Suisse is a bank domiciled in Geneva, Switzerland, with corporate offices in Geneva and Zurich, Switzerland. ECF No. [49-1] ¶ 2.

## II.   LEGAL STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is

satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

## III.   DISCUSSION

### A. Defendants' Motion

Defendants move for summary judgment on all Counts of the Amended Complaint, contending that Plaintiffs' claims are barred by the doctrine of *in pari delicto* and Plaintiffs lack standing to bring their claims. Defendants also move for summary judgment on Count I (Fraudulent Trading under Cayman Islands Companies Law § 147), Count II (Aiding and Abetting Breach of Fiduciary Duty), Count III (Breach of Fiduciary Duty), Count IV (Aiding and Abetting Conversion), Count V (Breach of Contract), and Count VI (Negligence) on the grounds that there are no disputes of material fact. Finally, Defendants seek summary judgment on the Counts against Defendants Deutsche Bank Suisse and Deutsche Lux for lack of personal jurisdiction.

### 1. *In Pari Delicto*

Defendants seek summary judgment on all Counts on the grounds that the doctrine of *in pari delicto* bars those claims. *See generally* ECF No. [143]. The Court begins by setting forth the law of the *in pari delicto* defense. The Court then addresses Defendants' argument that the "adverse interest exception" to the *in pari delicto* defense is unavailable to Plaintiffs, and the argument that there is no dispute that Plaintiffs are equally or more culpable than Defendants.

#### a. *In Pari Delicto Defense Legal Standard*

The *in pari delicto* doctrine prevents "a plaintiff who has participated in wrongdoing from recovering damages resulting from the wrongdoing." *See Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, No. 13-23998-CIV, 2017 WL 11103938, at *14 (S.D. Fla. June 26, 2017). The doctrine "operates to bar legal remedies when both parties are equally in the wrong . . . or where the plaintiff had greater responsibility for the wrongdoing than defendant." *Kipnis*, 2017 WL 11103938, at *14 (internal quotation marks omitted). Thus, the defense "does not require simply that both parties be to some degree wrongdoers. Rather, the parties must participate in the same wrongdoing" and must be "[e]qually at fault." *Earth Trades, Inc. v. T & G Corp.*, 108 So. 3d 580, 583 (Fla. 2013) (alterations in original).

However, if a corporate agent has "act[ed] adversely to the corporation's interests," the agent's knowledge and misconduct are not imputed to the corporation. *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044-45 (Fla. 2nd DCA 2007) (citation omitted). An agent acts adversely to the corporation's interests where the agent engages in misconduct that is "calculated to benefit the agent and to harm the corporation." *Id.* at 1045. For example, "[w]here the misconduct at issue consists . . . in looting the corporation, the corporation—which is itself purely the victim of the misconduct—may properly invoke the adverse interest exception and defeat an *in pari delicto* defense." *Id.* (citing *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006)).

By contrast, where an agent's acts are calculated to benefit the corporation, "it is in no position to invoke the adverse interest exception to prevent the imputation of wrongdoing to it." *In re Kapila*, 762 F. App'x 991, 994 (11th Cir. 2019) (quoting *O'Hallaran*, 969 So. 2d at 1045).

In determining whether an agent's acts are calculated to benefit the agent and to harm the corporation, it is necessary to determine whether the agent who engaged in wrongdoing is the "alter ego[]" of the corporation. *O'Halloran*, 969 So. 2d at 1045. In other words, where a corporation is "wholly dominated" by wrongdoers, the corporation itself has become "the instrument of wrongdoing." *Id.* In this circumstance, the corporation, being a mere alter ego, "cannot be said to suffer injury from the scheme it perpetrated." *Id.* at 1046. "Conversely, the presence of any innocent decision-maker in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing and defeating the use of the *in pari delicto* defense against the corporation." *O'Halloran*, 969 So. 2d at 1045 (citation omitted). An innocent decision-maker is one who could act to thwart the wrongdoing and did not knowingly and intentionally participate in the alleged misconduct. *See Mukamal v. Bakes*, No. 07-20793-CIV, 2008 WL 11391157, at *7 (S.D. Fla. May 20, 2008), *aff'd*, 378 F. App'x 890 (11th Cir. 2010) (holding that where all directors and officers of corporation knowingly and intentionally participated in the alleged misconduct, there are no innocent decision-makers at the corporation).

### b.  Adverse Interest Exception

Defendants argue the adverse interest exception does not apply because the Individual Wrongdoers' actions were not adverse to the Companies since the purpose of the fraud was to benefit the Companies, and since a company that is created to perpetuate a Ponzi scheme is not harmed by the scheme. ECF No. [143] at 12-14. Defendants also argue that the directors of the

Note Issuers were not "innocent decisionmakers," so the adverse interest exception does not apply. *Id.* at 15-16.

Plaintiffs respond that fact questions about the adverse interest exception preclude summary judgment. ECF No. [161] at 12. Specifically, Plaintiffs argue the record shows conduct adverse by the Individual Wrongdoers to the Companies, *id.* at 13, and a jury could find that SGG, an entity that served as a director of the Note Issuers, was innocent and ignorant of the fraud, which would prevent the application of *in pari delicto*, *id.* at 14-15. Plaintiffs also contend other evidence supports the conclusion that the Companies were not merely vehicles for fraud. *Id.* at 15-16.[14]

The adverse interest exception is only available to Plaintiffs in this case if the Companies were not "alter egos" of the Individual Wrongdoers, and this depends on the presence of "innocent decisionmakers" among the companies. Accordingly, the Court reviews the record to determine whether a reasonable factfinder could conclude there were innocent decisionmakers in this case.

### i. Innocent Decisionmakers

Defendants contend the Note Issuers' Directors were not innocent decisionmakers. Specifically, Defendants point to record evidence that the Directors of the Note Issuers were aware of the Note Issuers' repeated late payments to Deutsche Bank, participated in the misconduct by

---

[14] Defendants raise for the first time in their Reply that the "sole actor rule" bars Plaintiffs' claims *even if* the adverse interest exception to the *in pari delicto* defense applies because Trujillo, who was not a director of the Notes Issuers, was the sole actor charged with transferring proceeds from the Note Issuers to Madison. ECF No. [166] at 10-11. The "sole actor" doctrine applies only where a third party is defrauded by an agent acting in the course of his employment with a company. *Nerbonne, N.V. v. Lake Bryan Int'l Properties*, 685 So. 2d 1029, 1032 (Fla. 5th DCA 1997). It does not apply where the agent defrauds the corporation. *Id.* To the extent Trujillo acted as the Note Issuers' agent, his management of the transfers to Madison (ECF No. [138-1] at 92, 96) defrauded *the Note Issuers*, not the notes investors directly, so the sole actor rule does not apply. *Dehres LLC v. Underwriters at Int. at Lloyds London*, 826 F. Supp. 2d 1338 (S.D. Fla. 2011), the case on which Defendants rely, is not to the contrary. In *Dehres*, the "sole actor," a jewelry wholesaler's President, principal officer, and sole shareholder, acted as the wholesaler's agent when he defrauded jewelry consignors, i.e., third parties to the principal-agent relationship there. *Dehres LLC v. Underwriters at Int. at Lloyds London*, 826 F. Supp. 2d 1338, 1348 (S.D. Fla. 2011). Thus, the sole actor rule does not apply here.

authorizing Defendants to effect swap transactions and re-taps, and facilitated improper amendments to the terms of the notes. ECF No. [143] at 15. Defendants also point to the Directors' belated resignation more than one year after Deutsche Bank terminated its relationship with the Note Issuers. *Id.* at 15-16.

Plaintiffs respond that a factfinder could reasonably find that SGG, which served as Director of Sports Aficionados, Vanguardia Holdings, North Pointe, and the Note Issuers, was an innocent decisionmaker. Plaintiffs point to evidence that Oosten, on behalf of SGG, (1) raised inquiries about Madison subaccounts in the Note Issuers' names, Pls.' CSOMF ¶ 164, (2) refused Trujillo's request that SGG retroactively authorize Madison to provide custody services for a Note Issuer, Pls.' CSOMF ¶ 166, (3) questioned how Madison could have provided clearing and custody services to the Note Issuers or open subaccounts without the Note Issuers' Directors' approval or signed agreements, *id.* ¶ 167, and (4) questioned the Individual Wrongdoers on why "amounts [were] being transferred" to Madison from the subaccount ostensibly opened by Madison to provide services for Global Market Step Up, *id.* ¶ 168. ECF No. [161] at 14. Plaintiffs also point to evidence that the Individual Wrongdoers kept SGG "in the dark" on basic information about the Companies. ECF No. [161] at 14 (citing Pls.' CSOMF ¶ 165). Further, Plaintiffs argue that on summary judgment, a factfinder could reasonably find that SGG's resignation occurred later than Defendants because SGG was not aware of information Defendants had available to them. *Id.* at 15.

As the Court has explained, in analyzing the *in pari delicto* doctrine under Florida law, the presence of any innocent decision-maker in the management of a corporation can provide the basis for invoking the adverse interest exception, *O'Halloran*, 969 So. 2d at 1045, and an innocent decision-maker is one who could act to thwart the wrongdoing and did not knowingly and

intentionally participate in the alleged misconduct, *see Mukamal v. Bakes*, 2008 WL 11391157, at *7.

As an initial matter, Plaintiffs identify no innocent decisionmakers at the five Companies in which SGG was *not* a corporate director: Biscayne Capital (B.V.I.), Biscayne Capital Holdings, Sentinel Mandate, Spyglass, and Vanguardia Group. As stated *supra* III.A.1., the Individual Wrongdoers created the Companies for the purpose of enabling and perpetuating the Ponzi scheme. Absent any evidence of an innocent decisionmaker, these Companies were mere instrumentalities of the Ponzi scheme. Under the reasoning in *O'Hallaran*, those entities cannot invoke the adverse interest exception.

In contrast, as for the Note Issuers, the record supports a fact finder reasonably concluding that SGG was an innocent decisionmaker. To explain why, the Court restates the relevant evidence on the record.

SGG was aware that the Note Issuers were making late payments to note investors between 2010 and 2013, and from November 2016 through 2017. Defs.' SOMF ¶ 40; Pls.' CSOMF ¶ 40. SGG also voted to effect swap transactions, re-taps of notes, and amendments to note terms. Defs.' SOMF ¶ 44, Pls.' CSOMF ¶ 44. In addition, in one email exchange, Oosten explained to Yetton that the late payments were attributable to delays in the sales of real estate in Florida, and that the investor disclosure for the notes allowed for skipping interest payments. ECF No. [168-1] at 3. SGG was also aware that the SEC issued a cease-and-desist order against Individual Wrongdoers for their failure to disclose beneficial ownership interests and for South Bay's failure to generate sufficient cash flow to meet maturing debt. ECF No. [168-6] at 50. Moreover, by March 20, 2017, SGG was aware of the existence of Madison's custody subaccounts based on its possession of wire instructions. ECF No. [168-1] at 1.

Those facts, in the light most favorable to Plaintiffs, support a finding that SGG believed that South Bay was struggling and that SGG sought to mitigate South Bay's struggles selling real estate through acts calculated to mitigate discrepancies between South Bay's debt obligations and South Bay's real estate sales. There is no evidence that any note term amendments, re-taps, or swap transactions by themselves were illegal. In other words, those facts do not inexorably lead to the inference that SGG was knowingly participating in a Ponzi scheme. As for SGG's knowledge of the SEC Cease-and-Desist Order, although that Order flags the Individual Wrongdoers' failure to disclose conflicts, it does not support the inference that SGG was aware of the Individual Wrongdoers' expansive Ponzi scheme.

