## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-cv-22437-BLOOM/Otazo-Reyes

MICHAEL PEARSON, *et al*.,

     Plaintiffs,

v.

DEUTSCHE BANK AG, *et al.*,

     Defendants.

_____/

### <u>OMNIBUS ORDER ON DAUBERT MOTION AND MOTION TO STRIKE</u>

**THIS CAUSE** is before the Court on Defendants'[1] Motion to Exclude the Testimony of Plaintiffs' Proffered Experts Ian Ratner and Richard Fraher Pursuant to Federal Rule of Evidence 702, ECF No. [142] (the "*Daubert* Motion"), and Defendants' Motion to Strike December 9, 2022 "Supplement" to Report of Plaintiffs' Expert Ian Ratner, ECF No. [164] ("Motion to Strike"). Plaintiffs[2] filed a Response to the *Daubert* Motion, ECF No. [160], to which Defendants filed a Reply, ECF No. [165]. Plaintiffs also filed a Response to the Motion to Strike, ECF No. [172], to which Defendants filed a Reply, ECF No. [173]. The Court reviewed the *Daubert* Motion, the Motion to Strike, all opposing and supporting submissions, the attached exhibits, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendants' *Daubert* Motion is granted in part and denied in part, and Defendants' Motion to Strike is denied as moot.

---

[1] The Defendants in this action are Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Luxembourg S.A., and Deutsche Bank (Suisse) S.A. (collectively, the "Defendants").

[2] The Plaintiffs in this action are Michael Pearson, Andrew Childe, and Anna Silver.

## I.   BACKGROUND

Plaintiffs initiated the instant action on July 6, 2021, ECF No. [1], and they filed their Amended Complaint on September 24, 2021, ECF No. [31] ("Amended Complaint"), alleging a global Ponzi scheme resulting in hundreds of millions of dollars in losses and dozens of other lawsuits, ECF No. [84].

The Court presumes the parties' familiarity with the specific facts of this case and briefly summarizes the allegations that are pertinent to the *Daubert* Motion and the Motion to Strike. As alleged, the Ponzi scheme was perpetrated by four individuals—Roberto G. Cortes ("Roberto Cortes"), Ernesto H. Weisson ("Weisson"), Juan Carlos Cortes, and Frank Chatburn ("Chatburn") (collectively, the "Individual Wrongdoers")—as principals of two companies—South Bay Holdings, LLC ("South Bay") and Biscayne Capital International, LLC ("Biscayne"). ECF No. [31] ¶ 3.[3] South Bay purported to develop real estate in South Florida, and Biscayne helped raise capital for the real estate developments. *Id.* ¶¶ 9-10.

The Ponzi scheme generally worked as follows. The Individual Wrongdoers used the Note Issuers to sell notes to investors who believed that the notes were backed by South Bay's real estate assets. *Id.* ¶ 11. In truth, South Bay's properties were heavily leveraged, rendering the security interests worthless. *Id.* ¶¶ 12-13. The Individual Wrongdoers then

> used the proceeds generated through the issuance of notes to offset losses in real estate investments; cover liabilities incurred by other, Biscayne-related entities; pay interest and principal on other notes; enrich themselves, their relatives and associates . . . ; and fund unrelated investments and entities that they never disclosed to the innocent investors.

---

[3] When citing to the parties' memoranda of law, the Court cites to the page numbers created by the parties. When citing to deposition transcripts, the Court cites to the page number of the underlying transcripts. For all other sources, the Court cites to the page number generated by the CM/ECF filing system, at the top of the page.

*Id.* ¶ 14.

In 2014, following an inquiry from the Securities and Exchange Commission, the Individual Wrongdoers also formed Madison Asset, LLC ("Madison"), which steered investors toward the Note Issuers to fund the scheme. *Id.* ¶¶ 97-99. Deutsche Bank, working with Gustavo Trujillo ("Trujillo"), Madison's Operations Manager at the time, "set up nearly three dozen sub-accounts for various Note Issuers, Companies, and other entities related to the Individual Wrongdoers and Biscayne." *Id.* ¶¶ 101-107. According to Plaintiffs, Deutsche Bank played a role in the fraudulent scheme through these subaccounts, including by instructing "Trujillo . . . [on] how to circumvent Defendants' anti-money laundering and 'Know Your Customer' rules." *Id.* ¶¶ 108-09.

Plaintiffs are foreign representatives[4] and liquidators of 13 companies currently undergoing liquidation in the Cayman Islands (collectively, the "Companies"). *Id.* ¶ 18.[5] Five of the Companies—Diversified Real Estate, GMS Global Market Step Up, Preferred Income, Sentinel Investment, and SG Strategic (collectively, the "Note Issuers")—were created by the Individual Wrongdoers as special purpose vehicles to raise funds for South Bay. *Id.* ¶¶ 11, 19.  On November

---

[4] The Amended Complaint uses the term "foreign representative" as defined by the Bankruptcy Code: "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." Amend. Compl. at 7 n.4 (quoting 11 U.S.C.A. § 101(24)).

[5] The Companies are (1) Biscayne Capital (B.V.I.) Ltd. ("Biscayne Capital (B.V.I.)"); (2) Biscayne Capital Holdings Ltd. ("Biscayne Capital Holdings"); (3) Diversified Real Estate Development Ltd. ("Diversified Real Estate"); (4) GMS Global Market Step Up Note Ltd ("Global Market Step Up"); (5) North Pointe Holdings (B.V.I.) Ltd. ("North Pointe"); (6) Preferred Income Collateralized Interest Ltd. ("Preferred Income"); (7) Sentinel Investment Fund SPC ("Sentinel Investment"); (8) Sentinel Mandate and Escrow Ltd. ("Sentinel Mandate"); (9) SG Strategic Income Ltd. ("SG Strategic"); (10) Sports Aficionados Ltd. ("Sports Aficionados"); (11) Spyglass Investment Management Ltd. ("Spyglass"); (12) Vanguardia Group Inc. ("Vanguardia Group"); and (13) Vanguardia Holdings Ltd. ("Vanguardia Holdings"). Amend. Compl. ¶ 18.

2, 2018, the liquidation proceedings of the Companies domiciled in the Cayman Islands were placed under the supervision of the Grand Court of the Cayman Islands. *Id.* ¶ 23.

