## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| MICHAEL PEARSON, *et al.*, | |
| Plaintiffs, | |
| v. | **Civil Case No.:** |
| DEUTSCHE BANK AG, *et al.*, | **1:21-cv-22437-Bloom/Otazo-Reyes** |
| Defendants. | |

## JOINT PRETRIAL STIPULATION

Defendant Deutsche Bank AG and Plaintiffs pursuant to Local Rule of the Southern District of Florida 16.1(e), file this Joint Pretrial Stipulation, and in support thereof state[1]:

1. **Statement of the Case by Each Party**

    a. Plaintiffs' Statement of the Case[2]

    The Plaintiffs are the court-appointed Liquidators for four companies referred to as the Note Issuers (ORC Senior Secured Ltd. (later known as Diversified Real Estate Development Ltd); GMS Global Market Step Up Note Ltd.; Preferred Income Collateralized Interest Ltd.; and SG Strategic Income Ltd.).

---

[1] The Parties are working towards and plan to submit a stipulation in advance of the pretrial conference dismissing with prejudice claims brought by Plaintiffs North Pointe Holdings (B.V.I.) Ltd., Sports Aficionados Ltd., Sentinel Investment Fund SPC; Vanguardia Group, Inc.; and Vanguardia Holdings Ltd. and claims brought against Defendant Deutsche Bank Trust Company Americas.

[2] Defendant disputes certain statements made in Plaintiffs' Statement of the case and reserves all rights.

Each Note Issuer became a client of Deutsche Bank AG between 2011 and 2013, when that Bank and each Issuer entered into Agency Agreements. Under those agreements, the Bank agreed to serve as the agent of the Note Issuers with respect to the Notes and, specifically, to serve as the issuing agent, paying agent, and transfer agent for those Notes. The Bank knew that the funds to be raised from investors through these Notes were supposed to be used to develop valuable South Florida real estate and other investments.

In early 2014, individual wrongdoers formed a new company, Madison Asset LLC, that was not owned or controlled by the Note Issuers. In early 2014, Deutsche Bank AG allowed that newly-formed company to open new custody accounts, including four using the names of the Note Issuers; for example, "Madison Asset Custody & Clearing for ORC Senior Secured Ltd" and "Madison Asset Custody & Clearing SG Strategic Income Ltd." The Bank allowed Madison to open these accounts without adequate due diligence and money laundering precautions, without requiring any proof that Madison was authorized to perform any services for the Note Issuers, who were already Bank clients at this time, and without notifying the Note Issuers or their Independent Director of these accounts. In truth, the individual wrongdoers had no right to deliver the Note Issuers' assets into accounts they controlled through Madison.

From April 2014, when the Bank opened these Madison custody accounts, through March 2016, the Bank issued new notes for the Note Issuers and, acting on instructions from the wrongdoers, delivered them free of any payment into what the Bank knew were the Madison accounts. The Bank continued to do this through 83 new note issuances and free-of-payment transfers, totaling approximately $124 million, despite the improper activities it was observing first-hand in the Madison Accounts.

2

Specifically, shortly after the Bank opened the Madison Accounts, Bank employees witnessed Madison using the accounts in ways inconsistent with any legitimate custodial activity. Bank employees knew that custody accounts should not be used for cash transactions unrelated to securities custody and that they should not be overdrawn. Yet the Bank employees manually processing these wire transfers saw that Madison was requesting a dozen or more transfers a day that were both unrelated to custodial activity and directed to hundreds of different recipients around the world. Employees also saw that the Madison accounts were regularly overdrawn, often by millions of dollars for weeks or months, which would not occur if the accounts were being used for their stated purpose.

Bank employees regularly reported these matters to the Bank, including escalating their concerns about money laundering and other illegal conduct to the Bank's compliance group, urging investigation. Despite these repeated escalations, the Bank decided to continue processing all wire transfers requested by Madison even as it continued to transfer the Issuers' notes into these accounts. This continued through and even past June 2017, when the Bank finally gave notice it would close the Madison accounts. By that time, the Note Issuers were indebted by hundreds of millions of dollars to their investors but stripped of any assets to repay those debts.

