<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-22437-BLOOM/Otazo-Reyes**

</div>

MICHAEL PEARSON, *et al*.,

      Plaintiffs,

v.

DEUTSCHE BANK AG, *et al.*,

      Defendants.

_____/

## ORDER ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

    **THIS CAUSE** is before the Court upon Defendant Deutsche Bank AG's ("Defendant") *ore tenus* motion for judgment as a matter of law, pursuant to Rule 50(a) ("Motion") of the Federal Rules of Civil Procedure. On April 19, 2023, Defendant filed its supporting written Motion for Judgment as a Matter of Law. ECF No. [233]. On April 20, 2023, Plaintiffs filed its Response. ECF No. [235]. The Court has reviewed the Motion, the Response, the law, the record in this case, and—with the benefit of oral argument—is otherwise fully advised.

### I.    Background

    Defendant moves for judgment as a matter of law on Count III of the First Amended Complaint, ECF No. [31], Breach of Fiduciary Duty, on the ground that Plaintiff has failed to demonstrate the existence of a fiduciary duty. *See generally* ECF No. [233]. Defendant also moves for judgment as a matter of law on Count VI, Negligence, which Defendant argues is barred by an exculpatory clause in an agreement between the parties. Finally, Defendant moves to dismissal all Counts on the grounds that Plaintiffs failed to produce evidence of proximate causation or damages.

    The Court assumes the reader's familiarity with the general facts of this case and focuses

on the evidence relevant to Defendant's Motion.

### A. The Agency Agreements

Between 2011 and 2017, the Note Issuers entered into Agency Agreements with Defendant and Deutsche Bank Lux. ECF No. [137-1] at 478 and 495 (with GMS Global Market Step Up); 512 and 531 (ORC Senior Secure Limited); 550 (Preferred Income); and 566 and 578 (SG Strategic Income).[1] In those Agency Agreements, Defendant is identified as the "Issuing Agent, Principal Paying Agent and Transfer Agent." *See, e.g.*, Agency Agreement relating to Issue of Up to US$25,000,000 of GMS Global Market Step Up Note Ltd. Series 2 ("Global Market Step Up Agency Agreement") at 478.[2] Those Agency Agreements identify the Note Issuers as "Issuer[s]." *See, e.g.*, *id.* at 478. The Agency Agreements state that the Issuers agreed to issue "Notes." *Id.*

The Agency Agreements appoint "Agents." The Agency Agreements provide that "[t]he Principal Paying Agent hereby agrees to act, as agent of the Issuer in respect of the Notes, in accordance with the Conditions and the terms" of the Agency Agreements. *See, e.g.*, Global Market Step Up Agency Agreement cl. 2.1, ECF No. [137-1] at 480.[3] The Agency Agreements state that Defendant is appointed as Principal Paying Agent for the purposes of (a) completing, authenticating, and delivering the Notes and authenticating and delivering the "Definitive Notes (if any);" (b) making all notations on each Note required in accordance with its terms; (c) exchanging any Note for "Definitive Notes" in accordance with the terms of such Note and making all notations on such "Definitive Notes" required in accordance with "their terms (if applicable);"

---

[1] The Court cites to the page number generated by the CM/ECF Database when citing to Electronic Case Files. Otherwise, the Court cites to the page number of the PDF provided by the parties in support of their submissions.

[2] The parties agree that the provisions in the Agency Agreements are substantially similar. Accordingly, the Court cites to the GMS Global Market Step Up Agency Agreement for simplicity.

[3] The Agency Agreements do not define the term "Conditions." *See, e.g.*, *id.* ¶ 1.6(a).

(d) paying sums due on Notes and "Coupons;" (e) arranging on behalf of, and at the expense of, the Issuer for notices to be communicated to the Noteholders (meaning the holders of the Notes "for the time being") in accordance with the Conditions; and (f) performing all other obligations and duties imposed upon it by the Conditions and the Agency Agreements, "among other things." *See, e.g.*, *id.* cl. 2.1, ECF No. [137-1] at 480-81.

The Agency Agreements also describe the appointment of Paying Agents but do not define the identity of the Paying Agents. According to the Agency Agreements, those paying agents are appointed to act "as paying agent of the Issuer in respect of the Notes in accordance with the Conditions and the terms" of the Agency Agreements, "for the purpose of paying sums due on the Notes and the Coupons and performing all other obligations and duties imposed upon it by the Conditions" and the agreements. *See, e.g.*, *id.* cl. 2.2, ECF No. [137-1] at 481.

The Agency Agreements provide that the "Agents shall perform such duties as are set out in this Agreement together with those set out in the Conditions," and that "[n]o obligations or duties of the Agents which are not expressly stated herein or in the Conditions shall be implied." *See, e.g.*, *id.* cl. 2.3, ECF No. [137-1] at 481.

The Agency Agreements further provide that "[t]he Principal Paying Agent shall hold in safe the custody of the Registered Global Note." *See, e.g.*, *id.* cl. 3.2, ECF No. [137-1] at 481. The Agency Agreements also identify Defendant as the "Replacement Agent," who under the provisions of clause 6 of the Agency Agreements is to replace Notes or Coupons under certain circumstances. *See, e.g.*, *id.* cl. ¶ 6, ECF No. [137-1] at 484.

