UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 21-cv-22437-BLOOM/Otazo-Reyes**

MICHAEL PEARSON, *et al*.,

      Plaintiffs,

v.

DEUTSCHE BANK AG, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER ON POST TRIAL MOTIONS

**THIS CAUSE** is before the Court on Plaintiffs Michael Pearson, Andrew Childe, and Anna Silver's ("Plaintiffs") Motion to Amend Judgment and Request for Prejudgment Interest, ECF No. [259] ("Plaintiffs' Motion"); and Defendant Deutsche Bank AG's ("Defendant" or "Deutsche Bank") Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for New Trial. ECF No. [262] ("Defendant's Motion"). Regarding Plaintiffs' Motion, Defendants filed a Response in Opposition, ECF No. [263], and Plaintiffs filed a Reply, ECF No. [272]. Regarding Defendant's Motion, Plaintiffs filed a Response in Opposition, ECF No. [273], and Defendant filed a Reply, ECF No. [280]. The Court has reviewed the Motions, the Responses, the Replies, the record in this case, and the applicable law. For the following reasons, Defendant's Motion is denied, and Plaintiffs' Motion is granted in part and denied in part.

### I.    BACKGROUND

This action stems from a global Ponzi scheme resulting in hundreds of millions of dollars in losses and dozens of lawsuits. Amend. Compl. ¶¶ 1-2, 44, ECF No. [31].[1] The scheme was

---

[1] The Court assumes the parties' familiarity with the facts of this case but sets forth a summary of the action and the Motions. A fulsome review of the facts in the case is outlined in the Court's March 23, 2023

perpetrated by four individuals—Roberto G. Cortes, Ernesto H. Weisson, Juan Carlos Cortes, and Frank Chatburn (collectively, the "Individual Wrongdoers")—as principals of two companies—South Bay Holdings, LLC ("South Bay") and Biscayne Capital International, LLC ("Biscayne"). *Id.* ¶ 3. South Bay purported to develop real estate in South Florida, and Biscayne helped raised capital for the real estate developments. *Id.* ¶¶ 9-10. The Ponzi scheme generally worked as follows. The Individual Wrongdoers used five Companies that the parties refer to as "the Note Issuers"—Diversified Real Estate, GMS Global Market Step Up, Preferred Income, Sentinel Investment, and SG Strategic—to sell notes ("Notes") to investors who believed that the Notes were backed by South Bay's real estate assets. *Id.* ¶ 11. In truth, South Bay's properties were heavily leveraged, rendering the security interests worthless. *Id.* ¶¶ 12-13. The Individual Wrongdoers then

> used the proceeds generated through the issuance of notes to offset losses in real estate investments; cover liabilities incurred by other, Biscayne-related entities; pay interest and principal on other notes; enrich themselves, their relatives and associates . . . ; and fund unrelated investments and entities that they never disclosed to the innocent investors.

*Id.* ¶ 14. As described more fully in the Court's March 23, 2023 Order, Carlos Trujillo, the principal of Madison Asset, LLC ("Madison"), played an integral role in the Individual Wrongdoers' scheme, namely by opening custody sub-accounts at Deutsche Bank New York. *See* ECF No. [184] at 22.

Plaintiffs are foreign representatives[2] and liquidators of thirteen (13) companies currently undergoing liquidation in the Cayman Islands ("Companies"), including the Note Issuers, who

---

Omnibus Order on the parties' respective motions for summary judgment and partial summary judgment, ECF No. [184] ("March 23, 2023 Order"), and April 22, 2023 Order on Defendant's motion for judgment as a matter of law, ECF No. [239] ("April 22, 2023 Order").

[2] The Amended Complaint uses the term "foreign representative" as defined by the Bankruptcy Code: "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding

filed an Amended Complaint in which they assert eight Counts—including as relevant here Count VI: Negligence—against Defendants Deutsche Bank ("Defendant"), a global financial institution with branches in the United States and abroad, and three of its subsidiaries: Deutsche Trust, Deutsche Bank Luxembourg S.A., and Deutsche Bank Switzerland. *Id.* ¶¶ 18, 28-29, 373-461. Of relevance to the issues presented in Defendant's Motion, SGG was an entity that served as an independent director for the Note Issuers, and Herman Oosten ("Oosten") acted as SGG's agent for that purpose. ECF No. [184] at 17. Plaintiffs, on behalf of the Note Issuers only, and Defendant proceeded to an eight-day jury trial,[3] which commenced on April 10, 2023. ECF Nos. [223], [224], [230], [231], [232], [234], [246], and [247]. The jury returned a verdict for Plaintiffs in the amount of $95,000,000.00, finding Defendant liable on Count VI, the claim for Negligence. *See* ECF No. [252]. Accordingly, the Court entered Final Judgment in favor of Plaintiffs on Count VI and in favor or Defendant on all other Counts. ECF No. [254].

### A.   Defendant's Motion

Defendant argues that it is entitled to judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure or to a new trial under Rule 59. ECF No. [262] at 31. In Defendant's view, the jury verdict is unsupported by the evidence and manifestly contrary to law. *Id.* at 8. In support, Defendant marshals seven primary arguments.

***First***, the jury verdict is barred by the independent tort doctrine. To the extent the jury relied on evidence that Defendant transferred the Notes, that doctrine bars recovery because those transfers were subject to certain contractual agreements ("Agency Agreements") between the Note Issuers and Defendant and Plaintiffs failed to prove the existence of a duty of care separate from

---

to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." ECF No. [31] at 7 n.4 (quoting 11 U.S.C.A. § 101(24)).
[3] The other parties to this action were dismissed. *See* ECF Nos. [185] at 79, [206], [211].

those set forth in the Agency Agreements. *Id.* at 11-14. Because the jury verdict may be premised on Note transfers, a new trial is required. *Id.* at 18.

*Second*, the Negligence claim fails because the Agency Agreements expressly disclaim a duty of care. *Id.* at 14-15.

*Third*, Florida law bars the Negligence claim because a bank generally owes a duty of care only to its customers and the Note Issuers were not Defendant's customers with respect to the Madison Accounts. *Id.* at 15-18.

*Fourth*, there is no evidentiary basis on which a reasonable jury could have found proximate causation because the Note Issuers issued the Notes that caused the Note Issuers' deepening insolvency and because the Individual Wrongdoers' looting of the proceeds of the note issuances was a superseding cause. *Id.* at 19-22.

*Fifth*, contrary to Florida law, the Court failed to enter judgment against each party based on each party's percentage of fault because the jury was not instructed to apportion negligence damages. *Id.* at 22-26.

*Sixth*, the damages award is improper to the extent it was premised on a theory of deepening insolvency and that the evidence was insufficient to find damages on that basis. *Id.* at 27-30. The damages award is also improper because Plaintiffs' damages are entirely consequential or indirect. *Id.* at 28-30.

*Seventh*, the *in pari delicto* doctrine bars the Negligence claim because the only basis on which the jury could have found the doctrine did not apply was inadmissible hearsay. *Id.* at 30-31.

### B.   **Plaintiff's Motion**

On May 10, 2023, Plaintiffs filed their Motion, seeking an additional $38,019,727.00 for prejudgment interest, which would result in a total judgment of $133,019,727.00. Plaintiffs contend that they are entitled to prejudgment interest because the jury based their decision on the

note issuances and the date of those issuances is ascertainable. *See* ECF No. [259] at 3. As those losses occurred over time, Plaintiffs contend the jury awarded the verdict on the value of the last Notes that are collectively worth approximately $95,000,000.00. *Id.* In Attachment A of their Motion, Plaintiffs rely on the "Detail of Note Issuances with Prejudgment Interest," prepared by their damages expert Ian Ratner, which was introduced at trial to support their calculations. ECF No. [259-1].

### C.    Jury Instructions

The Court sets forth the jury instructions that are pertinent to the Defendant's Motion.

### 1.    *Negligence – Duty*

The Court provided the jury with the following instruction:

> Banks owe a duty of ordinary care to their customers. However, custodian banks, such as Deutsche Bank AG, are not required to monitor, verify, or ensure the validity of transactions or to investigate transactions made by the customer's authorized agent unless specific facts or knowledge about a customer or transaction would lead an ordinarily careful bank to do so.

*See* ECF No. [287] at 131:15-21.[4]

### 2.    *Proximate Cause*

The jury was instructed as follows on proximate and superseding causes:

> Negligence is a legal cause of loss if it directly and in natural and continuous sequence produces or contributes substantially to producing such loss, so that it can reasonably be said that, but for the negligence, the loss would not have occurred. Negligence may be a legal cause of loss even though it operates in combination with some other cause if the negligence contributes substantially to producing such loss. Negligence may also be a legal cause of loss even though it operates in combination with some other cause occurring after the negligence occurs if such other cause was itself reasonably foreseeable and the negligence contributes substantially to producing such loss.

---

[4] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings; except when citing to the trial transcript, in which case the Court cites to the page number in the transcript.

ECF No. [287] at 132.

### 3. Damages

Turning to damages, the Court stated that "Plaintiff[s] also seek[] damages for what is . . . known as deepening insolvency. Deepening insolvency refers to the injuries incurred due to an artificial or fraudulently prolonged life and consequent dissipation of assets of an insolvent company." *Id.* at 137:11-15. The Court further explained: "[i]f you find for Plaintiffs on their . . . negligence claim[], you may award damages for deepening insolvency. That is the additional debt the note issuers incurred after their insolvency due to Defendant's actions. Such damages may include dissipation of company assets." *Id.* at 137:16-22. Moreover, the Court stated that the jury should determine the amount of injury which "the greater weight of the evidence shows the note issuers sustained as a result of the injury." *Id.* at 137:24-138:4.

The Court also instructed the jury on "consequential" or "direct damages":

These damages do not arise within the scope of the immediate contracting parties' relationship, which in this case means the Plaintiffs and the Defendants, but rather as a result of a third party or third party's conduct, i.e., the conduct of the individual wrongdoers, which the Plaintiffs allege the Defendant failed to prevent. If you determine that Plaintiffs' damages are entirely consequential or indirect damages, you will not award damages to the Plaintiffs on their negligence claim.

*Id.* at 138:5-17.

### II.   LEGAL STANDARD

### A.   Rule 50

"Under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate only if the facts and inferences point so overwhelmingly in favor of one party . . . that reasonable people could not arrive at a contrary verdict." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010) (quotation marks omitted; alteration in the original). The Court must consider the evidence in the light most favorable to the nonmoving party and determine "whether or not

reasonable jurors could have concluded as this jury did based on the evidence presented." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997) (citation omitted). It is "the jury's task," not the Court's, "to weigh conflicted evidence and inferences, and determine the credibility of witnesses." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quotation marks and citation omitted).