In addition, there are facts suggesting that the Individual Wrongdoers hid the Ponzi scheme from SGG. In emails from the period beginning in March 2017, Oosten asked Yetton and Trujillo questions about the management of the Madison subaccounts. Pls.' CSOMF ¶ 164; Defs.' RSOMF ¶ 164. Oosten refused to retroactively authorize Trujillo to provide clearing and custody services for the Note Issuers until Trujillo provided satisfactory answers to his questions about the subaccounts, an action that undermines the conclusion that SGG knew about the Ponzi scheme. ECF No. [158-9] at 55. Oosten's frustration with being "kept completely in the dark" is evident in those communications. ECF No. [158-8] at 2. The record does not reflect that Oosten received fulsome answers to his inquiries. The evidence is consistent with Oosten being unaware of the Ponzi scheme.

Those facts, when viewed in the light most favorable to the nonmovant, further support the conclusion that SGG was not a participant in the Ponzi scheme. In addition, as shown by Oosten's refusal to retroactively approve the documents authorizing Trujillo to transact business on behalf of the Note Issuers through the Madison subaccounts, a fact finder could reasonably conclude that

SGG, as director of the Note Issuers, had the capacity to stop the Ponzi scheme had he known about it. Those facts distinguish the instant action from those cases on which Defendants rely where there was *no* evidence of a director or corporate officer who was not a participant in fraudulent conduct who could stop that conduct. *Cf. Mukamal v. Bakes*, No. 07-20793-CIV, 2008 WL 11391157, at *7 (S.D. Fla. May 20, 2008), *aff'd*, 378 F. App'x 890 (11th Cir. 2010) (finding that all directors and officers of the entities were knowing participants in the misconduct); *In re Kapila*, 762 F. at 994 (plaintiff admitting that the corporation's officers acted with intent to increase company profits when they overbilled on invoices).[15] As such, the record supports that SGG was an innocent decisionmaker.

> ii.  *Whether Individual Wrongdoers' Actions Were Adverse to the Companies*

Defendants assert that Plaintiffs concede that the Individual Wrongdoers created the Companies for the singular purpose of perpetuating the Ponzi scheme. ECF No. [143] at 13 (citing Amend. Compl. ¶¶ 89-90 (alleging that the Individual Wrongdoers created the Note Issuers to allow the Individual Wrongdoers to cover the Individual Wrongdoers' failures while perpetuating the scheme)). Defendants assert the Note Issuers had no legitimate business and their sole function was to raise capital for insolvent real estate companies. Amend. Compl. ¶ 73 ("the Individual Wrongdoers . . . began forming special purpose vehicles to raise additional capital"), ¶91 ("The Note Issuers played the same role in the scheme as the earlier special purpose vehicles. The Note Issuers transferred the money they raised from investors to South Bay. South Bay then paid interest payments or repaid earlier investors, thereby disguising its financial troubles."). Therefore,

---

[15] In addition, absent evidence that SGG possessed the same information as Defendants regarding the Individual Wrongdoers' improper use of the Madison subaccounts, a reasonable jury could find that SGG lacked the information that Deutsche Bank possessed, thus finding that SGG had no knowledge of the Ponzi scheme.

Defendants argue that the adverse interest exception does not apply. *Id.* at 13. Defendants contend that a company created to perpetuate a Ponzi scheme can be harmed by the scheme and alternatively contend that the scheme was intended to benefit the Companies. *Id.* at 14-15.

Plaintiffs respond that the adverse interest exception applies because the Companies were harmed by the Individual Wrongdoers being depleted of nearly $200 million of the Companies' assets and the Individual Wrongdoers, not the Companies, benefited from the scheme. ECF No. [161] at 13 (citing Pls.' CSOMF ¶¶ 169-71). Plaintiffs further respond that deepening insolvency is "additional debt incurred" which is a recognized measure of damages. *Id.*

As stated, where a corporate agent engages in misconduct that is calculated to benefit the agent and to harm the corporation, that agent acts adversely to the corporation's interests. *O'Halloran*, 969 So. 2d at 1044-45. Conversely, where an agent's acts are calculated to benefit the corporation, it is in no position to invoke the adverse interest exception. *In re Kapila*, 762 F. App'x at 994.

The Court has determined that a genuine dispute exists as to whether Sports Aficionados, Vanguardia Holdings, North Pointe, and the Note Issuers were alter egos of the Individual Wrongdoers. As to those entities, the issue remains whether the Wrongdoers' Ponzi scheme was calculated to benefit the Individual Wrongdoers and to harm the Companies. The record shows that Yetton testified that he calculated that the Note issuers owed their investors about $250 million. ECF No. [135-1] at 191:13-195:4; *see also* ECF No. [138-1] at 205 (Yetton calculating that a total of $251,324,688.00 in nominal value owed to note investors remained outstanding). In the light most favorable to the nonmovant, a factfinder could reasonably find that the approximately $250 million that the Note Issuers owed to investors was diverted from the intended real estate projects to perpetuate the Ponzi scheme, thereby depriving the Note Issuers of capital. This finding supports

a conclusion that the Individual Wrongdoers "looted" the Note Issuers, supporting that Individual Wrongdoers actions were calculated to benefit the Individual Wrongdoers and to harm the Note Issuers' interests. *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1344-45 (11th Cir. 2008) (affirming jury verdict that the series of transactions that corporate agent authorized "simply loot[ed]" the corporate debtor, adversely affecting the debtor's interests). As such, there is a genuine dispute of fact as to whether the Individual Wrongdoers adversely affected the Note Issuers' interests. Since the foregoing shows that the Individual Wrongdoers' actions were calculated to harm the Note Issuers, Defendants' argument that SGG's presence as an innocent decisionmaker is irrelevant fails.

However, the record does not contain evidence that the Ponzi scheme was calculated to harm the non-Note Issuer Companies for whom SGG served as Director. (Sports Aficionados, Vanguardia Holdings, North Pointe). Absent that evidence, those Companies cannot show that the scheme adversely affected their interests and, thus, the adverse interest exception is not available to the non-Note Issuer Companies. *In re Kapila*, 762 F. App'x at 994.

Therefore, the following Companies may invoke the adverse interest exception to the *in pari delicto* defense: Diversified Real Estate, GMS Global Market Step Up, Preferred Income, Sentinel Investment, and SG Strategic. The following Companies may not invoke the adverse interest exception: Biscayne Capital (B.V.I.), Biscayne Capital Holdings, Sentinel Mandate, Spyglass, Vanguardia Group, Sports Aficionados, Vanguardia Holdings, and North Pointe.

### c.   *Culpability of the Companies*

Defendants argue that *in pari delicto* bars all Plaintiffs' claims as a matter of law because the Companies were substantially more culpable as key drivers of the Ponzi scheme than Defendants. That is because (1) the Individual Wrongdoers used a web of offshore business structures to shield themselves from liability in connection with their fraud, ECF No. [143] at 10

(citing Amend. Compl. ¶ 73); (2) each of the Companies was beneficially owned and controlled by at least one of the Individual Wrongdoers, *id.* (citing Defs.' SOMF ¶¶ 14-28; Amend. Compl. ¶ 75 ("Each special purpose vehicle was legally separate from Biscayne and South Bay but managed—and, in some cases, beneficially owned—by the Individual Wrongdoers")); and (3) the Note Issuers could not have raised capital for a legitimate purpose when South Bay and its subsidiaries were insolvent and could only have done so to perpetuate the Ponzi scheme, ECF No. [143] at 10-11 (citing Amend. Compl.¶ 75 ("The Individual Wrongdoers caused the special purpose vehicles to prepare offering memoranda and raise capital by selling securities in the form of notes."), ¶ 88 ("Beginning in 2010 the Individual Wrongdoers formed more special purpose vehicles—including a number of the Note Issuers—and caused them to issue new securities and raise funds in order to pay interest to legacy investors."), ¶ 90 ("This allowed the Individual Wrongdoers to cover their failures while perpetuating the scheme."), ¶ 91 ("The Note Issuers played the same role in the scheme as the earlier special purpose vehicles. The Note Issuers transferred the money the Note Issuers raised from investors to South Bay. South Bay then paid interest payments or repaid earlier investors, thereby disguising its financial troubles."), and ¶ 96 ("The fraud lasted for nearly a decade. Although the original real estate development effectively failed during the Great Recession, the Note Issuers were utilized to raise more money for years thereafter.")); Defs.' SOMF ¶¶ 102-103.

In addition, Defendants assert the Non-Issuer Companies, such as Spyglass, actively participated in the fraud because Spyglass steered new investors "towards the scheme." ECF No. [143] at 11 (citing Amend. Compl. ¶¶ 92 ("The Individual Wrongdoers also relied on another of the Companies they created—Spyglass—to perpetuate the scheme. Spyglass, incorporated in the BVI, purported to be an investment advisor much like Biscayne."), ¶ 93 ("The Individual

Wrongdoers used Biscayne, Spyglass, and the Note Issuers to continually raise new money. These efforts concealed the failure of the real estate development and facilitated on-going misappropriation. The Individual Wrongdoers also used the notes to mask side deals and arrangements with preferred clients.")), ¶ 95 ("Further, the interrelated structure of the various business entities allowed the Individual Wrongdoers to avoid independent audit opinions.")).

Plaintiffs respond that there is no evidence that the Companies engaged in any wrongdoing, much less wrongdoing in cooperation with Defendants. ECF No. [161] at 16. Plaintiffs also contend that relative fault is a fact-intensive question that precludes summary judgment. *Id.* at 16-17.

The Court reiterates that a company cannot avail itself of the *in pari delicto* doctrine if it is an alter ego, or mere instrument, of a wrongdoer. *O'Halloran*, 969 So. 2d at 1045. Since there is a factual dispute whether the Companies for whom SGG was a director are alter egos, the Court first discusses whether those entites are *in pari delicto*, a separate question from whether the adverse interest exception to the *in pari delicto* doctrine applies. The Court then discusses whether the entities that are mere instrumentalities of the Individual Wrongdoers are *in pari delicto*.

The record shows that Individual Wrongdoers masterminded a Ponzi scheme, forming South Bay and Biscayne. Defs.' SOMF ¶¶ 2, 4, 5; Pls.' CSOMF ¶ 2, 4, 5. The Individual Wrongdoers formed South Bay in furtherance of the scheme. Defs.' SOMF ¶ 3; Pls.' CSOMF ¶ 3. Biscayne "convinced investors to sink money into South Bay's development projects." Defs.' SOMF ¶ 5; Pls.' CSOMF ¶ 5. The Individual Wrongdoers expanded their scheme by raising additional capital, including by creating SPVs, which include the Note Issuers. Defs.' SOMF ¶¶ 7, 8; Pls.' CSOMF ¶¶ 7, 8.