The Amended Complaint asserts eight Counts: Count I (Fraudulent Trading under Cayman Islands Companies Law § 147 (by the Liquidators on behalf of Diversified Real Estate, Global Market Step Up, Preferred Income, Sentinel Investment, SG Strategic, Sports Aficionados, and Vanguardia Group against all Defendants)); Count II (Aiding and Abetting Breach of Fiduciary Duty (against all Defendants)); Count III (Breach of Fiduciary Duty (by the Liquidators on behalf of Diversified Real Estate, Global Market Step Up, Preferred Income, and SG Strategic against Deutsche Bank)); Count IV (Aiding and Abetting Conversion (against all Defendants)); Count V (Breach of Contract (by the Liquidators on behalf of Diversified Real Estate, Global Market Step Up, Preferred Income, and SG Strategic against Deutsche Bank)); Count VI (Negligence (against Deutsche Bank)); Count VII (Violation of the Florida Civil Remedies for Criminal Practices Act ("Florida RICO Act"), Fla. Stat. §§ 772.101-772.19 (against all Defendants)); and Count VIII (Violation of Florida's Civil Remedy for Theft or Exploitation Statute ("Florida Civil Theft Statute"), Fla. Stat. § 772.11 (against Deutsche Bank and Deutsche Bank Trust Companies)). ECF No. [31] ¶¶ 373-461. Plaintiffs seek damages, including treble damages, contribution, prejudgment interest and post-judgment interest, and attorneys' fees and costs. ECF No. [31].

Defendants have filed their *Daubert* Motion seeking to exclude portions of the testimony of Ian Ratner ("Ratner") and Richard Fraher ("Fraher") pursuant to Rule 702 of the Federal Rules of Evidence. ECF No. [142] at 1. Specifically, as to Ratner, Defendants seek to exclude testimony on the measure of damages due to the Individual Wrongdoers' use of funds within Madison's

Deutsche Bank Custody Accounts[6] that are inconsistent with the Offering Documents[7] of the Notes Issuers' notes and the intended use of the Deutsche Bank Custody Account. Defendants contend that such testimony is unreliable and unhelpful to the jury. *See generally* ECF No. [142]. Defendants also seek to exclude Ratner's testimony regarding damages incurred on account of the Notes Issuers' issuance of notes to investors as unreliable and unhelpful, and further seek to exclude testimony on administrative expenses from the liquidation of the Companies as unreliable. *Id.* Moreover, Defendants seek to exclude Ratner's testimony on prejudgment interest because the determination of prejudgment interest is a question of law not susceptible to expert opinion. *Id.* Defendants also move to strike Ratner's December 9, 2022 supplement to his report on the grounds that the supplement is untimely and the late filing of the supplement is neither substantially justified nor harmless. *See generally* ECF No. [164].

As to Fraher, Defendants seek to exclude his testimony in its entirety on the grounds that he is unqualified. *Id.* Moreover, Defendants seek to exclude his opinion that Deutsche Bank facilitated the Individual Wrongdoers' Ponzi scheme by permitting Madison and the Biscayne entities to misuse the DB Custody Accounts and misappropriate the Note Issuers' funds in those accounts, and by extending credit to Madison and the Biscayne entities in the form of overdrafts that provided liquidity used to continue the fraud. *Id.*; *see also* ECF No. [142-2] at ¶¶ 35, 36.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears

---

[6] "DB Custody Accounts" refer to the twelve subaccounts opened with Deutsche Bank by Madison Asset, LLC ("Madison"). ECF No. [139-1] at 299, 301-02.
[7] "Offering Documents" are defined as the Agency Agreements, ECF No. [31] ¶ 143, together with the Offering Memoranda for each of the note issuances, *id.* ¶ 75. ECF No. [139-1] at 301 n.24.

the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the court must engage in a three-part inquiry that: (1) the expert is qualified to testify competently regarding the matters the expert intends to address; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among those requirements, the court must individually analyze each concept. *See id.*

As for the qualification prong, an expert may be qualified in the Eleventh Circuit "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12-21089-CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *See id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *1 (S.D. Fla. Jun. 25,

2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

Next, when determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (citation omitted) (quotation marks omitted). To make this determination, the district court typically examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *See id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). The Eleventh Circuit has emphasized that the four factors above are not exhaustive, and a court may need to conduct an alternative analysis to evaluate the reliability of an expert opinion. *See id.* at 1262 ("These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."). Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *See id.* at 1258 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

explained." *See id.* (quoting *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *See id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (citations and quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (citations and quotation marks omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *See Rink*, 400 F.3d at 1293 n.7.

On the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook ex rel. Est. of Tessier*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

## III.   DISCUSSION

### A.  Ratner's Proffered Expert Testimony

Ratner has formed the following opinions on damages:

1.  Based on an analysis of the DB Custody Accounts and the documents produced in this case, the Plaintiffs suffered damages totaling $192,159,847.

2.  The Companies' increased liabilities as of April 8, 2014 total $131,268,038. Prejudgment interest on the increased liabilities through the date of the Report is $50,937,838.48, and using the prevailing rates, per diem interest is $17,082.83.

Ratner Report ¶¶ 27, 28, ECF No. [139-1] at 308-10.

The Ratner Report explains that the "overall damages methodology was designed to identify and to quantify the losses caused by the Defendants by opening the DB Custody Accounts and allowing the Individual Wrongdoers to misappropriate funds from these accounts." Ratner Rep. ¶ 23, ECF No. [139-1] at 301. One of the categories of damages includes "[t]he funds disbursed from the DB Custody Accounts that were inconsistent with the Note Issuers' Offering Documents[] and the intended use of the accounts." *Id.*

Ratner conducted a "funds tracing analysis" to identify transactions into and out of the DB Custody Accounts and the uses of that cash from April 2014 through on or around December 31, 2017. Ratner Rep. ¶ 24, ECF No. [139-1] at 302. As pertinent here, Ratner organized DB Custody account transactions from April 2014 through December 2017 into categories to analyze and summarize the sources and uses of funds for each of the 12 DB Custody Accounts. Ratner Rep. App. 3, ¶ 1-2, ECF No. [142-3] at 100-01. In one of those categories, "Wires and Other Cash Activity," Ratner concluded that the net use of cash "was made in a manner that was inconsistent with the Offering Documents and the intended use of the DB Custody Accounts." Ratner Rep.

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

App. 3, ¶ 2, ECF No. [142-3] at 101. For other transactions, Ratner performed additional procedures, including reviewing complaints associated with litigation against the Individual Wrongdoers and "other related third parties," conducting searches in the Reveal document platform, and performing "Google searches." Ratner Rep. App. 3, ¶ 3, ECF No. [142-3] at 101-02. The purpose of those procedures was to "identify the nature of the transactions and/or gather information to assist [Mr. Ratner] with evaluating the relationship of [a] payee (if any) to the Individual Wrongdoers and the Companies in Liquidation." Ratner Rep. App. 3, ¶ 3, ECF No. [142-3] at 101-02.