Plaintiffs contend that, through its conduct summarized above and other acts, the Bank aided and abetted wrongdoers in converting the Note Issuers' assets and breaching their fiduciary duties to the Note Issuers. In addition, the Bank breached its own fiduciary duties arising from its agency relationship with the Note Issuers, and it failed to exercise even the ordinary level of care required of a reasonably prudent bank under these circumstances. The Bank also breached its duties under the Agency Agreements by failing to notify the Note Issuers' Independent Director that the Note Issuers were unable to pay their interest obligations on time. Finally, the Bank

violated Cayman Island Companies Law § 147 by substantially assisting the wrongdoers in driving up the Note Issuers' debt, misappropriating their assets, and cheating their creditors despite knowing of or turning a willfully blind eye to fraudulent conduct.

     b.  Defendant's Statement of the Case[3]

Plaintiffs are representatives of four companies that effected a Ponzi scheme generating hundreds of millions of dollars in losses for innocent investors (the "Note Issuers"). The scheme was orchestrated by a number of Individual Wrongdoers, including Frank Chatburn, Juan Carlos Cortes, Roberto Cortes, Ernesto Weisson, Fernando Haberer, and Gustavo Trujillo. Together, the Individual Wrongdoers created and controlled a web of entities, which they used to carry out their Ponzi scheme. Specifically, the Individual Wrongdoers created non-parties South Bay Holdings ("South Bay") (a real estate development firm) and Biscayne Capital International LLC ("Biscayne Capital") (an investment advisory firm). Biscayne Capital encouraged investors to invest in securities supposedly backed by South Bay's activities. In reality, however, and unbeknownst to Defendant, South Bay was insolvent and the Individual Wrongdoers used the funds that they raised to pay off earlier investors while collecting their own illicit profits.

Over time, the Individual Wrongdoers created additional offshore companies that they used to expand and conceal their schemes. Among these were the Note Issuers represented by Plaintiffs here (the "Companies"). The Note Issuers are special purpose vehicles that the which the Individual Wrongdoers used to issue securities for the purpose of fraudulently raising funds.

---

[3] Plaintiffs' dispute certain statements made in Defendant's Statement of the case and reserve all rights.

The scheme began to unravel in 2018. Since then, nearly all of the Individual Wrongdoers have been indicted and charged with money laundering, wire fraud, conspiracy to commit bank fraud, and other crimes connected to the Ponzi scheme.

In this case, Plaintiffs allege that Defendant aided and abetted or otherwise facilitated the wrongdoing by providing routine banking and administrative services to individuals and entities later discovered to have been involved in the Ponzi scheme. Plaintiffs allege further that Defendant breached its contractual duties, duty of care, and/or fiduciary duties to the Note Issuers, again, by providing these routine banking services and/or by failing to timely investigate certain transactions and relationships, which Plaintiffs allege would have revealed the underlying scheme.

Defendant denies Plaintiffs' allegations. Defendant provided only ordinary banking services to Note Issuers, and did not know and had no reason to believe that the Note Issuers along with their co-conspirators, were engaged in a Ponzi scheme. Moreover, the limited and ministerial role that Defendant played in certain financial transactions did not substantially assist or facilitate the fraud. Defendant voluntarily cooperated with law enforcement's investigation of the fraud only to be later identified as a victim of the fraud.

With respect to Plaintiffs' breach of contract claim, the relevant contracts narrowly circumscribed Defendant's obligations pursuant to which Plaintiffs cannot prove any breach. Defendant's arm's length relationship with the Note Issuers did not give rise to any fiduciary duty, and, in fact, the agreements between the Note Issuers and Defendant expressly disclaimed any duties beyond the ministerial banking services spelled out in the agreements. The Note Issuers' agreements with Defendant also expressly bar any claims against Defendant in connection with the agency services Defendants provided.

Plaintiffs' negligence claim also fails.  As indicated the Note Issuers' agreements with the Defendant expressly disclaimed all non-contractual duties, and therefore Defendant owed no duty of care to the Note Issuers, and acted with reasonable care at all times.  Nor was Defendant the proximate cause of the harm claimed by the Plaintiffs.