The Agency Agreements further describe Defendant's other obligations as the Principal Paying Agent. For instance, Defendant is obligated to "notify by electronic mail or fax each of the other Agents and the Issuer if it has not received" from the Note Issuer the payment of principal

and interest in respect of the Notes that is provided for under clause 4.1. *See, e.g.*, *id.* cl. 4.3, ECF No. [137-1] at 482. Defendant must also notify the Note Issuers and the other Agents of late payments. *See, e.g.*, *id.* cl. 4.4, ECF No. [137-1] at 482. The Agency Agreement further requires specific actions on Defendant's part. *See, e.g.*, *id.* cl. 4.6, ECF No. [137-1] at 482 (requiring Defendant to reimburse paying agents for payments made pursuant to the Conditions and the Agency Agreements).

The Agency Agreements contain a limitation of liability provision. In relevant part, "under no circumstances will the Agents be liable to the Issuer or any other party to this Agreement in contract, tort (including negligence) or otherwise for any consequential, special, indirect or speculative loss of damage . . . which arises out of or in connect with this Agreement[.]" *See, e.g.*, *id.* cl. 9, ECF No. [137-1] at 486.

The Agency Agreements contain a provision labeled "No Agency or Trust." That provision states that "[t]he Agents shall act solely as Agent of the Issuer and shall not have any obligation towards or relationship of agency or trust with the holder of any Note or Coupon." *See, e.g.*, *id.* cl. 10.1, ECF No. [137-1] at 486.[4]

**B.  Evidence of Proximate Causation**

At trial, Plaintiffs presented the testimony of several witnesses, including former Deutsche Bank employees, Floris Vreedenburgh and Scott Habura. *ee* ECF Nos. [223], [224], [230].

Plaintiffs also presented the testimony of Andrew Rutherford, who stated as follows:

> Q. Is it true that some portion of the proceeds of the sale of notes was sent to what at least appeared to be the note issuers or South Bay?
> A. That is accurate.
> Q. Some amount?
> A. That – I believe that to be the case, yes.

---

[4] The Agency Agreements also contain a choice of law provision, providing that the Agency Agreements are "governed by, and shall be construed in accordance with English law." *See, e.g.*, *id.* ¶ 16.1, ECF No. [137-1] at 490.

> Q. And the individual wrongdoers, though controlled the bank accounts of the issuers; is that right?
> A. The individual wrongdoers that would be accurate.
> Q. Yeah. And from looking at the Deutsche Bank statements that Ms. Ramesh showed you, we can't tell what happened to the money in that bank of New York Mellon account, can we?
> A. Not from looking at the Deutsche Bank New York statements, no.

*See* ECF No. [233] at 16-17.

On April 18, 2023, Plaintiff's damages expert, Ian Ratner, also testified. *See* ECF No. [231]. Defendant asserts that Ratner stated that "[b]y increasing the liabilities to the issuer, ultimately, it's going to cause less recovery. . . . So the damages are that you have borrowed more money. You owe more money. . . . It causes a greater liability. . . . And that creates damages." ECF No. [233] at 17. According to Defendant, Ratner also testified that "Deutsche Bank prepared 7 different excel schedules that listed out all of the notes that had been issued, which remember, those create the liabilities, all the notes that had been issued . . . . And included here those that occurred after April, midst April under the Madison watch." *Id.*

Michael Pearson testified, in sum and substance, that SGG, an independent director of SGG, "fell well short, far short, of reasonable expectations. They did a very, very poor job. . . . They needed to do their job, which was to ask questions on an ongoing basis. And [they] suggested they are very distance[d] and just failed comprehensively to ask any questions at any important junctures." *Id.* at 17-18.; *see also* Pls.' Ex. ("PX") 301 (SGG employee writes, "[w]e as directors of the different companies [i.e., the Note Issuers] are kept completely in the dark and do not get any answers/directions/documentation. We really try to perform our duties as expected from us but by not providing us with the requested information, our role as director is made impossible.").

### C.  Evidence of Damages

On April 18, 2023, Rutherford testified that, between April 2014 and 2016, the Note Issuers issued 83 new note issuances totaling $124,009,000 in nominal value.

Ratner also testified as to the Note Issuers' damages as measured under what Plaintiffs term a "deepening insolvency" theory. The parties agree that Plaintiffs' "deepening insolvency" theory of damages depends on whether there is admitted evidence that the Note Issuers were actually insolvent. *See Kapila v. Warburg Pincus, LLC*, No. 8:21-CV-2362-CEH, 2022 WL 4448604, at \*14 (M.D. Fla. Sept. 23, 2022).

On April 10, 2023, Pearson testified that the Note Issuers were "extremely insolvent." In addition, the parties stipulated that South Bay, the real estate development company, was insolvent as of 2008. ECF No. [194] at 7-8. The admitted evidence at trial also includes offering documents which purport to show that the issued Notes were secured by property developed or operated by South Bay. *See, e.g.*, Defs.' Tr. Ex. ("DTX") 116 at 1, 14.

## II.     Legal Standard

Fed. R. Civ. P. 50 is the mechanism for defendants to challenge the sufficiency of a plaintiff's evidence at and after the close of the case:

> (a) (1) If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>> (A) resolve the issue against the party; and
>> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50. On a motion for judgment as a matter of law, the Court must construe the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1275 (11th Cir.2008); *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998). A court should grant a motion for judgment as a matter of law only "when there is no legally sufficient evidentiary basis for a reasonable jury" to find for the nonmoving party on the particular issue. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir.2004); *see also Austrum v. Fed. Cleaning*

*Contractors, Inc.*, 190 F. Supp. 3d 1132, 1134 (S.D. Fla. 2016).