"[A]ny renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004).

**B.     Rule 59**

In addition to filing a renewed motion under Rule 50, a losing party may also move for a new trial "under Rule 59 on the grounds that 'the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" *McGinnis*, 817 F.3d at 1254 (alteration in the original) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

Unlike a Rule 50 Motion, "in a motion for a new trial the judge is free to weigh the evidence." *Id*. at 1254 (quotation marks omitted). "[W]hen independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well." *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982). A motion for new trial should be granted "when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotation omitted).

The standard for evaluating a Rule 59 motion for a new trial is "less stringent" than the standard for a motion for judgment as a matter of law. *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1320 n.3 (11th Cir. 1999). Therefore, failure to meet the Rule 59 standard is "fatal" to a Rule 50 motion. *Id*.

### C.  Prejudgment Interest

The Eleventh Circuit has held that a timely post-judgment motion for discretionary prejudgment interest falls under the purview of Rule 59(e) of the Federal Rules of Civil Procedure. *Alhassid v. Bank of Am., N.A.*, 688 F. App'x 753, 761 (11th Cir. 2017) (citing *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175-78 & n.3 (1989)). Rule 59(e) permits a party to file a motion to alter or amend a judgment within twenty-eight (28) days after the entry of the judgment. Fed. R. Civ. P. 59(e). Under Rule 59(e), "[t]he decision to alter or amend a judgment is committed to the sound discretion of the district court." *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992).

In diversity cases, state law governs prejudgment interest. *Royster v. Union Carbide Corp.*, 737 F.2d 941, 948 (11th Cir. 1984). However, when a federal court holds jurisdiction over a case under federal question jurisdiction, it is not bound by state law regarding prejudgment interest. *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GumbH*, 141 F.3d 1434, 1446-47 (11th Cir. 1998), *overruled on other grounds by Corporacion AIC, SA v. Hidroelectrica Santa Rita S.A.*, 66 F.4th 876 (11th Cir. 2023). In the Eleventh Circuit, awards of prejudgment interest are equitable remedies to be decided in a district court's sound discretion. *Indus. Risk Insurers*, 141 F.3d at 1446. Moreover, prejudgment interest is not a penalty but is compensation to the plaintiff for the use of funds that rightfully belonged to them. *Ins. Co. of N. Am. v. M/V Ocean Lynx*, 901 F.2d 934, 942 (11th Cir. 1990).

Where, as here, there is no controlling federal statute as to the manner of computing prejudgment interest, the choice of a rate at which to set the amount of prejudgment interest is

within the discretion of a federal court. *See Indus. Risk Insurers*, 141 F.3d at 1447. The Court's discretion is "usually guided by principles of reasonableness and fairness, by relevant state law, and by the relevant fifty-two week United States Treasury bond rate, which is the rate that federal courts must use in awarding post-judgment interest." *Id.* (citing 28 U.S.C. § 1961). The Eleventh Circuit has suggested that, at least as to the forum state's choice of law rules, federal courts exercising jurisdiction under 28 U.S.C. § 1334 should apply the forum state's law "when the underlying rights and obligations of the parties are defined by state law." *Mukamal v. Bakes*, 378 F. App'x 890, 896 (11th Cir. 2010) (citing *Off. Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 00-8688, 2002 WL 362794, at *5 (S.D.N.Y. Mar. 6, 2002)); *see also Indus. Risk Insurers*, 141 F.3d at 1447 n.18 (noting district court may choose to be guided by Florida law to determine entitlement to post-award prejudgment interest). Courts in this district have chosen to follow Florida law in calculating prejudgment interest in cases where state law claims are asserted. *See, e.g.*, *Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1329 (S.D. Fla. 2009).

Florida has adopted the "loss theory" of prejudgment interest, which means "the loss itself is a wrongful deprivation by the defendant of the plaintiff's property, and prejudgment interest is required to make the plaintiff whole from the date of loss." *Zokaites v. Balistreri Reality, Inc.*, 2007 WL 9700533, at *1 (S.D. Fla. Aug. 24, 2007) (quoting *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985)). Under Florida law, prejudgment interest may be awarded "when it is determined that the plaintiff has suffered an actual out of pocket loss at some date prior to the verdict." *Alvarado v. Rice*, 614 So. 2d 498, 499 (Fla. 1993). Thus, there are two prerequisites that a plaintiff must meet in order to be entitled to prejudgment interest: (1) an out-of-pocket pecuniary loss; and (2) a fixed date for that loss. *H & S Corp. v. U.S. Fid. & Guar. Co.*, 667 So.

2d 393, 399 (Fla. 1st DCA 1995). An out-of-pocket loss is generally defined as a loss of a vested property right. *Alvarado*, 614 So. 2d at 499. In tort cases, prejudgment interest is usually not awarded because damages are generally too speculative before final judgment. *Lumbermens Mut. Cas. Co. v. Percefull*, 653 So. 2d 389, 390 (Fla. 1995); *see also Underhill Fancy Veal, Inc. v. Padot*, 677 So. 2d 1378, 1380 (Fla. 1st DCA 1996). This rule, however, is not absolute and prejudgment interest may be awarded in tort cases as to those damages where there has been an ascertainable out-of-pocket loss occurring at a specific time prior to the entry of the judgment. *Alvarado*, 614 So. 2d at 498.

In addition to those two prerequisites, a court has discretion to deny or reduce prejudgment interest if an award would be inequitable. *Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 878 (11th Cir. 2011). Equitable considerations include whether the delay between injury and judgment was the prevailing party's fault or whether the party could have mitigated its damages but did not. *Kleiman v. Wright*, No. 18-CV-80176, 2022 WL 705971, at *3 (S.D. Fla. Mar. 9, 2022).

When a court is unable to ascertain the date when the damages occurred, "Florida law supports the proposition that prejudgment interest can be awarded properly from the latest possible date of loss." *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 795 (11th Cir. 2005); *see also Cohen v. Burlington Inc.*, No. 18-CV-81420, 2019 WL 1585100, at *3 (S.D. Fla. Apr. 12, 2019) (holding that date of injury does not necessarily equate to date of loss and insufficient support was provided to ascertain from the evidence the date of loss for certain expenses). When the record does not support damages as of any specific date, damages are considered liquidated by the jury verdict and the prevailing party is entitled to prejudgment interest from verdict until final judgment is entered. *Perdue Farms, Inc. v. Hook*, 777 So. 2d 1047, 1055 (Fla. 2nd DCA 2001); *see also Checkers*

*Drive-in Rest., Inc. v. Tampa Checkmate Food Serv., Inc.*, 805 So. 2d 941, 944-45 (Fla. 2nd DCA 2001) (finding damages only liquidated by jury verdict and prejudgment interest awarded from verdict). Once a verdict has liquidated damages as of a date certain, the determination of prejudgment interest is a mathematical computation. *Argonaut*, 474 So. 2d at 215.

### III.    DISCUSSION

#### A.    Defendant's Motion

##### 1.    *Apportionment of Damages*

Defendant argues that a new trial under Rule 59 is necessary because the Court erred by denying Defendant's request for a jury instruction to apportion damages among negligent parties. ECF No. [262] at 25. Defendant contends that Plaintiffs' argument that Florida's apportionment statute[5] does not apply in this case is based on a faulty reading of *Merrill Crossings Assocs. v. McDonald*, 705 So. 2d 560 (Fla. 1997). *Id.* at 22. Defendant submits that *Merrill Crossings* only held that "a negligent tortfeasor's liability cannot be apportioned with that of an *intentional* tortfeasor," something Defendant did not seek. *Id.* at 23 (emphasis in original). Defendant contends Florida courts interpreting section 768.81 and analyzing *Merrill Crossings* continue to apply comparative fault to apportion liability among negligent parties. *Id.* (citing *Hennis v. City Tropics Bistro, Inc.*, 1 So. 3d 1152, 1155 (Fla. 5th DCA 2009)); *Burns Int'l Sec. Servs. of Fla. v. Philadelphia Indem. Ins. Co.*, 899 So. 2d 361, 365-66 (Fla. 4th DCA 2005)). Defendant also relies on *Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112, 1135 (11th Cir. 2020), which states that, "at least where the jury does not find for the plaintiff on any intentional tort, an *Engle* progeny plaintiff's compensatory damages award is reduced by a percentage equal to how much he was at

---

[5] Fla. Stat. § 768.81(3).

fault for causing his own injury." *Id.* at 24.[6] Defendant thus seeks a new trial on the negligence claim because the Seventh Amendment bars limiting a new trial to the issue of apportionment. *Id.* at 25.

Plaintiffs respond the apportionment statute does not apply because this action is "based on an intentional tort." ECF No. [273] at 16-17. Plaintiffs contend that conclusion follows from the rationale in *Merrill Crossings*, which explains that courts must inquire as to whether "the entire action against or involving multiple parties is founded or constructed on an intentional tort. In other words, the issue is whether an action comprehending one or more negligent torts actually has at its core an intentional tort by someone." *Id.* at 17 (citing *Merrill Crossings*, 705 So. 2d at 563). That rationale applies here because "the negligence count is based on the Bank's failure to exercise ordinary care to prevent the wrongdoers from misappropriating the notes to enrich themselves and others[.]" *Id.* Plaintiff notes the Court denied Defendant's summary judgment and Rule 50(a) motions in part because the evidence tends to show Defendant committed intentional torts, which further supports the Court finding the instant action was "based upon an intentional tort." *Id.* at 18 n.17 (citing *Millette*, 435 F. App'x at 853). Plaintiffs further argue that while damages were apportioned in *Merrill Crossings*, the Florida Supreme Court did not rule on the propriety of that apportionment. *Id.* at 18. Plaintiffs argue that the two intermediate appellate decisions that Defendant cites are inconsistent with the rationale in *Merrill Crossings* and are not binding on the Court. *Id.*

---

[6] *Engle v. Liggett Group, Inc.* was smokers' class action lawsuit that sought damages against cigarette companies and industry organizations for alleged smoking-related injuries. *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1254 (Fla. 2006). Defendant also relies on an Eleventh Circuit case for the proposition that a jury may be instructed on the comparative fault of negligent tortfeasors who are not found liable for an intentional tort. *See Millette v. Tarnove*, 435 F. App'x 848, 853 (11th Cir. 2011). However, that case only held on the issue of whether a nonparty committed an intentional tort presents a pure question of law. *Id.* It does not support Defendant's contention here.