Critically, the parties agree that the Note Issuers played a role in the Individual Wrongdoers' scheme by transferring the money the Note Issuers raised from investors to South Bay, which then paid interest payments or repaid earlier investors, thereby disguising its financial troubles for nearly a decade. Defs.' SOMF ¶¶ 2-9; Pls.' CSOMF ¶¶ 2-9. In addition, Spyglass acted as an investment advisor for the Note issuers. Defs.' SOMF ¶ 24; Pls.' CSOMF ¶ 24. However, while the Notes Issuers and Spyglass's active participation in the scheme is established, in order for a party to be *in pari delicto*, both parties must either be equally in the wrong or a plaintiff must have greater responsibility for the wrongdoing than a defendant. *May v. Nygard Holdings Ltd.*, No. 6:03CV1832-ORL-DAB, 2007 WL 2120269, at *4 (M.D. Fla. July 20, 2007). Defendants assert that Deutsch Bank was at most a passive participant in the Ponzi, but the record supports that Defendants actively assisted the Ponzi scheme by assisting Trujillo with titling the Madison custody subaccounts to avoid Deutsche Bank's compliance procedures, ECF No. [134-1] at 83:11-86:12, and that Deutsche Bank processed wires to over 800 beneficiaries even when employees at Deutsche Bank raised concerns with Habura about whether it is proper to do so and were able to halt such transactions, ECF No. [137-1] at 90, 91. Given the evidence of wrongdoing by both Defendants and the Companies for whom SGG was a director (Sports Aficionados, Vanguardia Holdings, North Pointe, and the Note Issuers), a determination that the parties are *in pari delicto* requires a fact finder to weigh evidence of relative fault, an exercise in which the Court must not do on summary judgment. *See May v. Nygard Holdings Ltd.*, No. 6:03CV1832-ORL-DAB, 2007

WL 2120269, at *4 (M.D. Fla. July 20, 2007) (declining to hold as a matter of law that the parties were *in pari delicto* where there was evidence of wrongdoing by both parties).[16]

As for the other Companies, the Court has determined that they are mere instrumentalities of the Individual Wrongdoers. Those entities which actively participated in the Ponzi scheme are *in pari delicto*. *See Edwards*, 437 F.3d at 1155 (finding entity that was active participant in scheme was *in pari delicto* with defendants). Because Spyglass actively participated in the scheme as the investment advisor for the Note Issuers, Spyglass is *in pari delicto* with Defendants and cannot pursue its claims under Florida law. As for the remaining entities, Defendants point to no evidence specifically implicating those Companies in the scheme. Absent such evidence, the Court cannot hold as a matter of law whether those entities are *in pari delicto*.

Accordingly, the Court grants summary judgment on Defendants' *in pari delicto* defense as to Spyglass but denies summary judgment as to the other Companies.

### 2. Standing

Defendants argue that Plaintiffs do not have standing to bring claims on behalf of the Companies because the Companies were instruments created solely to perpetuate the Ponzi scheme. ECF No. [143] at 16 (relying on *Isaiah v. JP Morgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020)). Defendants also argue that Plaintiffs lack standing to seek damages in connection with bank accounts that were established and controlled by Madison because Plaintiffs do not represent Madison and not entitled to assert any claims on its behalf. *Id.* at 17.

---

[16] Defendants rely on *Edwards* to argue that the Companies had substantially equal responsibility for their injury, but that case is distinguishable on its allegations, in which the plaintiffs asserted the company in that case was the driver of the scheme. *Edwards*, 437 F.3d at 1155. The Amended Complaint alleges that the Individual Wrongdoers were the drivers of the Ponzi scheme here, and that the Companies were incorporated to shield the Individual Wrongdoers from liability. Amend. Compl. ¶ 73. Because the Individual Wrongdoers are the focus of the Amended Complaint, *Edwards* does not support that the Companies' facilitation of the scheme makes those entities *in pari delicto*.

Plaintiffs respond that the Court should follow *Edwards* to find that Plaintiffs have standing to pursue their claims. ECF No. [161] at 17. Plaintiffs urge the Court to follow *Edwards* and not *Isaiah* because the Eleventh Circuit decided *Edwards* earlier and has not overruled *Edwards*. *Id.* at 18. Alternatively, Plaintiffs argue *Isaiah* was wrongly decided because *Isaiah* wrongly conflates standing and *in pari delicto.* Moreover, Plaintiffs argue that the *Isaiah* Court's application of *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543 (Fla. 2d DCA 2003), a case upon which the *Isaiah* Court relied, "does not go nearly as far as *Isaiah* or the Bank suggests." ECF No. [161] at 17-18.[17] Plaintiffs further respond that record evidence shows that the Companies were not shams used exclusively for fraud and that there is a genuine dispute of fact as to whether the Companies had innocent decisionmakers. *Id.* at 19.

Defendants reply that *Edwards* does not conflict with *Isaiah* and both cases support entry of summary judgment, that *Isaiah* controls as the more recent Eleventh Circuit precedent, and the prior panel precedent rule instructs the Eleventh Circuit, not district courts, and that the rule does not apply here. ECF No. [166] at 7-9.

In *Isaiah*, a court-appointed receiver filed a complaint against a Bank in connection with its alleged enablement of a Ponzi scheme. The Ponzi scheme was orchestrated by the principals of the entities in receivership and the receiver sought damages for aiding and abetting the principals' breach of fiduciary duty, conversion, and fraud. *Isaiah*, 960 F.3d at 1300. The district court dismissed the complaint and the Eleventh Circuit requested supplemental briefing as to whether

---

[17] Plaintiffs also argue that the Court should not look to *Freeman*, a Second District case, because this action was filed in Miami-Dade County, in Florida's Third District. *Id.* at 18 (citing *Bravo v. United States*, 532 F.3d 1154, 1164 (11th Cir. 2008)). The Eleventh Circuit in *Bravo* faced conflicting decisions among the state appellate courts, so it decided to look to "the decisions of the Florida appellate court that would have had jurisdiction over an appeal in this case had it been filed in state court." *Bravo*, 532 F.3d at 1164. But this Court faces no such conflict here; Plaintiffs do not cite to legal authority within Florida's Third District that conflicts with *Freeman*. As such, the Court considers *Freeman*.

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

the principals' fraudulent acts were imputed to the receiver for purposes of his tort claims under

Florida law. *Id.* at 1305. The Eleventh Circuit reviewed the Second District Court of Appeal's

decision in *Freeman*, which held that the receiver in that case lacked standing to pursue aiding and

abetting claims against third parties because the entity in receivership itself could not pursue those

claims. *Id.* at 1307. That was because the entity in *Freeman* was controlled exclusively by persons

engaged in a fraudulent scheme and benefited from it and the entity lacked honest directors and

shareholders who were harmed by the wrongdoer's acts. *Id.* (citing *Freeman*, 865 So. 2d at 551).

*Isaiah* held the alleged facts in that case were indistinguishable from *Freeman*, reasoning:

> The complaint itself shows that the Receivership Entities were
> wholly dominated by persons engaged in wrongdoing and is devoid
> of any allegation that the Receivership Entities engaged in any
> legitimate activities or had "at least one honest member of the board
> of directors or an innocent stockholder" such that the fraudulent acts
> of its principals, the Ponzi schemers, should not be imputed to the
> Entities themselves. At least on the basis of this complaint, the Ponzi
> schemers' torts cannot properly be separated from the Receivership
> Entities, and the Receivership Entities cannot be said to have
> suffered any injury from the Ponzi scheme that the Entities
> themselves perpetrated. . . . Because Isaiah, as receiver, stands in the
> shoes of the Receivership Entities, he too lacks standing to bring
> these aiding and abetting claims against JPMC.

*Id.* at 1307-08.

*Isaiah* does not demand that summary judgment be granted here as to all Counts based on

lack of standing. *Isaiah* reviewed the district court's granting of a motion to dismiss and accepted

as true the complaint's factual allegations. Here, the Court on summary judgment reviews the

record evidence to determine whether disputes of fact exist or whether a reasonably jury could find

in the non-moving party's favor, *Shiver*, 549 F.3d at 1343, and views those facts in the light most

favorable to the non-moving party, drawing all reasonable inferences in the non-moving party's

favor, *see Davis v. Williams*, 451 F.3d 759, 763. Unlike in *Isaiah*, there are disputes of fact on

whether SGG was an innocent decisionmaker as director of Sports Aficionados, Vanguardia

Holdings, North Pointe, and the Note Issuers. There are also disputes of fact on whether those Companies were wholly dominated by the Individual Wrongdoers.

In addition, the record shows that South Bay held title to several pieces of Florida real estate, ECF No. [158-11] at 28-29, and that Global Market Step Up had trades in WTS Commerzbank AG securities, ECF No. [158-6] at 8, 9-10, 13-19, 28-29, 54-63. A fact finder could reasonably conclude from that evidence that not all the Companies' business activities were illegitimate. As such, there is a genuine dispute as to whether the Individual Wrongdoers' actions can be imputed to the Companies that had SGG as a director.

However, *Isaiah* dictates that summary judgment is warranted on Plaintiffs' claims as to those Companies where SGG did not serve as a director: Biscayne Capital (B.V.I.), Biscayne Capital Holdings, Sentinel Mandate, Spyglass, and Vanguardia Group. As the Court explained in its discussion on Plaintiffs' *in pari delicto* defense, there is no evidence that those entities had identities that were separate and apart from the Individual Wrongdoers.

Plaintiffs' arguments to the contrary are unavailing. First, *Isaiah* did not conflate the *in pari delicto* doctrine with standing. To the contrary, *Isaiah* recognized the difference and rested its decision on standing grounds. *See Isaiah*, 960 F.3d at 1308 ("Like in *Freeman*, Isaiah's ability to pursue these claims is barred **not** by the doctrine of *in pari delicto*, but by the fact that the Receivership Entities were controlled exclusively by persons engaging in and benefitting from the Ponzi scheme") (emphasis added). Second, *Edwards* merely held that the bankruptcy trustee had standing under Section 541(a)(1) of the Bankruptcy Code based on the alleged injury to the debtor estate. *Edwards*, 437 F.3d at 1150. *Edwards* proceeded to analyze whether the trustee was subject to equitable defenses that could have been raised against the debtor. *Id.* It did not consider whether the trustee had standing under Florida law to assert Florida tort claims.

Accordingly, summary judgment is denied on the basis of standing as to Diversified Real Estate, Global Market Step Up, North Pointe, Preferred Income, Sentinel Investment, SG Strategic, Sports Aficionados, and Vanguardia Holdings. Summary Judgment is granted as to Biscayne Capital (B.V.I.), Biscayne Capital Holdings, Sentinel Mandate, Spyglass, and Vanguardia Group. In addition, because Plaintiffs did not respond to Defendants' argument concerning their lack of standing to as to Madison, summary judgment is granted to the extent that Plaintiffs assert claims on behalf of Madison, a company Plaintiffs do not represent.

### 3.  *Aiding and Abetting Conversion and Breach of Duty*

Defendants seek summary judgment on Counts II and IV for aiding and abetting a breach of fiduciary duty and for conversion against all Defendants. *See generally* Amend. Compl., ECF No. [31]. Defendants assert there is no dispute of material fact as to whether Defendants had knowledge of the Individual Wrongdoer's misconduct, or as to whether Defendants substantially assisted them in that misconduct. ECF No. [143] at 17-18.

Under Florida law, a plaintiff asserting a claim for aiding and abetting must show "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *See Lawrence v. Bank of Am., N.A.,* 455 F. App'x 904, 906 (11th Cir. 2012) (citing *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991); *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.,* 917 So.2d 368, 372 (Fla. 5th DCA 2005)) (footnote omitted). Defendants assume *arguendo* that the Companies engaged in an

underlying breach of fiduciary duty. ECF No. [143] at 18 n.7.[18] The Court thus addresses only the knowledge and substantial assistance prongs in turn.

### a. Knowledge

Defendants submit that liability for aiding and abetting requires proof of actual knowledge and that "mere suspicions" and "red flags" do not suffice. ECF No. [143] at 18. Specifically, Defendants submit that Deutsche Bank's awareness of improper activity in the Madison custodial account and the publication of the SEC Order do not constitute actual knowledge. *Id.* at 18-19.