Ratner identifies the following subcategories as being inconsistent with both the Offering Documents and the intent of the DB Custody Accounts: (1) "Consultant- Atlantic Sky Consulting Group, Ltd.," (2) "Biscayne Entites [sic]," (3) "Madison Asset, LLC" and (4) "Wires and other cash activity." Ratner Rep. ¶ 25 tbl.6, ECF No. [139-1] at 303. Ratner justifies those categories by explaining that "Consultant- Atlantic Sky Consulting Group, Ltd." transactions were included because the Offering Documents cite general consulting agreements between Atlantic Sky and North Pointe Holdings Ltd. and Vanguardia Holdings Ltd. but Ratner does not cite agreements between Atlantic Sky and other entities for whom the DB Custody Accounts were maintained. Ratner Rep. ¶ 27, ECF No. [139-1] at 309. Ratner asserts, but does not explain why, the "Biscayne Entit[ies]" transactions were "inconsistent with the Offering Documents and the intended use of the DB Custody Accounts." Ratner Rep. ¶ 27, ECF No. [139-1] at 309. The "Madison Asset, LLC" transactions—438 cash transfers—were included in the damages analysis because "the cash activity in the DB Custody Accounts was intended to be based on securities transactions only." Ratner Rep. ¶ 26, ECF No. [139-1] at 306 (citing August 3, 2022 Floris Vreedenburgh Dep. Tr., at 23:16-22). The "Wires and other cash activity" transactions were included in the damages

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

analysis because the funds in those transactions went to a host of other payees, including the Individual Wrongdoers. Ratner Rep. ¶ 27, ECF No. [139-1] at 308.

Ratner also calculated damages as "the increase in liabilities that were allegedly caused by the wrongful conduct of the Defendants," which Ratner asserts totals $131,268,038.00. Ratner Rep. ¶ 28, ECF No. [139-1] at 310. Ratner calculates the prejudgment interest on that amount to be $50,937,838.00. *Id.* Ratner measures the damages by all note issuances after the DB Custody Accounts were opened on April 8, 2014. *Id.*; *see also id.* Schedule 9, ECF No. [142-3] at 153 (tabulating dollar value of note issuances).

Defendants challenge Ratner's proffered testimony on the grounds that his calculations of two categories of damages—Inconsistent Use Damages, and Interest and Issuance Damages—are unreliable and not helpful to the trier of fact. ECF No. [142]. Defendants also challenge his calculations of the administrative costs of winding down the Companies as unreliable, and his calculation of prejudgment interest because such a calculation is a question of law that is not susceptible to expert testimony. *Id.* The Court addresses each argument in turn.

### 1. *Ratner's Calculations on "Inconsistent Use Damages"*[8]

Defendants raise two arguments to exclude Ratner's opinion on Inconsistent Use Damages. First, Defendants submit that Mr. Ratner seeks to interpret the meaning of the Offering Documents in order to offer an impermissible legal conclusion. ECF No. [142] at 5 n.3. Moreover, Defendants

---

[8] "Inconsistent Use Damages" are defined as damages resulting from the net transfers from the "DB Custody Accounts" that Ratner asserts were inconsistent with the Offering Documents and the intended use of the DB Custody Accounts. ECF No. [139-1] 308-09. Ratner's Report ("the Ratner Report") does not define "DB Custody Accounts" but explains that Plaintiffs' losses were caused by Defendants' opening of these DB Custody Accounts "and allowing the Individual Wrongdoers to misappropriate funds from these accounts." Ratner Rep. ¶ 23, ECF No. [139-1] at 301. The Amended Complaint alleges that Madison, through Trujillo, opened custodial accounts at Deutsche Bank in the name of each of the Note Issuers in 2014. ECF No. [31] ¶¶ 278, 290. The Ratner Report states that the DB Custody Accounts were opened in April 2014. Ratner Rep. App. 3 ¶ 1, ECF No. [142-3] at 100. The Court assumes for the purposes of this Order that the DB Custody Accounts refer to the custody accounts described in the Amended Complaint.

contend Ratner fails to explain his methodology for categorizing each transaction or category of transaction as consistent or inconsistent either with the Offering Documents or the intended use of the DB Custody Accounts. *Id.* at 5-9 (relying on *Kallas v. Carnival Corp.*, 2009 WL 901507, at *6 (S.D. Fla. Mar. 30, 2009)). In attacking Ratner's methodology, Defendants refer the Court to the November 4, 2022 expert report of David Alfaro ("Alfaro Report"), ECF No. [142-1], wherein Alfaro argues Ratner did not consider the possibilities that transfers from DB Custody Accounts to others ultimately were used in a manner consistent with the Offering Documents or the intended use of the DB Custody Accounts, that the funds of those transfers ultimately may have been transferred back to the DB Custody Accounts, or that some of the disbursements from DB Custody Accounts may have been exchanged for reasonably equivalent value. *Id.* at 7 n.6.

Defendants further contend that Ratner's opinion is based on insufficient facts or data. *Id.* at 7 n.5 (relying on *In re Sonic Corp. Customer Data Securities Breach Litigation*, 2021 WL 5916743, at *5 (N.D. Ohio Dec. 15, 2021)).

Plaintiffs respond that Ratner does not seek to interpret the Offering Documents; Ratner's report quantifies "how much of the net uses of cash in the [DB Custody Accounts] was obviously inconsistent with the stated purposes of the note issuances and accounts;" the Offering Documents plainly are for "South Florida real estate development or investments in marketable securities;" and that the DB Custody Accounts were intended to be used only for trading securities or settlement activity. ECF No. [160] at 4-5. Plaintiffs contend that Defendants are free to point out on cross examination that Ratner may have erroneously identified a transaction as inconsistent with either the Offering Documents or the intended use of the DB Custody Accounts. *Id.* at 5-6.

Defendants reply that Ratner excluded transactions from his Inconsistent Use Damages calculations that clearly were not made in connection with South Florida real estate development

or investment in marketable securities, and that his opinion should be excluded to the extent Ratner misapplies his own standard in categorizing transactions. ECF No. [165] at 2.