Defendant also raises the affirmatives defenses of *in pari delicto*, *ex turpi causa non oritur actio*, equitable estoppel, unclean hands, and apportionment/contributory negligence because the Note Issuers—in whose shoes Plaintiffs stand—held themselves out as legitimate businesses and were active knowing participants in the Ponzi scheme, as they were beneficially owned and controlled by the Individual Wrongdoers and designed to perpetuate the fraud.  Plaintiffs should be precluded from recovery on their behalf as the Note Issuers are at least equally at fault for their losses as Defendant, and were the cause of their own losses.

Finally, with respect to the breach of contract claim, Defendant raises the affirmative defense of waiver.  The terms of the contracts from which the Note Issuers' claims arise did not require that Defendant prevent the transactions complained of by the Plaintiffs.  And even if they did, the Note Issuers have waived this argument because they knew about and explicitly directed these transactions.  Moreover, as indicated, the Note Issuers contractually waived their rights to recover under the theories of recovery advanced here.

**2.   Basis of Federal Jurisdiction**

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) because this action relates to cases pending under title 11 of the United States Bankruptcy Code, specifically foreign main proceedings under § 101(24) of the Bankruptcy Code.

**3.   Pleadings Raising the Issues**

- First Amended Complaint, filed on September 24, 2021 [D.E. 31]

- Defendants' Answer, Defenses, and Counterclaims to Plaintiffs' Amended Complaint, filed on May 13, 2022 [D.E. 93]

**4. Undisposed of Motions or Other Matters Requiring Action by the Court**

- Defendants' Omnibus Motion *in Limine*, filed on November 11, 2022 [D.E. 140]
- Plaintiffs' Motions *in Limine*, filed on November 11, 2022 [D.E. 147]

**5. Statement of Uncontested Facts Which Will Require No Proof at Trial**

The parties have stipulated to the accuracy of the facts below as well as their admissibility at trial:

a. Plaintiffs are Foreign Representatives and Joint Official Liquidators for certain entities currently in liquidation and based out of the Cayman Islands.

b. The four companies whose interests the Plaintiffs represent are known as the Note Issuers. They are:

   i. Diversified Real Estate Development Ltd (in Official Liquidation) ("Diversified Real Estate"), formerly known as ORC Senior Secured Ltd. ("ORC");

   ii. GMS Global Market Step Up Note Ltd (in Official Liquidation) ("Global Market Step Up");

   iii. Preferred Income Collateralized Interest Ltd (in Official Liquidation) ("Preferred Income"); and

   iv. SG Strategic Income Ltd (in Official Liquidation) ("SG Strategic").

c. Plaintiffs' claims in this action involve a Ponzi scheme orchestrated by non-parties Frank Chatburn, Juan Carlos Cortes, Roberto Cortes, Ernesto Weisson, and others (together, the "Wrongdoers").

d. Around 1999, certain of the Wrongdoers created and controlled a company called South Bay Holdings ("South Bay"), which claimed to develop real estate in South Florida.

e.   Shortly thereafter, the Wrongdoers created an investment advisory firm called Biscayne Capital International.

f.   Biscayne Capital International solicited investments for South Bay's purported development projects.

g.   In reality, however, South Bay and its subsidiaries were insolvent by at least 2008, and the Wrongdoers used some of the unknowing investors' funds to pay off earlier investors and to collect their own illicit profits.

h.   Over time, the Wrongdoers recruited others, including Gustavo Trujillo and Fernando Haberer in service of their Ponzi scheme (together with the Wrongdoers, the "Individual Wrongdoers").

i.   From that point forward, the Individual Wrongdoers created or caused to be created almost 100 entities to facilitate their scheme.

j.   This complex web of offshore business structures kept the scheme afloat while also shielding the Individual Wrongdoers from liability.

k.   Each of the Note Issuers was managed and beneficially owned by the Individual Wrongdoers.

l.   The Note Issuers were special purpose vehicles, created by the Individual Wrongdoers and used to raise funds in support of the Ponzi scheme.

m.   Through entities called Biscayne Capital (B.V.I.) Ltd. and Biscayne Capital Holdings, the Individual Wrongdoers also owned Biscayne Capital.

n.   Biscayne Capital Holdings was incorporated in Bermuda on July 30, 2012, and Roberto Carlos Rueda, Roberto Cortes, Ernesto Weisson, and Juan Carlos Cortes were appointed directors of the company on July 31, 2012.