The same standard applies to a Rule 50(a) motion for judgment as a matter whether it is made at the close of the plaintiff's case or at the close of all the evidence. *See U.S. Fid. & Guar. Co. v. Lee Invs., LLC*, 551 F.Supp.2d 1050, 1052 (E.D.Cal.2008) (quoting *Gibson v. City of Cranston*, 37 F.3d 731, 735 (1st Cir.1994)).

### III.    Discussion

The Court first addresses whether there is an evidentiary basis to support the existence of a fiduciary duty between the parties. The Court proceeds to consider whether there is an evidentiary basis for the jurors to reasonably conclude that Defendant's conduct proximately caused the Note Issuers' losses, whether there has been evidence of damages, and finally whether the exculpatory clauses in the Agency Agreements bar Plaintiffs' recovery.

### A.  Fiduciary Duty

#### i.   Independent Tort Doctrine

Defendant argues in its written submission that the independent tort doctrine bars Count III for Breach of Fiduciary Duty because Plaintiff has conceded that Defendant's fiduciary duty, if one exists, arises under the Agency Agreements. ECF No. [233] at 10 (citing *Royal Surplus Insurance Co. v. Coachman Industries Inc.*, 184 F. App'x 894, 902 (11th Cir. 2006)).[5] For the same reason, Defendant contends Plaintiff's Negligence Claim, Count VI, is also barred. *Id.* at 10 n.1 (citing *Wall Street Mortgage Bankers, Ltd. v. Attorneys Title Insurance Fund, Inc.*, 2009 WL 10668938, at *4 (S.D. Fla. Nov. 12, 2009)). Defendant maintains that Plaintiffs' decision to

---

[5] In its Order on Defendants' Motion to Dismiss, the Court noted that, unless a fiduciary relationship is formed through an express agreement, whether a fiduciary exists is necessarily fact-specific to a particular case. ECF No. [84] at 20. The Court noted that "Plaintiffs do not simply allege that Defendants owed a duty because of the Agency Agreement, or that Defendants had 'some general and all-encompassing duty' as a bank to monitor and investigate customer activity." *Id.* As Defendant notes, Plaintiffs now assert that the fiduciary duty arises solely from the Agency Agreements. ECF No. [233] at 10.

abandon Count V for Breach of Contract does not save the claims in Counts III and VI. ECF No. [233] at 11 (citing *Indemnity Ins. Co. of N.A. v. Am. Aviation, Inc.*, 891 So. 2d 532, 537 (Fla. 2004)).

The independent tort doctrine, also known as the economic loss rule, "bars a contracting party from recovery in tort where the act complained of related to the performance of a contract." *De Sterling v. Bank of Am., N.A.*, No. 09-21490-CIV, 2009 WL 3756335, at *3 (S.D. Fla. Nov. 6, 2009). But the Florida Supreme Court has expressly limited the economic loss rule to cases involving products liability. *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399, 407 (Fla. 2013). Since this action is not a products liability case, this argument is not meritorious.

### ii.  Existence of a Fiduciary Duty

Next, Defendant argues that the Agency Agreements expressly disclaimed a fiduciary relationship with Plaintiffs. ECF No. [233] at 11-12. At oral argument, Defendants pointed to clause 2.3 of the Agency Agreements which provides that no obligations or duties of the Agents which are not expressly stated herein or in the Conditions shall be implied. In its written Motion, Defendant also points to clause 9, which limits the Agent's liability in contract and tort for "any consequential, special, indirect or speculative loss or damage[.]" ECF No. [233] at 11-12.

Plaintiffs disagree that the Agency Agreements expressly disclaim a fiduciary relationship. At oral argument, Plaintiffs submitted that clause 2.1 of the Agency Agreements states that Defendant agrees "to act, as agent of the Issuer in respect of the Notes, in accordance with the Conditions and the terms" of the Agency Agreements. Plaintiffs reason that, when clause 2.3 is read together with clause 2.1, the Agency Agreements establish an agency relationship between the Note Issuers and Defendant that imposes a duty of care and loyalty on Defendant while it performs its obligations under the Agency Agreements.

The parties appear to agree that, if a fiduciary relationship exists between them, it would

be specified by the Agency Agreements' terms. However, the parties dispute the significance of the terms in those Agreements. Accordingly, the Court must interpret the terms of the Agency Agreements, which depends upon a choice of law. At oral argument, Defendant relied on *Lamm v. State Street Bank & Trust Co.*, 889 F. Supp. 2d 1321 (S.D. Fla. 2012) to support its argument that it owed no fiduciary duty to the Note Issuers. *Lamm* analyzed the existence of a fiduciary duty under Florida law; for this reason, and because Plaintiff does not dispute the choice of law issue, the parties seemingly agree that Florida law governs whether a fiduciary duty exists. "Under Florida law, a contractual choice-of-law provision is enforceable 'unless the law of the chosen forum contravenes strong public policy.'" *Lamm*, 899 F. Supp. 2d at 1326 (quoting *Maxcess, Inc. v. Lucent Techs, Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005)). As stated, the Agency Agreements contain a choice-of-law provision, which provides in clause 16.1 that the terms of the agreements are to be construed under English law. The Court thus considers how English courts would interpret the provisions in the Agency Agreements.