Moreover, Plaintiffs argue the Defendant's reading of Section 768.81(4) contravenes the plain words of the statute and is contrary to the substantive canon that calls for construing statutes in derogation of the common law strictly and narrowly. *Id.* at 19. Plaintiffs seek to distinguish *Sowers* on the grounds that that case did not rule on the issue presented here and concerned *Engle* progeny cases. *Id.* at 19-20. Plaintiff further maintains the Defendant waived any right to apportionment on procedural grounds and provided no evidentiary basis to find that the Note Issuers were comparatively negligent. *Id.* at 19-23. Finally, Plaintiffs dispute that the Seventh Amendment requires a re-trial on Defendant's negligence. *Id.* at 23-24.

Defendant replies that Plaintiffs' argument is untenable given that apportionment was allowed in both *Merrill Crossings* and in *Island City Flying Service v. General Electric Credit Corp.*, 585 So. 2d 274 (Fla. 1991). ECF No. [280] at 16. Defendant maintains Plaintiffs are essentially asking the Court to substitute Plaintiffs' interpretation of *Merrill Crossings* for *Hennis* and *Burns* and cannot avoid *Sowers*. *Id.* at 17.

Florida Statutes Section 768.81 provides in relevant part:

> **(1) Definitions.**--As used in this section, the term:
> . . .
> (c) "Negligence action" means, without limitation, a civil action for damages based upon a theory of negligence, strict liability, products liability, professional malpractice whether couched in terms of contract or tort, or breach of warranty and like theories. The substance of an action, not conclusory terms used by a party, determines whether an action is a negligence action.
> . . .
> **(3) Apportionment of damages.**--In a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability.
> . . .
> **(4) Applicability.**--This section does not apply to any action brought by any person to recover actual economic damages resulting from pollution, to any action based upon an intentional tort[.]

Fla. Stat. § 768.81. *Merrill Crossings*, a case involving an unknown assailant who shot a plaintiff in the parking lot of a Wal-Mart store, held the statute did not apply. *Merrill Crossings*, 705 So.

2d at 563. The plaintiff sued Wal-Mart and a shopping center owner for allegedly failing to maintain reasonable security measures. *Id.* at 561. The jury returned a verdict in the plaintiff's favor and found Wal-Mart and the shopping center owner seventy-five percent and twenty-five percent liable, respectively. *Id.* The issue before the court was whether the trial court erred in failing to include the assailant on the verdict form. *Id.*

The court stated that courts must look to "the substance of the action" in determining whether a case falls within the term "negligence cases." *Id.* The court concluded that the substance of that action was "an intentional tort, not merely negligence." *Id.* In reaching that conclusion, the court construed the statutory language "based upon an intentional tort" to mean that courts must determine whether "an action comprehending one or more negligent torts actually has at its core an intentional tort by someone." *Id.*

Here, the instant action has at its core an intentional tort by someone. As Defendant's Statement of the Case puts it, this action stems from a Ponzi scheme that was orchestrated by several Individual Wrongdoers that caused hundreds of millions of dollars of losses for innocent investors. ECF No. [194] at 4. Although the jury found in Plaintiffs' favor only on the negligence count, this is  a case that substantively arises from the Individual Wrongdoer's intentional torts. The Court, exercising its gate-keeping responsibility, clarifies that this is an action "based on an intentional tort" and concludes its decision not to include Defendant's comparative negligence instruction was proper. *See Millette*, 435 F. App'x at 853 (citing *Petit-Dos v. Sch. Bd. of Broward Cnty.*, 2 So. 3d 1022, 1024 (Fla. 4th DCA 2009) (stating that the determination of an intentional tort is "an objective inquiry, decided as a matter of law") (citation omitted)).

Defendant essentially asks the Court to instruct a new jury to apportion liability between the parties, but such an instruction would be inconsistent with *Merrill Crossings*. That case

explained "it would be irrational to allow a party who negligently fails to provide reasonable security measures to reduce its liability because there is an intervening intentional tort, where the . . . tort is exactly what the security measures are supposed to protect against." *Merrill Crossings*, 705 So. 2d at 562-63. Here, Defendant seeks to reduce its liability in a case where the jury found it negligent for failing to take measures to prevent or mitigate the Individual Wrongdoer's harms to the Note Issuers. Under *Merrill Crossings*, had Deutsche Bank Lux or Deutsche Bank Suisse remained in the action, apportionment of damages between them and Defendant would have been proper. By contrast, although the Florida Supreme Court did not reach the question of a victim's comparative negligence, a comparative negligence instruction here would be at variance with the Florida Supreme Court's reasoning. In other words, if it contravenes public policy effectuated by Section 768.81 to allow a negligent tortfeasor, i.e., a defendant in a negligence claim, to shift blame to an intentional non-party tortfeasor, it would also violate public policy *a fortiori* for that defendant to shift the blame to a negligent victim of the intentional tort. *See Merrill Crossings*, 705 So. 2d at 562 ("the language excluding actions 'based on an intentional tort' . . . gives effect to a public policy that negligent tortfeasors such as in the instant case should not be permitted to reduce their liability by shifting it to another tortfeasor whose intentional criminal conduct was a foreseeable result of their negligence."). The Court is therefore not persuaded that a comparative negligence jury instruction would have been consistent with *Merrill Crossings*.

Neither does the Court agree that *Hennis* and *Burns* counsel a contrary result. The courts in those cases determined that there were no intentional torts at their core. *See Hennis v. City Tropics Bistro, Inc.*, 1 So. 3d at 1156 ("Hennis'[s] lawsuit against City Tropics was based on the theory of negligent security, and City Tropics' claim for apportionment against Hennis and Betten was based on their alleged comparative negligence. As such, . . . there was no claim submitted by

either party 'based upon an intentional tort'"); *see also id.* (quoting *Burns*, 899 So. 2d at 365) ("the action against Burns is not based upon an intentional tort but instead is based on the negligent manner in which Burns conducted its security responsibilities").[7] The Court is not persuaded that *Sowers* demands a contrary result either. There, the Eleventh Circuit's observation that a plaintiff's compensatory damages award is reduced by his percentage of fault where the jury does not find for him on any intentional tort was expressly limited to *Engle* progeny cases. *Sowers*, 975 F.3d at 1135. That limitation makes sense because—as Plaintiffs persuasively argue—where there is no jury finding in favor of a plaintiff on an intentional tort, there is no finding that an intentional tort was committed at all. Here, there is no question that the Individual Wrongdoers committed intentional tortious conduct. Since this is not an *Engle* case, *Merrill Crossings*, not *Sowers*, controls.

For the foregoing reasons and given that Defendant has not shown that a new trial has previously been granted in an action at law in federal court on these grounds, the Court declines to order a new trial. *See* Fed. R. Civ. P. 59(a)(1)(A).

### 2.      *Independent Tort Doctrine*

Defendant contends the independent tort doctrine bars Plaintiffs' recovery for Defendant's conduct with respect to the delivery of the Notes because the only damages on which Plaintiffs offered evidence stemmed from the issuance and delivery of Notes, making that conduct inextricably intertwined with its performance under the Agency Agreements. ECF No. [262] at 14.

Plaintiffs respond that they proposed and received a jury instruction that a bank owes its customers a duty of ordinary care akin to the duty owed by a broker-dealer to their customers,

---

[7] *See also Island City Flying Serv. v. Gen. Elec. Credit Corp.*, 585 So. 2d 274, 277 (Fla. 1991) ("This action was based on negligent hiring or retention, not on the vicarious liability of an employer for the intentional tort of an employee.")

which is separate from the obligations imposed by the Agency Agreements. ECF No. [273] at 5. Plaintiffs state that "the jury could find that the Bank breached that . . . duty by facilitating the transfers and liquidation of the Notes through the Madison accounts *after* acquiring facts that would have caused an ordinarily careful bank to stop." *Id.* (emphasis in original). Plaintiff states that Agency Agreements do not provide for how or to whom the Notes must be delivered, and that the duty of care required that Defendant stop processing wire transfers of the Note proceeds or alert the Issuers' independent director. *Id.*

Defendant replies that the only injury for which Plaintiffs offered proof resulted from the transfers of Notes, an activity that the Agency Agreements expressly govern; and asserts there is nothing in the record indicating that the Note Issuers suffered any damages separate and apart from damages it suffered due to its failure to honor the Agency Agreements. ECF No. [280] at 7. Defendant argues Plaintiffs' negligence claim is "inextricably intertwined" with a claim for breach of the Agency Agreements. *Id.*

The independent tort doctrine bars "a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations." *Reagan Wireless Corp. v. Apto Sols., Inc.*, No. 18-cv-61147, 2018 WL 4901127, at \*3 (S.D. Fla. Oct. 9, 2018) (quotation marks omitted).[8] However, the independent tort doctrine will not bar tort claims based on an "action beyond and independent of breach of contract that amounts to an independent tort." *Id.* (quoting *Kay v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014 WL 2215770, at \*4 (S.D. Fla. May 29, 2014)). On the other hand, a tort claim that is inextricably intertwined with

---

[8] The Court rejected Defendant's argument in its April 22, 2023 Order on the grounds that *Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013), limited Florida's economic loss rule to products liability cases. ECF No. [239] at 8. However, Defendant correctly notes that the Eleventh Circuit has treated the independent tort doctrine and economic loss rule as "separate hurdle[s]" for a plaintiff to recover in a negligence action. *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014). The Court will therefore consider Defendant's argument.

a claim for breach of contract is not beyond or independent of the rights and duties of the parties'
contract. *Temurian v. Piccolo*, No. 18-cv-62737, 2019 WL 1763022, at *8 (S.D. Fla. Apr. 22,
2019).