Plaintiffs respond that actual knowledge may be established through circumstantial evidence, a corporation is charged with the cumulative knowledge of its several agents, and a corporation need only be generally aware of the improper activity to have actual knowledge. *See generally* ECF No. [161] at 19-23. Plaintiffs submit the evidence shows that Defendants failed to investigate red flags and then did nothing about the fraud after Deutsche Bank investigated and learned of the fraud. Plaintiffs add that the SEC Order was not the Bank's only notice of wrongdoing, and Defendant's argument that the Bank kept the Madison accounts open only because the FBI requested it do so is belied by evidence from April 2016 onward. *Id.* at 22-23.

---

[18] Defendants argue in a footnote that Plaintiffs cannot prove an underlying conversion because Plaintiffs cannot claim a right to assets in Madison's custody account and because Plaintiffs have not identified any demand for return from Madison. ECF No. [143] at 18 n.7. The Court rejects this argument. Under Florida law, "a conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *Mayo v. Allen,* 973 So. 2d 1257, 1258-59 (Fla. 1st DCA 2008) (citing *Star Fruit Co. v. Eagle Lake Growers. Inc.,* 160 Fla. 130, 33 So. 2d 858 (Fla. 1948)). Demand and refusal are not necessary where a defendants' original possession of the funds was unlawful. *Mullenmaster v. Newbern,* 679 So. 2d 1186, 1887 (Fla. 4th DCA 1996) (concluding that demand was not required for conversion claim where defendants' original possession of the disputed funds was unlawful). Because Defendants executed multiple requests to transfer notes issued by the Note Issuers to the custody of subaccounts controlled by Madison, ECF Nos. [158-4] ¶¶ 7-8, [158-12] at 2-11, and because those funds were transferred without the Note Issuers' authorization, ECF No. [158-9] at 55, a factfinder could reasonably find that the Note Issuers had been indefinitely deprived of their property without their authorization.  Under those circumstances, Florida law does not require a demand and refusal. Because Defendants rest their challenge to Count IV only on Plaintiffs' inability to prove conversion, the Court denies summary judgment as to Count IV.

Defendants reply that Plaintiffs conflate allegations that establish an inference of actual knowledge with constructive knowledge, which is insufficient to establish actual knowledge. ECF No. [166] at 11-12. Defendants contend that the evidence does not show that Defendants' internal escalations resulted in their concluding that the Madison account was used for unlawful or wrongful conduct. *Id.*

As stated, aiding and abetting under Florida law has three elements: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014). When a bank is accused of aiding and abetting, a plaintiff must show that the bank had "actual knowledge." *Freeman v. JPMorgan Chase Bank N.A.*, 675 F. App'x 926, 930 (11th Cir. 2017).

A corporate agent's knowledge may be imputed to a corporate entity unless the adverse interest exception applies, where the agent's interests are entirely adverse to the corporate entity's interests, meaning the agent's actions must neither be intended to benefit the corporation nor actually cause short-term or long-term benefit to the corporation. *Freeman*, 675 F. App'x at 933 (11th Cir. 2017); *see also Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017) (citing *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (recognizing that under Florida law, knowledge of corporate officer is generally imputed to corporation)). Absent a showing that the entity actually knew of wrongdoing, an aiding and abetting claim is unsustainable. *See Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014); *see also Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 536 (6th Cir. 2000) ("We stress that the requirement is actual knowledge (which, again, may be proven by circumstantial evidence), and

therefore evidence establishing negligence, i.e., that a bank 'should have known,' will not suffice.")
(citation omitted).

Here, the evidence supports that at least two bank employees had knowledge of the Ponzi
scheme. On February 21, 2014, Vreedenburgh learned that Madison sought to open a custodial
account with subaccounts in order to segregate wire activity for Madison's purported customers.
ECF No. [136-1] at 602-06. The parties dispute whether Vreedenburgh or someone else at
Deutsche Bank instructed Madison on how to circumvent Deutsche Bank's onboarding processes
by coaching Madison on how to title the custody subaccounts. Pls.' CSOMF ¶ 120; Defs.' RSOMF
¶ 120; *see also* ECF No. [134-1] at 83:11-86:12. In any event, Trujillo opened a custody account
on behalf of Madison with Deutsche Bank New York, Defs.' SOMF ¶ 71; Pls.' CSOF ¶ 71, and
three of the Madison subaccounts were titled, respectively, "Madison Asset Custody & Clearing
for ORC Senior Secured Ltd," "Preferred Income Collateralized Interest Ltd.," and "GMS Global
Market Step Up Ltd." Pls.' CSOMF ¶ 121; Defs.' RSOMF ¶ 121.

On July 9, 2014, Vreedenburgh also learned from another Deutsche Bank employee that
Deutsche Bank was seeing a "very huge spike in volumes" of wire transfers. ECF No. [136-1] at
608. Roughly a year and half later, Vreedenburgh wrote to Habura that payment instructions on a
Biscayne invoice were erased, and that "we need to stop [G]ustavo in his tracks – it's too obvious,
and been going on for too long." ECF No. [136-1] at 652.

Those facts may support the inference that Trujillo was running the Madison custodial
account poorly or incompetently, and Vreedenburgh and others tolerated the late payments because
Madison's wire activity generated overdraft fees. In the light most favorable to Plaintiffs, however,
those facts paint the portrait of someone who knew that the Madison subaccounts were being used

for improper purposes and helped the Individual Wrongdoers evade Deutsche Bank's onboarding procedures.

Record evidence establishes that Habura knew about fraudulent activity. Habura approved of how Madison's late payments generated overdraft fees for the Bank. ECF No. [136-1] at 652. In addition, Habura received an email in which one of his colleagues explained that "kicking clients out" would redound to Deutsche Bank's competitors benefit. ECF No. [136-1] at 916. This was in response to a discussion regarding potentially "off boarding" Biscayne Capital entities and Madison. *Id.* at 916-17. In addition, Habura was aware that many wire transfers had nothing to do with investment activity, but were related to payments to a law firm, individual employees of Madison and Biscayne Uruguay, approximately 800 different beneficiaries, and was aware of the high volume of wire transfers, credit card payments, and tuition payments. ECF Nos. [137-1] at 90-91, [136-1] at 376, [137-1] at 108. At least three other employees expressed grave concerns about the Madison account activity. ECF Nos. [137-1] at 90-91, [136-1] at 376, [137-1] at 108. One employee intimated that the activity was suspicious, and a director of investment services at the Bank told Habura that "I believe we stop payment for this client immediately! I am concerned with the activity and the attitude." ECF No. [136-1] at 910. Those warnings were serious enough that Habura told Trujillo in February 2016 that the Bank would stop processing wire transfers that were clearly not related to securities trading. ECF No. [127-1] at 57:10-14. Even so, Habura approved of at least one transaction that another employee thought was questionable. ECF Nos. [137-1] at 90.

Those facts support a reasonable inference that Habura knew that the Madison custodial account was being used to personally enrich the Individual Wrongdoers and hesitated to stop the

activity in the Madison account because of the prospect of lost overdraft fees and advantages to competitors.

The employees' communications reflect evidence of troubling activity in a custodial account that went beyond red flags. As the Court explained, ECF No. [84] at 14, such email exchanges and communications between bank employees such as Vreedenburgh and Habura regarding the improper use of custodial accounts establish "a fact pattern that, if proven, a reasonable fact finder could view as sufficient to go beyond 'red flags.'" *Id.* (citing *Perlman*, 559 F. App'x at 996); *Freeman v. JPMorgan Chase Bank N.A.*, 675 F. App'x 926, 933 (11th Cir. 2017) (holding that Bank had actual knowledge of theft of money from escrow account where vice president knew about theft). In addition, the foregoing shows that Vreedenburgh actively participated in the Ponzi scheme by assisting with labeling the custody account. *See Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017) (plaintiff alleged that a bank vice-president labeled the primary wrongdoer's bank account as an escrow account despite the wrongdoer's failure to comply with the bank's procedures for opening an escrow account).

Moreover, the knowledge of those two bank employees may be imputed to Defendants because the adverse interest exception does not apply. Their actions of setting up the custodial account and approving transactions were intended to benefit Deutsche Bank and cause short-term benefit to Deutsche Bank because Deutsche Bank earned overdraft fees from this activity. As such, the record supports that Defendants had knowledge of the Individual Wrongdoers' improper activity.

### b. *Substantial Assistance*

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the [underlying violation] to occur." *Richter v. Wells Fargo Bank NA*, No. 2:11-CV-695-FTM-29, 2015 WL 163086, at *3 (M.D. Fla. Jan. 13,

2015) (citation omitted). A defendant does not provide substantial assistance unless his action, or inaction, was a "substantial factor in causing the [underlying violation]." *Id.* (quoting *In re Palm Beach Fin. Partners,* L.P., 517 B.R. 310, 348 (Bankr. S.D. Fla.2013)) (alteration in original). Accordingly, where the amount of subsistence is minor in comparison to the massive scope of an overall fraudulent scheme, there is no substantial assistance. *Id.* To determine whether a defendant provided substantial assistance, courts examine a variety of factors including "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, [and] his relation to the other and his state of mind." *Id.* (quoting *In re Temporomandibular Joint Implants,* 113 F.3d 1484, 1495 (8th Cir. 1997)) (alteration in original).

The evidence that Vreedenburgh assisted with titling the Madison subaccounts, and Habura's approval of wire transfers associated with the Madison subaccounts supports a fact finder reasonably concluding that Vreedenburgh and Habura substantially assisted the Individual Wrongdoers' scheme. Here, the nature of the act encouraged is a Ponzi scheme. When viewed in the light most favorable to Plaintiffs, the evidence supports that Vreedenburgh assisted the Ponzi scheme by advising Madison on how to set up Madison's custodial account, and Habura affirmatively assisted the scheme by approving questionable wire transfers on January 19, 2016, ECF No. [137-1] at 90, 91, and on July 21, 2016, ECF No. [137-1] at 108. Further, given Vreedenburgh's statement that "at some point we need to stop [Trujillo] in his tracks – it's too obvious, and been going on for too long," and given that Madison sent wires to over 800 *different* beneficiaries over an eighteen-month period, the facts further support that Habura and Vreedenburgh knew that Madison's improper conduct was extensive in duration and frequency. The evidence supports that Habura had the ability to stop Trujillo, as evidenced by the instance on May 17, 2016 when Habura told Trujillo that "compliance will be stepping in and halting activity,"

ECF No. [137-1] at 376, yet chose not to, *see* ECF No. [137-1] at 108 (Habura recognizing a wire transfer was for college tuition for one of the Madison owner's children). Because neither employee took steps to stop Madison's trading activity when each knew that the activity was improper, and in view of their personal assistance, the amount of Deutsche Bank's assistance to the Ponzi scheme was beyond trivial. Moreover, the Madison trading activity was contemporaneously executed with the employees' involvement. Those employees were aware of the improper trading activity in the Madison account. Thus, the record supports that Deutsche Bank substantially assisted the Ponzi scheme.

Those facts distinguish this case from *Richter*, where the bank performed a ministerial function, e.g., processing and cashing a $100,000.00 check, well after the conversion in that case occurred. There, the court determined that the bank's failure to freeze the wrongdoers' account after the conversion was "exceedingly minor" in the context of the scale of the fraudulent scheme. *Richter*, 2015 WL 163086, at *4. Here, by contrast, Vreedenburgh and Habura actively assisted the scheme while it was ongoing by assisting with titling the Madison subaccounts and by approving a wire transfer, and their inaction in stopping the Madison custody account trading activity was essential to the continuation of the Ponzi scheme.