The Court considers—in determining whether an expert's opinion is reliable— (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *Frazier*, 387 F.3d at 1261-62. Ratner's analysis on Inconsistent Use damages fails the reliability prong of *Daubert* because it is not supported by any data or analysis that has been provided. *See Kallas v. Carnival Corp.*, No. 06-20115-CIV, 2009 WL 901507, at *5 (S.D. Fla. Mar. 30, 2009).

In *Kallas*, an expert purported to testify that a child plaintiff's loss—in the form of parental training and guidance that was proximately caused by the death of her father due to the father's allegedly dying from a virus contracted on the defendants' cruise ship—was measured by the difference between the child's earnings if she attended college and if she merely attended high school. *Id.* at *1-2. The court concluded that the expert's assumption that the child would attain a high school education but not a college-level education, leading to a corresponding loss in lifetime earnings, was not supported by the literature on which the expert relied or any scientific evidence and was therefore highly speculative. *Id.* at *5. Since that assumption was unsupported, the court held the expert's assertion that the child would lose educational attainment on account of her father's death was the expert's *ipse dixit* that the court need not admit and excluded the expert's opinion on that basis. *Id.*

Similarly, Ratner's opinion that certain transactions in the DB Custody Accounts were inconsistent with the Offering Documents and the intended use of the DB Custody Accounts is not supported by analysis or sufficient data. To begin with, Ratner provides no peer-reviewed,

published, or scientific authority that supports his categorization of the DB Custody Account transactions. In addition, only two of the four subcategories of Inconsistent Use damages—"Consultant- Atlantic Sky Consulting Group, Ltd." and "Madison Asset, LLC" transactions—are supported by record evidence. Ratner asserts in conclusory fashion that the Biscayne Entities transactions are inconsistent with the Offering Documents and the intended use of the Custody Accounts without explaining why that is so or citing to record evidence in support. The evidence for "Wires and other cash activity" transactions being inconsistent with the Offering Documents or the intended use of DB Custody Accounts is that the transfers went to many payees, including the Individual Wrongdoers, but Ratner does not explain why such transfers are inconsistent with the Offering Documents and the intended use of the custody accounts.

This conclusion is further supported by Ratner's deposition testimony, which does not reveal whether Ratner applied any discernable reasoning or methodology in his analysis that is based on scientifically valid principles; rather, Ratner's method for categorizing DB Custody Account transactions as consistent or inconsistent with the Offering Documents is based on his assessment of which transactions are plainly fraudulent. For instance, when asked to clarify what he meant when he wrote in his report that "the net use of cash" was "inconsistent with the offering documents," Ratner replied that, for example, "if SG Strategic [a Note Issuer] says it's going to invest in South bar or Florida real estate, but they're wiring money to pay payroll or pay broker commissions, that would" be inconsistent with the Offering Documents and the intended use of the custody accounts. ECF No. [139-1] at 72:2-21. In another example, Ratner explained that a transaction or transactions to an entity called Kingdom Trust was inconsistent because "we know that that company was involved in some Ponzi scheme." *Id.* at 73:2-6. When asked whether he was offering an opinion on what the Offering Documents permitted, Ratner replied that he was not

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

offering a legal opinion but added that "it doesn't matter because these accounts were not used right." *Id.* at 73:17-74:3. Ratner continued, "Not to be facetious, but certainly the offering documents didn't call for funds to pay a kickback or for money laundering, right? And we know that some of the individuals that received these funds are indicated or pled guilty or whatever." *Id.* at 74:7-19. When asked whether the interpretation what the Offering Documents do or do not permit would be a legal conclusion, Ratner replied that "I think it's a combination of business analysis, legal analysis. . . . I think it's a combination or business analysis and a *common sense analysis.*" *Id.* 75:21-76:14 (emphasis added).

To satisfy the reliability prong of the *Daubert* standard, Ratner's assessment of what transactions were or were not fraudulent must be based not on the expert's "common sense" but on the application of reliable scientific principles and methods. Ratner's assessments of the DB Custody Account transactions are thus *ipse dixit* if not based on his experience. To the extent Ratner purports to apply his experience with "business analysis" of notes and their offering documents, Ratner must explain how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Frazier*, 387 F.3d at 1261. Neither the Ratner Report not Ratner's deposition indicates such an explanation.

As such, Ratner's calculation of Inconsistent Use damages is based on unsupported assumptions that are Ratner's *ipse dixit*. Accordingly, the Court will not permit Ratner's opinion on Inconsistent Use damages.

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

### 2. Interest Damages and Issuance Damages

Defendants contend that Ratner's opinion on Interest Damages[9] and Issuance Damages[10] rest on assumptions—that (1) Deutsche Bank should have never opened the DB Custody Accounts at all or should have almost immediately closed them and (2) all proceeds from note issuances flowed through DB Custody Accounts—that are unsupported by any reasonable basis in evidence and must be excluded for this reason. ECF No. [142] at 11-12 (citing *Coquina Investments v. Rothstein*, 2011 WL 4949191, at *7 (S.D. Fla. Oct. 18, 2011)). Defendants further assert Ratner's opinion on Interest Damages is unhelpful to the trier of fact because his calculated Interest Damages do not comport with amounts actually lost. Rather, his Interest Damages calculation does not include as an offset payments the note issuers made to investors in the notes. ECF No. [142] at 12. Likewise, Ratner's Issuance Damages calculation fails to account for offsets from amounts investors were already repaid via interest payments, repurchases of notes, or otherwise. *Id.* at 12-13.

Plaintiffs do not address Defendants' attack on Ratner's opinion on Interest Damages and Issuance Damages, and Defendants reply that Plaintiffs have abandoned their opinion on those types of damages, ECF No. [165] at 4-5. In addition, Defendants contend that the Ratner Report fails to satisfy any of the usual indicia of reliability that courts in the Eleventh Circuit consider when evaluating an expert's opinion. ECF No. [142] at 4 n.2, ECF No. [165] at 5 n.4; *see also Frazier*, 387 F.3d at 1261-62.

---

[9] Defendants define Interest Damages as "the interest on the Notes [that] would have been saved had the Defendants closed the Note Issuers' accounts on or before the first interest payment on May 30, 2014." ECF No. [142] at 11 (quoting Ratner Rep. ¶ 27, ECF No. [139-1] at 308).

[10] Defendants define Issuance Damages as the sum of "all of the Note issuances subsequent to the date the DB Custody Accounts were opened" on April 18, 2014. *Id.* at 11 (quoting Ratner Rep. ¶ 28, ECF No. [139-1] at 310).