o.  Biscayne Capital (B.V.I.) was incorporated in the British Virgin Islands on August 24, 2006, and Juan Carlos Cortes, Roberto Cortes, Roberto G. Cortes, Ernesto Weisson, and Frank Chatburn were directors of the company as of December 11, 2013.

p.  On January 29, 2016, the Individual Wrongdoers settled a second British Virgin Islands trust called the SBH Trust (BVI), which held a number of limited liabilities companies, including South Bay's and Biscayne Capital's subsidiaries.  The beneficiaries of the SBH Trust were the Note Issuers.

q.  Each of the Note Issuers had a common outside director.  The name of the Note Issuers' outside director changed over time from New Haven Management Inc. to ANT Management B.V.I. Ltd. to SGG Group, but in this stipulation we will refer to the outside director as "SGG."  Certain individuals, including Herman Oosten, performed director services for the Note Issuers under all three of these company names.

r.  SGG, as director, signed a series of contracts called Agency Agreements with Deutsche Bank AG, London Branch on behalf of each Note Issuer.  Those are:

    i.  June 6, 2011 Agency Agreement with SG Strategic for SBH 2016 notes;

    ii.  June 6, 2011 Agency Agreement with SG Strategic SBH 2018 notes;

    iii.  December 9, 2011 Agency Agreement with Global Market Step Up for GMS Series 1 notes;

    iv.  December 9, 2011 Agency Agreement with Global Market Step Up for GMS Series 2 notes;

    v.  December 9, 2011 Agency Agreement with Global Market Step Up for GMS Series 3 notes;

vi.   December 9, 2011 Agency Agreement with Preferred Income for Preferred Series 1 notes;

vii.   December 9, 2011 Agency Agreement with Preferred Income for Preferred Series 2 notes;

viii.   May 10, 2013 Agency Agreement with ORC Senior for ORC Series 1 notes; and

ix.   August 7, 2013 Agency Agreement with ORC Senior for ORC Series 2 notes.

s.  Each Agreement identified the Note Issuer's director and provided the director's contact information.

t.  The Individual Wrongdoers caused the Note Issuers to raise capital by selling securities in the form of notes.

u.  Representations concerning the use and proceeds of the Note Issuers' funds, as well as information identifying the Note Issuers' outside director, appeared in the offering memoranda circulated to purchasers of the notes.  These offering memoranda included:

i.   June 6, 2011 SG Strategic Income Limited, SBH Diversified Preferred Income 2018

ii.   June 6, 2011 SG Strategic Income Limited, SBH Diversified Preferred Income 2014

iii.   June 6, 2011 SG Strategic Income Limited, SBH Diversified Preferred Income 2016

iv.   December 9, 2011 GMS Global Market Step Up Note Ltd., Series 1

v.   December 9, 2011 GMS Global Market Step Up Note Ltd., Series 2

vi.   December 9, 2011 GMS Global Market Step Up note Ltd. Series 3

      vii.   December 9, 2011 Preferred Income Collateralized Interest Ltd., Series 1

     viii.   December 9, 2011 Preferred Income Collateralized Interest Ltd., Series 2

       ix.   May 2013, ORC Senior Secured Limited, Series 1

       x.   August 2013, ORC Senior Secured Limited, Series 2

v.   Deutsche Bank possessed and could refer to the Agency Agreements and the Offering Memoranda.

w.   The Individual Wrongdoers marketed notes issued by the Note Issuers to investors through Biscayne Capital and its affiliated entities.

x.   In 2014, the Individual Wrongdoers created a new Cayman entity, Madison Asset LLC to avoid regulatory scrutiny.

***Aftermath of the Ponzi Scheme***

y.   On July 4, 2018, SGG resigned as director to the Note Issuers.

z.   Individual Wrongdoers Frank Chatburn, Roberto Cortes, Ernesto Weisson together with Gustavo Trujillo and Fernando Haberer have all been indicted for crimes connected to the Ponzi scheme.[4]

aa.  Chatburn, Weisson, and Trujillo, have all pled guilty to claims for, among other things, wire fraud and/or conspiracy to commit wire fraud.

bb. On October 11, 2019, Frank Chatburn entered into a plea agreement pursuant to which he agreed to plead guilty to one count of conspiracy to commit money laundering in violation of 18 U.S.C. 1956(h).