Per the Ninth Circuit, "English courts interpret contracts to discern the contracting parties' intent." *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1238 (9th Cir. 2021) (citing *Arnold v. Britton* [2015] UKSC 36, 2015 WL 3555408, [15]). In addition, to analyze text, English courts read contract terms according to their "natural and ordinary meaning." *Id.* (citing *Arnold v. Britton* [2015] UKSC 36, [15]). English courts also consider the meaning of relevant contractual words in their documentary, factual, and commercial context. *Id.* (citing *Arnold v. Britton* [2015] UKSC 36, [15]). To analyze context, English courts examine "the overall purpose" of a contract and its clauses. *Id.* (citing *Arnold v. Britton* [2015] UKSC 36, [15]). Because there is no indication that these contract interpretation principles contravene public policy in Florida, the Court considers the terms of the Agency Agreements with these interpretation principles in mind.

The Agency Agreements concern the issuance of the Note Issuers' Notes in "registered form" and as "registered global notes." *See, e.g.*, ECF No. [137-1] at 478. The Agency Agreements identify Defendant as an "Principal Paying Agent." *See, e.g.*, *id*. An "agent" is "1. Something that produced an effect <an intervening agent>. . . . 2. Someone who is authorized to act for or in place of another; a representative <a professional athlete's agent>." AGENT, Black's Law Dictionary (11th ed. 2019). The Agency Agreements delineate Defendant's responsibilities as a Principal Paying Agent. Those include "completing, authenticating, and delivering" the issued Notes, exchanging and replacing notes pursuant to the terms of the Notes or other circumstances specified by the agreements, making payments owed under the Notes to the Noteholders, transmitting communications to the Noteholders on behalf of the Note Issuers. *See, e.g.*, Global Market Step Up Agency Agreement cl. 2.1, ECF No. [137-1] at 480-81. Defendant is also obligated to report any late payments to the Note Issuers and other Paying Agents. *See, e.g.*, *id.* cl. 4.4. Further, clause 2.3 states that Defendant owes no obligations or duties "which are not expressly stated" in the Agency Agreements or in the Conditions, and none shall be implied. *See, e.g.*, *id.* cl. 2.3.

The foregoing provisions make plain that Defendant is obligated to perform certain specified tasks in support of the Note Issuers' issuances of registered Notes. No other obligations are specified. Those tasks are ministerial and do not indicate that Defendant is empowered to exercise any discretion. For this reason, as explained further below, the Court concludes that the Agency Agreements do not provide an evidentiary basis to support the existence of a fiduciary relationship between the parties.

Fiduciary relationships are either expressly or impliedly created. *Cap. Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. 3DCA 1994). "Those expressly created are either by contract, such as principal/agent or attorney/client, or through legal proceedings, such as trustee/beneficiary and

guardian/ward." *Id.* (citing *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235 (1982)). Fiduciary relationships that are implied in law depend upon "the specific factual situation surrounding the transaction and the relationship of the parties," and courts have found an implied fiduciary relationship when "confidence is reposed by one party and a trust accepted by the other." *Id.* (quoting *Denison*, 230 Kan. at 640, and *Dale v. Jennings,* 90 Fla. 234, 244, 107 So. 175, 179 (1925)).

"Under Florida law, banks ordinarily do not owe fiduciary duties to their customers." *Lamm*, 889 F. Supp. 2d at 1331. "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Jaffe v. Bank of Am., N.A.*, 667 F. Supp. 2d 1299, 1319 (S.D. Fla. 2009), *aff'd*, 395 F. App'x 583 (11th Cir. 2010) (quoting *Watkins v. NCNB Nat'l Bank, N.A.*, 622 So.2d 1063, 1065 (Fla. 3d DCA 1993)). However, in an arms-length transaction, there is generally no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could have discovered by its own diligence. *Id.*

As the Agency Agreement's provisions make clear, Defendant's role in respect of the Notes as an account custodian is strictly ministerial. *See Lamm*, 889 F. Supp. 2d at 1325. The Agency Agreements do not obligate Defendant to advise, counsel, or otherwise protect the Note Issuers as the weaker party. Because clause 2.3 limits Defendant's obligations to those expressly stated in the Agreements, the Agency Agreements do not imply any requirements for Defendants to act for the benefit or protection of the Note Issuers, or to disclose facts that the Note Issuers could have discovered by undertaking their own inquiry of the Individual Wrongdoers' action. Thus, the Agency Agreements do not support the existence of a fiduciary duty. *See Lamm*, 889 F. Supp. 2d at 1329 (discussing a custodial account established "for the purpose of holding or

disposing of any property" received by the bank-defendant was limited to carrying out specific tasks, including "receiv[ing] property/investments in the Account against payment or free against receipt," "deliver[ing] property/investments from the Account against payment or free against receipt," and "purchase and sell investments for the Account"). Instead, the limited obligations imposed on Defendant by the Agency Agreements indicate "an arms-length bargain." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 951 (11th Cir. 2014).