The Agency Agreements provide that Defendant is the agent of the Note Issuers "in respect
of the Notes" in accordance with the Agency Agreements' terms and conditions. ECF No. [239]
at 2. In its April 22, 2023 Order, the Court found that the terms and conditions of those agreements
detail ministerial or administrative tasks that relate to the transfer of Notes. The problem is not that
Defendant failed to perform those tasks, but rather that it continued doing so without notifying the
Note Issuers' independent director after Defendant's employees became aware of Gustavo
Trujillo's improper conduct in conjunction with those Notes, assuming the Defendant had a duty
to do so. To the extent that duty exists, it is separate from and in addition to the Defendant's
administrative obligations under the Agency Agreements. Thus, the independent tort doctrine
would not bar Plaintiffs' negligence claim if the duty that Plaintiffs identify is recognized in law.
The Court turns to that issue.[9]

---

[9] If an independent duty exists, Defendant's reliance on its long line of cases would be misplaced. In
*Kalpakchian*, the Court held Georgia's economic loss doctrine barred the plaintiff's claim because the
deposition agreement expressly covered an amended or canceled payment order when the plaintiff alleged
an independent duty concerning the making of payments to her account. Here, although the Agency
Agreements expressly disclaim liability for consequential and other damages, it does not disclaim any duty
of care. *See, e.g.*, ECF No. [137-1] at 486. In *Pastor*, the court determined that the plaintiff failed to
adequately allege a legally supported extra-contractual duty that is independent from those in the contract
that governed the plaintiff and defendant-bank's relationship. *Pastor v. Bank of Am., N.A.*, No. 22-24121-
CIV, 2023 WL 2646817, at *2 (S.D. Fla. Mar. 27, 2023). Here, Plaintiffs have maintained such a duty
exists. For that same reason, *Negron* is inapplicable since the alleged tort stemmed from a defendant's
material breach of a mortgage. *Negron v. CitiMortgage Inc.*, No. 16-CIV-61776, 2016 WL 10953267, at
*9 (S.D. Fla. Oct. 19, 2016). In *Dorvil*, the court found that a negligence claim was "only about Defendant's
alleged failure to perform its obligations" under two contracts. *Dorvil v. Nationstar Mortg. LLC*, No. 17-
23193-CIV, 2019 WL 1992932, at *17 (S.D. Fla. Mar. 26, 2019). Unlike in *Perez v. Scottsdale Insurance
Co.*, this is not a case where Plaintiff is seeking to recover losses that Defendant refused to cover under the
Agency Agreements. *Perez v. Scottsdale Ins. Co.*, No. CV 19-22761-CIV, 2019 WL 5457746, at *4 (S.D.
Fla. Oct. 24, 2019). The Agency Agreements disclaim consequential damages but not compensatory
damages in tort. ECF No. [239] at 22. Moreover, *Peebles* is inapposite because the dispute there concerned
damages suffered because of a party's failure to honor its contract with another party, whereas the problem

### 3.      Duty

Defendant argues Plaintiffs' negligence claim is barred because the Agency Agreements expressly disclaim any obligations or duties not expressly stated in those agreements. ECF No. [262] at 14-15. Defendant also argues that Defendant owed no duty to the Note Issuers because only Madison was the Defendant's customer. *Id.* at 16. Defendant asserts that Plaintiffs' reliance on *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087 (11th Cir. 2017) is misplaced because there was no evidentiary basis supporting the duty of banks described in that case and that the jury was not instructed on that duty in any event. *Id.* at 17.

Plaintiffs respond that Defendant waived its duty-of-care arguments by failing to raise them in its Motion for Judgment as a Matter of Law. ECF No. [273] at 7. Addressing the merits, Plaintiffs argue that each bank has a duty to their customers to act as an ordinarily careful bank. ECF No. [273] at 8. Plaintiffs rely on the March 23, 2023 Order, which found the evidence supports that Defendant's employees had actual knowledge of Madison's misappropriation, meaning that the evidence all the more supports a showing that Defendant failed to act as an ordinarily careful bank "given the information it had already learned opening and serving the Madison Accounts." *Id.* (citing ECF No. [184] at 47-48). Plaintiffs submit that this is not a case where a plaintiff seeks to hold a bank liable for failing to monitor or investigate transactions for fraud; rather, this is a case where a bank continued to process custodial transactions after it became aware of fraudulent activity, which would have led an ordinarily careful bank to "stop and verify" the transactions. *Id.* at 9. Plaintiffs further submit that Defendant also waived its argument concerning the Agency Agreements but alternatively contend that Florida law requires that a provision in a contract must be "strictly construed against a party claiming to be relieved of liability" and that the provision

---

here is that Defendant apparently performed the Agency Agreements, resulting in the Note Issuers' harm. *See Peebles v. Puig*, 223 So. 3d 1065, 1069 (Fla. 3d DCA 2017).

must be "clear and unequivocal;" since clause 2.3 of the Agency Agreements are not clear or unequivocal on that point, Plaintiffs' negligence claim is viable. *Id.* at 11.

Defendant replies that it preserved its arguments in a footnote to its Rule 50 Motion and that the argument is "closely related" such that it cannot be said Defendant waived the argument for purposes of a renewed motion for judgment as a matter of law. ECF No. [280] at 11-12. Defendant continues that the Note Issuers were not Defendant's customers because Madison, not the Note Issuers, was the custodial account holder. *Id.* Even if the Note Issuers were Defendant's customers, Defendant also argues actual knowledge of a fraud on a customer establishes a duty only where a fiduciary duty exists. *Id.* Defendant also asserts that it preserved its arguments and that the Court's ruling on the Motion for Judgment as a Matter of Law shows that the Defendant owes no duty of ordinary care to the Note Issuers. *Id.* at 14.

At the outset, the Court notes that it neither considered nor determined that clause 2.3 of the Agency Agreements disclaimed the Defendant's duty of ordinary care in its April 22, 2023 Order. The Court instead considered Defendant's argument that "the Agency Agreements expressly disclaimed a fiduciary relationship with plaintiffs." ECF No. [239] at 8. The Court declined to reconsider Plaintiffs' position that Defendant owed a duty of care to the Note Issuers on account of its relationship with Madison and the Defendant's treatment of the Madison sub-accounts. *Id.* at 15 n.6. As such, the Court disagrees with Defendant that its ruling on the Rule 50 motion dictates a finding that the Agency Agreements disclaim an ordinary duty of care. In fact, the Court went on to consider whether an exculpatory clause in the Agency Agreements foreclosed Plaintiffs' negligence claim and found that that clause did not bar recovery in tort under Florida law. *Id.* at 22.

As the Court set forth in the April 22, 2023 Order, clause 2.3 provides that "Agents shall perform such duties as are set out in this Agreement together with those set out in the Conditions," and that "[n]o obligations or duties of the Agents which are not expressly stated herein or in the Conditions shall be implied." *See, e.g.*, ECF No. [137-1] at 480. Under Florida law, "[e]xculpatory provisions which attempt to relieve a party of his or her own negligence are generally looked upon with disfavor, and Florida law requires that such clauses be strictly construed against the party claiming to be relieved of liability." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1166 (11th Cir. 2009) (citing *Sunny Isles Marina, Inc. v. Adulami*, 706 So. 2d 920, 922 (Fla. 3d DCA 1998)). "Such provisions, however, have been found to be valid and enforceable by Florida courts where the intention is made clear and unequivocal." *Id.* (quoting *Adulami*, 706 So. 2d at 922).[10]

Clause 2.3 does not expressly disclaim a duty of ordinary care. Moreover, as the Court explained with respect to clause 9 of the Agency Agreements in its April 22, 2023 Order, the Agency Agreements imply that they do not prohibit recovery for compensatory damages. As such, the Court reads clause 2.3 as limiting duties that may be implied by or follow from the express terms of the Agency Agreements, not duties that do not follow from and are independent of those terms. *See Cooper* 575 F.3d at 1166. The Court thus finds that clause 2.3 does not disclaim duties in tort.[11]

Another issue is whether the Note Issuers were Deutsche Bank's customers. Under Florida law, a customer is "a person having an account with [a] bank or for whom the bank has agreed to

---

[10] In its April 22, 2023 Order, the Court found that English law controlled the Agency Agreements based on a choice of law provision in those contracts, but the parties present argument only with respect to Florida law. ECF No. [239] at 9. Absent further argument or submission of English legal authorities, the Court assumes that Florida law provides substantive guidance in determining the legal significance of clause 2.3.

[11] Unlike the contract in *Paszamant*, the Agency Agreements do not disclaim any specific duties, only all implied contractual duties. This fact distinguishes this case from *Paszamant*, which affirmed the dismissal of negligence claims where the contract excluded any duty to advise on choice or risk of investments. *Paszamant v. Ret. Accts., Inc.*, 776 So. 2d 1049, 1053 (Fla. 5th DCA 2001).

collect items." *Megaval Enters., Ltd. v. Bank of Am., N.A.*, No. 14-20909-CIV, 2014 WL 12609318, at *4 (S.D. Fla. Oct. 8, 2014) (citing *Journeys Acad., Inc. v. PNC Bank*, No. 2:13-CV-285-FTM-38, 2013 WL 3772483, at *2 (M.D. Fla. July 16, 2013) (quoting Fla. Stat. § 647.104(e))). "The person in whose name the account is opened is the account holder and thus, the bank's customer." *Id.*

Here, the evidence admitted at trial includes bank statements for each of the custodial sub-accounts that are each identified as being maintained "for" each of the Note Issuers. *See, e.g.*, Pls.' Ex. 319, ECF No. [257-77] at 1 (for ORC Senior Secured Ltd.); Pls.' Ex. 320, ECF No. [257-78] at 1 (for Preferred Income Coll Interest Ltd.); Pls.' Ex. 321, ECF No. [257-79] (for Global Market Step Up Ltd.); Pls.' Ex. 323, ECF No. [257-80] (for Strategic Income Ltd.). That evidence supports that the Madison custodial sub-accounts were in the Note Issuers' names, further supporting that the Note Issuers were customers within the meaning of the Florida statute, consistent with the Court's jury instruction. *See Journeys Acad.*, 2013 WL 3772483, at *2 ("Even though the individual opening the account did not have authority to do so, the account that was opened was in Journeys name. Thus, Journeys was the account holder and accordingly, the customer of Liberty."). Although Madison opened the main custody account, Defendant has not presented a legal basis for the Court to distinguish between custodial accounts and sub-accounts in determining whether the Note Issuers were Deutsche Bank customers. The Court is thus unpersuaded that the Note Issuers were not owed a duty of care on that basis.