Given that the record supports that Vreedenburgh and Habura both knew of, and substantially assisted, the Individual Wrongdoers' improper conduct, summary judgment is denied as to Counts II and IV.

### 4. *Cayman Islands Companies Act § 147*

Defendants seek summary judgment on Count I on the grounds that Defendants had no knowledge of any fraudulent conduct and did not assist the Companies in the Ponzi scheme. ECF No. [143] at 24. Plaintiffs respond that actual knowledge is not an element of a Cayman Islands Companies Act § 147 ("§ 147") claim, such a claim has a lower, "blind eye" knowledge standard,

and that assistance to wrongdoers even in carrying out "bona fide business transactions" may result in liability. ECF No. [161] at 27. Plaintiffs also argue that there is a factual dispute as to Defendants' willful blindness, and Defendants participated in every aspect of the scheme. *Id.* at 27-28. Defendants reply that bona fide transactions are not sufficient to confer liability under § 147. ECF No. [166] at 14-15.

Because this case requires the Court to consider foreign law, Rule 44.1 of the Federal Rules of Civil Procedure applies. Under Rule 44.1,

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1. Accordingly, this Court considers record evidence of the law of the Cayman Islands to determine whether Plaintiffs may sustain a § 147 claim. *See Am. Pegasus SPC v. Clear Skies Holding Co., LLC*, No. 1:13-CV-03035-ELR, 2015 WL 10891937, at *15 (N.D. Ga. Sept. 22, 2015) (holding as a matter of law that the plaintiff's Cayman Island's Company Law § 146 action may proceed).

The parties agree that English cases on Section 213 of the English Insolvency Act of 1986 ("§ 213"), a statute which is substantially identical to § 147, provides substantive guidance on the application of § 147. Defendants direct this Court to the case, *Morris v. State Bank of India*, [2003] EWHC 1868 (Ch) 736. In *Morris*, the High Court for England and Wales, Chancery Division ("High Court"), set forth the elements necessary to find liability under § 213 in *Morris*:

> (1) that the business of the company in liquidation has been carried on with intent to defraud the creditors of the company or for any other fraudulent purpose; (2) that the defendant sought to be made liable . . . participated in the carrying on of the business of the company in that manner; and (3) that it did so knowingly: i.e. with knowledge that the transactions it was participating in were intended to defraud the creditors of the company or were in some other way fraudulent.

*Morris*, [2003] EWHC 1868 (Ch) 736, 740. The High Court explained that elements (1) and (2) were not at issue, so it focused on the third element. *Id.* at 736. While the High Court dismissed the § 213 claim against the defendant, *Morris* provides limited guidance on how to apply § 147 to the facts here. However, *Morris* does provide the Court with guidance on the knowledge element of a § 147 claim. The High Court explained that the Liquidators in that case alleged that the defendant had "actual knowledge of, or was deliberately blind or recklessly indifferent to, the fraudulent nature of the transactions" at issue in that case. *Id.* Counsel for defendant agreed that defendant would be liable if it had actual knowledge or had "blind-eye knowledge." *Id.* at 740-741.

The record supports a fact finder reasonably concluding that Defendants had actual knowledge of the Ponzi scheme, which would satisfy § 147's knowledge element. And since Defendants provide no legal support discussing the application of the participation prong of a § 213 claim, Defendants do not meet their burden to show there is no dispute of material fact concerning the participation prong of § 147. The Court therefore denies Defendants' Motion as to Count I.

### 5.   *Compliance with the Agency Agreements*

Defendants move for summary judgment on Count V (Breach of Contract) against Deutsche Bank. Defendants contend the Plaintiffs are attempting to paint Deutsche Bank's acceptance of late payments from the Note issuers as a breach of its duties under the Agency

Agreements. ECF No. [143] at 26. Between 2011 and August 2013, Note Issuers Diversified Real Estate, Global Market Step Up, Preferred Income, and SG Strategic entered into Agency Agreements with Deutsche Bank London and Deutsche Bank Lux. Defs.' SOMF ¶ 31; Pls.' CSOMF ¶ 31. Defendants point to the language of the Agency Agreements to argue that the Agency Agreements imposed a duty on Deutsche Bank to inform the Note Issuers' directors of late payments and that Deutsche Bank fulfilled this obligation by reporting on late payments on numerous occasions. *Id*. Defendants further contend that Deutsche Bank had no authority to refuse expressly authorized instructions from the Note Issuers or Directors pursuant to the Agency Agreements, such that the Bank's acts following those instructions was not a breach of contract. *Id.* at 27.

Plaintiffs respond that the Bank was required to notify the Note Issuers' Directors of any late payment, and it failed to do so from at least January 2014 through November 2016. ECF No. [161] at 25. Defendants reply that the evidence that Plaintiffs cite in response shows the Bank had notified the Note Issuers' Directors of late payments in June 2014 and November 2016. ECF No. [166] at 14.

Defendants cite to no legal authority in support of their argument. Courts in this district have held that where a party cites no legal authority it is grounds itself to reject an argument. *See, e.g.*, *Goldberg for Jay Peak, Inc. v. Raymond James Fin., Inc.*, 16-21831-CIV, 2017 WL 7791564, at *7 (S.D. Fla. Mar. 27, 2017). The Court declines Defendants' invitation to do its research on whether Defendants breached the Agency Agreements, so summary judgment is denied as to Count V.

### 6. *Duties Owed to the Companies*

Defendants move for summary judgment on Count III (Breach of Fiduciary Duty) and Count VI (Negligence). Defendants contend that Deutsche Bank did not owe a separate duty of

care to the Companies because it was not aware that Madison was misappropriating the Companies' funds. ECF No. [143] at 27. Defendants argue there is no duty because Deutsche Bank had no knowledge of misconduct relating to the Madison account. *Id.* Defendants further submit that there were no duties owed to the Companies beyond the scope of the contracts it had with Biscayne and Madison. *Id.*

There is a dispute of fact as to Deutsche Bank's knowledge of misconduct relating to those accounts. *See* II.A.3.a., *supra*. For that reason, the fiduciary duties applicable to all Defendants are independent from the obligations imposed by the Agency Agreements. ECF No. [84] at 19. Such a duty would likewise be independent from Deutsche Bank's contracts with Biscayne and Madison and, as such, summary judgment is denied as to Counts III and VI.

### 7. *Personal Jurisdiction*

Defendants argue the court lacks personal jurisdiction over DB Lux and DB Suisse in view of jurisdictional discovery showing that these entities are neither subject to general jurisdiction nor personal jurisdiction.[19]

In addressing whether personal jurisdiction over a nonresident Defendant exists, the Court must conduct a two-part inquiry. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623 (11th Cir.

---

[19] On February 20, 2022, the Court denied Defendants' motion to stay jurisdictional discovery pending their motion to dismiss for failure to state a claim, ECF No. [40]. ECF No. [78]. The Court ordered Defendants to respond to jurisdictional discovery requests by March 8, 2022. *Id.* at 7. The magistrate judge further ordered Defendants to produce discovery documents by August 31. ECF No. [103]. Plaintiffs now argue Defendants defied the Court's Order and never provided jurisdictional discovery and request that the Court sanction Defendants by asserting personal jurisdiction. ECF No. [161] at 28-29. Defendants do not deny that they did not produce all discovery that Plaintiffs sought but contend Plaintiffs ignore issues that purportedly prevented Defendants from doing so, including "bank secrecy issues," and that Plaintiffs failed to produce waivers required to produce documents consistently with foreign law. ECF No. [166] at 15. Defendants contend that Plaintiffs' request for sanctions, raised for the first time in its response to Defendants' Motion, is improper. The Court agrees and declines to consider sanctions at this juncture. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999) (citing Fed. R. Civ. P. 7(b) ("application to the court for an order shall be by motion which . . . shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought.")).

1996). First, the Court must determine whether the applicable state statute governing personal jurisdiction is satisfied. *Sculptchair*, 94 F.3d at 626. Florida's long-arm statute recognizes two kinds of personal jurisdiction over a nonresident defendant: general jurisdiction and specific jurisdiction. *See* Fla. Stat. §§ 48.193(1)-(2); *see also easyGroup Ltd. v. Skyscanner, Inc.*, No. 20-20062-CIV, 2020 WL 5500695, at *6 (S.D. Fla. Sept. 11, 2020). The Eleventh Circuit has held that the reach of Florida's long-arm statute is a question of state law, and federal courts must adhere to the statutory constructions offered by the Florida Supreme Court and Florida's District Courts of Appeal. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013). If the requirements of the long-arm statute are satisfied, under either general jurisdiction or specific jurisdiction, then the Court must consider the federal Due Process Clause. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1250-51 (11th Cir. 2000).

The Court's analysis of the Due Process Clause depends on three factors: (1) Defendant's purposeful availment of the forum state; (2) the cause of action arising out of the activities of which the Defendant purposefully availed himself; and (3) reasonable foreseeability of the Defendant being haled into court in the forum state. *See Future Tech.*, 218 F.3d at 1250-51 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). In addition, the Court must determine whether exercising jurisdiction will comport with traditional notions of fair play and substantial justice, meaning the Court must balance: "(a) the burden on the defendant; (b) the forum state's interest in adjudicating the dispute; (c) the Plaintiff's interest in obtaining convenient and effective relief; (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (e) the shared interest of the several states in furthering fundamental substantial social policies." *Id.* at 1251 (citing *Burger King Corp.*, 471 U.S. at 466).

*a.   General jurisdiction*

Defendants argue that DB Lux maintains both its principal place of business and place of incorporation in Luxembourg, while DB Suisse maintains both its principal place of business and place of incorporation in Switzerland. ECF No. [143] at 28. In making this argument, Defendants rely on the Supreme Court's decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014). Plaintiffs do not respond to this argument on the merits.

In *Daimler*, Argentinian plaintiffs brought suit in a California court against a German corporation. *Daimler AG*, 571 U.S. at 117. Plaintiffs alleged that an Argentinian subsidiary of defendant collaborated with state security forces during Argentina's 1976-1983 "Dirty War" to kidnap, detain, torture, and kill certain Argentinian workers. *Id.* The basis for personal jurisdiction over the defendant was defendant's United States subsidiary and its indirect contacts with California. *Id.* at 119. Neither the defendant in *Daimler* nor its subsidiary was incorporated or had a principal place of business in California. *Id.* at 123. The defendant's subsidiary was its sole United States distributor and it maintained multiple facilities in California. *Id.* The Supreme Court found that defendant's contacts with California, even with the subsidiary's contacts attributed to it, were insufficient for the purposes of establishing general jurisdiction. *Id.* at 124. But the Court made clear that a corporation is not "subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business," just that those places serve as "paradigm all-purpose forums." *Id.* at 137 (emphasis in original). Citing the *Goodyear* standard, the Court again wrote, "[t]he inquiry . . . is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Daimler AG*, 571 U.S. at 137 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Further, in *Waite v. AII Acquisition Corporation*, the Eleventh Circuit expanded on the contacts necessary to render a corporation "at home" in the forum state. *Waite v. AII Acquisition*

*Corporation,* 901 F.3d 1307 (11th Cir. 2018). When a Defendant's state of incorporation and principal place of business are not in the forum state, the Court's task is to decide whether the case is one of the exceptional cases in which general jurisdiction is still proper. *Id.* at 1317-18. "To make this decision, [the Court] must consider whether 'the corporation's activities in the forum closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business.'" *Waite,* 901 F.3d at 1318 (quoting *Carmouche v. Tamborlee Mgmt.*, 789 F.3d 1201, 1205 (11th Cir. 2015)). In *Waite,* a plaintiff diagnosed with mesothelioma caused by asbestos exposure in Massachusetts later sued an asbestos manufacturer in Florida. *Id.* at 1310. Despite the facts that the defendant manufacturer was registered to do business in Florida, maintained an agent for service of process in Florida, hired a Florida distributor, had customers in Florida, and operated a plant in Brevard County, the court found it was not "at home" in Florida. *Id.* at 1318. The Court noted that, outside of a corporation's place of incorporation and principal place of business, only a limited set of affiliations will be substantial enough to make the corporation at home in that State. *Id.* at 1317.