Whenever a party fails to respond to an opposing party's argument in a responsive brief, that party has forfeited any arguments in response; as a result, the party has conceded the opposing party's argument. *See Northstar Moving Holding Co., Inc. v. King David Van Lines*, No. 0:19-CV-62176, 2021 WL 9794593, at *6 (S.D. Fla. Oct. 15, 2021) (concluding that nonmoving party abandoned affirmative defenses that were the subject of the moving party's motion for summary judgment). Because Plaintiffs failed to respond to Defendants' arguments on the Ratner Reports' Interest Damages and Issuance Damages calculations, Plaintiffs are deemed to have abandoned that part of Ratner's opinion. Ratner's testimony is accordingly excluded to the extent he purports to testify on Interest Damages or Issuance Damages.

### 3. *Liquidation Expenses*

Defendants argue that Ratner's opinion on Plaintiffs' administrative expenses of the underlying liquidation proceedings is unhelpful to the trier of fact. ECF No. [142] at 13. Moreover, Ratner's opinion is unsupported by evidence that those expenses are losses that are attributable to Deutsche Bank's alleged misconduct since the Companies may have gone into liquidation regardless of that misconduct. ECF No. [142] at 13. Defendants fault Ratner for failing to analyze the administrative expenses in the liquidation proceeding and assert that this failure demonstrates Ratner's opinion on liquidation expenses is unreliable and not based on sufficient facts or data. *Id.* at 14.

Plaintiffs first respond that Ratner is offering an opinion on the proper measure of damages, not on Defendants' liability, so he was not required to analyze whether Deutsche Bank's misconduct caused Plaintiffs' administrative expenses in liquidation. ECF No. [160] at 9-10. Plaintiffs explain that Ratner's methodology is essentially a 'but for' approach" that "attempts to put the Companies back in the position they would have been in but for the Defendants' conduct."

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

*Id.* at 7 n.5. Plaintiffs next respond that Defendants' attacks on Ratners' purported failure to analyze the administrative expenses goes to the weight of his testimony and not its admissibility. *Id.* at 10.

Ratner states "[b]ased on my review of the documents and evidence produced, and from my analysis, education, past experience, and training, it is my opinion that the Companies in Liquidation suffered damages in the amounts described in **Tables 1** and **2**." Ratner Rep. ¶ 6, ECF No. [139-1] at 296 (footnotes omitted). Table 1 purports to show that the total of "Administrative Expenses of the Liquidation Proceedings" is $9,005,139. Ratner Rep. ¶ 6, ECF No. [139-1] at 296. Ratner states that the entire amount of these expenses is "a component of damages." Ratner Rep. ¶ 27, ECF No. [139-1] at 310.

Plaintiffs contend Ratner took a "but for" approach to damages—*viz.*, but for Defendants' wrongdoing, the Companies would not have gone into liquidation and not suffered administrative costs—but the Ratner Report does not say as much. To the extent that Ratner bases his administrative expenses calculation on a but for analysis, neither the report nor Plaintiffs' briefing cites to legal authority supporting the proposition that administrative expenses in a liquidation proceeding are part of the measure of damages for any of Plaintiffs' claims. *See* ECF No. [160] at 7 n.6 (not providing case law that administrative expenses in liquidation are a component of damages under any of the claims Plaintiffs assert in this litigation). Without such authority, Ratner's testimony is inadmissible to the extent that testimony offers a legal conclusion that is unhelpful to the trier of fact. *See O'Malley v. Royal Caribbean Cruises, Ltd.*, No. 17-21225-CIV, 2018 WL 2970728, at *4 (S.D. Fla. June 13, 2018) ("Mr. Gras' generic opinions are intertwined with legal conclusions that Defendant was negligent and that the vessel's personnel caused Plaintiff's injuries. Therefore, we conclude that Mr. Gras may not testify that Defendant was at

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

fault or that Defendant breached its duty of care."). The Ratner Report is also factually infirm to the extent that the Ratner's opinion is premised on the proposition that Plaintiffs' damages are the amount necessary to put Plaintiffs in the position they would have been had the alleged misconduct never occurred.[11] This is because the Ratner Report cites to no support in the record that the Companies would not have undergone liquidation but for Defendants' wrongdoing. Without such support, Ratner's conclusion that liquidation expenses are "a component of damages" is *ipse dixit* under the *Daubert* standard and thus unreliable. The Court therefore excludes Ratner's testimony on administrative expenses in liquidation.

### 4. *Prejudgment Interest*

Defendants argue that Ratner's testimony on prejudgment interest should be excluded because the applicability and amount of prejudgment interest is a question of law and proposed expert testimony that offers a legal conclusion is inadmissible. ECF No. [142] at 14-15. Moreover, Defendants contend that Ratner's testimony on prejudgment interest would confuse the jury and must be excluded under Rule 403 of the Federal Rules of Civil Procedure. *Id.* at 15 n.11.

Plaintiffs respond that Ratner's prejudgment interest calculations would assist the Court in calculating and awarding prejudgment interest after a verdict, and that an award of prejudgment interest in this case is mandatory. ECF No. [160] at 10.

Although expert testimony that offers a legal conclusion is indeed inadmissible, *In re Lynch*, 755 F. App'x 920, 925 (11th Cir. 2018) (citing *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018)), Ratner is not purporting to testify as to whether Plaintiffs are entitled to prejudgment interest (i.e., the applicability of prejudgment interest, in Defendants'

---

[11] *See, e.g.*, *DFG Grp., LLC v. Heritage Manor of Memorial Park, Inc.*, 237 So. 3d 419, 422-23 (Fla. 4th DCA 2018) ("The goal of damages in tort actions is to restore the injured party to the position it would have been in had the wrong not been committed.") (internal quotation marks omitted).

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

terms), which is a question of law. *See Wiand v. Lee*, 753 F.3d 1194, 1204 (11th Cir. 2014) (explaining that equitable factors guide a district court's decision on whether to award prejudgment interest or to reduce the amount of interest); *Allapattah Servs., Inc. v. Exxon Corp.*, No. 91-0986-CIV, 2006 WL 1132371, at *3 (S.D. Fla. Apr. 7, 2006) (explaining that the court concluded that the class of plaintiffs was entitled to an award of prejudgment interest). Rather, Ratner proposes to calculate the amount of prejudgment interest if Plaintiffs are entitled to prejudgment interest. Ratner Rep. ¶ 27, ECF No. [139-1] at 310; *see also* Schedules 8a and 8b, ECF No. [142-3] at 147-52 (purportedly calculating pre-judgment interest for different categories of damages). The legal authorities on which Defendants rely do not hold that the *amount* of prejudgment interest is a question of law. Without such support, Ratner's opinion on prejudgment interest is not excludable on the grounds that it offers a legal conclusion. Since the parties agree that prejudgment interest is a matter for the Court to decide post-trial, Plaintiff's argument that Ratners' testimony would confuse the jury is misplaced.