---

[4] By stipulating to the fact of the indictments, Plaintiffs do not withdraw their objection (as stated in their response to the Bank's motion in limine) to the admissibility of the underlying indictments or the facts alleged in those indictments.

cc. On December 18, 2019, Mr. Chatburn was sentenced to 42 months imprisonment followed by three years of supervised release and a fine of $40,000.

dd. On April 4, 2019, Gustavo Trujillo pled guilty to one count of conspiracy to commit wire fraud and one count of conspiracy to commit money laundering. Mr. Trujillo has not yet been sentenced.

ee. On September 1, 2021 Roberto Cortes, Fernando Haberer, and Ernesto Weisson were indicted for conspiracy to commit wire fraud, conspiracy to commit bank fraud, and conspiracy to commit money laundering.

ff. On September 8, 2021, Cortes, Haberer, and Weisson were arrested in Spain, Argentina, and Miami respectively.

**6. Issues of Fact Which Remain to be Litigated at Trial**

   a. Plaintiffs' List of Issues of Fact Which Remain to be Litigated at Trial.

      i. Whether Defendant aided and abetted conversion of Plaintiffs' property.

      ii. Whether Defendant breached fiduciary duties owed to the Note Issuers.

      iii. Whether Defendant aided and abetted a breach of fiduciary duty that one or more Individual Wrongdoers owed to the Note Issuers.

      iv. Whether Defendant breached a duty of care that it owed to Plaintiffs.

      v. Whether Defendant breached its contractual obligations under the Agency Agreements.

      vi. Whether Defendant engaged in activity prohibited by Cayman Island Companies Law § 147.

      vii. The damages that Plaintiffs are entitled to recover based on Defendant's conduct.

b. <u>Defendant's List of Issues of Fact Which Remain to be Litigated at Trial.</u>

    i.   Whether Defendant had actual or blind-eye knowledge of the Ponzi scheme, and, if so, whether Defendant substantially assisted in the carrying on of the business of the Ponzi scheme.

   ii.   Whether the Individual Wrongdoers owed and breached a fiduciary duty to the Companies and, if so, whether Defendant knowingly provided substantial assistance to the Individual Wrongdoers in breaching that duty.

  iii.   Whether Defendant owed the Note Issuers a fiduciary duty, and if so, whether Defendant breached that duty and whether that breach was a proximate cause of the Note Issuers' damages.

  iv.   Whether the Individual Wrongdoers converted the assets of the Note Issuers and, if so, whether Defendant knowingly provided substantial assistance in the conversion of assets belonging to the Note Issuers.

   v.   Whether Defendant breached terms of the governing Agency Agreements, and, if so, whether that breach was the proximate cause of the Note Issuers' damages.

  vi.   Whether Defendant had a duty of care to the Note Issuers, and, if so, whether Defendant breached that duty and whether that breach was the proximate cause of their damages.

 vii.   Whether the actions or negligence of any of the Note Issuers, the Individual Wrongdoers, or a third party caused the Note Issuers' losses, and, if so, what percentage.

viii.   Whether the doctrines of *in pari delicto*, *ex turpi causa non oritur actio*, unclean hands, equitable estoppel, illegality, or waiver bar recovery by Plaintiffs.

     ix.  Whether limitation of liability provisions in the applicable contracts bar Plaintiffs' recovery.

**7. Issues of Law on Which There is an Agreement**

While Parties may disagree about the precise contours of certain elements' meaning, they appear to agree on what the elements of each cause of action are.

**8. Issues of Law Which Remain for Determination by the Court**

a.  With respect to the parties proposed jury instructions:

     i.  The requirements to prove actual knowledge for aiding and abetting breach of fiduciary duty and conversion claims.

     ii.  The requirements to prove substantial assistance for aiding and abetting breach of fiduciary duty and conversion claims.

     iii.  The requirements to prove Defendant's participation in the "carrying on" of the business of the Companies for the fraudulent trading claim.

     iv.  The requirements to prove knowledge for the fraudulent trading claim.

     v.  The source and requirements to prove Defendant had a fiduciary relationship with the Note Issuers.

     vi.  The requirements to prove conversion for money.

     vii.  The source and requirements to prove Defendant's duty of care for negligence claim.

     viii.  The requirements to prove proximate cause for negligence claim.

     ix.  The applicability of comparative fault in the negligence claim.