Plaintiffs resist this conclusion. First, at oral argument, Plaintiffs directed the Court to clause 10.1 of the Agency Agreements, which is headed by the phrase "No Agency or Trust" and provides that Defendant has no obligation "or relationship of agency or trust" with the holders of the Note Issuers' securities. Invoking the statutory construction canon *expressio unius*, Plaintiffs reason that the disclaimer of a "relationship of agency or trust" between Defendant and the Noteholders means that a fiduciary relationship exists between Defendant and the Note Issuers. This argument may have had some force if clause 10.1 only concerned the Noteholders. However, clause 10.1 reiterates that "[t]he Agents shall act solely as Agent of the Issuer." Considering that clause 2.3 disclaims implied duties, clause 10.1 cannot be read to imply a fiduciary relationship between the parties. Rather, because Defendant's duties are specified elsewhere in the Agreements, and in view of the exclusion of implied obligations, clause 10.1 serves merely to limit the obligations of others to the Note Issuers. In context, clause 10.1 clarifies that Defendant's duties are limited <u>solely</u> to those duties it owes as an "Agent of the Issuer." In short, the statutory rule of construction *expressio unius* does not support Plaintiffs' position.

Given the Court's conclusion that there is no ambiguity in the contract with respect to Defendant's duties in the Agency Agreements, the rule construing ambiguity against the drafting party, raised by Plaintiffs at oral argument, is inapplicable. *See BladeRoom*, 20 F.4th at 1241

("English courts presume ambiguity in a commercial contract against the drafting party.").

Plaintiffs attempt to distinguish *Lamm* because the controlling custody agreements in that case expressly disclaimed any fiduciary relationship. In addition, Plaintiffs note that the evidence of knowing and substantial assistance by Defendant of the Individual Wrongdoers' Ponzi scheme was lacking in *Lamm*. Plaintiffs misread *Lamm*. Although *Lamm* found significance in the express disclaimer of a fiduciary responsibility by the bank, *Lamm* was careful to explain how the terms of the contract in that case describe an arm's length relationship. Plaintiffs appear to conflate the term "Agent" with the concept of common law agency, which is "[a] fiduciary relationship of agency created by express or implied mutual consent manifested by both the principal and the agent, in which the agent is subject in some degree to the principal's control." AGENCY, Black's Law Dictionary (11th ed. 2019). It is in the context of common-law agency that the Florida Supreme Court has explained, in *Fisher v. Grady*, that "[i]t is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency." 178 So. 852, 860 (1937). But the *Fisher* court was referring to a fiduciary duty that arises in contexts where "the principal has reposed some trust or confidence in the agent," such as between an employer and employee. *Id*. The terms of the Agency Agreements express that the relationship between the parties is not one of trust or confidence. Rather, as previously explained, the relationship between the parties is one occurring at arm's length. *Lamm*, 749 F.3d at 951.

Finally, Plaintiffs raise several additional arguments in their Response. First, Plaintiffs argue that, because clause 2.1 provides that Defendant agreed to act as "agent of the [Note] Issuer[s] in respect of the Notes . . . for the purposes of, *amongst other things*[,]" performing the duties specified in the Agency Agreements, Defendant assumed *an extra-contractual* duty of utmost care and loyalty under English law that is more expansive than what might be owed under

American law. ECF No. [235] at 4-5. However, this reading of clause 2.1 is inconsistent with clause 2.3, which limits Defendant's duties to those expressly provided for in the Agency Agreements. Contrary to Plaintiffs' position, reading clause 2.3 as limiting duties to those expressly provided for would not fail to give clause 2.1 meaning. Defendant was obligated to act as agent in respect of the Notes for the purposes of "other things," but those "other things" are delineated after clause 2. Those purposes include, for instance, "hold[ing] in safe custody the Registered Global Note," cl. 3.2, and notifying the Note Issuers and other Agents of late payment or non-payment by the Note Issuers on the issued Notes, cls. 4.3 and 4.4.

Second, Plaintiffs rely on *F.D.I.C. v. Floridian Title Grp., Inc.*, 972 F. Supp. 2d 1289, 1297 (S.D. Fla. 2013) for the contention that Florida law dictates that agents are fiduciaries. But *Floridian Title Group* concerned claims against a closing agent in respect of mortgages, and closing agents owe a fiduciary duty to all principal parties involved in the closing. *See generally id; Millette v. DEK Techs., Inc.*, 2011 WL 5331708, at *2 (S.D. Fla. Nov. 7, 2011). As discussed, banks generally do not owe customers fiduciary duties, and the Agency Agreements do not otherwise provide for such duties. Moreover, given the Court's review of the Agency Agreements, those Agreements do not reflect that Defendant manifested assent to an agency relationship. *Cabrera v. GEICO*, 452 F. Supp. 3d 1305 (S.D. Fla. 2014)—the other case on which Plaintiffs rely—does not support their position either. *See Cabrera*, 452 F. Supp. 3d at 1318-19.

Because the Court determines that the provisions of the Agency Agreements do not establish an "agency relationship," despite those agreements' use of the term "agent," the Court declines to consider the remaining arguments in Plaintiffs' Response on this point.

Accordingly, the Court grants judgment as a matter of law in favor of Defendant as to

Count III because no fiduciary relationship existed between the parties.[6]

### B.  Proximate Causation

Defendant contends that Plaintiffs have failed to present any evidence that could support that Defendant proximately caused the Note Issuers' injuries. ECF No. [233] at 15.[7] In support of its argument, Defendant points to the testimony of Andrew Rutherford to argue that payment on the Note issuances would have gone to the Individual Wrongdoers regardless of Deutsche Bank's conduct. ECF No. [233] at 16-17. Second, Defendant points to the testimony of Ian Ratner regarding Plaintiffs' "deepening insolvency" theory of damages to argue that the Note issuers were responsible for their own damages by continuing to issue Notes that caused their growing insolvency. ECF No. [233] at 17. Third, Defendant points to evidence that SGG, as an independent director of the Note Issuers, was unable or unwilling to stop the injury to the Note Issuers, and this inaction on SGG's part, not Deutsche Bank's inaction, was the superseding cause of the harm. *Id.* at 17-18.