The next question is whether the Defendant owed an extra-contractual duty to the Note Issuers. Defendant cites *Lamm* for the proposition that a bank's duty of care does not extend to verifying the propriety of or investigating transactions in a custodial account. The Court finds *Lamm* to be instructive. In that case, the Eleventh Circuit ultimately concluded that the plaintiff

failed to identify a duty to be "an extra pair of eyes watching the investment advisor." *Lamm*, 749 F.3d at 947 (citation omitted). *Lamm* stated that Florida cases have not extensively outlined the duty of custodial banks; nevertheless, the Eleventh Circuit explained that Florida law "generally accords" with courts in other jurisdictions that have held that "custodian banks with no discretion to invest a customer's assets have no independent duty to supervise transactions on a customer's account or to ensure that assets held for the customer are marketable or in valid form." *Id.* The plaintiff in *Lamm* sought to locate an independent duty in an S.E.C. rule; Florida Statutes § 674.103(1) Florida's version of U.C.C. § 4-103, which provides that banks cannot disclaim responsibility "for failure to exercise ordinary care;" and a standard of care set forth in the U.C.C. *Id.* at 948-50. The court held that none of those authorities supported an independent duty. *Id.* at 950. Lamm states that banks owe a duty of ordinary care under section 647.103(1) with respect to specific actions related to the processing of checks and similar instruments, such as presenting a check for payment or sending certain notices to the customer. *Id.* at 949.

*Lamm* suggests that custodial banks owe customers no general duty of ordinary care. In other words, the precise question here is whether a bank owes its customers a duty to "stop and verify" custodial account transactions upon learning of fraudulent activity in that account.

Recognizing this adverse case law, Plaintiffs respond that *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316 (M.D. Fla. 2015) and similar cases do not answer that precise question. In Plaintiffs' framing, this is not a case about "what the Bank *would have* learned from monitoring the Madison accounts; rather, it is about the Bank's failure to act based on information it *did* learn in opening and servicing those accounts." ECF No. [273] at 8. In Plaintiff's view, neither *Wiand* nor Defendant's other cases consider the situation here where a bank continued to process transactions once it learned facts that would lead an ordinarily careful bank to stop. *Id.* at 8-9. In

other words, the Defendant's employees' actual knowledge of Carlos Trujillo's fraudulent transactions should have led Deutsche Bank to cease processing further transactions. Plaintiffs' most persuasive authority is *O'Halloran v. First Union National Bank of Florida*, 350 F.3d 1197 (11th Cir. 2003) ("*First Union*"), which Plaintiffs argue supports their negligence claim because that case sets forth a "somewhat heightened" duty for a bank to verify transactions by an account holders' ostensible agent when the bank learned the agent intends to cause the account holder financial injury.

In *First Union*, the Eleventh Circuit considered whether a bank owed a duty to an entity whose agent to the bank embezzled the entity's bank funds as part of a Ponzi scheme where the trustee for that entity alleged the bank knew of the agent's criminal history and of the "suspect nature of the [entity's] dealings." *See O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir. 2003). The Eleventh Circuit explained that banks have a "right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds." *Id.* However,

> [a] bank's responsibility to a depositor may be somewhat heightened when the bank has knowledge that a particular individual ostensibly representing the depositor instead intends to cause financial injury to the depositor. Under such circumstances, the bank may be responsible for taking additional steps to ensure that the representative has complete authorization from the depositor.

*Id.* The court found that the complaint alleged that the agent was "fully authorized" to transact with the bank on the entity's behalf and stated that "[e]ven if . . . [the bank] had cause to be particularly cautious in the handling of [the entity's] accounts, the instant complaint alleges that the bank met this higher standard of diligence." *Id.* In holding so, *First Union* necessarily concluded that the bank, which knew of the customer's agent's fraudulent activities, had a duty to verify that those transactions were authorized.

Defendant has no persuasive response to *First Union*. Defendant contends the evidence was clearly insufficient to support finding that the bank owed a duty to verify transactions that are intended to cause financial injury to an account holder, but as the foregoing demonstrates, *First Union* found the opposite was true.

Defendant's other cases do not displace the Eleventh Circuit's determination that a bank has a "somewhat heightened" responsibility once it learns of a customer's agent's potentially harmful activities. For example, in *Wiand*, the court distinguished the receiver's reliance on *Marian Farms* on the grounds that that case involved a banks' "acceptance of obviously forged loan documents ***without attempting to verify authorization for a loan secured by Marian Farms' equipment***." *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1323 (M.D. Fla. 2015) (quoting *Marian Farms, Inc. v. Suntrust Banks, Inc.*, 135 So. 3d 363 (Fla. 5th DCA 2014)) (emphasis added). Defendant's reliance on *Insight Securities* is misplaced because the individual wrongdoer in that case was not the plaintiffs' agent and the court rejected the plaintiff's argument that the bank owed the plaintiff a duty on account of a "foreseeable zone of risk." *See Insight Sec., Inc. v. Deutsche Bank Tr. Co. Americas*, No. 20-23864-CIV, 2021 WL 3473763, at *4 (S.D. Fla. Aug. 6, 2021), *aff'd*, No. 21-12817, 2022 WL 2313980 (11th Cir. June 28, 2022). In particular, the individual wrongdoer was not trading on the plaintiff's behalf, but rather the reverse was true; as such, that case did not implicate the limited duty described in *First Union*. *See id.* at *2 ("Haberer's instructions directed Insight to deliver the funds to Depository Trust Corporation and to reference "account 33-3****1"—account 33-3****1 being the account number for the Rado account at Deutsche Bank.").

As for *Perlman*, the court rejected the plaintiff's argument, which relied on *Barnett Bank*, 498 So. 2d 923 (Fla. 1986), that a heightened duty arises "when a bank has actual knowledge of

fraud being perpetrated against a customer and nevertheless enters into a transaction with that customer in furtherance of the fraud." *Perlman v. Wells Fargo Bank, N.A.*, 830 F. Supp. 2d 1308, 1325 (S.D. Fla. 2011). *Perlman* reasoned that the heightened duty described in *Barnett Bank* presupposed a fiduciary relationship between a customer and the bank, a relationship which was absent in the case. *Id. Perlman* thus found that the receiver had not met its burden to show that the bank there owed any standard of care to the receivership entities beyond their contractual relationship; that case did not announce that a fiduciary relationship is a necessary condition to establishing a bank's duty of ordinary care. *Id.* at 1326.

For the foregoing reasons, the Court finds that none of Defendant's arguments regarding its duty of care in this case warrant either judgment as a matter of law or a new trial. In addition, the court rejects the premise of Defendant's argument that multiple independent negligence theories were submitted to the jury. *See* ECF No. [262] at 18. As Plaintiffs correctly note, the jury instructions show that only one negligence theory was submitted to the jury; thus, Defendant's reliance on *Maccabees* and like cases is misplaced. *See Maccabees Mut. Life Ins. Co. v. Morton*, 941 F.2d 1181, 1183 (11th Cir. 1991) (discussing a general verdict in a trial where plaintiff offered four theories for why the defendant was not entitled to life insurance policy and IRA proceeds: assignment, oral promise, fraud and misrepresentation, and waiver).

### 4. *Proximate Causation*

Defendant argues Deutsche Bank's conduct could not have been the proximate cause of the Note Issuers' increased indebtedness because Deutsche Bank did not cause the Note Issuers to issue Notes. ECF No. [262] at 19. Defendant submits that where a plaintiffs' own volitional act caused his injuries, that act is the sole proximate of those injuries. *Id.* at 20. Moreover, Defendant argues that Deutsche Bank's conduct could not have been the proximate cause of the Note Issuers' damages because the evidence shows that the Individual Wrongdoers would have looted the Note

Issuers' assets regardless of any of Deutsche Bank's conduct. Defendant further contends that a new trial is required to the extent that the jury could have found proximate causation on some other theory of injury. *Id.* at 21.

Plaintiffs respond that the evidence supports that the Individual Wrongdoers looted the Note Issuers' assets through the Madison account, increasing the Note Issuers' insolvency; and that the Defendant's failure to alert the Note Issuers' independent director was a substantial factor in the looting. ECF No. [273] at 15-16. Plaintiffs also respond that the Defendant's speculation that the Individual Wrongdoers could have effectuated the Ponzi scheme regardless of Deutsche Bank's negligence ignores how the jury was entitled to make a finding on this fact-intensive issue on the evidence presented. *Id.* at 16. Plaintiffs also state that the jury heard legally sufficient jury instructions on proximate causation and the Court should presume the jury follows instructions.

Defendant replies that the Note Issuers' own acts are an active and efficient intervening cause that forecloses a proximate cause finding as a matter of law. ECF No. [280] at 15-16.

Under Florida law, negligence is not actionable unless the tortfeasor can be deemed the proximate cause of the alleged injuries. *See Palma v. BP Products N. Am., Inc.*, 347 Fed. App'x. 526, 527 (11th Cir. 2009) (citing *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003)). "The issue of proximate cause is generally a question of fact concerned with 'whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.'" *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1116 (Fla. 2005) (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992)). A cause is "proximate" where "prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Id.* (citation omitted). However, where a separate force or action "intervenes," liability is eliminated. *See id.* ("A negligent actor

. . . is not liable for damages suffered by an injured party 'when some separate force or action is the active and efficient intervening cause' of the injury." (quoting *Gibson v. Avis Rent-A-Car Sys., Inc.*, 386 So. 2d 520, 522 (Fla. 1980))).

Plaintiffs' theory of negligence is that Defendant had a duty to verify that transactions in the Madison custody sub-accounts were authorized by the Note Issuers once Defendant's employees were alerted to activity that would harm the Note Issuers. As this Court has held, "[i]t is foreseeable that opening an account without the owner's knowledge would result in fraud on the account." *Anderson v. Branch Banking & Tr. Co.*, 119 F. Supp. 3d 1328, 1353 (S.D. Fla. 2015). Thus, it was a fact question whether the Individual Wrongdoers were authorized to open the Madison sub-accounts. ECF No. [239] at 18-19 (citing *Palma*, 347 F. App'x at 527 (the Court may decide proximate cause "when the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference.")). The jury was presented with evidence supporting that the Individual Wrongdoers were not authorized to transact from the Madison custody account. *See, e.g.*, ECF No. [282] at 24:20-25:4 ("Q. Do you ever remember seeing any documentation establishing that Madison Asset had the authority to perform clearing and custody services for any one of those three entities? A. I don't remember that that [*sic*], no."); *see also* ECF No. [283] at 139:11-25 ("Did you see any evidence that Madison provided Deutsche Bank that it had authority to perform custody and clearing services for any of these three note issuers? A. No.").

The jury was instructed on proximate and superseding causes. ECF No. [287] at 132. The Court agrees with Plaintiffs that it may presume the jury followed those instructions. *United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011). Based on the jury's verdict, the jury found that Deutsche Bank's failure to verify transactions directly and substantially contributed to the Note Issuers' loss of assets. The jury also rejected that the Note Issuers were alter egos of the Individual

Wrongdoers, so this is not a case where a plaintiff's own volitional act caused his or her harm. The Court therefore agrees with Plaintiffs that the jury finding of proximate causation was supported by the evidence and declines to alter its finding that the evidence presented at trial supported a jury finding proximate causation. ECF No. [239] at 19.