The record shows that DB Lux has its registered office in Kirchberg Plateau, Luxembourg, and that its principal place of business is in Luxembourg. ECF No. [49-2] ¶ 2. The record also shows DB Suisse is a bank domiciled in Geneva, Switzerland, with its corporate offices in Geneva and Zurich, Switzerland. ECF No. [49-1] ¶ 2. The parties point to no other facts regarding contacts with the forum state. As such, the Court finds that DB Lux and DB Suisse are not "at home" in Florida, so these Defendants are not subject to general jurisdiction under Florida's long-arm statute.

### b.   *Specific Jurisdiction*

Defendants argue there is no evidence DB Lux participated in wrongdoing. ECF No. [143] at 29. Defendants argue that DB Suisse offered wealth management services to an entity later

associated with the Ponzi scheme, but that there is no evidence that it participated in the scheme. Moreover, Plaintiffs cannot demonstrate a connection between DB Suisse's actions and the State of Florida. *Id.* at 29-30. Plaintiffs also do not respond to this argument on the merits.

As relevant to Defendants' Motion, under Section 48.193(1)(a) of the Florida Statutes, "[a] person . . . who . . . through an agent who does any of the acts enumerated in this subsection thereby submits himself or herself . . . to the jurisdiction of the courts of this state for any cause of action arising from any" of the enumerated acts. Fla. Stat. § 48.193(1). In relevant part, those acts include, "1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state[,]" or "2. Committing a tortious act within this state." *Id.* The Court reviews the record to determine whether a factfinder could reasonably find DB Lux or DB Suisse committed any of these acts.

According to the record, between 2011 and 2017, four of the five Note Issuers entered into Agency Agreements with DB Lux. Pls.' CSOMF ¶ 31; ECF No. [159]. DB Lux held a "note register." *Id.* ¶ 47. Pursuant to the Agency Agreements, DB Lux acted "solely as Agent of the Issuers." *Id.* ¶ 49. The Agency Agreements describe DB Lux as a "service provider[] to" the Note Issuers. *Id.* ¶ 55. These facts do not establish a nexus with the State of Florida. Accordingly, Plaintiffs cannot satisfy the long-arm statute's requirements.

Therefore, the Court lacks personal jurisdiction over DB Lux and DB Suisse.

### B. Plaintiffs' Motion

Plaintiffs contend that Defendants cannot avail themselves of the *in pari delicto* defense under Florida law because the Florida Supreme Court would likely hold that the application of that defense against Plaintiffs would be inequitable. ECF No. [141] at 1. In addition, Plaintiffs submit that the *in pari delicto* defense remains unavailable to Defendants against Count I because

Plaintiffs' § 147 claim is not subject to the defenses that Defendants could have brought against the Companies prior to liquidation. ECF No. [141] at 11-12.

Defendants respond that Plaintiffs lack standing to bring their claims, so the Court need not reach the merits of Plaintiffs' Motion. ECF No. [155] at 2-3. Defendants also respond that Plaintiffs' Motion should be denied as an untimely motion to strike. *Id.* at 4-5. Defendants further respond that Plaintiffs' argument is faulty because it misreads the Bankruptcy Code and relies on irrelevant legal authority or legal authority expressly rejected by the Eleventh Circuit. *Id.* at 1-2.

Because the Court has addressed Defendants' standing arguments in Defendants' Motion, it does not address those arguments in Plaintiffs' Motion. The Court considers Defendants' timeliness argument and then proceeds to consider the merits of Plaintiffs' Motion.

### 1. Defendants' Procedural Argument

Defendants argue that Plaintiffs forfeited the argument that the *in pari delicto* doctrine applies to them. ECF No. 155 at 3-4 (citing ECF No. [84] at 10 n.4). Specifically, Defendants contend that Plaintiffs conceded in opposing Defendants' motion to dismiss, ECF No. [52], that the *in pari delicto* doctrine is applicable to this case. ECF No. [155] at 4. Defendants further argue that, under Federal Rule of Civil Procedure 12(f), a plaintiff must file a motion to strike either before responding to a pleading, or if a response is not allowed, within 21 days after being served with a pleading, and Plaintiffs did not seek to strike the defense after Defendants answered the Complaint and asserted its affirmative defenses. *Id.* Defendants conclude that because Plaintiffs cannot show good cause, Plaintiffs' Motion should be denied. *Id.* at 5 (citing *Centre Hill Courts Condominium Association, Inc.* v. *Rockhill Insurance Co.*, No. 19-cv-80111-BFB, 2020 WL 442467, at *8-9 (S.D. Fla. Jan. 28, 2020)).

Plaintiffs respond that Rule 12 of the Federal Rules of Civil Procedure does not require a party to attack a legally invalid defense through a motion to strike, and Rule 56 expressly allows

a party to move for summary judgment on any defense. ECF No. [170] at 3-4. Plaintiffs also respond that Eleventh Circuit precedent disfavors attacking defenses through a motion to strike where that defense is subject to a substantial legal dispute. *Id.* at 4. Plaintiffs point out that this Court in *Centre Hill* considered the merits of the motion for summary judgment in that case. *Id.* at 4. Plaintiffs further contend that the case on which *Center Hill* relied, *Andreu v. Hewlett-Packard Co.*, No. 15-23270-CIV, 2016 WL 1697088 (S.D. Fla. Apr. 20, 2016), denied a motion for summary judgment where that motion cited to Rule 12(f) and associated case law and did not follow procedural rules governing summary judgment motions. *Id.* at 4-5 (citing *Andreu v. Hewlett-Packard Co.*, No. 15-23270-CIV, 2016 WL 1697088, at *4 (S.D. Fla. Apr. 20, 2016)).

The Court reiterates the procedural requirements of Rule 56 because these are essential to addressing Defendants' procedural challenge. Under that Rule, "[a] [movant] may move for summary judgment, identifying each . . . defense . . . on which summary judgment is sought," and the "court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). In making this showing, the movant "asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record[.]" *See* Fed. R. Civ. P. 56(c)(1).

Plaintiffs move for summary judgment on Defendants' *in pari delicto* defense on the grounds that there is no genuine dispute that Defendants may avail themselves of this affirmative defense. Specifically, Plaintiffs contend that the application of *in pari delicto* would be inequitable, and this unfairness precludes its application. Plaintiffs argue that it is both Congress and the Florida Legislature's policy judgment that foreign liquidators should be allowed to pursue claims like those here and applying *in pari delicto* would frustrate that policy. ECF No. [141] at 8-9. Plaintiffs also

support their contention that applying *in pari delicto* doctrine would be inequitable because Plaintiffs as Liquidators are pursuing claims on behalf of "innocent creditors[]" and preventing Plaintiffs from doing so "would produce inequitable results." *Id.* at 10-11. Plaintiffs point out they are the Liquidators of the Companies in certain "foreign main proceeding[s]" who will distribute all recovery in this action pursuant to judicial oversight in those foreign main proceedings, and Plaintiffs were not previously involved with the Companies or the Individual Wrongdoers. ECF No. [141-1] ¶¶ 1-3, 6, 8-10. Accordingly, the Court finds that Plaintiffs have complied with the procedural requirements of Rule 56(c)(1) of the Federal Rules of Civil Procedure. Having done so, Plaintiffs' Motion is distinguishable from the plaintiff's motion in *Andreu* where that plaintiff made no attempt to support its motion with a statement or material facts or with citations to the record. *Andreu*, 2016 WL 1697088, at *4 (S.D. Fla. Apr. 20, 2016). For this reason, the Court proceeds to consider the merits of Plaintiffs' Motion.

### 2. *11 U.S.C. § 541*

The parties agree that 11 U.S.C. § 541 does not apply to proceedings that arise from Chapter 15 of the Bankruptcy Code. ECF No. [141] at 3; ECF No. [155] at 6. The parties also agree that Chapter 15 governs this action. ECF No. [141] at 4; *see* ECF No. [155] at 5-7. However, Plaintiffs argue that "where § 541 does not apply, neither the Bankruptcy Code nor any other source of law requires applying the *in pari delicto* defense. Thus, this Court is not bound to apply it," meaning that the Court should not apply the *in pari delicto* defense. ECF No. [141] at 6.

Defendants respond that Plaintiffs' conclusion is a "logical leap" that is unsupported by legal authority. ECF No. [155] at 6. Relying on *In re ICP Strategic Credit Income Fund Ltd*, 2015 WL 5404880 (Bankr. S.D.N.Y. Sept. 15, 2015), Defendants argue that Chapter 15 does not imbue foreign liquidators with greater rights than the debtor itself. ECF No. [155] at 7-8.

Plaintiffs respond that Florida law governs what defenses are available regarding Plaintiffs'

claims brought under Florida law, so *ICP Strategic*, which applies New York law, does not apply

here.

Section 541 provides in the relevant part,

> The commencement of a case under section 301, 302, or 303 of this
> title creates an estate. Such estate is comprised of all the following
> property, wherever located and by whomever held: (1) Except as
> provided in subsections (b) and (c)(2) of this section, *all legal or
> equitable interests* of the debtor in property as of the commencement
> of the case."

11 U.S.C. § 541 (emphasis added). The legal or equitable interests in Section 541 are property of

the estate and include any claim the debtor could have brought outside of bankruptcy at the time

the case was commenced. *In re Gosman*, No. 01-30953-BKC-SHF, 2007 WL 776262, at *2 (Bankr.

S.D. Fla. Mar. 9, 2007), *aff'd*, 382 B.R. 826 (S.D. Fla. 2007). Those claims are subject to the

defense of *in pari delicto* if those claims, if asserted by the debtor, would have been subject to an

*in pari delicto* defense. *Edwards,* 437 F.3d at 1149-50.

Plaintiffs urge the Court to find significance in the absence of a provision that is analogous

to Section 541 under Chapter 15 of the Bankruptcy Code. In *ICP Strategic*, the court explained

that state law applied to the claims of the liquidators because, regardless of whether an "estate"

has come into being, the liquidators still act as successors to the liquidated companies. *In re ICP

Strategic*, 2015 WL 5404880, at *18 n.118 (Bankr. S.D.N.Y. Sept. 15, 2015). In other words,

Florida law, not the Bankruptcy Code, dictates whether *in pari delicto* is available to Defendants.

Plaintiffs agree. ECF No. [170] at 6 ("Florida law governs what defenses are available against the

Liquidators' claims brought under Florida law."). As such, the Court rejects that *the Bankruptcy

Code* requires the preclusion of *in pari delicto* here. The Court rejects Plaintiffs' argument for the

additional reason that it is illogical. If a provision of the Bankruptcy code applicable in a given

case provides that a court *must* allow an equitable defense under state law, it does not follow, without support in the case law, that the inapplicability of that provision to a case means a court *must not* allow that defense. The Court thus proceeds to Plaintiffs' other arguments.