Accordingly, the Court denies Defendants' *Daubert* Motion regarding Ratner's testimony on prejudgment interest.

### 5. *Increased Liabilities*

In a footnote, Defendants argue that the Ratner Report in its entirety is unreliable because it "fails to satisfy any of the usual indicia of reliability set forth in" *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014) ("(1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally accepted."). ECF No. [142] at 4 n.2. As to Ratner's opinion on Plaintiffs' damages due to increases in liability from note issuances after April 8, 2014, Plaintiffs respond that Ratner has applied a

straightforward and reliable methodology, specifically by calculating the total amount of the value of note issuances that were executed by Deutsche Bank that Deutsche Bank then delivered to Madison free of payment without a legal or contractual right to do so. ECF No. [160] at 2, 3. Plaintiffs further explain that Mr. Ratner's analysis supports a damages award based on a "deepening insolvency" theory. *Id.*

The Eleventh Circuit has emphasized that the four factors set forth in *Frazier* are not exhaustive, and a court may need to conduct an alternative analysis to evaluate the reliability of an expert opinion. *See Frazier*, 387 F.3d. at 1262 ("These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."). To the extent Ratner purports to testify on damages calculations that are based on a deepening insolvency theory, that testimony would not be automatically excluded on the basis of being unreliable, *Kapila v. Warburg Pincus, LLC*, No. 8:21-CV-2362-CEH, 2022 WL 4448604, at *13-14 (M.D. Fla. Sept. 23, 2022) (not excluding expert testimony on damages based on deepening insolvency theory), and Ratner has testified he intends to testify on damages under a deepening insolvency theory, ECF No. [139-1] 16:8-17:20 ("the second analysis is . . . looking at increasing the liabilities or kind of a deepening insolvency methodology where . . . but for the defendant . . . not ceasing the operation, these additional liabilities were incurred by . . . . the entities that are in liquidation."). For this reason, the case that Defendants cite, *Seawell v. Brown*, is inapplicable here. *Seawell v. Brown*, 2010 WL 11561287, at *9 (S.D. Ohio Sept. 9, 2010). There, the court concluded that the expert eschewed statistical analysis in calculating damages to use a method that the expert seemingly created solely for the purposes of the litigation. *Id.* Here, Ratner seeks to testify on damages under a theory supported by Florida case law. *See In re Flagship Healthcare, Inc.*, 269 B.R. 721, 728 (Bankr. S.D. Fla.

2001) ("even if the Debtor may have been insolvent before the Greenleaf Valuation, the additional debt incurred thereafter, and allegedly as a result of the Defendants' negligence, may provide a measure of damages recoverable by the Trustee"). Given that Defendants do not attack the deepening insolvency methodology, the Court will not exclude Ratner's alternative increased liability damages opinion.

### B.  Fraher's Proffered Expert Testimony

Defendants contend Fraher is not qualified to testify on Deutsche Bank's customer on-boarding, KYC, or transaction monitoring processes, or Deutsche Bank's later attempts to remediate its relationship with its customers. ECF No. [142] at 15-16.[12] Alternatively, Defendants contend Fraher's opinion that Deutsche Bank facilitated the Ponzi scheme by "failing to remediate issues related to the Madison accounts or terminate its relationship with Madison" is an attempt to instruct the jury on how to decide. Fraher Rep. at 14, ECF No. [142-2] at 206.

Plaintiffs respond that Fraher has extensive experience with KYC and anti-money compliance policy and procedures, and that his lack of employment experience with a commercial bank does not make him unqualified to render his opinions. ECF No. [142] at 13-15. Plaintiffs further respond that Fraher's opinion is not objectionable simply because it embraces the ultimate issue of whether Deutsche Bank facilitated the Ponzi scheme. ECF No. [160] at 16-17.

Defendants reply that Plaintiffs exaggerate Fraher's experience with bank compliance procedures and Fraher's opinion improperly "tells the jury what result to reach." ECF No. [165]

---

[12] In his report ("the Fraher Report"), Fraher purports to testify on "the policies, procedures, due diligence, operational controls, and risk management practices that a deposition institution such as Deutsche Bank should follow to ensure (i) that its business is conducted with appropriate identification, measurements, and management of risks and (ii) that appropriate controls are in place to prevent, detect, and deter financial crimes such as fraud, money laundering, terrorist financing, and/or violations of federal sanctions regimes." Fraher Rep. ¶ 3, ECF No. [142-2] at 193-94. For convenience, the Court refers to the subject area of Fraher's testimony as "bank compliance procedures."

at 8- 10. (citing *AIM Recycling of Florida, LLC* v. *Metals USA, Inc.*, 2020 WL 209236 (S.D. Fla. Jan. 14, 2020)).

### 1. *Fraher's Qualifications*

Defendants argue that Fraher's employment experience does not qualify him to render opinions on the requirements of a KYC program, standard bank practices for onboarding new customers, or the circumstances under which a bank must remediate or terminate an account relationship. ECF No. [142] at 16. Defendants contend that Fraher's experience is insufficient to opine on such issues since Deutsche Bank is a "major financial institution" and Fraher has no experience working in such a bank. *Id.* at 18.[13]

Plaintiffs respond that Fraher has sufficient experience to opine on bank compliance procedures because his general expertise on the subject will assist the trier of fact. ECF No. [160] at 14-15. Moreover, Plaintiffs contend that Defendants fail to demonstrate why Deutsche Bank's size and sophistication is relevant to whether Fraher is qualified to render an opinion in this case. ECF No. [160] at 15-16.

The Court reiterates that an expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12-21089-CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d

---

[13] Defendants contend that Fraher's status as an attorney poses a heightened risk that the jury will treat his testimony as an instruction on the legal effect of Defendants' conduct. ECF No. [142] at 19 n.13 (citing Fed. R. Evid. 403 and *In re Titanium Oxide Antitrust Litigation*, 2013 WL 1855980, at *8 (D. M.D. May 1, 2013)). Under Rule 403 of the Federal Rules of evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . misleading the jury[.]" Fed. R. Evid. 403. The court in *Titanium Oxide* held that the expert testimony of a law professor had minimal probative value because the law professor was not qualified to give economics testimony; as such, the court concluded the danger of the professor misleading the jury because he was a law professor substantially outweighed the probative value of his testimony, and the court excluded that testimony. *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *7-8. Because the Court concludes Fraher is qualified to testify in this case regarding Deutsche Bank's compliance procedures, *Titanium Dioxide* does not compel the conclusion that Fraher's testimony is excludable merely because he is an attorney.