     x.  The applicability of the economic loss doctrine to the negligence claim.

     xi.  The applicability of U.S. law to the negligence claim.

      xii.   The applicability of exculpatory clauses to the claims.

     xiii.   The availability of punitive damages.

     xiv.   The availability of deepening insolvency damages.

     xv.   Whether Plaintiffs lack standing to pursue their claims.  Plaintiffs contend that, under the Court's summary judgment ruling, this is an issue of fact.

b.  The admissibility of evidence regarding Defendant's policies and procedures and compliance therewith, as well as Defendant's compliance with the Bank Secrecy Act and other Anti-Money Laundering ("AML") regulations, and any of Defendant's public statements concerning the same.

c.  The admissibility of the Rule 2004 deposition testimony.

d.  The admissibility of evidence concerning Defendant's settlements with regulators or its internal remedial measures concerning Anti-Money Laundering and Know-Your-Customer policies and procedures.

e.  Whether Plaintiff may ask questions, refer to, or make arguments to the jury that could only be fairly addressed by revealing the existence of a suspicious activity report.

f.  The admissibility of evidence of Defendant's assets, market capitalization or other evidence implying that Defendant is a wealthy company.

g.  Whether in light of the Court's summary judgment ruling, Plaintiffs may present evidence concerning the operation of Madison's custody account.

h.  Whether in light of the Court's summary judgment ruling and Daubert rulings, Mr. Ratner may present testimony on (a) any funds raised by the Note Issuers that were subsequently transferred to the Madison custody account, or (b) funds for which Mr. Ratner cannot determine whether such amounts were transferred to the Madison custody account.

*Defendant's Position concerning item 8(b)*

Regulatory and policy requirements like those described at item 8(b) are irrelevant to any duty Defendant owed to the companies the Plaintiffs represent, and their introduction at trial would only confuse the jury into believing that a violation of these laws and policies equates to liability on the part of Deutsche Bank.  In its motions *in limine*, the Defendant argued that (1) evidence and arguments concerning fines related to AML compliance are irrelevant and unduly prejudicial and therefore should be precluded, and (2) evidence and arguments concerning Defendant's statements concerning its AML policies are irrelevant and unduly prejudicial and therefore should be precluded.  D.E. 140 at 5-12.  A review of Plaintiffs' exhibit list and deposition designations has made clear that Plaintiffs intend to introduce evidence concerning statutory and regulatory AML requirements, and the requirements of Defendant's AML and KYC policies.  This should not be permitted, and such evidence should be excluded.

*First*, evidence of the requirements of AML statutes and regulations is irrelevant to whether Defendant violated any duty to the Companies because it is clear as a matter of law that these statutes and rules do not create any duties to private parties.  *See, e.g.*, *Wiand* v. *Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1322 (M.D. Fla. 2015), *aff'd*, 677 F. App'x 573 (11th Cir. 2017) (acknowledging that federal banking statutes do not create a private right of action for private litigants to seek enforcement and redress).[5]  Moreover, Courts have repeatedly held that a company's internal corporate policies are not relevant to the question of whether wrongful conduct or a violation of a legal duty occurred.  *Chalco* v. *Belair*, 2019 WL 456162, at *8 (D. Conn. Feb.

---

[5] *See also Nesbeth* v. *Wachovia Bank*, 2010 WL 11601016, at *9 (S.D. Fla. July 19, 2010) ("[T]his Court, like many others, finds no private right of action under the [Bank Secrecy Act.]"); *In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010) ("[B]ecause the Bank Secrecy Act does not create a private right of action, the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements.").

5, 2019) (excluding evidence of police department policies as irrelevant to whether police officer's use of force was in violation of applicable legal standard).[6]

*Second*, introducing evidence regarding AML laws and regulations, and Defendant's policies and procedures—even if it were marginally relevant, which it is not—would create a substantial risk of unfair prejudice and jury confusion, and should therefore be excluded under Federal Rule of Evidence 403 as well. Such evidence would allow the jury to infer that any asserted instance of Defendant failing to fully comply with AML procedures and/or legal requirements reflected a breach of some duty to Plaintiffs, when this is clearly contrary to the law. *See Nesbeth*, 2010 WL 11601016, at *9 ("[T]his Court, like many others, finds no private right of action under the [Bank Secrecy Act.]").[7] The resulting prejudice and confusion would be too great to be cured by a jury instruction. *See Thompson* v. *City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006) (holding that limiting instruction regarding jury consideration of police general orders "would have led to unnecessary and detrimental jury confusion"). This evidence, if admitted, would also require the introduction of rebuttal evidence about the scope, purpose, training, and enforcement of each policy, creating a "trial within a trial" about potential policy violations that