Plaintiffs first respond that the evidence supports that Defendant's conduct was a "substantial factor" in bringing about the Note Issuers' harms. ECF No. [235] at 10 (citing *Diczok v. Celebrity Cruises, Inc.*, 263 F. Supp. 3d 1261, 1265-66 (S.D. Fla. 2017)). Plaintiffs rely on the

---

[6] This conclusion does not require the Court to grant judgment as a matter of law on Count VI, the negligence claim. As the Court has previously explained in its Order on Defendants' motion to dismiss, Plaintiffs' position in Count VI is that Defendant owed a duty of care to the Note issuers due to its relationship with Madison and its treatment of the Madison sub-accounts. *See* ECF No. [84] at 19-20 (citing *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094-95 (11th Cir. 2017)). The Motion does not address that position, so the Court declines to reconsider its Order on the motion to dismiss.

[7] Defendant asserts that all Plaintiffs' claims require a showing of proximate case. However, Defendant cites only to Count III (Breach of Fiduciary Duty), Count IV (Aiding and Abetting Conversion), and Count VI (Negligence) as the claims that require a showing of proximate causation, leaving out Count I (Fraudulent Trading) and Count II (Aiding and Abetting Breach of Fiduciary Duty). The Court limits its consideration to whether the evidence supports a finding of proximate cause as to Counts IV and VI, because the Court has found that Defendants are entitled to judgment as a matter of law on Count III.

Court's Order on summary judgment for the proposition that a juror could reasonably find that the evidence at trial supports Defendant's liability as to Counts II and IV. Plaintiffs do not specifically cite to portions of the unfiled, rough draft trial transcripts or the admitted trial exhibits that support Counts II and IV. *Id.* at 11 (citing ECF No. [184] at 44-51).[8] Turning to Rutherford's testimony, Plaintiffs contend that his testimony does not inexorably compel a conclusion that the Individual Wrongdoers would have effectuated the Ponzi scheme regardless of Deutsche Bank's knowing assistance since that testimony related only to three transfers out of the Madison sub-accounts to the Bank of New York Mellon that was controlled by the Individual Wrongdoers. *Id.* at 11-12. Next, Plaintiffs submit that Defendant misses how the question of proximate causation is one of foreseeability, not one of whether Defendant's conduct was the sole cause in fact of the Note Issuers' harms, and this Court has previously held that it is foreseeable that "opening an account without the account owner's knowledge would result in fraud on the account." *Id.* at 12 (citing *Anderson v. Branch Banking & Tr. Co.*, 119 F. Supp. 3d 1328, 1353-54 (S.D. Fla. 2015)). In addition, Plaintiffs analogize this case to one involving premises liability for criminal acts occurring on a property, arguing that proximate causation in such cases is a jury question since the Individual Wrongdoers' acts were foreseeable to a bank. *Id.* at 12 (citing *Truog v. Mid-Am. Apt. Cmtys., Inc.*, 358 F. Supp. 3d 1332, 1340 (M.D. Fla. 2019)).

Second, addressing together Defendant's arguments that the Note Issuers caused their own "deepening insolvency" and that SGG's inability or unwillingness to stop the Note Issuers' losses, Plaintiffs cast those arguments as reprising Defendant's arguments at summary judgment concerning the *in pari delicto* defense. Specifically, Plaintiffs note that the Court concluded that the acts of the Individual Wrongdoers are not imputable to the Note Issuers where the Individual

---

[8] In a footnote, Plaintiffs contend "the summary judgment ruling controls here because Plaintiffs' trial proof was delivered through the same depositions and exhibits tendered on summary judgment."

Wrongdoers' actions were adverse to the Note Issuers and where there was an innocent decisionmaker who could act to thwart the wrongdoing. *Id.* at 13. Plaintiffs contend that the evidence rebuts that SGG was unwilling or unable to stop the fraud. *Id.* at 14 (citing PTX 302, PTX 303, PTX 300, and PTX 301).

Under Florida law, Defendant's negligence must be the proximate cause of the Note Issuers' injuries for the Plaintiffs to recover. *See Palma v. BP Prod. N. Am., Inc.*, 347 F. App'x 526, 527 (11th Cir. 2009) (citing *Clay Elec. Coop., Inc. v. Johnson,* 873 So.2d 1182, 1185 (Fla. 2003) (listing as an element of a cause of action based on negligence "[a] reasonably causal connection between the conduct and the resulting injury")). Foreseeability is crucial to evaluating proximate cause and the absence of foreseeability can foreclose liability. *Id.* As the Eleventh Circuit observed:

> [H]arm is "proximate" in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question. In other words, human experience teaches that the same harm can be expected to recur if the same act or omission is repeated in a similar context. . . .
> On the other hand, an injury caused by a freakish and improbable chain of events would not be "proximate" precisely because it is unquestionably unforeseeable, even where the injury may have arisen from a zone of risk. The law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience.