Defendant's cases do not support its arguments on this point. In *Akal Security*, the plaintiff created the dangerous condition that led to his injuries; for the reasons stated, the jury did not find that the Individual Wrongdoers' conduct was imputed to the Note Issuers, so *Akal Security* is not applicable to this case. *Rodriguez v. Akal Sec., Inc.*, 534 F. App'x 921, 923 (11th Cir. 2013). Defendant responds that this observation is beside the point because the design and nature of the Note Issuers was to issue the very Notes that caused its injuries. ECF No. [262] at 20 n.4. But as the Court explained to the jury, negligence may be the legal cause of a loss even though it operates in combination with some other cause. Although the Note Issuers' note issuances were a but-for cause of their injuries, that is separate from the question of whether Defendants' negligence is the legal cause of Plaintiff's losses. Here, Defendant's negligence was a substantial factor in bringing about the losses that exacerbated the Note Issuers' indebtedness and supports a finding of proximate causation. *See Diczok v. Celebrity Cruises, Inc.*, 263 F. Supp. 3d 1261, 1266 (S.D. Fla. 2017) (finding that whether defendant's negligence was a substantial factor in plaintiff's injury was a question of fact even where there was evidence that plaintiff's lack of attention caused his injuries). In *Kwoka*, the court explained that an injury that is not a reasonably foreseeable consequence of the defendant's negligence is not proximately caused by that negligence. *Kwoka v. Campbell*, 296 So. 2d 629, 631 (Fla. 3d DCA 1974). However, as the Court stated in *Anderson*, it is reasonably foreseeable that the opening of a bank without authorization may lead to fraud. *Kwoka* thus does not advance Defendant's argument.

Nor does *O'Donnell*. In that products liability case, the plaintiffs conceded that each of the defendants' products contributed only a small fraction of the victim's lifetime exposure, which the court stated was far below the threshold amount likely to have caused the victim's illness. *O'Donnell v. W.F. Taylor Co.*, 292 So. 3d 785, 789 (Fla. 4th DCA 2020). Here, Defendant relies on Rutherford's testimony that the individual wrongdoers controlled the Note Issuers' bank accounts to argue that the Individual Wrongdoers would have continued the Ponzi scheme had Deutsche Bank not verified the custodial sub-account transactions with the Note issuers. ECF No. [284] at 82:2-4. But that evidence, without more, does not support that SGG would have assented to the custodial account transactions had Deutsche Bank sought to verify those transactions with SGG. The emails from Oosten suggested SGG would have rejected those transactions. It therefore cannot be said that the Ponzi scheme would have continued regardless of Deutsche Bank's conduct, so *O'Donnell* does not compel the Court to grant judgment as a matter of law as to proximate causation. For those reasons, judgment as a matter of law is not warranted on proximate causation.

### 5.     *Damages Award*

Defendant next argues that "deepening insolvency" damages are not available for recovery on a negligence claim. ECF No. [262] at 26-27. Defendant also contends there was no evidence of when the Note Issuers became insolvent, and the Note Issuers' insolvency cannot be based on an unsupported assumption of insolvency. *Id.* at 28. Third, Defendants argue that the only damages that Plaintiffs asserted were "consequential" or "indirect" damages, which are barred by the Agency Agreements. *Id.* at 28. In other words, because the Note Issuers' injury "arose from the conduct of third parties," such as Biscayne Capital, its principals, Madison, or any other Individual Wrongdoer, the Defendant cannot be held liable for its negligence, even if the Note Issuers' injuries were foreseeable. *Id.* at 29. Moreover, Defendant asserts it was erroneous for the Court to

submit the issue of whether damages are direct or consequential to the jury. *Id.* at 30. Further, since there were multiple theories of damages, a new trial would be warranted even if the jury awarded damages on some other legally sufficient basis. *Id.*

Plaintiffs first respond that Defendant never raised the argument that deepening insolvency damages were not available. ECF No. [273] at 24. Second, Plaintiffs note that courts have acknowledged that traditional tort damages encompass deepening insolvency damages and that Florida law's description of tort damages amply supports a damages award based on a theory of deepening insolvency. *Id.* at 25. Next, Plaintiffs respond that the evidence supports that the Note Issuers' debts increased by over $130,000,000.00 from April 2014 through 2017, and that there is no evidence the Note Issuers had any assets, except South Bay's real estate, further supporting that the Note Issuers were insolvent. *Id.* at 26. Plaintiffs further maintain that the Eleventh Circuit has recognized that Ponzi schemes are insolvent by their nature. *Id.*

Plaintiffs continue that the Defendant waived the argument that the evidence only showed indirect or consequential damages. *Id.* On the merits, Plaintiffs submit that the jury was instructed to award damages only if they are "direct damages," meaning tort damages, and that construing "direct damages" as barring recovery from a defendant who negligently enabled an intentional tort or crime inappropriately narrows the scope of tort damages. *Id.* at 26-27.

Defendant replies that the authorities briefed show that deepening insolvency damages are unavailable for a claim of negligence. ECF No. [280] at 19. Defendant asserts that Plaintiffs' waiver arguments are "frivolous" because the record supports that Defendant objected to the deepening insolvency instructions. *Id.* Defendant further replies that Plaintiffs' attempt to distinguish Defendant's cases on the grounds that those were contract cases is legally unsupported. *Id.* at 20. In Defendant's view, the Note Issuers may have been able to sue Defendant for

negligently enabling an intentional tortfeasor, but they bargained away that right in the Agency Agreements. *Id.*

The Court instructed the jury to award damages to Plaintiffs if Defendant's negligence directly and substantially contributed to the Note Issuers' loss, even if other events caused the Note Issuers' loss, so long as those other events—such as the Individual Wrongdoers' fraud perpetrated with the Madison account—were reasonably foreseeable. ECF No. [287] at 287:7-19. The Court also instructed the jury that the Note Issuers' loss may be measured by the injury resulting from the Note Issuers' deepening insolvency, which the Court further defined as an injury incurred from dissipation of the Note Issuers' assets, which harms the insolvent Note Issuers by making it less likely that they can service or secure their debt. *Id.* at 137:11-22. Alternatively, the court defined the loss as the dollar amount of loss the Note Issuers sustained because of the injury resulting from Defendant's conduct under a more general theory of negligence. *Id.* at 137:24-138:4. The Court excluded from the Note Issuers' cognizable injury, whether framed as a negligence or deepening insolvency injury, those harms resulting from third parties' conduct, i.e., the harms that are *not* directly attributable or substantially contributed to by Defendant's negligence, which the court further defined as "consequential" or "indirect" damages. *Id.* at 138:5-17. The Court instructed the jury on those terms because of Defendant's request for a jury instruction relating to clause 9 of the Agency Agreements, which states that "under no circumstances will the Agents be liable to the Issuer or any other party to this Agreement in contract, tort (including negligence) or otherwise for any ***consequential***, special, ***indirect*** or speculative loss or damage . . . which arises out of or in connect with this Agreement[.]" *See, e.g.*, *id.* cl. 9, ECF No. [137-1] at 486 (emphasis added); *see also* Def.'s Ex. 463, ECF No. [255-54].[12]

---

[12] At the Charging Conference, Counsel for Plaintiffs stated, "[m]y next objection is to the next instruction "Consequential or Indirect Damages." ECF No. [287] at 80:12-13. Counsel for Defendant stated in part,

The jury thus heard instructions that allowed them to award only those damages directly and substantially arising from Defendant's failure to verify transactions from the Madison account, a failure that enabled the individual wrongdoers to loot the Note Issuers' assets, which exacerbated their insolvency; and barred them from awarding damages stemming directly from the Individual Wrongdoers' conduct. Those instructions are consistent with Florida law on proximate causation for the reasons stated above and Florida law's definition of tort damages. *See Tillman v. Howell*, 634 So. 2d 268, 270 (Fla. 4th DCA 1994) ("under present Florida law one liable for the tort of negligence must answer for all of the natural, direct and proximate consequences of his tortious conduct, whereas one who breaches a contract is answerable only for damages that were or reasonably should have been in the contemplation of the contracting parties.").

Defendant casts the Note Issuers' harm entirely as "consequential damages." As the parties recall, the Court asked at the Charging Conference why the instruction on "consequential" or "indirect" damages was not redundant of the Court's proximate causation charge. ECF No. [287] at 83:18-20. Counsel for Defendant replied that a defendant's failure to prevent harm by a third party may be a but-for cause of a plaintiff's harm, which is equivalent to constituting a legal cause of consequential damages. *Id.* at 87:24-88:4. However, that interpretation is in deep tension with the Court's proximate causation instruction, which specifically defined proximate cause as direct and substantial contribution. In other words, Defendant asks this Court to say that Defendant's

---

"Judge, the authorities we cited in support of this instruction are – I'm looking for them. . . . I don't disagree with the notion that . . . negligence damages can be rewarded for conduct that is done by a third party. But that's exactly what [clause 9] was designed to exclude here." *Id.* at 83:18-24. This is the same instruction that Defendant now states was erroneously given. ECF No. [262] at 30 ("we respectfully submit that the issue should not even have been submitted to the jury.").

negligence can directly cause indirect damages, but the Court instructed the jury only to award damages directly caused by Defendant's negligence.[13]

The better reading of the consequential damages instruction is that the jury must not award damages where the Note Issuers' harms were "entirely" the result of the Individual Wrongdoers' intentionally tortious or criminal conduct, i.e., "consequential" damages. In other words, the Court instructed the jury that it must only award damages to Plaintiffs for Defendant's negligence, not the Individual Wrongdoers' torts or crimes, to the extent Defendant's negligence was the proximate cause of the injury. That reading is consistent with the jury verdict.