### 3. *In Pari Delicto Doctrine's Equitable Purpose*

Plaintiff next argues that because nothing requires applying *in pari delicto* and its application would frustrate the doctrine's purpose, this Court should decline to apply it. The argument may be subdivided into two parts. First, Plaintiffs argue the Florida Supreme Court has held that a defendant is not entitled to assert the *in pari delicto* defense where its application would violate legislatively declared policy. ECF No. [141] at 7 (citing *Earth Trades*, 108 So. 3d at 584). Second, Plaintiffs assert that *in pari delicto* is an unavailable defense here because its application is not in the public interest.

#### a. *Legislative Policy*

Plaintiffs specifically contend that the legislative policy relevant to this action includes Congress's judgment that foreign liquidators should not be subject to mandatory application of pre-petition defenses like *in pari delicto*. *Id.* at 8.[20] Plaintiffs also stress that Florida legislative policy is for there to be a "'full reporting to creditors and equal distribution of assets according to' established priorities" in state law proceedings involving creditor claims. ECF No. [141] at 9 (quoting Fla. Stat. § 727.101).

Defendants respond that *Earth Trades* held that the Florida Legislature had clearly allocated fault to unlicensed contractors in the statute at issue there and, as a result, the subcontractor that sought to assert the *in pari delicto* defense against a general contractor could

---

[20] Because the Court has determined that 11 U.S.C. § 541 does not provide substantive guidance concerning the availability of the *in pari delicto* defense in Chapter 15 Bankruptcy cases, it does not revisit this argument.

not do so. ECF No. [155] at 9. Defendants also argue that *Earth Trades* did not endorse applying legislative policy to bar equitable defenses. *Id.* at 10.

Plaintiffs reply that *Earth Trades* stands for the proposition that where Florida's statutorily expressed policy precludes the assertion of an equitable defense, that defense is unavailable as a matter of law. ECF No. [170] at 9. Plaintiffs further reply that Section 727.108(1)(b) of the Florida Statutes similarly expresses a policy to preclude the *in pari delicto* defense in cases like this one where Liquidators seek to consolidate assets for the benefit of the Companies' creditors. *Id.* at 10.

The parties disagree on the significance of *Earth Trades* to this case, and an analysis is warranted. In *Earth Trades*, an unlicensed subcontractor brought breach of contract claims against a general contractor. *Earth Trades*, 108 So. 3d at 581. The general contractor counterclaimed for breach of contract. *Id.* The general contractor argued that the subcontractor's claim was barred under Section 489.128 of the Florida Statutes. *Id.* at 582. The subcontractor sought to assert the *in pari delicto* defense against the general contractor's counterclaim on the basis that the general contractor was equally at fault because it knew the subcontractor was unlicensed. *Id.*

The Florida Supreme Court reviewed Section 149.128 and concluded that "as a matter of state policy, the Legislature has imposed a substantial penalty on the unlicensed contractor as the wrongdoer with regard to a construction contract." *Id.* at 586. The Florida Supreme Court explained that "the applicable statute has clearly placed the onus of unlicensed contracting on the unlicensed contractor and that the *in pari delicto* doctrine did not preclude [the general contractor] from enforcing the contract." *Id.* Moreover, "[the general contractor's] alleged knowledge of [the subcontractor's] licensure status, if proven, would make both parties wrongdoers, but they would not share substantially equal fault" because in amended Section 489.128, the Legislature had, "as a matter of state policy, greatly disadvantaged the contractor who chooses not to obtain the legally

required license." *Id.* at 586. Accordingly, the Florida Supreme Court determined that where Section 489.128 applies, "a party's knowledge that a contractor is unlicensed is insufficient as a matter of law to establish the defense of *in pari delicto*." *Id.* at 587.

By their own concession, Plaintiffs are not asserting any claims arising from a transaction or occurrence subject to Section 727.108. Rather, Plaintiffs contend that the legislative policy judgment evinced by that section attaches to any claims brought by a third party seeking to assert a claim that an insolvent entity could have brought. This contention misreads *Earth Trades*, which does not stand for the general principle that the *in pari delicto* defense is unavailable against plaintiffs asserting claims to the benefit of creditors. *Earth Trades* expressly limited its holding to claims brought under the statute at issue in that case. At least one state court is in accord. *See Brock v. Garner Window & Door Sales, Inc.*, 187 So. 3d 294, 296 (Fla. 5th DCA 2016) (explaining that *Earth Trades* addressed the question of whether an unlicensed contractor could enforce a contract, notwithstanding Section 489.128). Nothing in § 489.128 or *Earth Trades* precludes a defendant from asserting the *in pari delicto* defense in the circumstances of this case. Without any other supporting legal authority for this argument, Plaintiffs have not met their burden to show that *in pari delicto* is an unavailable defense on grounds of legislative policy.

### b. *Public Interest*

Plaintiffs assert that Liquidators were appointed to marshal assets and recover on behalf of the Companies in order to distribute funds to the Companies' creditors. ECF No. [141] at 9-10. Plaintiffs argue their task serves "[a]n important public purpose," and therefore *in pari delicto* is unavailable as a matter of law. *Id.* at 10 citing (*In re Fuzion Techs. Grp., Inc.*, 332 B.R. 225, 232-36 (Bankr. S.D. Fla. 2005)). Plaintiffs cite other legal support for the proposition that the Florida Supreme Court would bar the *in pari delicto* defense here on the same grounds. *See* ECF No. [141] at 10-11.

Defendants respond that *Fuzion* has been overruled by the Eleventh Circuit and the Eleventh Circuit expressly rejected Plaintiffs' argument on the grounds that creditors may pursue their own claims without the aid of individuals like the Liquidators. ECF No. [155] at 11-12. Defendants also respond that the other legal authority on which Plaintiffs rely is distinguishable. *Id.* at 12-13.

Plaintiffs reply that although *Edwards* overruled *Fuzion*'s holding that *in pari delicto* was unavailable in § 541 cases, *Edwards* did not disapprove of *Fuzion's* reasoning, which should be considered for its persuasive authority. ECF No. [170] at 9-10. Plaintiffs also reply that Defendants have failed to show why the other legal authority on which Plaintiffs rely is distinguishable. *Id.* at 10-11.

In *In re Fuzion*, two entities filed for Chapter 11 protection. *In re Fuzion Techs. Grp., Inc.*, 332 B.R. at 228. One director dominated those entities and transferred millions of dollars to another entity that the director controlled. *Id.* at 228-29. The Chapter 11 Trustee sought recovery from a law firm for negligently failing to render appropriate advice regarding a whistle blower letter that contained details on the director's transfers to the other entity. *Id.* at 228-29. The law firm asserted that the parties were *in pari delicto*. *Id.* at 229. *Fuzion* held that the law firm, as a matter of law, could not assert the *in pari delicto* defense. *Id.* at 236. In doing so, *Fuzion* noted that state law applies in determining what defenses may be asserted against the Trustee in the case. *Id.* at 234. The Eleventh Circuit overruled *Fuzion* as contrary to 11 U.S.C. § 541(a)(2). *Edwards*, 437 F.3d at 1150-52. Nevertheless, Plaintiffs argue that the public policy reasoning in *Fuzion* is persuasive and should be applied to cases not subject to § 541. The Court disagrees. As set forth above, and contrary to their representations, Plaintiffs' public policy argument lacks legal authority. Moreover, the Eleventh Circuit has disapproved of Plaintiffs public policy reasoning. *Edwards*, 437 F.3d at

1151 (rejecting plaintiff's argument that "his recovery would ultimately inure to the benefit of innocent creditors instead of the wrongful debtor" because creditors whose legal interests were harmed by the Ponzi scheme "could rightfully recover more outside of bankruptcy because they would not compete with the trustee's claims on behalf of the debtor estate."). Plaintiffs' reasoning ignores how the Companies' creditors may pursue their own claims against third parties who assisted a Ponzi scheme and thereby avoid having their claims subordinated to senior creditors' claims in liquidation, which would limit their recovery under the Bankruptcy Code's claim prioritization rules. *Edwards*, 437 F.3d at 1151. Plaintiffs do not address this weakness in their policy argument. Since Plaintiffs' contentions fails on this basis, and because it is entirely unclear how barring the application of *in pari delicto* advances any other important public policy, Plaintiffs' contentions are unavailing.

Because *Edwards* is binding on this Court, it declines to consider Plaintiffs' other out-of-circuit authority.

Plaintiffs also rely on *American Pegasus SPC v. Clear Skies Holding Co.*, 2015 WL 10891937, at *20 (N.D. Ga. Sept. 22, 2015), a case where the court declined to apply the *in pari delicto* defense to fraudulent conveyance claims. *See, e.g.*, *Edwards*, 437 F.3d at 1152 ("[F]raudulent conveyances also are an exception to the general rule that the trustee takes the debtor estate as it is at the commencement of the bankruptcy."). Plaintiffs argue that *American Pegasus* supports their argument because fraudulent transfer and avoidance claims are not subject to § 541, so it follows from the inapplicability of § 541 to the instant action that this Court should also bar the *in pari delicto* defense. But Plaintiffs are not asserting fraudulent conveyance or avoidance claims brought under U.S. law against Defendants. As such, *American Pegasus* is inapplicable to the claims at bar.

Plaintiffs also rely on *Rural International Bank Ltd. v. Key Financial Investment Group LLC*, 2017 WL 5891463, at *5 (S.D. Fla. Oct. 24, 2017), but their reliance is misplaced. The court in *Rural International* held that there was no genuine issue of material fact as to whether the plaintiff had engaged in *any* wrongdoing, so the doctrine of *in pari delicto* was inapplicable to the case. *Id.* Here, Plaintiffs do not dispute that the Note Issuers participated in the Individual Wrongdoers' scheme by transferring the money the Note Issuers raised from notes investors to South Bay, or that Spyglass steered investors towards the Note Issuers. Defs.' SOMF ¶¶ 2-9; Pls.' CSOMF ¶¶ 2-9. Thus, *Rural International* is inapplicable to the facts here.

Accordingly, summary judgment is denied on the basis of Plaintiffs' public policy arguments.

### 4. *In Pari Delicto Defense as to Plaintiffs' § 147 Claim*

Plaintiffs submit that the *in pari delicto* defense remains unavailable to Defendants against Count I, Fraudulent Trading under Cayman Islands Companies Law § 147, because Plaintiffs' § 147 claim is not subject to the defenses that Defendants could have brought against the Companies prior to liquidation. ECF No. [141] at 11-12. Specifically, Plaintiffs contend that Cayman Islands Companies Law § 146 is analogous to an avoidance or preference action brought under the U.S. Bankruptcy Code, for which the *in pari delicto* defense does not apply. *Id.* at 12. Plaintiffs reason that because §§ 146 and 147 should be "read together" as addressing "different aspects of the same mischief," *id.* (citing *In re ICP Strategic Credit Income Fund, Ltd.*, 2014 (2) CILR 1; ECF No. [40-1] at 26-30), the Court should similarly construe § 147 as prohibiting the defense. *Id.*

Defendants respond that Plaintiffs misread *ICP Strategic*, which merely held that a foreign court is empowered to apply §§ 146 and 147. ECF No. [155] at 14.

Plaintiffs reply that claims brought under § 147 are personal to liquidators and are not those that a company undergoing liquidation could have brought pre-insolvency. ECF No. [170] at 12.[21] Plaintiffs point to their expert's declaration concerning the law governing § 147 fraudulent trading claims to support the conclusion that § 147 claims are not subject to the *in pari delicto* defense. *Id.* at 13 (citing ECF No. [158-1] ¶¶ 80-101).