1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc.*, 280 F.R.D. at 661 (citing *Kilpatrick*, 2009 WL 2058384, at *1). Where an expert proffers non-scientific, experience-based testimony, a court has flexibility in assessing the relevant factors relating to reliability. *Frazier*, 387 F.3d at 1262. This assessment "will depend . . . on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire Co.*, 526 U.S. at 150). An expert relying on his personal knowledge and experience—as opposed to scientific training or certifications—may testify as long as he may reliably apply his experience to assist the trier of fact. *See Whelan v. Royal Caribbean Cruises, Ltd.*, 976 F. Supp. 2d 1328 (S.D. Fla. 2013) (citing *Frazier*, 387 F.3d at 1261). Questions about the expert's lack of specific knowledge regarding a sub-topic within his industry are more appropriately considered as a challenge to the foundation for his opinion, not his qualifications. The Court must ensure the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Frazier*, 387 F.3d at 1261. "An expert's unexplained assurance that [his] opinions rest on accepted principles" is not enough. *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1130 (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005)). Further, an expert's qualifications need not be narrowly tailored to the precise circumstances of the case; merely "because [the expert's] experience does not precisely match the matter at hand" does not render him unqualified. *J.G.*, 2013 WL 752697, at *3 (citations omitted). An expert may "testify regarding narrow sub-topics within his broader expertise—notwithstanding a lack of specific experience with the narrower area—as long as his testimony would still assist a trier of fact." *See Remington v.*

*Newbridge Secs. Corp.*, No. 13-60384-CIV, 2014 WL 505153, at *4 (S.D. Fla. Feb. 7, 2014); *see also Maiz*, 253 F.3d at 665 (affirming the district court's decision to permit an economic expert to testify on damages relating to real-estate fraud, even though the expert had no specific real-estate experience, finding the issue of damages was sufficiently within the expert's broader expertise).

Fraher was retained to provide an expert opinion on bank compliance procedures. Note 12, *supra*; Fraher Rep. ¶ 3, ECF No. [142-2] at 193-94. Fraher offers the following opinions:

**Opinion 1:** Deutsche Bank fell short of the ordinary standard of care in the banking industry when Deutsche Bank conducted its KYC process for onboarding and opening custody accounts and subaccounts for Madison. Fraher Rep. at 5-10, ECF No. [142-2] at 197-202.

**Opinion 2:** When Deutsche Bank employees raised concerns about Madison, standard banking practice would have been either to remediate Madison's misuse of the DB Custody Accounts or to terminate Deutsche Bank's relationship with Madison. Fraher Rep. at 10, ECF No. [142-2] at 202. Because Deutsche Bank took neither of these actions, Deutsche Bank fell short of the standard of ordinary care for a similarly situated bank. *Id.* Had Deutsche Bank met this standard of ordinary care, Deutsche Bank either could have prevented Madison from making payments from its DB Custody Accounts that were unrelated to securities transactions and to stop running overdrafts either by terminating its dealings with Madison or by imposing effective measures to stop Madison from doing so. *Id.*

**Opinion 3**: Deutsche Bank facilitated the continuation and the cover up of the Individual Wrongdoer's Ponzi scheme by failing to follow standard banking practice and either terminating its relationship with Madison or implementing effective

measures to prevent Madison's misuse of the custody account. Fraher Rep. at 14, ECF No. [142-2] at 206.

Fraher provides consulting services to financial institutions and "fintechs" on "legal compliance questions presented by open banking." Fraher Rep. ¶ 6, ECF No. [142-2] at 195. Fraher testified that he was tasked with establishing "the initial policies, procedures and practices with respect to standing up [the] [Office of Foreign Asset Control (OFAC)]/[Bank Secrecy Act (BSA)]/[anti-money laundering (AML)], Know Your Customer ['KYC'] program" when he served in a bank compliance role while working on a system known as FedGlobal ACH as vice president and counsel to the Retail Payments Office at the Atlanta Fed. ECF No. [153-1] at 12:1-21. Fraher testified that the BSA requires "federal insured depository institutions" to have a program that includes KYC policies and procedures, *id.* 15:24-16:9, and that the Atlanta Fed's "KYC piece" was aimed at the banks that used the Atlanta Fed's services, *id.* at 47:7-21.[14] Fraher testified at length about his personal experience with KYC policies while working on running FedGlobal ACH. *See, e.g.*, *id.* at 55:25-56:13 ("And in the real world that just means when you do the initial KYC, at least in my experience when we were running the FedGlobal ACH, we demanded that the banks that were going to send us international payments, they give us a profile of the businesses that they were running, either large customers' worth, what their volumes were intended to be, what business they were in."). Fraher also testified about his experience with on-boarding customers at the Atlanta Fed. *Id.* at 86:4-94:5. Fraher's experience includes reviewing

---

[14] 31 U.S.C. §§ 5311, *et seq.*; *see also United States v. Schwarzbaum*, No. 18-CV-81147, 2020 WL 1316232, at *6 (S.D. Fla. Mar. 20, 2020) ("The primary purpose of the BSA was to require the making of certain reports that 'have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings.'"). As amended, the Bank Secrecy Act requires every bank to adopt a customer identification program (*i.e.*, Know Your Customer ("KYC")) as part of its Bank Secrecy Act compliance program. *Matter of Seizure & Search of Motor Yacht Tango*, 597 F. Supp. 3d 149, 162 (D.D.C. 2022) (citing 12 C.F.R. §§ 21.11, 21.21).

custody accounts, "fiduciary accounts," and "trust accounts." *Id.* at 112:9-113:9. In addition, Mr. Fraher testified to his experience working on AML compliance policies. *Id.* at 29:20-31:13, 12:1-21.