---

[6] *See also United States* v. *Stoecker*, 920 F. Supp. 867, 874–75 (N.D. Ill. 1996) (excluding evidence of bank's internal operating procedures and ethical standards because violations of the procedures did not constitute unlawful conduct and any such violations was not relevant to whether defendant violated the law); *In re Urethane Antitrust Litig.*, 2016 WL 475339, at *2 (D.N.J. Feb. 8, 2016) (holding that the manner in which defendant interpreted its own antitrust policies was irrelevant in antitrust case); *United States* v. *Penn*, 2022 WL 523004, at *2 (D. Colo. Feb. 22, 2022) (excluding antitrust training and policies as irrelevant).

[7] *See also In re Agape Litig.*, 681 F. Supp. 2d at 360 ("[B]ecause the Bank Secrecy Act does not create a private right of action, the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements."); *Urethane*, 2016 WL 475339, at *2 ("Even if such [internal policy] evidence were relevant, it would be substantially . . . outweighed by prejudice because the testimony could confuse the jury on what the governing law was."); *Penn*, 2022 WL 5230004, at *2 ("The antitrust training may contain statements that confuse or mislead the jury on the standard the jury is to apply.").

ultimately have nothing to do with the issues to be tried.  *See* Defs.' MIL at 12; *see also English* v. *District of Columbia*, 651 F.3d 1, 10 (D.C. Cir. 2011) (affirming exclusion of evidence of policy violations because admission "would cause 'big time' confusion of the issues, and preventing such confusion would require the admission of the conclusions to be 'hedged with jury instructions' and necessitate a 'trial within a trial about the whole District of Columbia disciplinary system'").

> *Plaintiffs' Position concerning item 8(b)*

Plaintiffs object to Defendant's statement of position because it is a motion in limine, and motions in limine were due November 11, 2022, pursuant to the briefing schedule in the Court's scheduling order. ECF No. [116]. If the Court elects to entertain this motion, Plaintiffs will respond at the motions in limine hearing that the Court has scheduled for April 4 at 2 p.m.

**9.  Exhibits with Objections**

Attached hereto as Exhibit A and Exhibit B are Plaintiffs' and Defendant's Exhibit Lists, respectively.

**10. Trial Witnesses and Deposition Designations**

Plaintiffs intend to call the following witnesses at trial:

- Ian Ratner (Plaintiffs' Expert) -- Atlanta, GA, time to testify: 4 hours
- Richard Fraher (Plaintiffs' Expert) – Blue Ridge, GA, time to testify: 2 hours 30 minutes.

Plaintiffs may call the following witnesses at trial. An asterisk indicates Plaintiffs are likely to call the witnesses. Plaintiffs reserve the rights with respect to the others.

- Javier Britos – Jacksonville, FL (unlikely to call, > 1 hour)
- *Scott Habura – Milwaukee, WI, deposition run time: 1 hour 50 minutes
- * Floris Vreedenburgh – New York, NY, deposition run time: 2 hours 5 minutes

- * Paul Yetton – London, UK, deposition run time: 2 hours 20 minutes

- Andrew Childe – Cayman Islands: <1 hour

- * Patrick Hannon – Tampa, FL, deposition run time: 45 minutes

- * Frederick Kolb – Nashville, TN, deposition run time: 30 minutes

- Gloria Molina – Miami, FL (unlikely to call, > 1 hour)

- Michael Pearson – Cayman Islands: <1 hour

- * Anna Silver – British Virgin Islands, time to testify: 45 minutes

- * Kamalita Abdool – New York, NY, deposition run time: 1 hour 5 minutes

- * Oye Olufemi – London, UK, deposition run time: 30 minutes

- * Andrew Rutherford – Ontario, Canada, time to testify: 1 hour 30 minutes

Defendant intends to call the following witnesses at trial:

- David Alfaro (Defendant's Expert) – San Francisco, CA, time to testify: 3 hours