*Id.* (quoting *McCain v. Fla. Power Corp.*, 593 So.2d 500, 503 (Fla. 1992)). Although the issue of foreseeability is ordinarily a question of fact for a jury to resolve, the Court may decide that issue "when the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference." *Id.*(quotation marks omitted).

As the Court set forth in its Order on summary judgment, under Florida law, a claim of aiding and abetting requires proof of (1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the

rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor. ECF No. [184] at 46; *see also Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (citing *AmeriFirst Bank v. Bomar,* 757 F. Supp. 1365, 1380 (S.D. Fla. 1991); *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.,* 917 So.2d 368, 372 (Fla. 5th DCA 2005)). Defendant's contention that proximate cause is a separate element that must be proven is legally unsupported. Plaintiffs presented sufficient evidence at trial, including the testimony of Habura and Vreedenburgh, with associated exhibits, for a reasonable juror to find that Defendant aided and abetted the Individual Wrongdoers' fraud. *See* I,B., *supra*.

The question before the Court is thus narrowed to whether there is evidence of proximate cause as to Count VI, Plaintiffs' Negligence Claim. Specifically, the question is whether prudent human foresight would lead one to expect that harm of the type that the Note Issuers suffered was likely to be substantially caused by Defendant's conduct, as shown by the evidence presented at trial. Here, Defendants do not contend that the Note Issuers' losses on account of the Individual Wrongdoers' scheme were the result of a "freakish and [an] improbable chain of events" that is unquestionably unforeseeable. "It is foreseeable that opening an account with the account owner's knowledge would result in fraud on the account." *Anderson v. Branch Banking & Tr. Co.*, 119 F. Supp. 3d 1328, 1353 (S.D. Fla. 2015). Plaintiffs note that the parties dispute whether Madison lacked the authority to open the subaccounts and received the Note Issuers' assets. ECF No. [235] at 12. This dispute is a factual question, which should properly go to the jury. *See Coral Gables Fed. Sav. & Loan Ass'n v. City of Opa-Locka*, 516 So. 2d 989, 993 (Fla. 3rd DCA 1987 ("The precise reason that banks employ sophisticated safeguards is to detect and prevent losses caused by criminal acts such as embezzlement. Thus the threat of embezzlement is clearly within the zone of risk created by a bank's negligent security procedures. Consequently, the trial court properly

determined that Johnson's criminal act was foreseeable and did not amount to a superseding cause breaking the causal chain between CGS & L's negligence and the city's loss.").

As for Defendant's argument that the Note Issuers caused the harm to themselves, there is a question of fact as to whether the Individual Wrongdoers' wrongful acts could be imputed to the Notes Issuers. *See* ECF No. [184] at 28-40 (finding that a reasonable juror could find that SGG was an innocent decisionmaker and that the Individual Wrongdoers looted the Note Issuers). As such, the question of whether the Note Issuers' conduct, rather than Defendant's conduct, is the proximate cause of the Note Issuers' injury, is not a question of law for the Court to decide in this Motion. *See Kwoka v. Campbell*, 296 So. 2d 629, 631 (Fla. 3rd DCA 1974) ("The question of proximate cause is one for the court where there is an active and efficient intervening cause."). As for Defendant's contention that SGG was unable or unwilling to stop the fraud, as this Court has explained in its Order on summary judgment, that contention is a factual question for the jury. ECF No. [184] at 36.

Defendant's reliance on *Ruiz v. Westbrooke Lake Homes, Inc.*, 559 So. 2d 1172, 1173-74 (Fla. 3rd DCA 1990) is misplaced. Defendant cites to *Ruiz* for the proposition that an unforeseeable intervening cause is the proximate cause of a plaintiff's harms in a simple negligence case. The unforeseeable intervening act in that case—the child's volitional act of attempting to jump from a set of monkey bars to a slide—was the proximate cause of the child's injuries, not the negligence of the homeowner's association that owned and maintained the monkey bars and the slide. *Id.* As explained, it is a factual question for the jury whether the Note Issuers caused their own losses.

Accordingly, the Court denies judgment as a matter of law on proximate causation.

## C. Award of Damages

Defendant argues that there is no evidence of damages in this case. Defendant notes the Court excluded Ratner's testimony regarding "Inconsistent Use Damages" but permitted him to

offer his opinion regarding damages under a deepening insolvency theory. ECF No. [233] at 18-19. Defendant reasons that Plaintiffs failed at trial to lay the proper factual predicate for the introduction of Ratner's opinions on deepening insolvency, specifically by failing to establish that the Note Issuers were insolvent at the time that the Individual Wrongdoers injured the Note Issuers by increasing their liabilities. ECF No. [233] at 19.

Plaintiffs respond that Ratner's testimony is not the only evidence from which the jury could award damages. Plaintiffs cite to Defendant's calculations of the Note Issuers' outstanding liabilities, ECF No. [235] at 15 (citing PTX 223),[9] and witness Rutherford's testimony that Defendant transferred $124 million in newly issued notes to the Madison sub-accounts after April 2014, as evidence of the Note Issuers' damages. Plaintiffs also respond that ample evidence supports that the Note Issuers were insolvent. First, Plaintiffs cite to Pearson's testimony that the Note Issuers were "extremely insolvent." *Id.* at 16. Second, Plaintiffs cite to the testimony of Paul Yetton that the Note Issuers owed principal of $120,056,650.00 on the Notes, which had not been repaid in 2014, those liabilities grew to $251,324,688.00 in 2017, and there was no evidence that the Note Issuers had any assets. *Id.* at 16-17 (citing PTX223). Third, Plaintiffs contend that the parties stipulated that the real estate development projects associated with South Bay were insolvent, and that the offering memoranda for the Notes confirm those real estate projects were the collateral that backed the Notes, and ergo, the Note Issuers were also insolvent. *Id.* at 17 (citing ECF No. [194] at 7-8; DTX 120 at 6, 9). Fourth, Plaintiffs submit that Ponzi schemes are insolvent as a matter of law. *Id.* (citing *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014); *In re Fin. Federated Title & Tr., Inc.*, 309 F.3d 1325, 1332 (11th Cir. 2002)).