In addition, the Court disagrees with Defendant that the evidence does not support a damages award under a deepening insolvency theory. Defendant points to no evidence that the Note Issuers possessed any assets and the jury heard evidence that the Note Issuers' debts grew from 2014 through 2017. *See, e.g.*, ECF No. [257-61]; ECF No. [257-74]; ECF No. [285] at 215-217. The jury could soundly find that the Note Issuers were insolvent and increased their insolvency during the relevant period. As set forth above, the jury could also find that Defendants' failure to verify transactions directly and substantially contributed to the looting of the Note Issuers, deepening their insolvency. In any event, Defendants' reliance on its authorities is misplaced. In *Martinez*, the court said, "it is not the label on Plaintiff's damages that controls

---

[13] To the extent that the Agency Agreements can be read as excluding recovery for "indirect" damages in the sense that negligence actions based on third-party actions are not recoverable, that reading conflates the scope of a remedy sought with the nature of a claim brought and is contrary to this Court's determination in the April 22, 2023 Order that the Agency Agreements do not exclude compensatory damages for any tort action, regardless of the theory of negligence. ECF No. [239] at 22 (citing *inter alia Am. Bd. of Cardiovascular Med. v. John Wiley & Sons, Inc.*, No. 8:16-cv-00469-T-27JSS, 2016 WL 9383326, at *2 (M.D. Fla. June 15, 2016) (holding that provision limiting liability for "any incidental, consequential, special, or indirect loss or damage" does not limit "actual or direct damages")); *see also Coral Gables Fed. Sav. & Loan Ass'n v. City of Opa-Locka*, 516 So. 2d 989, 993 (Fla. 3d DCA 1987) ("The precise reason that banks employ sophisticated safeguards is to detect and prevent losses caused by criminal acts such as embezzlement.").

whether a Plaintiff has a claim for relief, but rather the nature of relief sought by the Plaintiff – that is, the label on Plaintiff's claim not the label on its damages." *Martinez v. Spear Safer CPAs & Advisors*, No. 06-60727-CIV, 2007 WL 9700782, at \*5 (S.D. Fla. June 26, 2007). As in *Martinez*, Plaintiffs brought a negligence claim, not a "deepening insolvency" cause of action, and the law presumes damages for the invasion of a right, however characterized and so long as those damages are based on evidence. *See id.* To the extent Defendant's other cases conflict with *Martinez*, the court follows *Martinez* on this point as a persuasive case decided in this district.

Further, because the Court finds the damages award is supported under either a deepening insolvency theory or a general negligence damages theory, a new trial is not warranted.

### 6.    *In Pari Delicto*

Defendant contends Plaintiffs' rebuttal to Defendant's *in pari delicto* defense was that SGG was an "innocent insider" that was kept in the dark about the fraud and asserts that the sole basis for this exception to the defense was one email from Herman Oosten of SGG asserting that SGG had been "kept completely in the dark" by the Individual Wrongdoers. *Id.* at 31 (citing Pl.'s Ex. 301, ECF No. [257-69] at 1). Defendant maintains that the email is inadmissible hearsay because the exception to the hearsay rule under Rule 803(3) of the Federal Rules of Evidence, concerning Oosten's state of mind, does not apply. *Id.* In particular, Oosten's statement that SGG has been "kept completely in the dark" was not admissible to prove his belief that SGG had been "kept completely in the dark," the purpose for which the email was offered. *Id.* Defendant submits that the evidence should not have been admitted, so the *in pari delicto* defense bars the negligence claim. *Id.*

Plaintiffs respond that other evidence supported that SGG was an innocent insider, including evidence that SGG refused to retroactively authorize Madison's dealings. ECF No. [273] at 27 (citing ECF Nos. [257-70], [257-71]). They also state that the evidence at trial also did not

show that SGG knew of the Individuals Wrongdoers' nefarious activities. *Id.* In any event, Plaintiffs maintain that the Court did not abuse its broad discretion in admitting the email and fault Defendant for not seeking a limiting instruction. Defendant does not reply to Plaintiffs' Response.

The Court explained in its March 23, 2023 Order that the presence of any innocent decisionmaker in the management of the Note Issuers provides a basis for invoking the adverse interest exception to the *in pari delicto* defense. ECF No. [184] at 31-32. In that Order, the Court found Oosten's email supports that the Individual Wrongdoers hid the scheme from SGG, further supporting that SGG was an innocent decisionmaker. *Id.* at 33. At trial, the Court admitted the email under Rule 803(3) as evidence of Oosten's state of mind, i.e., motive, intent, or plan, for the more limited purpose of showing that Oosten had no intent or plan of the Ponzi scheme. ECF No. [284] at 127.[14] That evidence is relevant to show SGG did not knowing and intentionally participate in that scheme, supporting that SGG was an innocent insider. *Cf. Mukamal v. Bakes*, No. 07-20793-CIV, 2008 WL 11391157, at *7 (S.D. Fla. May 20, 2008), *aff'd,* 378 F. App'x 890 (11th Cir. 2010) (finding that complaint alleged directors and officers of entity knowing intentionally participated in wrongdoing, precluding the adverse interest exception).

In any event, as Plaintiffs correctly point out, no evidence at trial supports that SGG was aware of or participated in the Ponzi scheme, and other evidence demonstrated that SGG was kept "in the dark." *E.g.*, Pls.' Ex. 300, ECF No. [257-68]; Pls.' Ex. 302, ECF No. [257-70]; Pls.' Ex. 303, ECF No. [257-71]. Accordingly, the Court does not believe its evidentiary ruling produced a substantially prejudicial effect. *See SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 790 (11th Cir.

---

[14] Fed R. Evid. 803(3) (excluding from the rule against hearsay "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) . . . but not including a statement of memory or belief to prove the fact remembered or believed[.]").

2005) ("If we find error, we will not overturn the erroneous ruling and order a new trial unless the objecting party has demonstrated that the ruling produced a substantial prejudicial effect.").

Neither judgment as a matter of law nor a new trial is appropriate in favor of Defendant on the *in pari delicto* defense.

  **B.**  **Plaintiffs' Motion**

In diversity cases, the federal courts apply substantive state law. *Royster*, 737 F.2d at 948. The Eleventh Circuit has considered both the availability and amount of prejudgment interest to be an issue of substantive state law. *Fed. Deposit Ins. Corp. v. Certain Underwriters at Lloyd's of London*, 45 F.4th 1301, 1307 (11th Cir. 2022). When the underlying rights and obligations arise from state law claims, the Eleventh Circuit has applied substantive state law in cases arising under 28 U.S.C. § 1334. *See, e.g.*, *Mukamal*, 378 F. App'x at 896. Here, the underlying claim at issue is the jury's finding of negligence, a Florida tort claim. Plaintiffs and Defendant also agree that Florida law should be used in determining entitlement to prejudgment interest. *See* ECF No. [272] at 3; ECF No. [263] at 6-7.

While Florida courts are reluctant to award prejudgment interest in tort cases because the tort damages are too speculative to liquidate before final judgment, *see Lumbermens*, 653 So. 2d at 39, this is not a blanket rule. As already noted, the Court can award prejudgment interest in tort claims if two prerequisites are satisfied: (1) an out-of-pocket loss and (2) a date certain that the loss occurred. *H & S Corp.*, 667 So. 2d at 399*; see also Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 311-12 (Fla. 1st DCA 2011) (prejudgment interest on tort claims where loss is wholly pecuniary and fixed at definite time).

  *1.*  *Out-of-Pocket Loss*

Plaintiffs seek $38,019,727.00 in prejudgment interest, based upon the jury verdict of $95,000,000.00. According to Plaintiffs, their losses stem from certain note issuances that occurred

over time as Deutsche Bank issued and delivered Notes into the Madison accounts. *Id.* In particular, Plaintiffs contend the jury awarded the value of the last roughly $95,000,000.00 of note issuances as the Plaintiffs' losses.

Defendant responds that Plaintiffs did not incur out-of-pocket losses because no "immediate actual loss of funds" occurred. ECF No. [263] at 13. Defendant further contends that an out-of-pocket loss requires an actual payment on the Notes and the incurrence of future debt obligations is not an out-of-pocket pecuniary loss. Defendant points out that "[t]he notes issued by Plaintiffs provided that Plaintiffs would make interest payments on the notes and would pay the principal value of the notes to the noteholders upon maturity." *Id.* As such, the only out-of-pocket losses, according to Defendant, could have been payments made in furtherance of those Notes, but none were made.

Plaintiffs reply that an out-of-pocket loss can include the deprivation or diminution of a person's property and includes the loss of a vested property right, not just actual payments. ECF No. [272] at 4-5. Here, it was the "misappropriation of valuable assets belonging to the Note Issuers." *Id.* at 2. The Notes had value and Madison gained full control over them once transferred, depriving Plaintiffs of the time-value of their funds. *Id.* at 3. "[T]he deliveries of the notes . . . necessarily entailed the loss of their property rights to control and possess their notes." *Id.* at 6. With each delivery, there was a debt incurred and a lost asset. *Id.*

An "out-of-pocket loss" is a loss in a vested property right. *Alvarado*, 614 So. 2d at 499. Contrary to Defendant's argument, such a loss need not be an immediate payment of funds.

Here, the unlawful issuance of the Notes in furtherance of the Ponzi scheme constitutes the Note Issuers' loss in a vested property right, particularly the issuance of Notes that were transferred into the Madison accounts. Although there were no payments made on the Notes, such payments

are not required if a vested property right is lost. Thus, the Court turns to the second requirement, the need for a specific set date of the loss.

### 2.    *Date of Loss*

Plaintiffs, relying on their expert's testimony and Schedule 9 of Ratner's Expert Report, claim that the Notes starting on March 5, 2015 through September 30, 2017, are valued at roughly the $95,000,000.00 amount that the jury awarded. ECF No. [259] at 3; *see also* ECF No. [257-82]. Plaintiffs calculate prejudgment interest from March 5, 2015 through April 25, 2023, using Florida's prejudgment interest rate, pursuant to Florida Statutes § 55.03, which amounts to $38,019,727.00. *See* ECF No. [259] at 3.

Defendant responds that Plaintiffs' prejudgment interest calculations are based entirely on the unfounded assumption that the jury award reflects the last $95,000,000.00 of note issuances, which is unjustified for at least two reasons. ECF No. [263] at 7-8. First, the jury instructions for negligence and the two damages instructions relevant to the negligence claim invited the jury to find Defendant negligent for other conduct, not necessarily related to the issuance dates of any specific Notes. *Id.* There were many types of acts Plaintiffs asserted were negligent and the jury did not specify which one for which the Defendant was liable. *Id.* at 9. Further, the instructions did not limit the jury to a damages award based on the values from the Notes and nothing excluded the jury from awarding damages based on other acts of negligence by Defendant. *Id.* at 10. Second, "the $95,000,000.00 figure . . . does not relate back to any specific and identifiable note issuances." *Id.* at 6. No calculations using Ratner's Schedule 9 yield the $95,000,000.00 figure. *Id.* at 10. Defendant supports its argument with its own data analytics expert, David Alfaro. ECF No. [263-1] at 2.