### a.   Whether Courts in the Cayman Islands Recognize the Doctrine of in Pari Delicto

The Court first addresses whether courts of the Cayman Islands recognize the doctrine of *in pari delicto*.[22] The *in pari delicto* doctrine was set forth in English law in *Smith v. Bromley* (1790) 99 Eng. Rep. 441, 2 Doug. 696 (Mansfield, J.). Brian A. Blum, *Equity's Leaded Feet in A Contest of Scoundrels: The Assertion of the in Pari Delicto Defense Against a Lawbreaking Plaintiff and Innocent Successors*, 44 HOFSTRA L. REV. 781, 786 n.31 (2016); *see also id.* (citing *Holman v. Johnson* (1775) 98 Eng. Rep. 1120, 1121; 1 Cowp. 342, 343) (explaining that Lord Mansfield expressed both the *in pari delicto* doctrine and *ex turpi causa* principle).[23] Plaintiffs assert, and Defendants do not contest, that English law is part of Cayman Islands law. *See* ECF No. [158-1] (citing *Ahmad Hamad Algosaibi Company v Saad Investments Company Limited*, 2018 (3) CILR 1) (following *Bilta v. Nazir*, [2016] AC 1 (SC)). Thus, the Court concludes that *in pari delicto* is a defense recognized in Cayman Islands law.

---

[21] Plaintiffs reply that Defendants have failed to meet their burden to show there is a genuine issue of material fact as to whether the *in pari delicto* defense is available. As discussed in III.A., *supra*, there is a question of fact on whether the Individual Wrongdoer's conduct, undisputed in Plaintiffs' Counter Statement of Material Facts to Defendants' Motion, is imputed to the Companies. As such, Plaintiffs' argument is rejected.

[22] The parties do not squarely address this issue, but Plaintiffs' briefing suggests, and Defendants do not dispute, that there are circumstances where the doctrine of *in pari delicto* may apply under Cayman Islands law. ECF No. [158-1] ¶ 80.

[23] Under the *ex turpi causa* principle, courts will not lend aid to a plaintiff when, by their own admission, the plaintiff's cause of action appears to arise from the transgression of a positive law. *See* John W. Wade, *Benefits Obtained Under Illegal Transactions-Reasons for and Against Allowing Restitution*, 25 TEX. L. REV. 31, 44 (1946).

### b.  Whether § 147 Bars Defendants' in Pari Delicto Defense

The Court next considers Plaintiffs' contention that precedent of the Cayman Islands establishes that § 147 bars the *in pari delicto* defense. Plaintiffs rely on *ICP Strategic*, a decision of the Cayman Islands Grand Court, Financial Services Division. There, liquidators of a company sought to bring an action against a U.S. law firm for assisting in a breach of fiduciary duty and fraud committed by the company's CEO. *ICP Strategic*, 2014 (2) CILR 1 at 1; ECF No. [40-1] at 26. "After having reviewed the subsequent evidence," the liquidators sought to bring an action in the United States under § 147. *Id. ICP Strategic* quotes § 147, which provides as follows.

> (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.
>
> (2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

*Id.* at 28. *ICP Strategic* reasoned that,

> Section 147 creates a compensatory remedy when any part of a company's business has been carried on with intent to defraud creditors. Section 146 creates a restitutionary remedy when any of a company's property has been disposed of at an undervalue with intent to defraud its creditors. These sections create statutory remedies aimed at different aspects of the same kind of mischief. There is no apparent reason why the legislature should have intended that official liquidators be permitted to pursue the s. 146 remedy in a foreign court but prohibited from pursuing the s. 147 remedy in a foreign court.

*Id. ICP Strategic* thereafter held that "on its true construction, official liquidators are not prohibited from pursuing s. 147 claims in foreign courts." *Id.* As shown, *ICP Strategic* addressed whether § 147 has extraterritorial application, not whether § 147 bars equitable defenses against liquidators. As such, *ICP Strategic* does not support Plaintiffs' contentions.

### c. *Plaintiff's Arguments in the Toube and Mokal Declaration*

The Court next considers Plaintiffs' additional arguments, which incorporate their legal experts' joint Declaration. *See generally* Toube & Mokal Decl., ECF No. [158-1]. Plaintiffs argue that the doctrine of *in pari delicto* is inapplicable to Plaintiffs' § 147 claim because (1) the dishonest knowledge of a company's employees or agents is not attributable to the Company, (2) the doctrine of *ex turpi causa* does not apply to bar the claim, and (3) since claims under § 147 vest with Plaintiffs as liquidators, not with the Companies, the Companies' wrongdoing does not affect Plaintiffs' claims. ECF No. [158-1] ¶ 80.

In making their first argument, Plaintiffs rely on *Bilta v. Nazir*, [2016] AC 1 (SC), cited in *ICP Strategic*, 2014 (2) CILR 1, ECF No. [40-1] at 29, where the Supreme Court for the United Kingdom held that directors of a company could not assert the defense of *ex turpi causa* against the company's claim against the directors because the directors' wrongful conduct could not be attributed to the company. *Bilta*, [2016] AC (SC) at 2C-2E, ECF No. [158-2] at 1072; *see also id.* ¶¶ 46, 47, ECF No. [158-2] at 1090-91 (adopting conclusion in *Stone & Rolss Ltd v. Moore Stephens* [2009] AC 1391, that *ex turpi causa* cannot be asserted by defendant against a corporation for damages caused by acts committed by those defendants in the defendant's capacity as the corporation's agents). In holding so, the Justices of the UK Supreme Court examined the circumstances in which it was appropriate to attribute to a company the acts, knowledge, or state of mind of its wrongdoing directors. *Bilta*, [2016] AC 1 (SC) ¶ 15, ECF No. [158-2] at 1071. The liquidators of the company in *Bilta* claimed the defendants conspired "to injure and defraud the company by trading in carbon credits and dealing with the resulting proceeds in such a way as to deprive the company of its ability to meet its VAT obligations on such trades." *Bilta*, [2016] AC 1 (SC) at 1, ECF No. [158-2] at 1071. The liquidators claimed the defendants were knowing parties

to the scheme and should be ordered to contribute to the company's assets under § 213 of the English Insolvency Act of 1986, a statutory provision substantially identical to § 147. *Id.*

Lord Mance explained that it may be appropriate to attribute the director's acts, knowledge, or state of mind to the company for some purposes (such as when a third party which has been defrauded brings a claim against the company), while at the same time not making such an attribution for other purposes (such as when that company brings a claim against its dishonest director). *Id.* ¶ 43, ECF No. [158-2] at 1088-89.

All the Justices expressed similar views. *Id.* ¶ 9, ECF No. [158-2] at 1080-81 (Lord Neuberger, with whom Lords Clarke and Carnwath agreed); *Bilta*, [2016] AC 1 (SC) ¶ 92, ECF No. [158-2] at 1110 (Lord Sumption); *Id.* ¶¶ 181, 191; ECF No. [158-2] at 1134, 1136 (Lords Toulson and Hodge).

One Justice, Lord Sumption, further reasoned that where a fraudulent agent of a company breaches a fiduciary duty owed to the company, the agent's knowledge was not attributable to the company as a matter of law. *Id.* ¶ 71, ECF No. [158-2] at 1099. That is because it would be paradoxical for the agent to shield himself or herself from a claim by the company for wrongs the agent perpetrated while acting the company's agent. *Id.* ¶ 90, ECF No. [158-2] at 1109.

However, the question here is whether § 147 bars the defense of *in pari delicto*, not whether the *ex turpi causa* defense is available to § 147. Plaintiffs provide no legal authority for the proposition that § 147 bars the former equitable defense, or that the defenses of *in pari delicto* and *ex turpi causa* are equivalent defenses. In fact, the Court has found that the doctrines of *ex turpi causa* and *in pari delicto* have been historically applied in different circumstances: *ex turpi causa* has been asserted to defend against the enforcement of illegal or immoral contracts while the *in pari delicto* doctrine has been asserted in suits for restitution. Wade, *supra* note 23, at 46. Absent

supporting legal authority, the Court rejects Plaintiffs' first argument in the Toube and Mokal Declaration. For this reason, Plaintiffs' second argument based on the Toube and Mokal Declaration that the doctrine of *ex turpi causa* does not apply to bar the claim is immaterial.

Plaintiffs' third argument is that a § 147 claim vests with the Liquidators and not the Companies, so that the Companies' wrongdoing should not defeat a § 147 claim. Plaintiffs rely on *ICP Strategic* for the proposition that § 147 claims vest not with the Companies but with the Liquidators. ECF No. [158-1] ¶ 100. But *ICP Strategic* addressed whether § 147 has extraterritorial application, not whether § 147 bars equitable defenses against liquidators, and thus does not support Plaintiff's argument.

Plaintiffs also rely on *In re Oasis Merchandising Services Ltd.*, [1998] Ch 170 (CA). There, the Court of Appeal of England and Wales held that a claim under § 214 of the Insolvency Act of 1986 is not the property of a company in liquidation. *Id.* at 181E-182E, ECF No. [158-2] at 21-22. The court further reasoned that a claim under § 213 of the Insolvency Act of 1986 is also not property of a company in liquidation. However, *Oasis Merchandising* does not answer whether § 213 claims are subject to equitable defenses that could have been brought against a company prior to liquidation; as such, *Oasis Merchandising* does not provide guidance as to whether § 147 bars Defendants' *in pari delicto* defense here.

Because the legal authority to which Plaintiffs cite does not support any of the arguments raised in the Toube and Mokal Declaration, summary judgment is not warranted on Defendants' *in pari delicto* defense regarding Count I.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows.

1. Defendant's Motion for Summary Judgment, **ECF No. [143]**, is **GRANTED IN PART AND DENIED IN PART**.

    a. The Court grants in part and denies in part Defendants' Motion for Summary Judgment as to whether the *in pari delicto* defense bars Plaintiffs' claims. The Court grants summary judgment in favor of Defendants as to Spyglass's claims brought under Florida law. The following Companies may invoke the adverse interest exception to the *in pari delicto* defense against the Counts brought under Florida law: Diversified Real Estate, GMS Global Market Step Up, Preferred Income, Sentinel Investment, and SG Strategic. Conversely, the following Companies may not invoke the adverse interest exception: Biscayne Capital (B.V.I.), Biscayne Capital Holdings, Sentinel Mandate, Spyglass, Vanguardia Group, Sports Aficionados, Vanguardia Holdings, and North Pointe.

    b. Summary judgment is denied on grounds of standing for Counts brought under Florida law as to Diversified Real Estate, Global Market Step Up, North Pointe, Preferred Income, Sentinel Investment, SG Strategic, Sports Aficionados, and Vanguardia Holdings, but granted as to Biscayne Capital (B.V.I.), Biscayne Capital Holdings, Sentinel Mandate, Spyglass, and Vanguardia Group. In addition, because Plaintiffs did not respond to Defendants' argument concerning their lack of standing as to Madison, summary judgment is granted to the extent that Plaintiffs assert claims on behalf of Madison, a company Plaintiffs do not represent.

    c. Summary judgment is otherwise denied as to Counts I through VI.

    d.  Summary judgment is granted as to Deutsche Bank Suisse and Deutsche Bank Lux for lack of personal jurisdiction.

2.  Plaintiffs' Motion for Partial Summary Judgment, **ECF No. [141]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 23, 2023.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record