The Court concludes that Fraher's background and experience meet the "minimum qualifications" necessary to permit him to testify in this case. *See J.G.*, 2013 WL 752697, at *3 ("an expert must satisfy a relatively low threshold, beyond which qualification becomes a credibility issue for the jury") (citing *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, at *3 (M.D. Fla. Aug. 3, 2005)). Defendants have not explained why Fraher's experience at the Atlanta Fed working on bank compliance procedures is insufficient to allow him to opine on bank compliance procedures at a large and sophisticated bank like Deutsche Bank. Further, this Court finds that Fraher's ability to assess a bank's compliance with the requirements of the Bank Secrecy Act is sufficiently within his expertise. *See Martinez*, 2005 WL 1862677, at *3 (explaining that once there exists "reasonable indication of qualifications," those qualifications then "become an issue for the trier of fact rather than for the court in its gate-keeping capacity") (citation omitted).[15]

---

[15] In their Reply, Defendants argue that Fraher cannot "appropriately explain[] how his experience leads to the conclusions he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts." ECF No. [165] at 9 (citing *AIM Recycling*, 2020 WL 209236, at *6). But that critique is a challenge to the reliability of his opinions, not his qualifications. *See Frazier*, 387 F.3d at 1264 (affirming exclusion of qualified expert where expert's opinions were not methodologically reliable or sound). Because Defendants did not challenge Fraher's opinion on reliability grounds in their opening brief, the Court declines to do so here. *See Herring v. Secretary, Dep't of Corrections,* 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court."); *Lovett v. Ray,* 327 F.3d 1181, 1183 (11th Cir. 2003) ("Because he raises that argument for the first time in his reply brief, it is not properly before us."); *F.T.C. v. IAB Mktg. Associates, LP*, 972 F. Supp. 2d 1307, 1311 (S.D. Fla. 2013) ("[T]hese arguments are forfeited because they were raised for the first time in a reply brief."); *Foley v. Wells Fargo Bank, N.A.,* 849 F. Supp. 2d 1345, 1349 (S.D. Fla. 2012) ("Because it is improper for Defendant to raise this new argument in its Reply brief, the argument will not be considered."); *Willis v. DHL Global Customer Solutions (USA), Inc.*, 2011 WL 4737909, at *3 (S.D. Fla. Oct. 07, 2011) (collecting cases stating that it is inappropriate to raise new arguments in a reply brief and stating that courts in this district generally do not consider these arguments); *Park City Water Authority, Inc. v. North Fork Apartments,* L.P., 2009 WL 4898354, at *1 n. 2 (S.D. Ala. Dec. 14, 2009) (citing cases from 2009 in over 40 districts in which courts

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

Thus, the Court concludes that Defendants' arguments regarding Fraher's qualifications are insufficient to render his opinions inadmissible. Such arguments are more appropriately considered as a challenge to the weight that should be given to his opinions and not to their admissibility.

### 2.  *Mr. Fraher's Opinion 3*

Defendants contend that Fraher's Opinion 3 that Defendants "facilitated the continuation and cover up of the fraud," Fraher Rep. at 14, ECF No. [142-2] at 206, is not helpful because whether Defendants facilitated the Individual Wrongdoers' fraud is a question ultimately for the trier of fact, ECF No. [142] at 18-19. Plaintiffs respond that Fraher may testify as to his opinion on an issue of fact and that opinion would help the jury understand how Deutsche Bank's services were of substantial assistance to the Individual Wrongdoers' scheme by allowing unlimited wiring activity and artificial liquidity. ECF No. [160] at 17.

An expert may testify as to his opinion on an ultimate issue of fact but may not tell the jury what result to reach. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (citing Fed. R. Evid. 704). "[A]n expert's opinion on an ultimate issue must be helpful to the jury and also must be based on adequately explored legal criteria." *Hanson v. Waller*, 888 F.2d 806, 812 (11th Cir. 1989).

Here, Fraher opines that Deutsche Bank helped cover up the fraud and facilitated its continuation by not prohibiting Madison's misuse of the funds in the DB Custody Accounts and by effectively providing liquidity to the scheme by allowing overdrafts. Fraher Rep. ¶ 36, ECF No. [142-2] at 206. That opinion would help the jury determine whether Deutsche Bank provided "substantial assistance" to the scheme. *See Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988,

---

acknowledged the rule that arguments raised for the first time in a reply brief are ordinarily not considered).

933 (11th Cir. 2014) (explaining that an aiding and abetting claim requires that the plaintiff show that a defendant substantially assisted an underlying tort). Fraher does not conclude that Deutsche Bank provided substantial assistance. As such, Opinion 3 is not excludable on the grounds that it reaches an ultimate issue for the jury.

Defendants' arguments regarding Fraher's opinions are more appropriately considered as a challenge to the weight that should be given to his opinion and not to its admissibility.

For the reasons discussed above, Defendants' *Daubert* Motion is granted in part and denied in part.

### C.  Defendants' Motion to Strike December 9, 2022 Supplement to Ratner Report

Defendants move to strike Ratner's December 9, 2022 supplement to the Ratner Report, ECF No. 158-5 ("Ratner Supplement"). ECF No. [164] ("Motion to Strike"). Defendants argue Ratner did not properly supplement the Ratner Report under Rule 26(e) of the Federal Rules of Civil Procedure because that supplement is neither based on new evidence or information previously not available to the expert, nor designed purely to address inadvertent errors in the Ratner Report. ECF No. [164] at 1, 6. Defendants further argue that because the Ratner Supplement is not proper supplementation under Rule 26(e), that supplement may be excluded under Rule 37(c) of the Federal Rules of Civil Procedure because the Ratner Supplement is untimely, and its late filing was neither substantially justified nor harmless. *Id.* at 6-7.

Plaintiffs respond that Ratner disclosed relatively minor corrections to his calculations based on the Alfaro Report. ECF No. [172] at 1. Plaintiffs also respond that the Ratner Supplement includes another calculation that merely shows damages if Defendants' liability terminated in July 2016, when the FBI asked Deutsche Bank to keep the DB Custody Accounts open for the FBI's investigation. *Id.* at 2. Plaintiffs stress that the Ratner Supplement does not change Ratner's

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

methodology and note that Ratner's supplemental calculations do not affect Ratner's deepening

insolvency methodology. *Id.* at 1, 2, 5.

Because the Court has concluded that Ratner may not testify on Inconsistent Use Damages,

Defendant's Motion to Strike is moot because the Ratner Supplement modifies calculations are

not based on a reliable methodology for categorizing DB Custody Account transactions.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' *Daubert* Motion, **ECF No. [142]**, is **GRANTED IN PART AND DENIED IN PART**.

    a. Ratner may testify regarding his opinions on to Plaintiffs' increased liabilities damages and may testify on prejudgment interest.

    b. Ratner may not testify on Inconsistent Use Damages, Issuance Damages, Interest Damages, or administrative expenses in Liquidation.

    c. Fraher's opinion is not excluded.

2. Defendant's Motion to Strike, **ECF No. [164]**, is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 23, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:  Counsel of Record