- Sepideh Rowland (Defendant's Expert) – Washington, DC, time to testify: 1 hour

- Paul Yetton – London, UK, time to testify: 3 hours

Defendant may call the following witnesses at trial:[8]

- Javier Britos – Jacksonville, FL,  time to testify: 1.5 hours

- Andrew Childe – Cayman Islands, time to testify: 2 hours

- Reynaldo Figueredo – Miami, FL, time to testify: 1 hour

- Scott Habura – Milwaukee, WI, time to testify: 3 hours

- Patrick Hannon – Tampa, FL, deposition run time, 30 minutes

- Frederick Kolb – Nashville, TN, time to testify: 1.5 hours

---

[8]     Defendant reserves the right to call those witnesses identified as testifying via video deposition live at trial and vice versa.

19

- Don Linford – Logan, UT, time to testify: 2 hours

- Michael Pearson – Cayman Islands, time to testify: 2 hours

- Anna Silver – British Virgin Islands, time to testify: 2 hours

- Douglas Sloan – New York, NY, time to testify: 2 hours

- Floris Vreedenburgh – New York, NY, deposition run rime, 40 minutes.

- Ian Ratner (Plaintiffs' Expert) – Blue Ridge, Georgia, time to testify: 4 hours

- Richard Fraher (Plaintiffs' Expert) – Atlanta, Georgia, time to testify:  2 hours

- Olufemi Oye – London, UK, time to testify: 2 hours

- Kamalita Abdool – New York, NY, time to testify 1 hour

Pursuant to this Court's Scheduling Order [D.E. 149], Parties filed their Deposition Designations with the Court on March 20, 2023 [D.E. 182 and 183], and objections and counter-designations on March 24, 2023 [D.E. 187 and 188].

## 11. Estimated Trial Time

a.  Plaintiffs estimate that the presentation of their case (excluding opening statements and cross-examination by Defendant's counsel) will be 2.5 to 3.5 trial days.

b.  Defendant estimates that the presentation of its case (excluding opening statements and cross-examination by Defendant's counsel) will be 2.5 to 3.5 trial days.

c.  Parties estimate that trial will last [8] trial days.

Dated: March 27, 2023

/s/ Harvey W. Gurland, Jr.
Harvey W. Gurland, Jr.
Florida Bar No. 284033
DUANE MORRIS LLP
201 S. Biscayne Boulevard, Suite 3400
Miami, FL 33131-4325

/s/ John H. Rains
Frank M. Lowrey IV *(Pro Hac Vice)*
Georgia Bar No. 410310
lowrey@bmelaw.com
Ronan P. Doherty *(Pro Hac Vice)*
Georgia Bar No. 224885
doherty@bmelaw.com
John H. Rains

(305) 960-2214
hwgurland@duanemorris.com
pnmendoza@duanemorris.com

David G. Januszewski *(Pro Hac Vice)*
Anirudh Bansal *(Pro Hac Vice)*
Sheila C. Ramesh *(Pro Hac Vice)*
Sesi V. Garimella *(Pro Hac Vice)*
Margaret A. Barone *(Pro Hac Vice*)
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000
djanuszewski@cahill.com
abansal@cahill.com
sramesh@cahill.com
sgarimella@cahill.com
mbarone@cahill.com

*Attorneys for Defendant Deutsche Bank AG*

Florida Bar No. 0056859
Georgia Bar No. 556052
rains@bmelaw.com
Amanda Kay Seals *(Pro Hac Vice)*
Georgia Bar No. 502720
seals@bmelaw.com Zoe Beiner (*pro hac vice*)
Georgia Bar No. 878340
*beiner@bmelaw.com*
Juliana Mesa *(Pro Hac Vice)*
Georgia Bar No. 585087
mesa@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

Eduardo F. Rodriguez
Florida Bar No. 36423
eddie@efrlawfirm.com
1 Alhambra Plaza, Suite 1225
Coral Gables, FL 33134
Telephone: (305) 340-0034

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I hereby certify that by filing the foregoing **JOINT PRETRIAL STIPULATION** with the Clerk of Court using the CM/ECF system, I have caused it to be served upon all counsel of record.

This 27th day of March, 2023.

*/s/ John H. Rains IV*
John H. Rains IV