Upon review of the parties' submissions, the Court concludes that there is sufficient

---

[9] The Court does not have a copy of this exhibit as of the date of this Order.

evidence from which the jury may conclude that the Note Issuers suffered damages. For example, Yetton testified that there were 83 Note issuances between April 2014 and 2016 which were valued at $124,009,000.00. Drawing the inference in favor of Plaintiffs, as the Court must in this posture, a jury can reasonably conclude that $124,009,000.00 is an appropriate measure of the Note Issuers' damages. In addition, the parties' stipulation confirms that "[a]round 1999, certain of the Wrongdoers' created and controlled a company called [South Bay], which claimed to develop real estate in South Florida," and that "South Bay and its subsidiaries were insolvent by at least 2008." ECF No. [194] at 7-8. The trial evidence supports that the Note issuances in this action were purportedly backed only by South Bay's real estate. For example, the record indicates that SG Strategic Income Limited prepared a document, dated June 6, 2011, for an issue of up to $25,000,000.00 in Notes linked to the credit of "South Bay Holdings LLC." DX 116 at 1. South Bay Holdings LLC is identified as the "Referenced Entity," and the document represents that "the Referenced Entity primarily invests into mortgages, mortgage backed securities, lands, development of real estate and a wide variety of real estate related investments." *Id.* at 14. Accordingly, a reasonable jury may conclude that the Individual Wrongdoers caused the issuance of Notes that were backed by the assets of an entity that was itself insolvent, supporting Plaintiffs' deepening insolvency theory.

Accordingly, the Court finds that judgment as a matter of law is not warranted as to an award of damages.

### D. Whether the Exculpatory Clauses in the Agency Agreements Bar Plaintiff's Negligence Claim

Defendant asserts that clause 9 of the Agency Agreements expressly bar Plaintiff's Claim for Negligence under Count VI. Clause 9 provides that "under no circumstances will the Agents be liable to the Issuer or any other party to this Agreement in contract, tort (including negligence)

or otherwise for *any consequential, special, indirect or speculative loss or damage . . .* which arises out of or in connection with this Agreement[.]" *See, e.g.*, ECF No. [137-1] at 486 (emphasis added). The Court notes that Clause 9 is titled "Limitation of Liability," and that the nouns "loss" and "damages" are modified by the adjectives "consequential, special, indirect or speculative." *Id.* In context, the Court concludes that the Agency Agreements limit liability for losses or damages that are consequential, special, indirect or speculative but do not purport to exclude all damages entirely. For example, Florida law recognizes "compensatory damages" as damages which arise from a plaintiff's actual and indirect losses, such as pecuniary losses. *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1285 (S.D. Fla. 2021) (quoting *Margaret Ann Super Mkts., Inc. v. Dent*, 64 So. 2d 291, 292 (Fla. 1953)). As discussed above at III.A., English law controls the interpretation of the Agency Agreements, and, as this Court's research confirms, English courts, like American courts, distinguish between different types of damages, such as "consequential damages." *See Saipol v. Inerco* [2014] EWHC 211, ¶ 7 (acknowledging claim for "consequential damages"); *see also Monarch Steamship Co. v. Karlshamns Olje-Fabriker (A/B)*, [1949] A.C. 196, 221 (distinguishing between "damages arising naturally (which means in the normal course of things), and cases where there were special and extraordinary circumstances beyond the reasonable prevision of the parties."). Absent evidence to the contrary, the Court finds that clause 9 does not prevent Plaintiffs from recovering damages which are *not* consequential, special, indirect or speculative. Thus, clause 9 cannot be read to limit damages in tort under Florida law. *See Am. Bd. of Cardiovascular Medicine v. John Wiley & Sons, Inc.*, 2016 WL 9383326, at *2 (M.D. Fla. June 15, 2016) (holding that provision limiting liability for "any incidental, consequential, special, or indirect loss or damage" does not limit "actual or direct damages"); *Tardif v. People for the Ethical Treatment of Animals*, 2011 WL 6005280, at *2 (M.D. Fla. Dec.

Case No. 21-cv-22437-BLOOM/Otazo-Reyes

1, 2011) (explaining that tort recovery includes all damages which are the natural, direct and proximate cause of tortious conduct); *see also Tillman v. Howell*, 634 So. 2d 268, 270 (Fla. 4th DCA 1994) (same).

Thus, the Court concludes clause 9 does not foreclose Plaintiffs' Claim for Negligence under Count VI.

**IV.     Conclusion**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Motion, **ECF No. [233]**, is **GRANTED IN PART AND DENIED IN PART**.

2. Judgment as a matter of law is **GRANTED** as to Count III.

3. Otherwise, the Motion is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 22, 2023.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:      Counsel of Record

23