Plaintiffs reply that the date can be ascertained from the evidence "because the only assets the Note Issuers lost are the Notes, and the record shows when they were lost." ECF No. [272] at

9. In Plaintiffs' view, the reasonable interpretation of the jury's verdict is that the damages award represents an approximate value of the Notes delivered around March 2015. *See id.* at 10-11 (describing how "Schedule 9 . . . shows $96,805,333 in notes delivered into the Madison accounts after February 28, 2015 and $90,433,261 delivered after March 31, 2013"). Plaintiffs claim that Defendant confuses the date of negligence with the date of the loss and that, regardless of the theory of negligence, the culmination was the loss of the Notes. *Id.* Moreover, "[t]he jury need not achieve mathematical precision when computing damages." *Id.* at 10.

In determining the entitlement of prejudgment interest, the Court looks to the date of the out-of-pocket loss. "[T]here does not need to be a special verdict as to the date of the loss, where the loss is established by the verdict and the pertinent date can be ascertained from the evidence." *Pace Prop. Fin. Auth., Inc. v. Jones*, 24 So. 3d 1271, 1272 (Fla. 1st DCA 2009).

The Court is not persuaded that the date of loss is ascertainable here. Plaintiffs contend it is a reasonable and conservative assumption to state that the jury was basing the award on the "last" $95,000,000.00 of note transfers. ECF No. [259] at 3. However, even accepting the Plaintiffs' argument that the jury was considering the Notes, Schedule 9 also does not reflect *any* quantities on dates that total the verdict's award of $95,000,000.00. While a jury verdict need not be mathematically precise, and the jury may have entered award reflecting an approximate value of note issuances in mind, the verdict must be supported by the evidence and the Court cannot discern *which* note issuances represent a loss to the Note Issuers. Although the jury may have rounded down from the value of note issuances on February 28, 2015, or rounded up from the note issuances on March 31, 2015, to obtain the $95,000,000.00 number, those calculations are not the only ones that are available for obtaining the damages amount the jury awarded. For example, had the jury identified all note issuances issued from May 31, 2014 as the loss, except for those issued

on December 31, 2015 and March 31, 2016, the jury could have calculated the Note Issuers'
damages at $95,152,038.00 and rounded down to the nearest million dollars to arrive at
$95,000,000.00. *See* ECF No. [257-18]. In that case, the date of loss would be May 31, 2014, not
March 2015 as Plaintiff suggests. In either scenario, the Court is left to speculate as to which note
issuances the jury considered.

Regardless, the jury instructions did not limit the jury to considering only the issuance of
the Notes. Plaintiffs fail to demonstrate that the jury awarded damages solely on Ratner's Schedule
9. Moreover, that the jury requested Ratner's Schedule 9 during their deliberations is not enough
to find this was the basis for the verdict; rather, there must be some objective measure offered by
the Plaintiffs. *Lebron v. Royal Caribbean Cruises, Ltd.*, No. 20-14449, 2021 WL 2917265, at *2-
3 (11th Cir. July 12, 2021) (per curiam).

### 3.    *Latest Possible Date*

Defendant contends prejudgment interest can only be calculated from the date the jury
returned its verdict where there is no ascertainable date of loss. ECF No. [264] at 17. In support,
Plaintiff cites to this Court's opinion in *Cohen* and the Eleventh Circuit's opinion in *Sunbeam
Corp.*, and the Second District's decision in *Perdue Farms Inc.* The Court agrees because the
Eleventh Circuit has held that prejudgment interest may be awarded from the date of the verdict
to the date of the final judgment. *See KMS Rest. Corp. v. Wendy's Int'l Inc*, 194 Fed. App'x. 593,
595 (11th Cir. 2006) (affirming district court's finding that plaintiff was entitled to prejudgment
interest from "the date of the verdict through the date of the final judgment"); *see also Checkers*,
805 So. 2d at  945 (holding that prejudgment interest appropriate only from date of jury's verdict
where damages were not liquidated prior to that date).[15]

---

[15] Plaintiffs point out that the latest possible date in which the loss could have occurred was November
2018, when the Cayman Court appointed the Liquidators to represent the Note Issuers. ECF No. [272] at

A question remains as to the "date" of the Final Judgment. The Final Judgment is dated April 25, 2023, the same day as the jury verdict. ECF Nos. [252], [254]. However, the Final Judgment was docketed the following day, on April 26, 2023. *Perdue* and *KMS* state that the date of the final judgment represents the end of the period for prejudgment interest but the cases do not define "the date of the final judgment." *See Perdue*, 777 So. 2d at 1055 ("We determine that Hook's damages were liquidated by the jury's verdict on April 9, 1999. Therefore, Hook is entitled to prejudgment interest from that date to May 3, 1999, the date of the final judgment."); *see also KMS Rest.*, 194 Fed. App'x. at 595. The Fourth District has stated that "a successful claimant is entitled to prejudgment interest on such a claim from the jury verdict to *the entry of judgment*." *Palm Beach Cnty. Sch. Bd. v. Montgomery*, 641 So. 2d 183, 184 (Fla. 4th DCA 1994) (emphasis added). Moreover, "[a] judgment is entered when it is noted on the docket." Fed. R. Civ. P. 36. Thus, upon Defendant's concession that prejudgment interest is due for the one day that elapsed between the verdict and the entry of the Final Judgment on the docket, the Court determines it is appropriate to award prejudgment interest for one day.

### 4. *Equitable Considerations*

Defendant points to equitable considerations in denying prejudgment interest in this case. ECF No. [263] at 15. First, "any delay between the asserted injury and judgment here was the Note Issuers' continued participation in the unlawful scheme . . . ." *Id.* at 16. Moreover, the Note Issuers continued the fraud, meaning that the Note Issuers failed to take steps to mitigate the damages. *Id.* Further, Defendant argues that "the purpose of prejudgment interest is to provide the prevailing party with the time value of money it should have had at the time it was wronged." *Id.* However,

---

11. However, Plaintiffs do not provide support that the appointment of the Liquidators fixes the loss as of their appointment date. In any event, it is not clear for which losses the jury awarded damages.

Defendant argues, there is no ascertainable out-of-pocket loss due to the negligence and, thus, awarding prejudgment interest would amount to a windfall. *Id.*

Plaintiffs reply that the Note Issuers were not to blame for their losses and the jury rejected those arguments, along with other equitable defenses. ECF No. [272] at 12. Just as the jury denied those theories in awarding damages, those theories should also be rejected in regard to prejudgment interest, which is a component of damages under Florida law. *Id.*

A court has discretion to deny or reduce prejudgment interest if an award would be inequitable. *Validsa*, 424 F. App'x at 878. Some equitable considerations are whether the delay between injury and judgment was the prevailing party's fault or whether the party could have mitigated its damages but did not. *Kleiman*, 2022 WL 705971, at *3.

The Court agrees with Plaintiff. Defendants presented argument before the jury that the Note Issuers were at fault for their own losses, but the jury rejected those arguments when they rendered their verdict. As such, the jury did not determine the Note Issuers were responsible either for the delay between the asserted injury and the judgment, or for any failure to mitigate their losses. In fact, the jury was not asked to make such determinations. Those findings being absent from the record, the Court finds no equitable basis to deny prejudgment interest.

### 5. *Rate of Interest*

Plaintiffs advise the Court to use the Florida statutory rate. ECF No. [272] at 3. Defendant counters that the Court should apply the federal rate. ECF No. [263] at 17 (citing *Goldman Sachs Execution & Clearing, L.P. v. The Off. Unsecured Creditors' Comm. of Bayou Grp., LLC*, No. 10 Civ. 5622, 2011 WL 2224629, at *2 (S.D.N.Y. May 31, 2011)).

It is fair and reasonable in this case to be guided by the state rate and apply the Florida statutory rate in calculating the prejudgment interest award. There is no federal prejudgment statute, and absent a controlling statute, the Court has discretion on the rate to be used. *Indus.*, 141

F.3d at 1447. Further, as the Court has explained, the Eleventh Circuit has suggested that district courts in their discretion may apply Florida law in awarding prejudgment interest. This is so because the Eleventh Circuit has indicated district courts may apply the substantive law of the forum state when sitting in a case arising under 28 U.S.C. § 1334. *See id.* at 1447 n.18. The state statutory rate is based on Florida Statutes § 55.03 and calculations were made in Ratner's Schedule 9. The rate at the time of the verdict was 6.58%. *See* ECF No. [259-1] at 3 (showing that on April 25, 2023, the date of verdict, the Rate Per Annum was 6.58%). Prejudgment interest on the damages award thus equals $16,587.59:

$$\$95,000,000.00\left(\left(1+\left(\tfrac{6.58\%}{100\%}\right)\right)^{\tfrac{1\,day}{365\,day}}-1\right).$$

*Goldman Sachs* applied the federal rate in awarding prejudgment interest, a decision that the Second Circuit affirmed. *See Goldman Sachs*, 2011 WL 2224629, at *2. However, *Goldman Sachs* had not considered how even courts in the Second Circuit apply the forum state's law in bankruptcy cases, including the forum state's choice of law principles, *See Donaldson*, 2002 WL 362794, at *5, and did not in any event hold that the federal rate is the only rate a district court may choose.

Moreover, *Mukamal* suggests this Court may be guided by the state's rule on prejudgment interest. Indeed, other decisions in this district have applied the state rate for prejudgment interest. *See, e.g.*, *Allstate Ins. Co.*, 653 F. Supp. 2d at 1329 (finding fair and reasonable method to calculate prejudgment interest using Florida statutory prejudgment interest rate on plaintiffs' claims that arise under federal law); *see also Equity Inv. Partners, LP v. United States*, No. 09-60002-CIV, 2011 WL 13173577, at *3 (S.D. Fla. Nov. 30, 2011) (holding "Florida law provides reasonable and fair method of calculating prejudgment interest"). Thus, the Court, guided by Florida's statutory rate, awards prejudgment interest in the amount of $16,587.59.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendant's Motion, **ECF No. [262]**, is **DENIED**.

2.  Plaintiffs' Motion, **ECF No. [259]**, is **GRANTED IN PART AND DENIED IN PART**.

3.  The Court will amend the Final Judgment, ECF No. [254], in a separate Order.

4.  Defendant shall file a Response to Plaintiffs' Bill of Costs, ECF No. [268], **by September 25, 2023,** in accordance with the Court's Order, ECF No. [271].

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 11, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record